FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA** 2016 MAY 20  P 1: 21

| | |
|---|---|
| SARAH ROE, ) | |
| c/o Jones Day ) | |
| 51 Louisiana Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | CIVIL ACTION NO. *1:16 cv 562* |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| LINDA HOWARD, ) | |
| ▆▆▆▆▆▆▆▆ ) | |
| Docklands, Victoria 3008, Australia ) | |
| ) | |
| ESTATE OF RUSSELL HOWARD ) | |
| | |
| Defendants. | |

---

### MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE UNDER PSEUDONYM AND TO FILE UNDER PERMANENT SEAL

Plaintiff, Sarah Roe, by and through her undersigned counsel, hereby submits this Memorandum in Support of her Motion for Leave to File under Permanent Seal and to File under Pseudonym.  Confidential and non-confidential affidavits accompany the motion and memorandum as Exhibits A and B.  In particular, Ms. Roe seeks an Order permitting her to proceed under pseudonym and placing under seal the confidential affidavit that reveals her name and address.

### BACKGROUND

This case arises under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1583 and 1584.  Plaintiff Sarah Roe, an Ethiopian woman, is the victim of sexual abuse and human trafficking by Defendant Linda Howard, an employee of the U.S. Department of State, and

Russell Howard, Linda Howard's husband. Ms. Roe suffered forced labor, including repeated, brutal rapes and sexual assault at the hands of the Howards.

The Howards coerced Ms. Roe to move into their home, despite her desire to remain in her own home, and isolated her from her friends and others in the community. Compl. ¶¶ 23, 25, 26. When Ms. Roe began working for the Howards as a domestic worker, she believed that she would be a housekeeper and engage in normal housekeeping services such as cooking, cleaning, and ironing. *Id.* ¶ 19. Soon after her arrival at the Howards' home, Linda and Russell Howard forced Ms. Roe to engage in sexual activities with both of them, and Russell Howard repeatedly raped Ms. Roe. *Id.* ¶¶ 27–50. On her first day of work, Russell Howard assaulted her, grabbing her breasts and bottom. *Id.* ¶ 30. A few days later, Russell Howard accosted Ms. Roe in her room completely naked and forced himself on her. *Id.* ¶ 32. After this initial rape, Russell Howard raped her nearly every day and sometimes multiple times a day. *Id.* ¶¶ 33–35. Linda Howard would also assault Ms. Roe sexually, fondling her breasts and engaging in other sexually abusive behavior. *Id.* ¶¶ 39–41, 44–46, 48. The Howards would come into her room at night and demand that Ms. Roe touch them sexually and demand that she join them in bed for sex, in addition to other demands for sexual activity. *Id.* ¶¶ 41–49. Ms. Roe felt trapped and would cry frequently. *Id.* ¶¶ 50, 58–60. She felt helpless and lived in a constant state of fear. *Id.* Defendant trafficked Ms. Roe for the purpose of providing Russell Howard with sexual services and fulfilling Defendant's sexual desires, in addition to performing unreasonably long hours of household labor.

In order to keep her silent, the Howards threatened her, telling her that they would have her arrested if she told anyone about what was happening. *Id.* ¶¶ 42, 57. She believed that they could falsely accuse her and have her arrested because the Howards had previously had done the

same thing to the husband of another domestic worker. *Id.* ¶ 57. She could not go to the Yemini police because rape allegations were not taken seriously by the authorities and because she knew that the Howards enjoyed diplomatic immunity. *Id.* ¶¶ 56–57.

After several months of enduring sexual assault and degradation by both Linda and Russell Howard, Russell Howard grew angry at Ms. Roe for her repeated attempts at resistance and threw her out of the house. *Id.* ¶ 67. Ms. Roe fled and thereafter learned that she was not the only victim of Linda and Russell Howard. *Id.* Ms. Roe finally gained the courage to file her own civil suit against Linda Howard.

Nevertheless, despite Ms. Roe's newfound courage, Ms. Roe faces extreme social stigma, financial repercussions, and danger in her community due to the sexual nature of her allegations should her name become public. She fears for her daughter's life and safety. She is particularly afraid of her ex-husband, a violent man who previously attacked her physically in an attempt to kill her and who abused both her and her daughter. Accordingly, Ms. Roe files the present motions to file under pseudonym and to seal in order to protect herself and her identity, as well as to shield her daughter from any of the attendant stigma and violence associated with these revelations.

## ARGUMENT

Much like with Plaintiff Jane Doe in a related case against Linda Howard in this Court, the Court should exercise its broad discretion to allow Ms. Roe to proceed under pseudonym to protect her identity, and she should be allowed to file under seal to effectuate the request to file under pseudonym. See Doe v. Howard, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012). Allowing Ms. Roe to proceed under pseudonym is the only effective method to protect her, her daughter, and her family from the social stigma and physical danger that would result from revelation of these facts. Moreover, permitting Ms. Roe to file under seal would reveal her identity to both Linda Howard and the court while maintaining the protection of filing under pseudonym. Allowing Ms. Roe to file her confidential affidavit revealing her true identity and address under seal would also strike the appropriate balance between Ms. Roe's strong privacy interest and the public's interest in openness. Accordingly, Ms. Roe should be permitted to file under pseudonym and to file a confidential affidavit under seal.

I. **Ms. Roe should be permitted to proceed under pseudonym because her strong privacy interests at stake outweigh the public's interest and any prejudice to the defendant.**

The Fourth Circuit has recognized that there are times when "the general presumption of open trials—including identification of parties and witnesses by their real names—should yield in deference to sufficiently pressing needs for party or witness anonymity." James v. Jacobson, 6 F.3d 233, 242 (4th Cir. 1993) (reversing trial court's decision denying leave to file anonymously even under an abuse of discretion standard because the judge failed to make a "case specific" exercise of discretion). The decision about whether to permit a party to proceed anonymously is committed to the sound discretion of the trial court. Id. Further, it is an inquiry that requires "a

particularized assessment of the equities involved" rather than a generalized assessment of the request for anonymity. Id. at 239.

To determine whether a party may proceed anonymously, courts have looked at factors such as

> whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action to proceed against it anonymously.

Id. at 238–39 (citing Doe v. A. Corp., 709 F.2d 1043, 1044 n.1 (5th Cir 1983); Doe v. Stegall, 653 F.2d 180, 185–86 (5th Cir. 1981); Southern Methodist Univ. Ass'n v. Wynne & Jaffe, 599 F.2d 707, 712–13 (5th Cir. 1979); Doe v. United Servs. Life Ins. Co., 123 F.R.D. 437 (S.D.N.Y. 1988); Doe v. Hallock, 119 F.R.D. 640 (S.D. Miss. 1987); Candy H. v. Redemption Ranch, 563 F. Supp. 505 (M.D. Ala. 1983); accord Va. Code Ann. § 8.01-15.1 (permitting parties to proceed anonymously if the litigant shows "special circumstances such that the need for anonymity outweighs the public's interest in knowing the party's identity and outweighs any prejudice to any other party"). This list of factors, however, is not exhaustive, and "the particular facts of a case may suggest the relevance of additional factors." Doe v. Merten, 219 F.R.D. 387, 392 (E.D. Va. 2004). Rather, at its essence, "the test was designed to enable the court to weigh the plaintiff's right[s] to privacy and security against the dual concerns of (1) public interest in identification of litigants and (2) harm to the defendant stemming from [suppression] of plaintiff's name." Doe v. Smith, 105 F. Supp. 2d 40, 44 (E.D.N.Y. 1999) (internal quotation marks omitted).

5

### A.  Ms. Roe's privacy interests involve sensitive and highly personal matters which justify her request to proceed under pseudonym.

Here, the "privacy or confidentiality concerns are sufficiently critical," James, 6 F.3d at 238, to allow party anonymity because of the particularly sensitive and highly personal matters at issue. Ms. Roe's privacy interests are threefold: First, the allegations in this case involve highly personal and sensitive matters of the utmost intimacy. Second, publicly exposing the sordid details of the abuse Ms. Roe suffered and connecting those details to Ms. Roe would have a traumatic effect on her daughter. Third, revelation of such highly personal and sensitive matters of the utmost intimacy would pose a danger to her and her daughter as well as to her family. Neither her family nor her daughter know about the sexual abuses that she has endured. Roe Aff. ¶ 11.

As the court in Merten recognized, "the types of personal intimate information justifying anonymity for litigating parties have typically involved such intimate personal matters such as birth control, abortion, homosexuality, or the welfare rights of illegitimate children or abandoned families." Id.[1] "[M]any courts have held that, in lawsuits centering around sexual activity and behavior, a plaintiff is entitled to proceed under a pseudonym where revealing the plaintiff's name subjects him or her to the risk of public disapproval, harassment, or bodily harm." EW v. N.Y. Blood Ctr., 213 F.R.D. 108, 111 (E.D.N.Y. 2003). The information in this case involves "intimate personal matters" such as sexual contact and abuse, including unwanted homosexual interactions, and would subject Ms. Roe to public disapproval, harassment, and bodily harm. Not only would it subject Ms. Roe to harm, but it would also expose her five-year-old daughter

---

[1] Though the Merten court ultimately found that there was insufficient reason to file under pseudonym, unlike in Merten, where the court found that "unlawful or problematic immigration status is simply not the type of 'personal information of utmost intimacy,'" Merten, 219 F.R.D. at 392, the reason that Ms. Roe seeks to proceed anonymously is that her allegations involve intimate details of sexual exploitation, rape, homosexuality, and human trafficking. These are the exact areas that Merten recognized justify filing under pseudonym.

to mental trauma if such abuses were revealed to her in an untimely and indelicate manner. Cf. James v. Jacobson, at 241 (finding that "sudden, unplanned revelation" rather than "planned, sequential revelation by parents" of the circumstances surrounding the children's conception would be traumatic to the children).

Additionally, the sensitivity of these matters is exacerbated by the cultural context of Ms. Roe's allegations. See N.C. Cent. Univ., 1999 WL 1939248, at *3 (finding that "Plaintiff's concerns of embarrassment do not weigh as heavily as in some other circumstances involving more serious risk of social stigma or disclosure of more intimate personal information" (emphasis added)). Here, because of the cultural context, the sensitivity of these matters is inextricably intertwined with the danger Ms. Roe, her daughter, and her family face. As Ms. Roe explains in her affidavit, her culture views the sexual acts that she was subjected to as shameful to all involved, regardless of her status as an unwilling victim. Roe Aff. ¶ 8; see also U.S. Dep't of State, Bureau of Democracy Human Rights and Labor, *Country Reports on Human Rights Practices for 2013– Ethiopia* 26 (2014) (explaining that gender-based violence such as rape is underreported due, in part, to cultural acceptance and shame); U.S. Dep't of State, Ethiopia's Human Rights Practices 10 (1996) (noting that "the press rarely covers instances of rape because of the stigma attached to the crime"). Indeed, as Ms. Roe explains, she would be blamed for the sexual abuses she suffered. Roe Aff. ¶ 8. Not only would further revelation of Roe's participation in sexual activity with the Howards destroy her reputation and make it impossible for her to work and, thus, support her family, Roe Aff. ¶ 8, but she would also face severe social stigma, persecution, and even violence, Roe Aff. ¶¶ 8-15. Even more troubling, Ms. Roe's daughter would face similar dangers, Roe Aff. ¶ 12, as would her family, Roe Aff. ¶ 12.

Ms. Roe's allegations also expose her to criminal liability in Ethiopia, her home country. Same-sex activity is illegal in Ethiopia, see Crim. Code of Ethiopia Art. 629, and the involuntary nature of such activity is not a defense. Moreover, despite Ms. Roe's unwilling participation, she would be faced with the violence and stigma that gay and lesbian individuals are threatened with in Ethiopia. See U.S. Dep't of State, Bureau of Democracy Human Rights and Labor, *Country Reports on Human Rights Practices for 2013– Ethiopia* 32 (explaining that gay and lesbian individuals were faced with periodic detentions, interrogation, physical abuse, retribution, discrimination, and severe societal stigma, in addition to criminal liability).

### B.   *Ms. Roe also faces* particular *retribution from both Linda Howard and her daughter's father if details of the abuse she endured are revealed.*

The Howards have previously threatened their other victims of sexual abuse and attempted to use the legal system to threaten their victims. See, e.g., Doe v. Howard, 2012 WL 3834867, at *5 (E.D. Va. 2011) (explaining that Mr. Howard had traveled 8,000 miles from Virginia to Ethiopia to threaten another victim's husband and to file "bogus criminal charges"). Further, the Howards have already threatened Ms. Roe with arrest, both while Ms. Roe was trapped in the Howards' home and after her escape. Roe Aff. ¶ 5. Ms. Roe's family is still in Ethiopia, and Ms. Roe is afraid that Linda Howard will similarly try to intimidate her family or harm her. Roe Aff. ¶¶ 6, 13, 15.

Additionally, Ms. Roe is afraid that if her name is associated with this case, her ex-husband and father to her daughter ("John Roe") will discover that she has been living in the United States and will track her down. Roe Aff. ¶ 16. John Roe has tried to kill Ms. Roe before, holding a knife to her neck. Roe Aff. ¶ 17. He also abused Ms. Roe's daughter, Roe Aff. ¶ 18, and Ms. Roe is deeply afraid that he will find her and hurt her and her daughter, Roe Aff. ¶¶ 16-18.

**C.**      ***No prejudice to Linda Howard or restriction to the public's right of access to judicial proceedings outweighs Ms. Roe's stated privacy interests.***

Any countervailing prejudice to the defendant is limited by the narrow scope of the anonymity request. As the Fourth Circuit stated in <u>James</u>, "[I]t would seem to make no difference to a jury in assessing whether such things as the particular occupation or place of residence of a witness might bear upon his credibility whether the witness bore the name John Smith or Henry Williams." <u>James</u>, 6 F.3d at 242. Here, Ms. Roe only seeks to keep her name anonymous, and is willing to engage in the full exchange of discovery. Roe Aff. ¶ 22. Further, because Linda Howard already knows Ms. Roe's identity, this will not impair Howard's ability to defend herself. <u>See</u> <u>Smith</u>, 105 F. Supp. 2d at 44 (rejecting defendant's assertion of prejudice and finding that "allowing the plaintiff to proceed anonymously will not hinder the defendant's defense" because "the defendant is already aware of plaintiff's identity and since the court will not in any way limit defendant's right to full discovery and vigorous cross examination").

Nor does the public's right to access to judicial proceedings outweigh Ms. Roe's aforementioned privacy interests. As the Fifth Circuit explained in <u>Doe v. Stegall</u>, a case which was cited favorably by the Fourth Circuit in <u>James v. Jacobson</u>, 6 F.3d at 238–39,

> The equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical. The public right to scrutinize governmental functioning is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself. Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name. **These crucial interests served by open trials are not inevitably compromised by allowing a party to proceed anonymously.**

<u>Doe v. Stegall</u>, 653 F.2d 180, 186 (5th Cir. 1981) (internal citations omitted). Here, Ms. Roe is not requesting that the public be barred from attending the trial, nor is she requesting that the public be prohibited from reviewing the substance of any of the filings. Rather, she only

requests the limited redaction of her name and address, neither of which are material to her

claims. Accordingly, the public's right of access is not significantly impaired by the request to

proceed under pseudonym, and, thus, does not outweigh Ms. Roe's privacy interests.

## II. In order to effectuate Ms. Roe's request to proceed under pseudonym, the court should also grant her motion to seal the non-confidential affidavit that reveals her name.

The presumption of openness also implicates the court's consideration of motions to seal.

A motion to seal is governed by one of two standards, depending on whether the information is

subject to the common law presumption of openness or a First Amendment right of access. See

In re Wash. Post Co., 807 F.2d 383 (4th Cir. 1986) ("The first question in any case involving a

denial of public access to judicial proceedings or materials is whether the First Amendment right

of access extends to the type of proceeding or materials to which access is sought."); see also In

re Knight Pub. Co., 743 F.2d 231, 235 (4th Cir. 1984) (discussing sealing documents for which

there is a common law presumption of openness). For documents that are afforded a First

Amendment right of access, "[t]he movant must show the denial [of access] is necessitated by a

compelling governmental interest, and is narrowly tailored to serve that interest." Wilmink v.

Kanawha Cnty. Bd. of Edu., 2006 WL 456021, at *3 (W.D. Va. February 23, 2006). In contrast,

for documents where there is only a common law right of access, "if competing interests

outweigh the public's right of access," then the court should seal the document. Id. at *2. In

determining whether competing interests outweigh the public's right of access, the court

examines "whether the records are sought for improper purposes, such as promoting public

scandals or unfairly gaining a business advantage; whether release would enhance the public's

understanding of an important historical event; and whether the public has already had access to

the information contained in the records." In re Knight, 743 F.2d at 235.

Under either standard, Ms. Roe's motion to seal should be granted.  As the Western District of Virginia explained in assessing a similarly narrow redaction request, "the very limited redaction" of plaintiffs' names and identify information "is precisely the type of narrowly tailored request our court of appeals has encouraged" and is permitted under both the common-law and First Amendment's rights of access.  Wilmink, 2006 WL 456021 at *3.  In Wilmink, the plaintiff sought to redact "the names or other identifying information (address, phone, social security number, date of birth) of persons who were identified as victims or potential victims of sexual abuse."  Id. at *2.  Indeed, as the court explains, the "redacted names and identifying information here serve no useful public or investigative purpose."  Id. Rather,  because "[t]he events described in the documents represent some of the most painful chapters in the lives of the individuals whose information has been redacted. . . . [T]he competing interest of keeping this information private significantly outweighs the public's common-law right of access."  Id. Here, Ms. Roe is being asked to recount horrific details of her sexual abuse and human trafficking.  These events have left lasting scars on Ms. Roe's psyche, and the limited redactions of her name and address allow her to preserve some of her dignity in her community.

Additionally, "the privacy interests at stake support a compelling governmental interest in shielding the information from the First Amendment right of access."  Id. As the court explained,

> [i]f individuals are assured their identities will be protected in situations like those at issue in this and related cases, they are more likely to come forward and candidly recount their experiences.  This facilities both the removal, and prosecution, of dangerous and active sexual predators employed in positions of public trust.

Id. at *3.  Here, those exact same privacy interests are at stake.  Indeed, this Court's decision to allow another victim of the Howards' to proceed under pseudonym gave Ms. Roe the courage here to proceed with her case against the Howards, see Doe v. Howard, 2012 WL 3834867 (E.D.

11

Va. Sept. 4, 2012), furthering the goal of prosecuting dangerous sexual predators like Linda Howard who are employed in a position of public trust yet repeatedly defy that trust.

Further, much like the request to proceed anonymously, the release of Ms. Roe's name has no bearing on the substance of Ms. Roe's claim, nor will the limited redaction serve to limit the public's access to the underlying facts of the case or limit the defendant's ability to raise a defense. The seal requested here is not a broad seal of the entire record, but in fact allows the public access to the bulk of the record. Cf. Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 182 (4th Cir. 1988) (reversing the district court's decision to seal the bulk of the record because the court did not consider alternatives "used to preserve public access to at least a portion of the record"). Ultimately, Ms. Roe's request here is a narrowly tailored request that balances both her privacy interest and the public's right of access to the record of this case.

## CONCLUSION

On the balance, the factors favor permitting Ms. Roe to proceed under pseudonym. The highly personal and sensitive nature of the information revealed, the societal stigma and violence that Ms. Roe would face if she were forced to reveal her name, and the limited prejudice to the defendant's defense and the public's right to access judicial proceedings all lead to this conclusion. In addition, a motion to seal is justified to effectuate her request to proceed under pseudonym, and it is permissible under both the common-law right of access and the First Amendment right of access. Accordingly, Ms. Roe respectfully requests that her motion to proceed under pseudonym and to seal the confidential affidavit be granted.

12

Respectfully submitted,

JONES DAY

May 20, 2016       By:

M. Carter Delorme, VA State Bar No. 38568
Alison B. Marshall (pro hac vice pending)
Christian G. Vergonis (pro hac vice pending)
Melissa Lim Patterson (pro hac vice pending)
JONES DAY
51 Louisiana Ave. N.W.
Washington, D.C. 20001-2113
Telephone (202) 879-3939
Fax (202) 626-1700
cdelorme@jonesday.com
abmarshall@jonesday.com
cvergonis@jonesday.com
mlim@jonesday.com

*Attorneys for Plaintiff Sarah Roe*

13