1

UNITED STATES DISTRICT COURT?
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
SARAH ROE,                    :
              Plaintiff,      :
                              :
     -vs-                     :        Case No. 1:16-cv-562
                              :
                              :
LINDA HOWARD, et al.,         :
              Defendants,     :
                              :
------------------------------:
```

V O L U M E   1 of 5

TRIAL TRANSCRIPT

July 25-28 & 31, 2017

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

Melissa L. Patterson, M. Carter DeLorme, and Andres C. Salinas,
Counsel for the Plaintiff

Richard F. Rinaldo and Timothy J. Battle,
Counsel for Defendant Linda Howard

INDEX

OPENING STATEMENTS BY:

MS. PATTERSON                                                    100

MR. RINALDO                                                      110


WITNESS                          EXAMINATION          PAGE


MICHAEL MESZAROS

                                 DIRECT               126
                                 CROSS                165
                                 REDIRECT             178

FLORENCE BURKE

                                 DIRECT               179


COURT'S INITIAL INSTRUCTIONS


    THE COURT                                                    90

3

1          NOTE:  The case begins in the absence of the jury

2    panel as follows:

3    JURY PANEL OUT

4          THE CLERK:  The Court calls case 1:16-cv-562, Sarah

5    Roe versus Linda Howard for a jury trial.  May I have the

6    appearances, please, first for the plaintiff.

7          MR. DeLORME:  Good morning, Your Honor.  Carter

8    DeLorme from Jones Day along with Melissa Lim Patterson and

9    Andres Salinas.  Steve Ferry from our office is with us as

10   well.  As well as our client, Sarah Roe.

11         As you know, Your Honor, Ms. Patterson is lead

12   counsel, and both Ms. Patterson and Mr. Salinas are admitted

13   pro hac vice.  So I would ask that they be allowed to lead the

14   proceedings for the plaintiff.

15         THE COURT:  Certainly.  Good morning to each of you.

16   Good morning, sir.

17         Good morning.

18         MR. BATTLE:  Your Honor, Timothy Battle for the

19   defendant, Linda Howard.  Mrs. Howard is seated at my left.

20         And Rick Rinaldo from Pittsburgh, Pennsylvania has

21   been admitted pro hac vice in this court.  With the Court's

22   permission, I ask that he be allowed to serve as lead counsel

23   for the duration of this jury trial.

24         THE COURT:  All right, certainly.  Good morning, Mr.

25   Battle.

4

1             Good morning, Mr. Rinaldo.

2             MR. RINALDO:  Good morning, Your Honor.

3             THE COURT:  And Mrs. Howard.

4             All right.  You have some preliminary matters?

5             MR. RINALDO:  Your Honor, they are very brief, Your

6   Honor.

7             THE COURT:  Yes, sir.

8             MR. RINALDO:  One of them may have already resolved

9   itself when I heard the case announced, it said Sarah Roe

10  versus Linda Howard.  I take it that because of the dismissal

11  yesterday afternoon, the voluntary dismissal, we have

12  essentially amended the caption of the case?

13            THE COURT:  Correct.  And I have signed that order.

14            MR. RINALDO:  That takes care of the first one.

15            THE COURT:  All right.

16            MR. RINALDO:  The second one is we know we're going

17  to have a charging conference, so this is not the time to talk

18  about instructions to the jury.  There is one, however, which

19  is a preliminary instruction, and I'm not sure how the Court

20  plans to address the jury this morning with respect to the

21  claims that are being made in this case.

22            The plaintiffs have submitted preliminary instruction

23  number 6 which -- to which I -- to which I object.  I wouldn't

24  have a problem if Ms. Lim Patterson said that, but coming from

25  the Court, it's a little bit slanted, I think.

1

2  A.   I prepared an alternative which I gave to her this morning

3  which I would like to submit to the Court for its

4  consideration.  It's about 20 lines.  If you don't mind.

5          THE COURT:  Sure.  I'm happy --

6          MR. RINALDO:  Your Honor --

7          THE COURT:  What's the instruction 6?

8          MR. RINALDO:  It's preliminary instruction 6 on their

9  proposed instructions.  I don't know if the Court was going to

10  give it.  So in an abundance of caution, I prepared what I

11  thought I hoped was a neutral one.

12          THE COURT:  I'm just going to give a very discrete

13  description of the offense right up front before I even get

14  into voir dire, and I'm just going to say that plaintiff has

15  sued Linda Howard in a four-count complaint alleging violations

16  of the Trafficking Victims Protection Act that occurred in 2007

17  while they were in Yemen, and that it involves forced labor,

18  forced sexual services, commercial sex trafficking, and

19  conspiracy to do the above.

20          And that Mrs. Howard was a United States State

21  Department employee assigned to the U.S. Embassy in Yemen.  And

22  that she and her husband lived in the embassy housing.  They

23  came to employ Ms. Roe as a live-in housekeeper in June of

24  2007.  That while employed with them there for a period until

25  December 0f 2007, Ms. Roe alleges that she was forced to work

6

```
 1    90-plus hours per week, that she was repeatedly raped by Mrs.

 2    Howard, that she was sexually assaulted by Mrs. Howard.  That

 3    she was held in the apartment by threats before being evicted

 4    for refusing sex in December of 2007.  And she seeks damages

 5    for these claims.

 6              I am going to leave it at that.

 7              MR. RINALDO:  Are you going to say, Your Honor --

 8              THE COURT:  I am going to say that Mrs. Howard has

 9    denied all of these claims.

10              MR. RINALDO:  Okay.  Thank you, Your Honor, I hope

11    so.

12              THE COURT:  Yeah.  All right.

13              MR. RINALDO:  With respect to voir dire questions, I

14    don't know whether the Court is going to propose all of them or

15    whether it's worth making any objections to some of the ones

16    that the plaintiff had suggested.  Most of them are from

17    O'Malley.  None of the ones that I have a problem with were.

18              I was able to find a copy of O'Malley in Pittsburgh,

19    Your Honor, so that was helpful for me.

20              The only ones, questions 32 and 33 on their proposed

21    voir dire, I think might be a little confusing to the jurors

22    and the use of an instruction -- you're going to have an

23    instruction on the use of an interpreter at trial, so I don't

24    know that there is -- I think.

25              THE COURT:  Probably not.
```

1              MR. RINALDO:  Oh, okay.

2              THE COURT:  I'm going to generally ask in voir dire

3    whether -- I'm going to say that there will be witnesses

4    testifying by interpreter.  That the case deals with -- that

5    Ms. Roe is of Ethiopian heritage.  That she is going to use an

6    interpreter.  And pretty much -- and ask whether anybody has

7    any feelings about a person from another country using an

8    interpreter.  Anybody believe that they couldn't be fair and

9    impartial based on those circumstances.

10             MR. RINALDO:  That's fine, Your Honor.

11             THE COURT:  Okay.

12             MR. RINALDO:  And then I don't know whether their

13   question 39 is one you're going to ask.  My suggestion is very

14   minor.

15             THE COURT:  I'm going to ask, would you give more or

16   less weight to a witness based solely on their occupation?

17             MR. RINALDO:  That's fine.  It was the "or less" that

18   I was wondering about.  That's fine.

19             THE COURT:  And I will give ask, for instance, a law

20   enforcement officer or a State Department employee.

21             MR. RINALDO:  Fine, Your Honor.

22             THE COURT:  Okay.

23             MR. RINALDO:  And the last one are questions 41 to

24   45, and particularly questions 43 to 45.  Which I think suggest

25   their answer and are potentially prejudicial to my client.  I

1    don't know if you were thinking about giving them at all.

2              THE COURT:  No, I am not giving any of those.

3              MR. RINALDO:  Okay.  Then I don't have any objection

4    to that, obviously.  So that takes care of that.

5              There are two other, both very minor things.

6              THE COURT:  Okay.

7              MR. RINALDO:  One is I would like to revisit this

8    morning just for a moment the potential testimony of Jane Doe.

9              First of all, the transcript wasn't ready until last

10   night, so I am not quite sure what the Court ruled on that, but

11   there were two issues that were not raised that have come up

12   since then.

13             One is that under Rule 415(b) of the Federal Rules of

14   Evidence -- because if I recall, you ruled that it might be

15   proper under 415.  Under 415(b) -- excuse me, Your Honor, I

16   just need to get the rule.

17             THE COURT:  Certainly.  I think I ruled under both.

18             MR. RINALDO:  Well, specifically --

19             THE COURT:  Well, it's 404 --

20             MR. RINALDO:  Well, 415(b), the reason I raise is it

21   that they would have been required to give me a summary of the

22   testimony at least 15 days before trial, which they did not do.

23             And 404 I'm pretty sure only applies in a criminal

24   proceeding because it talks about the prosecutor.  It would be

25   admissible under 415(b) based on your ruling, Your Honor, over

1    my objection if they had given me a summary.  But they didn't.

2    And she has not been deposed in this case.

3            THE COURT:  Okay.  Ms. Patterson, do you want to

4    respond?

5            MS. PATTERSON:  Absolutely, Your Honor.

6            MR. RINALDO:  Let me move over here.

7            MS. PATTERSON:  Absolutely, Your Honor.  Under Rule

8    404(b), 404(b) does not just apply to criminal cases.  While

9    the notice requirement does apply to criminal cases, it does

10   not apply to civil cases.  And, therefore, according to Your

11   Honor's ruling last Friday, we are permitted to bring in

12   evidence related to Ms. Doe.

13           With respect to 415 and the disclosure to the

14   opponent, in this case, Your Honor, there was a complaint that

15   Jane Doe submitted to the Court many years ago that outlined

16   what her testimony is going to be.

17           The purpose of the disclosure requirement is to

18   provide the other side with fair notice about what the witness

19   may testify to.  And Mr. Rinaldo has that fair notice.  He has

20   evidence -- or he has a summary of what she will testify to.

21           Not only does he have that notice, but he also had

22   the opportunity to depose her had he chose to.  We provided

23   that notice when we stated that we were intending to call Ms.

24   Doe.  And we provided that -- and that evidence is within the

25   complaint, something that he has had since the beginning of

1  this case, Your Honor.

2              MR. RINALDO:  May I respond briefly, Your Honor?

3              THE COURT:  Yes, sir.

4              MR. RINALDO:  First of all, Your Honor, with respect

5  to the kind of notice.  I don't think 415 says that because

6  somebody filed a complaint in another case, I'm deemed to have

7  notice that her testimony in this case is going to be in those

8  areas.

9              I think I'm entitled under 415(b) to a summary of

10  what a witness is going to do in this case, not some other case

11  that just happens to be filed of record.

12              Secondly, with respect to the notice that I had and

13  an opportunity to depose her, I will say that Ms. Doe was added

14  to the witness list by a supplemental initial disclosure the

15  day before discovery closed, but I'm not going to rest on that

16  because I don't think she -- and if you look at 404, I don't

17  think 404 let's her testify in this case, Your Honor.

18              And I know you may disagree, and if that happens, she

19  is going to testify, but the reason I raise it in another way

20  is I really don't know, based on the Court's ruling because I

21  haven't gotten a chance to see the transcript yet, it just came

22  in last night apparently, I don't know what it is the Court was

23  going to let her testify about.

24              I remember you said conditions in the Howard

25  residence, but I didn't know whether you were going to let her

```
 1    testify about all of the alleged acts that took place.

 2    Because, first, they took place after.

 3           Second, they are highly prejudicial, obviously, to my

 4    client, whether they took place or not.  And it essentially

 5    creates a trial within a trial because you have ruled

 6    collateral estoppel doesn't apply here.

 7           THE COURT:  I think I was pretty clear that I wasn't

 8    going to allow her to testify about what occurred in her own

 9    case and that she got a judgment and the circumstances of the

10    award, none of that's coming in.

11           But I stated, I thought pretty clearly, that she

12    would be allowed to testify about what happened to her while

13    she was employed by the Howards.  I found that the acts are so

14    similar, conduct so similar that it's not a bar that it

15    occurred after because they're so close in time.  And that she

16    would testify to the substance of what happened to her,

17    including the sexual assaults and the forced labor.  And so,

18    that was certainly what I intended by my ruling.

19           Now, you have through discovery, what did you get

20    about Ms. Doe's case in discovery?

21           MR. RINALDO:  Nothing.  Well, I mean, they produced

22    the complaint as part of the documents.  But what they haven't

23    done is to tell me what she's planning to testify, a summary of

24    what she is testifying to today.

25           THE COURT:  And you found out that she was an
```

1   intended witness only at the close --

2          MR. RINALDO:  It was on May 17, I think.

3          MS. PATTERSON:  Yes, Your Honor, but we did state

4   that we would be willing to consent to a motion to extend

5   discovery because of the late notice.  And Mr. Rinaldo didn't

6   take us up on that offer.

7          THE COURT:  Okay.  Well, when is she going to testify

8   in your case?

9          MS. PATTERSON:  We expect tomorrow morning, Your

10  Honor.

11         THE COURT:  All right.  Then let's get a summary of

12  her testimony together and give it to Mr. Rinaldo by this

13  evening so that you will have the late notice, which I hope is

14  better than no notice.

15         MR. RINALDO:  It is, Your Honor.

16         THE COURT:  All right.

17         MR. RINALDO:  Just so that I don't ever get in a

18  position where someone can say I waived my objection, I presume

19  that the reasons I have given, plus the general reasons I gave

20  in the motion in limine as well, preserve my objection?

21         THE COURT:  Yes, sir.  And your exception is noted

22  this morning as well.

23         MR. RINALDO:  I understand, Your Honor.  And then we

24  just have one more thing.

25         THE COURT:  Yes, sir.

1      MR. RINALDO:  The last thing is that it's my

2 understanding, I heard, I guess it would be a week ago today,

3 that Michael Meszaros would be permitted to testify by the

4 State Department.  And I think they're planning to call him as

5 a witness.

6      MS. PATTERSON:  Yes, we are, Your Honor.

7      MR. RINALDO:  It was not practical to try to depose

8 him and get him subpoenaed before this trial this morning.  I

9 did, however, have a telephone conversation with Mr. Meszaros,

10 he was gracious enough to speak with me.

11      And based on my conversation, I would at least like

12 an offer of proof maybe out of the presence of the jury at some

13 point before he testifies because I don't think he has any

14 information which would be admissible.  He didn't even meet the

15 plaintiff in this case until after she had ended her employment

16 with my client.

17      He left Yemen not knowing anything about this, and

18 they resumed their acquaintance when he reached out to a number

19 of people on Facebook that he had known in Yemen.  He met her

20 while she was a waitress after she left.  And he didn't know

21 anything about any of this.  And they resumed communication by,

22 I guess it's Facebook, that's what he said.  And when he

23 reached out to a number of people he had known in Yemen some

24 years after he left Yemen, she responded on Facebook and they

25 began a conversation.

1       He has told me he has no personal knowledge at all of

2   the facts of this case or the circumstances of this case.  So I

3   would like an offer of proof before he testifies.

4       THE COURT:  All right.

5       MR. RINALDO:  And that's all I have this morning,

6   Your Honor.

7       THE COURT:  All right.  Thank you, Mr. Rinaldo.

8       Ms. Patterson, do you want to respond?

9       MS. PATTERSON:  Absolutely, Your Honor.  And because

10  we are planning on calling Mr. Meszaros first, I'm happy to

11  provide the offer of proof now as to what he may be testifying

12  to.

13      THE COURT:  Go ahead.

14      MS. PATTERSON:  Mr. Meszaros was a State Department

15  employee who worked in Yemen in 2008 and was familiar with the

16  Howards.  Not only with the -- while Mr. Rinaldo is correct

17  that Mr. Meszaros did not know Sarah Roe at the time that she

18  worked for the Howards, he did know the Howards in 2008 as well

19  as some of their other housekeepers.

20      He intends to testify about, first, his experience in

21  Yemen to give the jury background about what it was like in

22  Yemen, about the State Department community, and about the

23  housing compound that both Mr. Meszaros and the Howards lived

24  at.

25      Furthermore, he will testify about the State

1   Department community and the Howards' role in the State

2   Department community, including specific instances where he

3   interacted with both Russell and Linda Howard, as well as some

4   of their housekeepers.

5        Those are all relevant to today's case in particular

6   because he will also testify about some of his observations of

7   Linda Howard with Jane Doe, one of our other witnesses.

8        All of these are relevant.  And under Rule 401, Your

9   Honor, the bar for relevance is extremely low, and we've met

10   that.

11        THE COURT:  What is the intended testimony about his

12   observations concerning Ms. Doe and Mrs. Howard?

13        MS. PATTERSON:  Yes, Your Honor.  In 2008, somewhere

14   between February to April or May of 2008, he observed Mrs.

15   Howard and Ms. Doe traveling about the embassy compound or at

16   the embassy itself and observed some of their interactions.  He

17   will testify as to the fact that he saw them sometimes together

18   at the gym and at other kind of more social events.

19        And, Your Honor, what Mrs. Howard has put forward in

20   this case is that she had strictly an employer/employee

21   relationship with her housekeepers.  And we intend for Mr.

22   Meszaros to provide testimony about what he observed about

23   those relationships.

24        THE COURT:  All right.  Thank you, Ms. Patterson.

25        Mr. Rinaldo, do you want to respond?

1          MR. RINALDO:  May I, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. RINALDO:  I don't have an objection to Mr.

4   Meszaros testifying about his experience in Yemen as an

5   employee of the State Department and testifying about the

6   circumstances in Yemen in 2008 when he was there.  And he

7   clearly can describe the Hunt Oil Compound.

8          To the extent that he is going to testify that he saw

9   Mrs. Howard with Jane Doe at the gym and so forth, I'm not

10  entirely sure that's relevant because the issue in this case is

11  the relationship between Mrs. Howard and Sarah Roe, not the

12  relationship with Jane Doe.  And she hasn't -- she certainly

13  hasn't offered any testimony yet about housekeepers and their

14  relationship other than Sarah Roe.

15          And that experience with Mr. and Mrs. Howard and Mr.

16  Meszaros is going to be pretty limited.  He told me he had

17  never visited their house.  And they left Yemen, as I think

18  this Court knows, for Tokyo in 2008.  So that's a pretty

19  limited experience.

20          As a practical matter then, since he can testify I

21  think about certain things, I will probably object as we go

22  along if that's okay with the Court.

23          THE COURT:  Yes, sir.  I mean, I think that the

24  outline that Ms. Patterson has given includes permissible

25  testimony.  The relevance, you know, in every case you tie

1    things together through subsequent witnesses.  If you believe

2    that at the end of the plaintiff's case, or at the end of the

3    case entirely, the evidence should be stricken because it was

4    never tied together, then you let me know and we'll talk about

5    that and, if appropriate, I'll let the jury know that.

6              MR. RINALDO:  Right.  So that Your Honor -- since I

7    have never tried a jury trial in front of you before, that I

8    don't inadvertently violate a procedure that you follow, if a

9    particular question I believe is objectionable, I take it I can

10   make the objection?

11             THE COURT:  Please, absolutely, to preserve your

12   record.  But no speaking objections.

13             MR. RINALDO:  No.

14             THE COURT:  Relevance --

15             MR. RINALDO:  The only concern I have, Your Honor, is

16   if I make an objection -- and my understanding is if I don't

17   site the basis for the objection, then if there is any possible

18   basis on which it could be objected, it's deemed to be a proper

19   admission.  So I suppose I best state as briefly as possible

20   the nature of my objection without a speech.

21             THE COURT:  Relevance.

22             MR. RINALDO:  Right, that's what I was talking.

23             THE COURT:  Just one word, two words.

24             MR. RINALDO:  Unfairly prejudicial, right.

25             THE COURT:  And if I need more of an explanation to

1  understand what I think you're getting at, then I'll ask you

2  for it.

3         MR. RINALDO:  That's fine.  That's what I was

4  planning to do, Your Honor.

5         THE COURT:  All right.  Now --

6         MR. RINALDO:  That's all I have on my preliminaries.

7         THE COURT:  All right.  Ms. Patterson, I expect that

8  the direct-examination, I don't mind leading questions for

9  background information, but I expect non-leading questions for

10  matters which are important to the jury's consideration of the

11  case.

12         So let's be mindful of that, all right?  And we're

13  obviously going to be testifying through interpreters, and

14  things go a little slower, and there may be some confusion, but

15  let's be careful about your questions on direct.  All right?

16         MS. PATTERSON:  Absolutely, Your Honor.

17         THE COURT:  All right.  Anything else that we need to

18  talk about before we get our jury up?

19         MS. PATTERSON:  Not for the plaintiff, Your Honor.

20         MR. RINALDO:  Not for the defendant.

21         THE COURT:  All right.  At the end of voir dire, as I

22  indicated last week, I'll ask you to the side-bar.  I will ask

23  you whether you have any objections to the questions I have

24  asked, whether you want further questions included, and that's

25  the time to preserve the record on the voir dire questions if

1    you think that -- for whatever reason.

2          All right?  Okay.  All right, then let's take a brief

3    recess and we'll get our jury upstairs, and we'll begin our

4    jury selection.

5          All right, we're in recess.

6          NOTE:  At this point a recess is taken; at the

7    conclusion of which the case continues in the presence of the

8    jury panel as follows:

9    JURY PANEL IN

10         THE CLERK:  The Court calls case 1:16-cv-562, Sarah

11   Roe versus Linda Howard for a jury trial.

12         May I have the appearances, please, first for the

13   plaintiff.

14         MR. DeLORME:  Good morning, Your Honor.  Again,

15   Carter DeLorme from Jones Day, alone with Melissa Lim Patterson

16   and Andres Salinas.

17         THE COURT:  All right.  Good morning.

18         MR. BATTLE:  Good morning, Your Honor.  Timothy

19   Battle for the defendant, Linda Howard.  And with me is

20   attorney Rick Rinaldo.

21         THE COURT:  All right, good morning again to each of

22   you.  Good morning.

23         MR. RINALDO:  Good morning, Your Honor.

24         THE COURT:  All right.  Good morning, ladies and

25   gentlemen.  We're going to -- this is a civil case, which I

1  will go over the basic facts of in a few moments, but why don't

2  we start by calling the roll and finding out who is with us

3  today.

4          THE CLERK:  Ladies and gentlemen, as I call your

5  name, would you please stand, answer present, and then you may

6  be seated after your name is called.

7          When I call your name, I will be calling your juror

8  number, please try to remember those when we ask you questions

9  later.

10          NOTE:  At this point the jury panel is called and

11  sworn.

12          THE COURT:  All right.  Good morning.  Now that we

13  know who is with us, just for background information, the

14  persons who are not here today whose names were called will be

15  notified that they should have been here.  Often times there is

16  a problem with an address or there is a language problem.

17          And those persons, as I said, they will be contacted,

18  they will be asked why they were not here, and of course they

19  are subject to penalties for not being present.  We, obviously,

20  take service here as jurors very seriously.

21          Sir, are you just an observer this morning, or are

22  you --

23          A WITNESS:  Witness.

24          THE COURT:  A witness.  All right.  Thank you, sir.

25          Why don't we have our witnesses excluded from the

1  courtroom at this time, Ms. Patterson.

2          Sir, if you could remain outside in the hallway, I

3  apologize.

4          NOTE:  The witnesses for the case are excluded from

5  the courtroom.

6          THE COURT:  All right.  My name is Liam O'Grady, and

7  I will be the trial judge in this case.

8          It's a civil case, as I indicated.  The plaintiff is

9  Sarah Roe.  That's not her real name, it's the name that she

10  has used in filing this lawsuit for personal reasons.  The fact

11  that we're using a pseudonym for her real name is not a matter

12  that you should consider as having any special significance,

13  and certainly shouldn't be evidence for or against any party

14  that is present here today.

15          Ms. Roe has filed suit against Linda Howard, the

16  defendant in the case, and has accused Mrs. Howard in a

17  four-count complaint with violations of the Trafficking Victims

18  Protection Act.  She alleges that between June and December of

19  2007 while in Yemen she was forced -- in the four counts of the

20  complaint she alleges that she underwent forced labor, forced

21  sexual services, commercial sex trafficking, and also a

22  conspiracy to do those above acts.

23          In a little more particular, it's alleged in the

24  complaint that Mrs. Howard was a United States State Department

25  employee and was assigned to the U.S. Embassy in Yemen.  That

1    she and her husband, who is now deceased, lived in embassy

2    housing and came to employ Ms. Roe as a live-in housekeeper in

3    June of 2007.

4            That while employed there for a period of six months,

5    Ms. Roe claims that she was forced to work 90-plus hours a week

6    and received insufficient compensation.  That she was

7    repeatedly raped by Mr. Howard.  That she was sexually

8    assaulted by Mrs. Howard.  That she was held in the apartment

9    as the live-in housekeeper by threats before being evicted for

10   refusing sex in December of 2007.  And she seeks damages for

11   the injuries that she suffered from these claims.

12           Mrs. Howard has denied each of those claims, and

13   that's why we're here today, to try the case before a jury.

14           Why don't we introduce the parties again with a

15   little more specificity.

16           Ms. Patterson, would you identify yourself and your

17   team here and your client at this time.

18           MS. PATTERSON:  Absolutely, Your Honor.  My name is

19   Melissa Lim Patterson.  And I, along with my colleagues Andres

20   Salinas and Carter DeLorme, represent our client, Ms. Sarah

21   Roe.

22           THE COURT:  All right.  Thank you, Ms. Patterson.

23           MS. PATTERSON:  Yes, Your Honor.

24           THE COURT:  Mr. Battle, if you would introduce your

25   team as well.

1          MR. BATTLE:  I am Timothy Battle.  And seated to my

2     right is Linda Howard.  And to her right is Rick Rinaldo, who

3     you have heard is from Pittsburgh, Pennsylvania, who will be

4     speaking today as lead counsel.

5          THE COURT:  All right, thank you.

6          Ms. Patterson and her team are from the law firm of

7     Jones Day, it's a large law firm, but they come from the

8     Washington, D.C. office.

9          Mr. Battle is a sole practitioner here in Alexandria,

10    Virginia and has over the years been a member of a couple of

11    different firms, but presently on your own; is that correct,

12    Mr. Battle?

13         MR. BATTLE:  Yes, sir.

14         THE COURT:  And Mr. Rinaldo is with the law firm of

15    Williams Coulson, it's located in Pittsburgh, Pennsylvania, and

16    is here as lead counsel in the case today.

17         Have any members of the jury panel had dealings with

18    any of the counsel that have now been introduced, either

19    personally or as business?

20         And how about the Jones Day law firm, anyone had any

21    business or personal dealings with the firm?  All right.

22         And do any of you have -- have you had any dealings

23    personally or through the firm of Mr. Battle?  How about Mr.

24    Rinaldo or his law firm?  All right.

25         Do any of you know or recognize Sarah Roe?  Or Linda

1    Howard?  All right.

2          When I ask a question, I'll assume that the answer is

3    no so I don't make you all tired of shaking your heads back and

4    forth.  But if you're going to answer yes to a question, then

5    if you would stand up and tell us your name so that we can be

6    reminded before you answer, that would be very helpful.  And if

7    you recall your juror number, that also is helpful.

8          Ms. Patterson, why don't you identify the witnesses

9    that you expect to testify in the plaintiff's case.  Go ahead.

10         MS. PATTERSON:  Absolutely Your Honor.  We expect to

11   call Mr. Michael Meszaros, Florence Burke, a witness by the

12   pseudonym Jane Doe, and then our client, Ms. Sarah Roe.

13         THE COURT:  All right, thank you.

14         Do any of you recognize any of the names that Ms.

15   Patterson has just referenced?

16         Mr. Rinaldo, do you want to identify any witnesses at

17   this time, sir?

18         MR. RINALDO:  Yes, Your Honor, I can.  Mrs. Howard

19   will be calling, of course, Mrs. Howard.  And we will also be

20   calling Sarah Roe.

21         THE COURT:  All right.  And again, I've already asked

22   you, but you don't recognize Ms. Roe or Mrs. Howard; is that

23   correct?  All right.

24         The case I believe will go until the end of the week.

25   And we're all very busy and all want to sit on a jury, but not

1    today.  So as a result, there is only a few circumstances under

2    which I excuse jurors from participating in a trial because of

3    a conflict.  They would include single parents who have no

4    child care available, sole practitioners whose shops are closed

5    if they are not here, medical appointments that are coming up

6    this week that can't be rescheduled, a preplanned vacation that

7    is paid for that can't be rescheduled.

8          So with that narrowing of reasons, is there anyone

9    who cannot sit as a juror here between now and the end of the

10   week because of a conflict that is outside of the ones I have

11   just discussed?  All right.

12         I'm going to ask you a series of questions now, it's

13   called voir dire or voir dire, kind of depending upon what TV

14   show you may have watched, but it's a series of questions which

15   will take us through a number of areas that are perhaps

16   relevant to this case.  And counsel will be trying to select

17   what they think is the best jury for this case, and these

18   questions will help them be able to do so.  And it also will

19   identify other matters which are important.

20         It's not by any means an empirical type of science

21   that you may have heard it is considered, but it is helpful in

22   trying to narrow the type of juror that would best serve in

23   this case.

24         So have any of you acquired any information about

25   this case from any source?

1          Do any of you have any interest in the trial or the

2   outcome of the case?

3          Do any of you have already any feeling of sympathy

4   toward either party that may affect your ability to be fair to

5   both sides?

6          Do any of you have a problem seeing or hearing that

7   may prevent you from understanding the testimony or observing

8   the evidence?

9          Is there anyone here on the jury that has any other

10  disability that would make it difficult to serve on a jury here

11  for the week?

12         Do any of you have difficulty understanding the

13  English language?

14         Have any of you served as jurors in a criminal or a

15  civil case or as a member of a grand jury in either federal or

16  state court.  I will go to the far side.  Anyone on the left

17  side?

18         Yes, sir.

19         JUROR WILLMORE:  City court of Alexandria, and in the

20  District of Columbia city court.

21         THE COURT:  All right, your last name, sir.

22         JUROR WILLMORE:  Willmore.

23         THE COURT:  Willmore?

24         JUROR WILLMORE:  Yes.

25         THE COURT:  Mr. Willmore, how long ago was the case

1   in Alexandria?

2           JUROR WILLMORE:  Probably three or four years ago.

3           THE COURT:  And was it a civil or criminal case?

4           JUROR WILLMORE:  Criminal case.

5           THE COURT:  All right.  Was the jury able to reach a

6   verdict in the case?

7           JUROR WILLMORE:  Yes, we did.

8           THE COURT:  All right.  How about the District of

9   Columbia?

10          JUROR WILLMORE:  It was 15, 20 years ago.

11          THE COURT:  All right.  Do you remember whether it

12  was a civil or criminal case?

13          JUROR WILLMORE:  Criminal.

14          THE COURT:  Criminal case?

15          JUROR WILLMORE:  Yes.

16          THE COURT:  Was the jury able to reach a verdict in

17  that case?

18          JUROR WILLMORE:  Yes, we did.

19          THE COURT:  Any reason why those experiences would

20  make it difficult for you to be fair and impartial here today?

21          JUROR WILLMORE:  No.

22          THE COURT:  All right.  Thank you, Mr. Willmore.

23          Anyone else on the far side?  All right.

24          All right, the middle, Mr. Melvin.

25          JUROR MELVIN:  I served on a case probably 15 years

1    ago or so, it was before I was even 20 years old.

2              THE COURT:  All right.  And where did that take

3    place?

4              JUROR MELVIN?  It was in New Jersey.

5              THE COURT:  And was it a criminal or civil case?

6              JUROR MELVIN:  Civil case.

7              THE COURT:  And was the jury able to reach a verdict

8    in the case?

9              JUROR MELVIN:  Yes.

10             THE COURT:  All right.  Any reason why that

11   experience would make it difficult for you to be fair and

12   impartial here?

13             JUROR MELVIN:  No.

14             THE COURT:  Thank you, Mr. Melvin.

15             Anyone else?  Yes, sir, in the front.

16             JUROR REYNOLDS:  Brian Reynolds, number 33.

17             THE COURT:  All right.  Yes, Mr. Reynolds.

18             JUROR REYNOLDS:  I served on a case in New Jersey

19   about 30 years ago, criminal case.

20             THE COURT:  All right.  And was the jury able to

21   reach a verdict?

22             JUROR REYNOLDS:  They did not.

23             THE COURT:  They did not?

24             JUROR REYNOLDS:  No.

25             THE COURT:  Okay.  And any reason why that experience

1    would make it difficult for you to be fair and impartial here

2    today?

3              JUROR REYNOLDS:  No, sir.

4              THE COURT:  All right.  Thank you, Mr. Reynolds.

5              Yes, ma'am.

6              JUROR DODGE:  Angela Dodge.  Prince William County,

7    criminal case.

8              THE COURT:  And what kind of case was it, civil or

9    criminal?

10             JUROR DODGE:  Criminal.

11             THE COURT:  Ms. Dodge, was the jury able to reach a

12   verdict in the case?

13             JUROR DODGE:  Yes.

14             THE COURT:  All right.  And any reason why you

15   couldn't be fair and impartial in this case based on that

16   experience?

17             JUROR DODGE:  No.

18             THE COURT:  All right.  And any reason why you

19   couldn't be fair and impartial in this case based on that

20   experience.

21             JUROR DODGE:  No.

22             THE COURT:  All right.  Thank you, Ms. Dodge.

23             Anyone else in the middle?  Yes, ma'am.

24             JUROR SHANNON:  I served on two, one was in

25   Louisville, Kentucky in 1980, and it was criminal.  And it

1    settled out of court.

2         And then the second one was three years ago in

3    Alexandria, drunk driving.  And he was not found guilty of

4    being drunk.

5         THE COURT:  You were able to reach a verdict in that

6    case?

7         JUROR SHANNON:  Yes.

8         THE COURT:  Tell me your name.

9         JUROR SHANNON:  Mary Angela Shannon.

10         THE COURT:  All right.  Ms. Shannon, any reason why

11    those experiences would make it difficult to serve here in this

12    case?

13         JUROR SHANNON:  No.

14         THE COURT:  Thank you, Ms. Shannon.

15         Anybody else?

16         JUROR KOBYLINSKI:  Actually I wanted to clarify, I

17    thought you said federal court.

18         THE COURT:  No, state or federal.

19         JUROR KOBYLINSKI:  Okay.  Local both times.  I served

20    in Loudoun County, and then once in Prince William County.

21         THE COURT:  Okay.  And you're Ms. Kobylinski?

22         JUROR KOBYLINSKI:  Kristy Kobylinski.

23         THE COURT:  And how long ago were those cases?

24         JUROR KOBYLINSKI:  The one in Loudoun County was

25    probably eight to ten years ago.  And the other one was

1    probably 15 years ago.

2              THE COURT:  Okay.  Were they criminal or civil cases?

3              JUROR KOBYLINSKI:  One was criminal, and we reached a

4    verdict, it was guilty.  The other one was, it was civil, and

5    it settled out of court.

6              THE COURT:  All right.  And any reason why those

7    experiences would make it difficult for you to be fair and

8    impartial here today?

9              JUROR KOBYLINSKI:  No.

10             THE COURT:  All right.  Thank you, Mr. Kobylinski.

11             Anybody else?  Have any of you served as an expert

12    witness for any party in a lawsuit?

13             Yes, sir.

14             JUROR BAKER:  Yes.  I worked for Milbank Gogenham in

15    New York.

16             THE COURT:  And your last name, sir?

17             JUROR BAKER:  Baker.

18             THE COURT:  And in what capacity did you serve as an

19    expert?

20             JUROR BAKER:  Technical expert, helping establish a

21    case, lay out the argument.

22             THE COURT:  So you worked for the law firm in doing

23    that, and did you actually ever testify?

24             JUROR BAKER:  No, I did not.

25             THE COURT:  Okay.  You did that on one occasion?  How

1    long ago was that?

2           JUROR BAKER:  Ten years ago.

3           THE COURT:  All right.  And anything about that

4    experience that would make it difficult for you to be fair and

5    impartial here today?

6           JUROR BAKER:  No.

7           THE COURT:  All right.  Thank you, Mr. Buker.  Is it

8    Buker, right?

9           JUROR BAKER:  Baker.

10          THE COURT:  Oh, number 2, Mr. Baker.  I'm sorry.  All

11   right.

12          Do any of you have any legal training, either a law

13   degree, or paralegal degree, have you worked in that capacity

14   in the past?

15          And let's go to the far side.  Anybody on the far

16   side?  All right.

17          How about in the middle?  Yes, sir.

18          JUROR HALLMAN:  Yes, Brad Hallman, juror 18.  I am a

19   licensed attorney.

20          THE COURT:  You are a licensed attorney, Mr. Hallman,

21   right?

22          JUROR HALLMAN:  Yes, sir.

23          THE COURT:  All right.  And do you practice?

24          JUROR HALLMAN:  I do not practice.  I am a federal

25   consultant.

1          THE COURT:  All right.  What area are you a

2    consultant in, sir?

3          JUROR HALLMAN:  Normally with HHS, Department of

4    Health and Human Services.

5          THE COURT:  Okay.  Have you practiced in the past?

6          JUROR HALLMAN:  I have practiced in the past, a

7    little bit, yes.

8          THE COURT:  Was that civil or criminal litigation?

9          JUROR HALLMAN:  Civil mainly.

10         THE COURT:  Were you involved as a trial lawyer?

11         JUROR HALLMAN:  Trial preparation.

12         THE COURT:  Okay.  Was that for a firm?

13         JUROR HALLMAN:  It was in support of a firm.  I was

14   contracted by a firm.

15         THE COURT:  And do you believe any of your

16   experiences in practicing law would make it difficult for you

17   to follow the instructions that I give you here or make it

18   difficult for you to be fair and impartial here?

19         JUROR HALLMAN:  No, I think I could follow the

20   instructions.

21         THE COURT:  All right.

22         JUROR HALLMAN:  I did want to say, thinking back to

23   one of your other questions as far as being sympathetic, I have

24   had friends who have been stationed abroad.  And I have been

25   thinking about that, I am little concerned that those

1    friendships might make me a little more sympathetic to one side

2    over the other.  But I just wanted to mention that.

3           THE COURT:  All right, thank you.  I have got some

4    other questions down the pike which may occasion you to stand

5    up and speak again as well.

6           Have any of you participated in a lawsuit as either a

7    party or as a witness, you or an immediate family member or

8    close friend?

9           Yes, ma'am.

10           JUROR LEONARD:  I brought suit against an automotive

11    company.

12           THE COURT:  A lawsuit against -- you are Ms. Leonard?

13           JUROR LEONARD:  Yes, sir.

14           THE COURT:  A lawsuit again an automotive deal --

15           JUROR LEONARD:  Automotive company.

16           THE COURT:  And were the plaintiff in the case?

17           JUROR LEONARD:  Yes.

18           THE COURT:  And how long ago was that, Ms. Leonard?

19           JUROR LEONARD:  Oh, goodness.  Eight years ago,

20    approximately.

21           THE COURT:  All right.  And was that here or

22    somewhere else?

23           JUROR LEONARD:  It was not in Alexandria, but it was

24    local, yes.  It was heard in D.C.

25           THE COURT:  All right.  And anything about that

1   experience make it difficult for you to be fair and impartial

2   here today?

3           JUROR LEONARD:  I don't think so.

4           THE COURT:  All right.  Thank you, Ms. Leonard.

5           Yes, ma'am.

6           MS. ALLEN:  I'm not sure if this counts or not, but

7   we recently went to mediation, but we never actually went to

8   court.

9           So Kathleen Allen, juror 1.

10          THE COURT:  I apologize, your last name?

11          MR. ALLEN:  Kathleen Allen.

12          THE COURT:  Yes, Ms. Allen.  So you had a dispute, it

13  didn't go to court, but it was resolved in mediation?

14          JUROR ALLEN:  Correct.

15          THE COURT:  And anything about that experience which

16  would make it difficult for you to be fair and impartial here?

17          JUROR ALLEN:  No.

18          THE COURT:  Thank you, Ms. Allen.  Was that a civil

19  dispute?

20          JUROR ALLEN:  It was an estate issue.  So civil, I

21  think.

22          THE COURT:  Okay.  Thank you, Ms. Allen.

23          Someone else raised -- yes, sir.

24          JUROR WILLMORE:  Chris Willmore.  I am a high school

25  principal, and at times teenagers make some bad decisions, and

1   my name goes on it as a case against them for certain cases.

2           THE COURT:  So you are the named plaintiff?

3           JUROR WILLMORE:  I am the name on it.  Occasionally I

4   show up in court.

5           THE COURT:  Well, having a couple kids that are

6   passing through high schools, my sympathies are with you, Mr.

7   Willmore.  So do you actually wind up having to testify in

8   court?

9           JUROR WILLMORE:  Occasionally, yes.

10          THE COURT:  In juvenile proceedings usually?

11          JUROR WILLMORE:  Yes.  It is usually family juvenile

12  court in Arlington.

13          THE COURT:  All right.  And anything about that

14  experience or experiences which would make it difficult for you

15  to be fair and impartial here?

16          JUROR WILLMORE:  No.

17          THE COURT:  All right.  Thank you, Mr. Willmore.

18          Yes, sir, in the back.

19          JUROR BROWNLOW:  4, Brownlow.  I was named in a suit

20  involving inheritance, but I didn't have to go to court, but it

21  would probably come up in a search.

22          THE COURT:  Okay.  I apologize, you are Mr. Brownlow?

23          JUROR BROWNLOW:  Yes.

24          THE COURT:  You were named in --

25          JUROR BROWNLOW:  In a suit involving inheritance.

1          THE COURT:  Involving what?

2          JUROR BROWNLOW:  Inheritance.

3          THE COURT:  Oh, an inheritance.  And was it resolved?

4    Did you actually have to go to court in the case?

5          JUROR BROWNLOW:  It was somehow resolved, we didn't

6    go to court.

7          THE COURT:  All right.  And how long ago was that,

8    Mr. Brownlow?

9          JUROR BROWNLOW:  It was 2002, I believe.

10         THE COURT:  All right.  And anything about that

11   experience which would make it difficult for you to be fair and

12   impartial here?

13         JUROR BROWNLOW:  No.

14         THE COURT:  All right.  Thank you, Mr. Brownlow.

15         Anybody else?

16         Are any of you members of any tort reform

17   organization or civil justice advocacy group?

18         Have you or any member of your immediate family or

19   close personal friend either served in the military or as a law

20   enforcement officer?

21         Ms. Leonard.

22         JUROR LEONARD:  My husband is a Sergeant with the

23   Loudoun County Sheriff's Office.

24         THE COURT:  All right.  And he's in the Sheriff's

25   Office?

1          JUROR LEONARD:  Yes, sir, Loudoun County Sheriff's

2     Office, not police department.

3          THE COURT:  And how long has he been doing that?

4          JUROR LEONARD:  He has been with Loudoun County for

5     six years.  He was formerly with Manassas City prior to that

6     for six years prior.  So he has been in law enforcement for

7     12 years.

8          THE COURT:  All right.  Any reason why your

9     communications with him would make it difficult for you to be

10    fair and impartial in this civil case?

11         JUROR LEONARD:  I am not sure that his job would, but

12    I think might sway me in one direction versus another.

13         THE COURT:  And what's your occupation, Ms. Leonard?

14         JUROR LEONARD:  I work as a school counselor.  And

15    much like one of the other jurors have experience in court with

16    children, and actually had a situation this past year with a

17    student who was involved in potential sex trafficking.

18         THE COURT:  All right.  And do you think that that

19    would make it difficult for you to be fair and impartial here

20    today?

21         JUROR LEONARD:  Yeah, it would.

22         THE COURT:  Thank you, Ms. Leonard.

23         Yes, ma'am.

24         JUROR DWYER:  Bridget Dwyer, juror number 13.  My mom

25    served in the Air Force.

1            THE COURT:  All right.  And you are a teacher now?

2            JUROR DWYER:  Yes.

3            THE COURT:  And how long ago were you in the Air

4    Force?

5            JUROR DWYER:  My mom.

6            THE COURT:  Oh, your mom was in the Air Force.  I

7    didn't think you were old enough to have been in the Air Force

8    and become a teacher.  Was she career Air Force?

9            JUROR DWYER:  Yes.

10           THE COURT:  All right.  So you traveled the world

11   while you were growing up?

12           JUROR DWYER:  Yes.

13           THE COURT:  And what countries did that bring you to?

14           JUROR DWYER:  Germany, Spain, and that's it.

15           THE COURT:  All right.  And do you believe that there

16   is any reason why it would be difficult to serve as a juror in

17   this case based on your experiences or her experiences

18   communicated to you?

19           JUROR DWYER:  No.

20           THE COURT:  Thank you, Ms. Dwyer.

21           Yes, sir.

22           JUROR DALLSTREAM:  Sam Dallstream, number 9.  My wife

23   was active duty military MP.  I was active duty military and

24   then Reserve, and I am not retired, ordnance.

25           THE COURT:  And which service?

40

1                JUROR DALLSTREAM:  Army.

2                THE COURT:  All right.  And did you serve around the

3      world as well?

4                JUROR DALLSTREAM:  Germany.

5                THE COURT:  Germany.  All right.  Anything about that

6      experience which would make it difficult for you to be fair and

7      impartial here today?

8                JUROR DALLSTREAM:  No.

9                THE COURT:  All right, thank you.

10               Yes, the third row, gentleman on the far side.

11               JUROR RENER:  Doug Rener, juror number 32.

12               THE COURT:  All right.

13               JUROR RENER:  I served four years with the U.S. Air

14     Force.

15               THE COURT:  And where did you do your service, Mr.

16     Rener?

17               JUROR RENER:  Over in the U.K.

18               THE COURT:  I'm sorry, Germany and U.K.?

19               JUROR RENER:  U.K.  But I have also been to Germany,

20     Luxemburg, France.

21               THE COURT:  Any reason why your service would make it

22     difficult for you to be fair and impartial here today?

23               JUROR RENER:  No.

24               THE COURT:  All right.  Thank you, Mr. Rener.

25               Yes.

1          JUROR ALLEN:  I am juror number 1, Kathleen Allen.

2     My husband is a Fairfax County police officer.  Actually, he

3     just retired after 28 years last year, but is still employed by

4     the police department, he works in the courts.

5          THE COURT:  All right.  And was he -- what types of

6     positions did he hold in the police department?

7          JUROR ALLEN:  Besides working on the street, he

8     served -- he was on a bicycle team.  And he worked in auto

9     theft.  But for the bulk of his career, for the last probably

10    15 years, he worked in the fugitive division.

11         THE COURT:  All right.  And any reason why his work

12    that he has communicated to you would make it difficult for you

13    to be fair and impartial in this case, Ms. Allen?

14         JUROR ALLEN:  I think potentially.

15         THE COURT:  Well, would you be willing to follow my

16    legal instructions and consider the evidence and decide this

17    case based only on those instructions that I give you and the

18    evidence you hear from the witness stand?

19         JUROR ALLEN:  Yes.

20         THE COURT:  All right.  Thank you, Ms. Allen.

21         Anybody else?  Yes, sir.

22         JUROR HUANG:  Juror number 22.  My younger brother is

23    active in the U.S. Army in Europe.

24         THE COURT:  All right.  Mr. Huang, I lost you for a

25    second there.  You served --

1           JUROR HUANG:  My younger brother.

2           THE COURT:  Your younger brother?

3           JUROR HUANG:  U.S. Army.

4           THE COURT:  U.S. Army.  And is he still in the

5    service?

6           JUROR HUANG:  Yes.

7           THE COURT:  And where is he?

8           JUROR HUANG:  Somewhere in Europe right now.  I have

9    no idea where.

10          THE COURT:  All right.  Anything about his experience

11   which would make it difficult for you to be fair and impartial

12   in this case?

13          JUROR HUANG:  No, sir.

14          THE COURT:  All right.  Thank you, Mr. Huang.

15          Yes, ma'am.

16          JUROR MASON:  Mason, juror number 26.  My son is in

17   the military, he is in Germany right now.

18          THE COURT:  In Germany right now?

19          JUROR MASON:  Yes.

20          THE COURT:  What branch of service?

21          JUROR MASON:  Army.

22          THE COURT:  All right.  Anything that he has related

23   to you that would make it difficult for you to be fair and

24   impartial in this case?

25          JUROR MASON:  No.

43

1          THE COURT:  Thank you, Ms. Mason.

2          Anybody else on the far side?  Yes, sir.

3          JUROR BROWNLOW:  Juror number 4, Jason Brownlow.  I

4    had a parent who was in the Army and the Reserves.

5          THE COURT:  All right.  And did you travel with them

6    around any parts of the world?

7          JUROR BROWNLOW:  No, there was no travel.

8          THE COURT:  Any reason why that would make it

9    difficult for you to be fair and impartial in this case, Mr.

10   Brownlow?

11         MR. BROWNLOW:  No.

12         THE COURT:  Thank you.  All right, in the middle.

13   Yes, ma'am, on the left side.

14         JUROR BUKER:  Mercy Buker.  I forget my juror number.

15   Sorry.

16         THE COURT:  That's all right.

17         JUROR BUKER:  My husband is retired, Master Deputy

18   Sheriff in the Alexandria jail.  And I have a son-in-law who

19   worked for FBI, human trafficking, and also now he works for

20   ICE.

21         THE COURT:  Your son-in-law?

22         JUROR BUKER:  Son-in=law.

23         THE COURT:  Son-in-law worked for --

24         JUROR BUKER:  He used to work for the FBI, human

25   trafficking, and now he's ICE.

1            THE COURT:  What kind of position does he have?  What

2    does he --

3            JUROR BUKER:  I don't know.

4            THE COURT:  All right.  And tell me your last name

5    again.

6            JUROR BUKER:  Buker, B-u-k-e-r.

7            THE COURT:  All right.  Thank you, Ms. Buker.  Any

8    reason why anything that they have shared with you would make

9    it difficult for you to be fair and impartial in this case?

10            JUROR BUKER:  I would try to be as impartial as I

11    possibly could.

12            THE COURT:  Well, you have to agree that you will put

13    aside any biases or prejudice for or against anybody and decide

14    the case just based on the evidence that you hear and the law

15    that I give you.

16            JUROR BUKER:  Right.  That's the job, right?

17            THE COURT:  That's your job.  It's not an easy one,

18    but it --

19            JUROR BUKER:  No --

20            THE COURT:  But that's what we require of each of our

21    jurors.  Can you do that?

22            JUROR BUKER:  I think I can.

23            THE COURT:  All right.  Thank you, Ms. Buker.

24            Yes, ma'am, Ms. Dodge.

25            JUROR DODGE:  Yes, my stepson, he is in the Army,

1   stationed in Okinawa, Japan.

2          THE COURT:  In Japan?

3          JUROR DODGE:  Yes.

4          THE COURT:  And he is in the Army?

5          JUROR DODGE:  Yes.

6          THE COURT:  Any reason why that would make it

7   difficult for you to be fair and impartial in this case?

8          JUROR DODGE:  No.

9          THE COURT:  Thank you, Ms. Dodge.

10         Yes, ma'am.

11         JUROR GUMBEL:  Gumbel, number 17.  So my dad is

12  retired Air Force and he now works at the Pentagon through the

13  Navy.

14         And my stepsister does something with the Air Force

15  for the Reserves something.

16         THE COURT:  All right.  And I'm sorry, what does your

17  dad do at the Pentagon now?

18         JUROR GUMBEL:  I don't know what he does.  He works

19  through the Navy.  It's classified.  I don't know what he does.

20         THE COURT:  Okay.  Any reason why the experiences

21  that they have shared with you would make it difficult for you

22  to fair and impartial in this case, Ms. Gumbel?

23         JUROR GUMBEL:  No.

24         THE COURT:  All right.  Thank you.

25         Yes, ma'am, in the first row.

1            JUROR DAVIS:  Shannon Davis, juror 10.  My father is

2   a Vietnam era veteran from the U.S. Army.

3            THE COURT:  All right.  Any reason why that would

4   make it difficult for you to be fair and impartial here?

5            JUROR DAVIS:  No, sir.

6            THE COURT:  Thank you, Ms. Davis.

7            Yes.

8            JUROR SUBLETT:  Henry Sublett, juror number 37, Your

9   Honor.

10           THE COURT:  Yes, sir.

11           JUROR SUBLETT:  I served 28 years on active duty,

12   Reserve and Guard in the United States Air Force.

13           THE COURT:  In the Air Force?

14           JUROR SUBLETT:  Yes, sir.

15           THE COURT:  All right.  And did that -- did you serve

16   overseas at all?

17           JUROR SUBLETT:  Yes, sir, I did.

18           THE COURT:  And where did you serve overseas?

19           JUROR SUBLETT:  Primarily in the Republic of Korea,

20   South Korea.

21           THE COURT:  And any reason why your service would

22   make it difficult for you to be fair and impartial here?

23           JUROR SUBLETT:  No, sir.

24           THE COURT:  Thank you, Mr. Sublett.

25           Yes, sir.  Okay, I will get you next.

1          JUROR REYNOLDS:  Brian Reynolds number 33.

2          THE COURT:  Yes, sir, Mr. Reynolds.

3          JUROR REYNOLDS:  I have a father who once a Marine,

4     always a Marine.  He served in Korea.  And I have a brother who

5     served in the Air Force.

6          THE COURT:  All right.  And anything about their

7     experiences which would make it difficult for you to be fair

8     and impartial?

9          JUROR REYNOLDS:  No, sir.

10          THE COURT:  Thank you, Mr. Reynolds.

11          Yes, sir, now.

12          JUROR BRUSSEAU:  Brusseau, juror 5.  My dad was in

13     the Coast Guard.

14          THE COURT:  In the Coast Guard?

15          JUROR BRUSSEAU:  Yes, sir.

16          THE COURT:  Did he serve overseas?

17          JUROR BRUSSEAU:  Yes.

18          THE COURT:  And did you go with him overseas at all?

19          JUROR BRUSSEAU:  Yes.

20          THE COURT:  And where did he serve overseas?

21          JUROR BRUSSEAU:  Japan and then Singapore?

22          THE COURT:  Singapore?

23          JUROR BRUSSEAU:  Yes.

24          THE COURT:  All right.  And anything about those

25     experiences which would make it difficult for you to be fair

1    and impartial, Mr. Brusseau?

2            JUROR BRUSSEAU:  No, sir.

3            THE COURT:  Thank you.  Yes, sir.

4            JUROR HOBBS:  Brian Hobbs.  I believe it's juror 18.

5            THE COURT:  19.

6            JUROR HOBBS:  19.  My step-grandfather was a Marine

7    and served in Korea.

8            THE COURT:  In Korea.  And anything about anything he

9    shared with you that would make it difficult for you to be fair

10   and impartial here, Mr. Hobbs?

11           JUROR HOBBS:  No.

12           THE COURT:  Thank you.  Anybody else?

13           COURT SECURITY OFFICER:  One in the back, Judge.

14           THE COURT:  Yes, Ms. Allen.

15           JUROR ALLEN:  I am sorry, I felt that I left some

16   things out.  In addition to my husband being a police officer,

17   I also have a brother-in-law who is with the Pennsylvania State

18   Police.  And I have a nephew who works for the FBI.  And

19   another nephew who is in the Navy.

20           THE COURT:  All right.  And are those people that you

21   regularly communicate with?

22           JUROR ALLEN:  Yes.

23           THE COURT:  All right.  And any reason why any of

24   that information would make it difficult for you to be fair and

25   impartial in this case?

1          JUROR ALLEN:  No.

2          THE COURT:  Thank you, Ms. Allen.

3          Yes, sir.

4          JUROR THOMASSON:  James Thomasson.  My mother and

5    father-in-law were active duty Air Force.

6          THE COURT:  Okay.  And tell me your name again.

7          JUROR THOMASSON:  James Thomasson, juror 39.

8          THE COURT:  Mr. Thomasson, all right.  Any reason why

9    that would make it difficult for you to be fair and impartial

10   in this case, sir?

11         JUROR THOMASSON:  No, sir.

12         THE COURT:  Thank you, Mr. Thomasson.

13         Yes, ma'am.

14         JUROR WHITAKER:  Erin Whitaker, juror 41.  I thought

15   the question was about immediately, but if we're getting into

16   extended family, uncles, grandparents that have been career

17   Navy, Army, Air Force.  But I don't think that will make me in

18   any way lose my impartiality.

19         THE COURT:  All right.  Thank you, Ms. Whitaker.

20         JUROR KOBYLINSKI:  Kristy Kobylinski, 24.  My father

21   was also a Vietnam veteran before I was born, but I have never

22   traveled --

23         THE COURT:  Internationally with him, obviously.

24   Okay.

25         JUROR KOBYLINSKI:  So that wouldn't affect my

1    impartiality.

2           THE COURT:  All right.  Any reason why that would

3    make it difficult for you to be fair and impartial here?

4           JUROR KOBYLINSKI:  No, sir.

5           THE COURT:  All right.  Thank you, Ms. Kobylinski.

6           I have asked you about law enforcement service and

7    military service.  Let me ask you now about whether any of you

8    or members of your immediate family are close personal friends

9    of either -- another multiple choice.  Been employed by the

10   State Department, or been a member of the foreign service, or

11   the Department of Homeland Security.

12          And let's start again over here.  Mr. Brownlow.

13          JUROR LEONARD:  Leonard, juror number 25.  My

14   grandfather on my mother's side was in the foreign service.

15          THE COURT:  Was in the foreign service?

16          JUROR LEONARD:  Yes, sir.

17          THE COURT:  And did you get any feedback about that

18   service?

19          JUROR LEONARD:  Through stories told.

20          THE COURT:  All right.  Where did he serve?

21          JUROR LEONARD:  Australia, Turkey, Germany, those are

22   the ones I remember.

23          THE COURT:  Okay.  And anything about those

24   recountings that would make it difficult for you to be fair and

25   impartial here?

1          JUROR LEONARD:  No.  I don't think so.

2          THE COURT:  All right.  Thank you, Ms. Leonard.

3          Ms. Mason.

4          JUROR MASON:  My father-in-law was with the State

5     Department, CIA, and the foreign service?

6          THE COURT:  Who was?

7          JUROR MASON:  My father-in-law.

8          THE COURT:  Your father-in-law?

9          JUROR MASON:  Yes.

10         THE COURT:  And where was he stationed?

11         JUROR MASON:  He was stationed in Ethiopia, he was

12    stationed in Denmark, and I am not sure where else.

13         THE COURT:  All right.  Now, this case, as we have

14    said, Ms. Roe is of Ethiopian nationality.  Anything that your

15    father-in-law expressed to you that would make it difficult for

16    you to fair and impartial in this case?

17         JUROR MASON:  No.

18         THE COURT:  All right.  Thank you, Ms. Mason.

19         All right, anybody else on the far side?  Yes, sir.

20         JUROR BAKER:  Yes, sir.  Karl Baker, number 2.

21         THE COURT:  Right.

22         JUROR BAKER:  I guess I should have mentioned this

23    last time, I didn't think about it as a law enforcement thing.

24    But I worked on a computer system for DHS and FBI for two

25    years.

```
 1              THE COURT:  For two years?

 2              JUROR BAKER:  Yeah.

 3              THE COURT:  And is that here in the Washington

 4    metropolitan area?  Do you actually work inside either of those

 5    locations or --

 6              JUROR BAKER:  It was inside the FBI data center.

 7              THE COURT:  All right.  And would that experience in

 8    your working for those agencies make it difficult for you to be

 9    fair and impartial here today?

10              JUROR BAKER:  It would not.

11              THE COURT:  All right.  Thank you, Mr. Baker.

12              Yes, Mr. Brownlow.

13              JUROR BROWNLOW:  Yes, sir, number 4.  My sister is

14    foreign service for probably 15 years.  And through her I know

15    probably ten other people who are foreign service.

16              THE COURT:  Okay.  And where has she served?

17              JUROR BROWNLOW:  Mexico, Central America, U.K.,

18    Albania, D.C.

19              THE COURT:  All right.  And anything about her

20    experience or the others that you've met which make it

21    difficult for you to be fair and impartial in this case?

22              JUROR BROWNLOW:  No.

23              THE COURT:  Thank you, Mr. Brownlow.

24              Anybody else on the far side?

25              All right in the middle.  Yes, sir.  Well, stand up,
```

1    somebody.

2              JUROR HALLMAN:  Brad Hallman, juror number 18.  My

3    wife is an ethics attorney at TSA.  And myself during law

4    school had an internship at Homeland Security at headquarters.

5    And I then two friends who we went and visited while they were

6    in the foreign service stationed at the U.S. Embassy in

7    Brussels.

8              THE COURT:  And your wife is an ethics --

9              JUROR HALLMAN:  Ethics attorney at TSA,

10   Transportation Security Administration.

11             THE COURT:  Oh, TSA.

12             JUROR HALLMAN:  Yes, yes.

13             THE COURT:  I was hoping it was GSA.  They're

14   responsible for this mess that you see around the building.  I

15   was going to take a recess and speak with you.

16             JUROR HALLMAN:  Sorry.

17             THE COURT:  Any reason why anything about their

18   careers would make it difficult for you to be fair and

19   impartial in this case?

20             JUROR HALLMAN:  Well, while we were visiting our

21   friends who were stationed in Brussels, I recall speaking to

22   them about the process through which they had to go through

23   training and stuff.  So I would be a little worried about being

24   more bias about that side of the case.

25             THE COURT:  Well, we all have training in different

1    disciplines.  Is there any reason why you wouldn't be able to

2    put aside any of that information and decide a case just based

3    on the facts that you hear in the courtroom and the law that I

4    give you?

5                JUROR HALLMAN:  I suppose not.

6                THE COURT:  Well, you have got the legal training.

7    You understand what your requirements are, right, sir?

8                JUROR HALLMAN:  Yes.

9                THE COURT:  All right.  And you would be able to do

10   that?

11               JUROR HALLMAN:  I think I could.

12               THE COURT:  All right.  Thank you, Mr. Hallman.

13               Yes, sir.

14               JUROR BRUSSEAU:  Brusseau, 5.

15               THE COURT:  Right.

16               JUROR BRUSSEAU:  One of my high school buddies works

17   at DEA.

18               THE COURT:  All right.  And any reason why that would

19   make it difficult for you to be fair and impartial here, Mr.

20   Brusseau?

21               JUROR BRUSSEAU:  No, sir.

22               THE COURT:  Thank you.  Yes, ma'am.

23               JUROR DAVIS:  Davis, number 10.  My brother is a TSA

24   agent.

25               THE COURT:  And what does he do for TSA?

1    JUROR DAVIS:  Whatever they ask him to do, sir.  He

2 has been at three different airports with both the face-to-face

3 with passengers coming through the airport as well as baggage

4 handling.

5    THE COURT:  All right.  So he would be dealing with

6 international arrivals and that type of information?

7    JUROR DAVIS:  Yes, Your Honor.

8    THE COURT:  Anything that he has shared with you that

9 would make it difficult for you to be fair and impartial in

10 this case?

11    JUROR DAVIS:  No, sir.

12    THE COURT:  All right.  Thank you, Ms. Davis.

13    Yes, sir.

14    JUROR WOJCIK:  My wife was a federal contractor for

15 the State Department, consular and visa affairs, for

16 approximately two years about two to three years ago.

17    THE COURT:  All right.  And your last name, sir?

18    JUROR WOJCIK:  Wojcik, juror 43.

19    THE COURT:  Mr. Wojcik, she stayed right here in the

20 Washington, D.C. area?

21    JUROR WOJCIK:  Yes, she worked mostly at the

22 headquarters in D.C.

23    THE COURT:  And anything that she shared with you

24 that would make it difficult for you to fair and impartial here

25 today?

1            JUROR WOJCIK:  No, Your Honor.

2            THE COURT:  Thank you, Mr. Wojcik.

3            Yes, ma'am.

4            JUROR PIANALTO:  Pianalto, number 29.  I served at

5    the State Department at our embassy in London in 1995 through

6    '97.

7            THE COURT:  All right.  What was your position there?

8            JUROR PIANALTO:  It was senior advisor to the

9    Ambassador.  And also have quite a few friends who are foreign

10   service officers as a result of that.

11           THE COURT:  All right.  So you lived in London during

12   that period of time?

13           JUROR PIANALTO:  Yes.

14           THE COURT:  And did you live in any other locations?

15           JUROR PIANALTO:  No.

16           THE COURT:  And anything about that experience or

17   your friends' experiences that were shared with you that would

18   make it difficult for you to be fair and impartial in this

19   case?

20           JUROR PIANALTO:  I would have to say potentially,

21   yes.

22           THE COURT:  Why would that be?  I mean, you're tasked

23   with listening to the evidence here in the courtroom today,

24   making credibility determinations on witnesses based on their

25   testimony, and also following the law that I give you.

1          Would you be unable to set aside any prejudice or

2     bias one way or the other?

3          JUROR PIANALTO:  No, I think I can set them aside.

4          THE COURT:  All right.  Thank you, Ms. Pianalto.

5          Yes, sir.

6          JUROR MATHALON:  My father is a retired customs agent

7     and ICE agent.  And I should have mentioned previously, he used

8     to be in law enforcement.

9          THE COURT:  Okay.

10         JUROR MATHALON:  What department of law enforcement,

11    I'm not sure.

12         THE COURT:  Okay.  So he presently works for ICE?

13         JUROR MATHALON:  No, he's retired?

14         THE COURT:  He is retired.  And tell me your name.

15         JUROR MATHALON:  Jordan, Jordan Mathalon, juror 27, I

16    believe.

17         THE COURT:  All right.  Mr. Jordan -- or Mr.

18    Mathalon.

19         JUROR MATHALON:  Yes.

20         THE COURT:  Okay.  And what types of positions did he

21    have with Homeland Security?

22         JUROR MATHALON:  So to the best of my knowledge, what

23    I heard, he used to do like jump teams, some of which dealt

24    with child labor, going to factories and making sure everything

25    was up to par.

1          THE COURT:  All right.  And anything that he shared

2    with you that would make it difficult for you to be fair and

3    impartial in this case?

4          JUROR MATHALON:  I'll hear the facts.  I will make my

5    judgment based on facts.

6          THE COURT:  Well, you have to agree --

7          JUROR MATHALON:  Yes, I will be impartial.

8          THE COURT:  All right.  Thank you, Mr. Mathalon.

9          Anybody else?  Yes, ma'am.

10          JUROR ENGLISH:  Terri English.  My dad is a retired

11    CIA officer.  And my sister currently works at the CIA.

12          THE COURT:  All right.  And did you travel around the

13    world with your father?

14          JUROR ENGLISH:  No.

15          THE COURT:  All right.  And anything about the

16    experiences that those people have shared with you that would

17    make it difficult for you to be fair and impartial in this

18    case?

19          JUROR ENGLISH:  No, sir.

20          THE COURT:  Thank you, Ms. English.

21          I have another multiple part question, and it

22    involves potentially sensitive matters that you might not want

23    to share with other members who are here in the courtroom.  So

24    if you answer yes to any of these questions, then I will have

25    you line up and we'll do a sidebar and we'll hear your answers

1   at the sidebar.

2           So the first part of the question is, have you or any

3   members of your immediate family or close personal friends ever

4   been the victim of a crime, a witness to a crime, or arrested,

5   or accused of, or convicted of a crime, including any form of

6   sexual assault?

7           The second part is, have you or members of your

8   immediate family or close personal friends ever been involved

9   in a sexual harassment claim?

10          The third part of the question is, have you or

11  members of your immediate family or close personal friends ever

12  owned or participated in a business that involved the adult sex

13  industry?

14          Fourth is, have you, members of your immediate

15  family, or close personal friends ever been accused of human

16  trafficking?

17          And fifth, have you, or an immediate family member,

18  or close friend ever been accused of something that they did

19  not do?

20          And sixth, have you or close family members or

21  personal friends ever employed live-in help?

22          And if you have a yes answer to any of those

23  questions, please come forward and Mr. Ruelas will direct you

24  back to us.

25          All right.  If I could see counsel at sidebar,

1    please.

2         NOTE:  A side-bar discussion is had between the Court

3    and counsel out of the hearing of the jury panel as follows:

4    AT SIDE BAR

5         COURT SECURITY OFFICER:  Number 29.

6         THE COURT:  Please come forward, Ms. Pianalto.

7         JUROR PIANALTO:  One of my best friends brought a

8    suit against her employer for sexual harassment, it was here in

9    the city of Alexandria.

10        THE COURT:  This year in the city?

11        JUROR PIANALTO:  No.  I said it was here in the city,

12   it was probably about 25 years ago.

13        THE COURT:  All right.  And was it resolved?

14        JUROR PIANALTO:  It went to trial and she lost.

15        THE COURT:  Okay.  And any reason why that would make

16   it difficult for you to be fair and impartial in this case?

17        JUROR PIANALTO:  No.

18        THE COURT:  All right.  Thank you, Ms. Pianalto.

19        COURT SECURITY OFFICER:  Number 41.

20        THE COURT:  Ms. Whitaker.  Good morning.

21        JUROR WHITAKER:  Good morning.  I am number 41.  My

22   mother and my cousin were both sexually assaulted.  My mother's

23   perpetrator was in fact caught, but my cousin's was not

24   charged.

25        THE COURT:  How long ago did these very unfortunate

1    incidents occur?

2              JUROR WHITAKER:  My mother's abduction was '82 maybe.

3    And my cousin's assault was a few years ago, about three years

4    ago.

5              THE COURT:  All right.  And they were both sexually

6    assaulted?

7              JUROR WHITAKER:  Yes.

8              THE COURT:  And were they here in the United States

9    when that occurred?

10             JUROR WHITAKER:  Yes.

11             THE COURT:  And no one was charged in your cousin's?

12             JUROR WHITAKER:  In my cousin's case.  She named the

13   perpetrator, but they did not feel that they had sufficient

14   evidence to charge.

15             THE COURT:  Okay.  Anything about -- did you have to

16   testify as a witness in either case?

17             JUROR WHITAKER:  No.

18             THE COURT:  All right.  Anything --

19             JUROR WHITAKER:  I did, however, my mother did ask me

20   to read her victim impact statement when she went to his parole

21   hearing.

22             THE COURT:  Okay.  How long ago was that?

23             JUROR WHITAKER:  I was in high school.

24             THE COURT:  You were in high school.  Anything about

25   those experiences which would make it difficult for you to be

1  fair and impartial in this case?

2          JUROR WHITAKER:  I will do my duty and be fair and

3  impartial.

4          THE COURT:  All right.  Thank you, Ms. Whitaker.

5          COURT SECURITY OFFICER:  Number 27.

6          THE COURT:  Good morning again.

7          JUROR MATHALON:  So someone very close to me, also I

8  used to date, was sexually assaulted.  And I would be lying if

9  I said it didn't leave a bad emotion with me.

10         THE COURT:  How long ago did it occur, Mr. Mathalon?

11         JUROR MATHALON:  So I believe her assault at this

12  point was probably close to eight years ago.  She never filed

13  anything, charges or anything like that.  But she shared it

14  with me.

15         THE COURT:  Okay.  All right.  You believe that would

16  make it difficult for you to be fair and impartial in this

17  case?

18         JUROR MATHALON:  Honestly, yeah.

19         THE COURT:  The circumstances were -- well, I'm not

20  going to ask you anything more.  Thank you, Mr. Mathalon.

21         JUROR MATHALON:  Thank you, Your Honor.

22         COURT SECURITY OFFICER:  Number 26.

23         THE COURT:  Hi, Ms. Mason.

24         JUROR MASON:  My late husband had a very long

25  criminal history, drugs, stealing, all kinds of things.  And my

1    in-laws did hire people overseas to work in their homes.

2              THE COURT:  Okay.  And what countries were they in,

3    if you recall?

4              JUROR MASON:  They were in Ethiopia.  They were in

5    Ghana.  Several other places.

6              THE COURT:  Did they she share personal experiences

7    about any live-ins or hiring people?

8              JUROR MASON:  Hiring people, yes.

9              THE COURT:  And would any of that information make it

10   difficult for you to be fair and impartial here?

11             JUROR MASON:  I don't think so.

12             THE COURT:  Did you have -- when your husband was

13   charged with these criminal offenses, was he prosecuted and

14   went to jail?

15             JUROR MASON:  Yes.

16             THE COURT:  And were you ever a witness in those

17   matters?

18             JUROR MASON:  Yes.  I was in lots of courtrooms like

19   this, unfortunately.

20             THE COURT:  And did you think he was treated fairly

21   or not by the system?

22             JUROR MASON:  Sometimes.

23             THE COURT:  Sometimes?

24             JUROR MASON:  Once you get caught in the system, you

25   are caught in the system.

64

1              THE COURT:  Yeah.  And it goes on for a very long

2    time, right?

3              JUROR MASON:  Yes, it does.

4              THE COURT:  Service of a sentence is only one part of

5    it.

6              JUROR MASON:  Right.

7              THE COURT:  How long ago was that?

8              JUROR MASON:  He died -- well, let's see he died in

9    '14, so he died two years ago.  He was incarcerated when he

10   died?

11             THE COURT:  At the time he passed away?

12             JUROR MASON:  Yes.

13             THE COURT:  I am very sorry to hear that.  Anything

14   about that experience, either of the experiences you have

15   related make it difficult for you to be fair and impartial in

16   this case?

17             JUROR MASON:  I don't know.

18             THE COURT:  All right.  Well, your duty would be --

19             JUROR MASON:  Yes.

20             THE COURT:  -- kind of put aside any bias or

21   prejudice for or against anyone, just hear the evidence --

22             JUROR MASON:  Right.

23             THE COURT:  -- and decide it.  The credibility of

24   witnesses is one of your jobs.

25             JUROR MASON:  I understand.

```
 1                 THE COURT:  And then I give you the law, and you

 2     apply the law to the facts.

 3                 JUROR MASON:  Yep.

 4                 THE COURT:  Can you do that?

 5                 JUROR MASON:  Yep.

 6                 THE COURT:  All right.  Thank you, Ms. Mason.

 7                 JUROR MASON:  Thank you.

 8                 COURT SECURITY OFFICER:  Number 2.

 9                 THE COURT:  Good morning.

10                 JUROR BAKER:  Good morning.  Juror number 2, Karl

11     Baker.

12                 THE COURT:  Yes, Mr. Baker, right.

13                 JUROR BAKER:  My son was accused of sexual assault at

14     the University of Virginia last year.  And I think it's still

15     within the statute of limitations, but criminal charges were

16     not brought against him.

17                 THE COURT:  Just the university notified him of an

18     allegation and they pursued an investigation?

19                 JUROR BAKER:  They pursued an investigation, and he

20     was suspended for six months.

21                 THE COURT:  So he lost a semester of school?

22                 JUROR BAKER:  Yeah.

23                 THE COURT:  It's obviously an administrative matter,

24     an in-school type of a situation that they take those cases

25     through.  Do you think that your son was treated fairly or not?
```

```
 1              JUROR BAKER:  No, absolutely not.  Absolutely not.

 2              THE COURT:  Was law enforcement involved at all in

 3    this?

 4              JUROR BAKER:  Not yet.

 5              THE COURT:  Okay.

 6              JUROR BAKER:  We don't know.  She could potentially

 7    bring criminal charges against him, but --

 8              THE COURT:  Yeah.

 9              JUROR BAKER:  Absolutely.

10              THE COURT:  Okay.  And so law enforcement hasn't been

11    involved yet.  You don't know whether the statute has run or

12    not.

13              Do you believe that that would make it difficult for

14    you to be fair and impartial in this case?

15              JUROR BAKER:  Maybe.  Honestly, maybe.

16              THE COURT:  Just because you believe it was a false

17    accusation and --

18              JUROR BAKER:  Yeah.

19              THE COURT:  It left doubt in your mind?

20              JUROR BAKER:  Yeah, it's very emotional for me.  It's

21    really hard to come up here and talk about it, to be honest

22    with you.

23              THE COURT:  You are still living right in the middle

24    of it.

25              JUROR BAKER:  Yeah, yeah.
```

67

1          THE COURT:  Okay.  All right.  Thank you, Mr. Baker.

2          JUROR BAKER:  Okay, thank you.

3          COURT SECURITY OFFICER:  Number 39.

4          JUROR THOMASSON:  James Thomasson, juror 39.

5          THE COURT:  Yes, sir.

6          JUROR THOMASSON:  Drinking in public and drunk in

7   public when I was in college back in 1988 and '89.  And my

8   wife's car was broken into seven years ago.

9          THE COURT:  All right.  Any of those experiences make

10  it difficult for you to be fair and impartial in this case?

11         JUROR THOMASSON:  No, sir.

12         THE COURT:  Do you think everybody was -- you were

13  treated fairly?

14         JUROR THOMASSON:  Yes.

15         THE COURT:  All right.  Youthful indiscretions.

16         JUROR THOMASSON:  Yes.  I had to tell you.

17         THE COURT:  All right.  Thank you, Mr. Thomasson.

18         JUROR THOMASSON:  Okay.

19         COURT SECURITY OFFICER:  Number 6.

20         THE COURT:  Good morning again, Ms. Buker.

21         JUROR BUKER:  I have a first cousin who was a music

22  teacher, and he was accused of sexual inappropriateness with a

23  student, and he pleaded out.  So he took a plea deal.

24         THE COURT:  He pled guilty to that offense?

25         JUROR BUKER:  Yes, to avoid jail.

1          THE COURT:  I am sorry, to avoid jail?

2          JUROR BUKER:  To avoid jail.

3          THE COURT:  And how long ago was this?

4          JUROR BUKER:  Two years ago.

5          THE COURT:  And locally here?

6          JUROR BUKER:  Puerto Rico.

7          THE COURT:  Oh, in Puerto Rico.  And I take it from

8   the way you framed it, you don't think he was really treated

9   fairly?

10          JUROR BUKER:  Not at all.  Not in Puerto Rico.

11   Everything is such a mess over there.

12          THE COURT:  All right.  Do you believe that his

13   experience as you've heard it would make it difficult for you

14   to be fair and impartial in this case?

15          JUROR BUKER:  I don't think so.  I think I can do the

16   job.

17          THE COURT:  All right.  We went over that a few

18   minutes ago.  I thank you for that.

19          JUROR BUKER:  You're welcome.

20          COURT SECURITY OFFICER:  Number 25.

21          THE COURT:  Good morning again, Ms. Leonard.

22          JUROR LEONARD:  Good morning.  Just in the interests

23   of full disclosure, I have a good friend in high school, we

24   haven't talked in the last few years, but she was being

25   molested by her father.  And I went through that experience

1  with her -- we were good friends until the end of college, and

2  then she moved away and went overseas, so we kind of lost touch

3  since then.

4  And again, in the interest of full disclosure,

5  between my job and my husband's job, I have a lot of

6  information about students who have been obviously involved in

7  sexual situations with family members or church members who

8  have performed sexual acts that were obviously illegal.  And

9  then through my husband's position, things have come to him

10  criminally.

11  THE COURT:  Yeah, so you're kind of getting both

12  sides of the aisle, aren't you?  You are having accusations

13  that you have to evaluate, is that fair to say?  And some are

14  found to be, if not true -- certainly there is foundation for

15  some of them and some of them there is no foundation for, is

16  that fair to say or not?

17  JUROR LEONARD:  Agreed.  Certainly in situations with

18  students that I work with at school, for sure.  Some will come

19  in and then present information that is spot on with

20  appropriate accusations, and other times it is

21  attention-seeking behavior.

22  THE COURT:  Right.  So in this case you will be asked

23  to judge the credibility of two victims.  And will you be able

24  to do that just based on the testimony that you hear here in

25  the courtroom and not bring any bias or prejudice one way or

1    the other?

2              JUROR LEONARD:  I would do what you asked me to do.

3              THE COURT:  Well, it's pretty straightforward.

4              JUROR LEONARD:  You give the letter of the law, and

5    that's what I have to follow.

6              THE COURT:  I give you the law.

7              JUROR LEONARD:  I have heard that a lot in my house.

8              THE COURT:  Yeah, I bet you do, yeah.

9              JUROR LEONARD:  I would do what you asked me to do.

10             THE COURT:  All right.  Thank you, Ms. Leonard.

11             COURT SECURITY OFFICER:  Number 11.

12             THE COURT:  Yes, sir.

13             JUROR DIAZ:  I have an immediate neighbor who was

14   actually convicted of human sex trafficking of younger women.

15             And I have another immediate neighbor who was also

16   two times charged.

17             And I witnessed the arrest of another man whose

18   crimes were sexual assault of a minor, two times.

19             THE COURT:  Okay.  And you need to move out of that

20   neighborhood.

21             Did you know either of these people?

22             JUROR DIAZ:  We knew, since they were my immediate

23   neighbor, the one who had participated in sex trafficking, we

24   knew -- I personally knew his younger sister, we were in high

25   school together.

1          And I know the mother of the young man.  My family

2     occasionally talks to her and checks up.

3          And as for the other one who had done the sexual

4     assault, we only know that he was our neighbor right across

5     from my house, but we have never spoken to him.

6          THE COURT:  All right.  So you knew that they were

7     charged.  Do you know whether they were convicted of those

8     crimes?

9          JUROR DIAZ:  The one, sex trafficking, I think --

10    what I do know is that he had to face prison time for

11    participating in the trafficking aspect of it.  And for the

12    other, I'm not sure what the two outcomes were exactly.

13         THE COURT:  All right.  Well, would any of the

14    information that you learned about your neighbors make it

15    difficult for you to be fair and impartial in this case?

16         JUROR DIAZ:  It does get me a little sympathetic

17    towards the victims of sexual assault and trafficking since I

18    have heard from both views, and it kind of gets me a little

19    biased towards those who commit those acts.

20         THE COURT:  Well, did you actually speak to any of

21    the victims of any of these offenses?

22         JUROR DIAZ:  Not directly to them, no.  I have only

23    witnessed on behalf of what their family had to suffer through.

24         THE COURT:  So you knew family members of victims?

25         JUROR DIAZ:  I'm sorry.  So to be perfectly clear, I

1    mean the mother of the man who had committed the crime.  So

2    having to do deal with her suffering and worry, and she

3    personally came to us I think for help for finding a lawyer.

4                 THE COURT:  Oh, on behalf of her son?

5                 JUROR DIAZ:  On behalf of her son, yeah.

6                 THE COURT:  Okay.  So now how does that -- what

7    prejudice or bias do you think you might have as it relates to

8    this case?

9                 JUROR DIAZ:  It's kind of towards an ethical issue of

10   why would you do such a thing to younger people.  It's an

11   ethical concern.  Seeing it from two immediate neighbors makes

12   me really question what's going through your head personally.

13                THE COURT:  Well, here we've got two victims who are

14   adults.  You're going to have to judge the credibility of what

15   they say as to whether it's the truth or not the truth.  And

16   I'm going to give you the law, and you have got to follow the

17   law that I give you.

18                Do you think that you would be unable to do that?

19                JUROR DIAZ:  Yes, Your Honor, I can.

20                THE COURT:  You can do it?

21                JUROR DIAZ:  I can follow your law, yes.

22                THE COURT:  Okay.  And put your bias that you --

23                THE WITNESS:  The bias won't affect me.  I just want

24   to let you all know that I have been exposed to this situation.

25                THE COURT:  Okay.  I appreciate it.  Thank you, Mr.

1    Diaz.

2           JUROR DIAZ:  Thank you.

3           COURT SECURITY OFFICER:  17.

4           THE COURT:  Hi again, Ms. Gumbel.

5           JUROR GUMBEL:  This is weird.

6           THE COURT:  I know.  I apologize.

7           JUROR GUMBEL:  It's all good.  So when I was still

8    living on the west coast, I was 18, and my friend was sexually

9    assaulted when she was 19.

10          THE COURT:  She was 19?

11          JUROR GUMBEL:  Yeah.

12          THE COURT:  And was anybody prosecuted for that?

13          JUROR GUMBEL:  No.  We did go to the hospital and

14   start going through the process, but then towards the end she

15   decided not to do anything about it.

16          THE COURT:  She decided not to file?

17          JUROR GUMBEL:  She didn't want to do deal with all

18   that.

19          THE COURT:  So it was somebody she knew?

20          JUROR GUMBEL:  It was at a party, so it was not

21   someone we knew like super swell or anything like that, but we

22   knew of them.

23          THE COURT:  All right.  How long ago was that?

24          JUROR GUMBEL:  I am 31 now, so ten years, something

25   like that.

1          THE COURT:  All right.  And anything about that

2   experience which would make it difficult for you to be fair and

3   impartial in this case?

4          JUROR GUMBEL:  It was quite a long time ago.  So, no.

5          THE COURT:  So there will be testimony, as I've

6   recounted earlier, that two victims were sexually assaulted in

7   this case.  And do you think you can be fair and impartial?

8          JUROR GUMBEL:  I do, yeah.  Each case is different.

9   So I --

10          THE COURT:  Very true.  All right.  Thank you very

11   much, Ms. Gumbel.

12          JUROR GUMBEL:  Thank you.

13          COURT SECURITY OFFICER:  Number 4.

14          THE COURT:  Good morning, Mr. Brownlow.

15          JUROR BROWNLOW:  I am number 4, Jason Brownlow.  So

16   having a sister who is foreign service, she has had staff, she

17   may have had live-in staff, I am not sure, but I have topical

18   familiarity with what it's like to have a staff member in-house

19   if you are in the foreign service, but just sort of from an

20   understanding of listening to her talk about people.

21          So for instance, I would think that if you had a

22   staff member who comes from your country, you would pay them

23   one way.  If they come from within the country, you may pay

24   them that country's wage, that sort of thing.

25          So I have some understanding beyond what the average

1    person would have what that's like.  I don't think it would

2    affect my impartiality, but I'm just noting it.

3            THE COURT:  Well, there will be testimony about the

4    payment of live-in nannies in this case, and there will be

5    particulars that will be testified to.  And what you would be

6    asked would be to put aside any of that other information that

7    you know generally and just focus on the evidence that you hear

8    in this courtroom.

9            JUROR BROWNLOW:  Right.  So listen to the law rather

10   than what I think.

11           THE COURT:  Yeah.  The evidence will come off that

12   witness stand, and you judge the credibility of the people

13   involved, and I give you the law and you make the decision

14   then.

15           JUROR BROWNLOW:  Right.  Yep, no problem.

16           THE COURT:  No problem?

17           JUROR BROWNLOW:  Okay.

18           THE COURT:  All right.  Thank you, Mr. Brownlow.

19           Okay, let's continue on.  Thank you.

20           NOTE:  The side-bar discussion is concluded;

21   whereupon the case continues before the jury panel as follows:

22   BEFORE THE JURY PANEL

23           THE COURT:  All right.  Thank you all.  As I have

24   alluded to, Ms. Roe is from Ethiopia, and she will be using an

25   interpreter.  And there will be a second witness who also will

1    be using an interpreter.  And they are not U.S. citizens.

2            Does anybody believe that they have any bias or

3    prejudice one way or the other about persons who are in that

4    position so that you couldn't be fair and impartial in this

5    case?

6            Would any of you give greater weight to the testimony

7    of a witness based solely on their occupation?

8            In other words, for instance, if they are a law

9    enforcement officer, or they are a State Department employee,

10   or working in another capacity within law enforcement, just

11   because of the position that they have?

12           Have any of you lived or members of your immediate

13   family livid in the Middle East or in Africa?

14           COURT SECURITY OFFICER:  We have one, Judge.

15           JUROR MATHALON:  My father was born in Sudan, and he

16   used to live in Egypt for a few years.

17           THE COURT:  I am sorry, he lived in --

18           JUROR MATHALON:  He was born in Sudan.  And he lived

19   in the Middle East before he came to the United States.  Egypt

20   is where he lived.

21           THE COURT:  All right.  And how long did he come to

22   the United States?

23           JUROR MATHALON:  Oh, he will kill me for this, but

24   like 50 years ago.

25           THE COURT:  All right, thank you, Mr. Mathalon.

1              I have asked you all about many aspects of your

2    employment.  Have any of you worked with sex abuse or rape

3    victims?

4              COURT SECURITY OFFICER:  I believe we have one,

5    Judge.

6              JUROR KOBYLINSKI:  I was a counselor for young women,

7    and several of my clients had experiences that were a little

8    traumatic.

9              THE COURT:  Okay.  And still today, Ms. Kobylinski?

10             JUROR KOBYLINSKI:  No.  I stopped doing that about

11   five years ago.  And I did it for seven years.

12             THE COURT:  You did it for seven years?

13             JUROR KOBYLINSKI:  Yeah.  Many young expecting

14   mothers, was my --

15             THE COURT:  You worked with young expecting mothers?

16             JUROR KOBYLINSKI:  Yes.  Pregnant mothers.

17             THE COURT:  All right.  And would that experience

18   make it difficult for you to be fair and impartial in this

19   case?

20             JUROR KOBYLINSKI:  No.

21             THE COURT:  All right.  Thank you, Ms. Kobylinski.

22             Ms. Allen.

23             JUROR ALLEN:  I am a psychologist, a research

24   psychologist, but I have a lot of friends who are

25   psychologists, clinical psychologists and who have worked with

 1     sexual abuse victims.

 2              THE COURT:  And you have spoken to them about what

 3     they do and their jobs?

 4              JUROR ALLEN:  Yes.

 5              THE COURT:  And would that make it difficult for you

 6     to be fair and impartial in this case?

 7              JUROR ALLEN:  No.

 8              THE COURT:  All right.  Thank you, Ms. Allen.

 9              As I said, the victim, the plaintiff in this case is

10     Ethiopian, and there may be another second witness from

11     Ethiopia.

12              Do any of you have a relationship with an Ethiopian

13     person here in the United States that would make it difficult

14     for you to be fair and impartial in this case because of that

15     relationship?

16              Is there any other reason that anyone believes that

17     you would be unable to be fair and impartial in this case and

18     decide it only based on the evidence you receive and the law

19     that I give you for any other reason other than questions I

20     have already asked you?

21              All right.  Let me see counsel at the sidebar then.

22              NOTE:  A side-bar discussion is had between the Court

23     and counsel out of the hearing of the jury panel as follows:

24     AT SIDE BAR

25              THE COURT:  Are there additional questions that you

1    want me to ask?

2          MR. RINALDO:  I don't think so, Your Honor.

3          THE COURT:  All right.

4          MS. PATTERSON:  No, Your Honor.

5          THE COURT:  I think I asked pretty much all the

6    questions that you offered.  And I appreciate the work that you

7    did on the voir dire.

8          Then let's talk about excuses for cause.

9          MR. RINALDO:  Do you want to go first, Melissa?  Is

10   that how you handle it?  Or do you have some, Your Honor?

11         THE COURT:  Well, let me propose a couple.  How about

12   Mr. Baker?  His son is at UVA, he has undergone administrative

13   review.  He is obviously pretty upset about it.

14         Is there any objection to excusing him?

15         MR. RINALDO:  Not from me, Your Honor.

16         MS. PATTERSON:  No, Your Honor.

17         THE COURT:  All right.  Then Mr. Baker.

18         Mr. Mathalon, who is --

19         MR. RINALDO:  What's that number, Your Honor?

20         THE COURT:  27.  His girlfriend was assaulted and he

21   is pretty upset about it.  He said he couldn't be fair and

22   impartial.

23         Any objection?

24         MR. RINALDO:  No objection, Your Honor.

25         MS. PATTERSON:  No objection.

1          THE COURT:  All right.  That's my immediate list.

2          Mr. Rinaldo, do you want to go first?

3          MR. RINALDO:  Do you want me to go first?

4          THE COURT:  Yes, sir, go ahead.

5          MR. RINALDO:  I think a combination of the answers

6   from Ms. Allen, number 1, based on several answers she gave.

7   And her hesitation about whether she could be fair and

8   impartial in at least two areas, I think it would be fair to

9   excuse her for cause.

10          THE COURT:  Okay.

11          MS. PATTERSON:  We have no objection to that, Your

12   Honor.

13          THE COURT:  You have no objection?  All right, I

14   think that she did kind of -- I had to work her over a little

15   bit to get her to say she would be fair and impartial, and I

16   think that's fair.  We will excuse Ms. Allen.

17          MR. RINALDO:  Number 6, Ms. Buker, her son works in

18   human trafficking for the FBI and so forth.  There were a

19   couple of them.  And she also on the other hand said that she

20   wasn't -- somebody wasn't treated fairly by the system at all.

21   Somebody who is a cousin accused of sexually inappropriate

22   conduct in Puerto Rico.  It kind of cuts both ways.

23          I am thinking maybe -- I mean, one is on each side of

24   that issue.

25          THE COURT:  Yeah.

1          MS. PATTERSON:  Your Honor, I think, as Mr. Rinaldo

2     pointed out, she kind of cut both ways and she said that she

3     could be fair and impartial.

4          MR. RINALDO:  If you want to leave her in there,

5     that's okay.

6          THE COURT:  Yeah.  I am going to leave her in there.

7          MR. RINALDO:  At least as a cause issue.

8          THE COURT:  Right.  And you will have an opportunity

9     to strike her.  So we will leave Ms. Buker on.  Your exception

10    is noted.

11         MR. RINALDO:  Right.  What about Mr. Diaz with the

12    next door neighbor who was convicted of sex trafficking.

13         THE COURT:  Yeah, and he gave some confusing answers.

14         MR. RINALDO:  He did.

15         THE COURT:  But he ended by saying, I want you to

16    know I can be fair and impartial.

17         MR. RINALDO:  I know how he ended.

18         THE COURT:  He didn't know these people personally,

19    he just heard --

20         MR. RINALDO:  -- from the mother.

21         THE COURT:  Of the defendant.

22         MR. RINALDO:  He helped him get a lawyer.

23         THE COURT:  Right.  I just don't see that that

24    experience --

25         MR. RINALDO:  Okay.

1    THE COURT:  -- is going to bias him or prejudice him

2  against, especially against Mrs. Howard.  I mean, he was more

3  empathetic to the defendant and his family.

4    MR. RINALDO:  All right.

5    THE COURT:  I am not going to excuse Mr. Diaz.

6    MR. RINALDO:  What about Ms. Kobylinski, number 24,

7  counselor for young women victims?

8    THE COURT:  Yeah.

9    MR. RINALDO:  I mean, I didn't really have a problem

10  until we got to that at the end.

11    THE COURT:  Yeah.

12    MR. RINALDO:  Young women victims being assaulted by

13  older people.  I mean, really, Your Honor --

14    THE COURT:  What did she say?  She said she worked

15  with pregnant --

16    MS. PATTERSON:  She said worked --

17    THE COURT:  Pregnant teenagers, right.

18    MR. RINALDO:  Young women victims, generally

19  expectant mothers who had been victims --

20    THE COURT:  Did she say victims?

21    JUROR ALLEN:  Yes, she specifically said young women

22  victims because I wrote that down.

23    MS. PATTERSON:  I have that it was young women, Your

24  Honor.  It may have been victims.  But in any case, she didn't

25  say anything about whether they were victims of sexual assault

1   or rape.  She just said that they were young expectant mothers.

2          THE COURT:  Well, the question was, have you worked

3   with rape victims or sexual assault victims.

4          MR. RINALDO:  Yes.

5          THE COURT:  So that was the question which would

6   bring it up.

7          MR. RINALDO:  I do have a pretty specific

8   recollection she used the term "victims" there.

9          THE COURT:  All right.  She did say she could be fair

10  and impartial, and she is not in that position --

11         MR. RINALDO:  She is not in the position anymore.

12         THE COURT:  -- anymore.

13         MS. PATTERSON:  She said it was years ago.

14         MR. DeLORME:  Seven years ago.

15         THE COURT:  Four or five years ago.

16         MR. DeLORME:  Seven years ago.

17         MR. RINALDO:  That's the one whose father worked with

18  child labor too, but he's gone.

19         THE COURT:  I am going to excuse Ms. Kobylinski.

20         MR. RINALDO:  You will?

21         THE COURT:  Yes.

22         MR. RINALDO:  Any others?

23         MR. BATTLE:  No, that's my list too.

24         MR. RINALDO:  I think that's -- it's always nice to

25  have a lawyer on the jury.

1          THE COURT:  What number?

2          MR. RINALDO:  Hoffman.  I think that it was his name,

3    yeah.

4          THE COURT:  Hallman, right?

5          MR. RINALDO:  Oh, Hallman, juror number 18.  I don't

6    think that it's a cause excuse, Your Honor, but based on my own

7    personal trial history, I once let a lawyer on the jury and he

8    proceeded to, in a federal case, to take them from 5/1 to 0/6

9    because he gave them a lecture on proximate cause.

10          THE COURT:  All right.

11          MR. RINALDO:  But I don't think it's a fair strike

12    for cause.  I just thought I would pass that along.

13          THE COURT:  Okay.  Thank you.  We are not going to

14    excuse Mr. Hallman.

15          MS. PATTERSON:  Ms. Leonard, who is number 25.  She

16    mentioned that she was -- her husband is a Sergeant, and she

17    seemed to demonstrate some reluctance to be fair and impartial.

18    She said she was a school counselor and worked with victims

19    that sometimes made false accusations and sometimes didn't.

20    And so, I think that would potentially influence her.

21          MR. RINALDO:  That was the person whose grandfather

22    was in the foreign service, right?  I think.

23          MR. SALINAS:  Yes.

24          THE COURT:  Ms. Leonard's husband works for the

25    Loudoun County Sheriff's Department and she is the school

1    counselor.

2              MR. RINALDO:  Right.

3              THE COURT:  So you want her excused for cause?

4              MS. PATTERSON:  Yes.

5              THE COURT:  She is very close to these matters and

6    has an awful lot of history.

7              MR. RINALDO:  I am okay with that, Your Honor.

8              THE COURT:  So we will excuse Ms. Leonard.

9              Anybody else for you, Mr. Rinaldo?

10             MR. RINALDO:  No.  Is that all you have, Melissa,

11   because that was the only one she was listing.  I thought I

12   would give her a fair chance.  I went through my list.  Let me

13   see if I missed anybody while she is doing that.

14             MS. PATTERSON:  We don't have anyone else.

15             MR. RINALDO:  Oh, yes, Whitaker, number 41.  Mother

16   and cousin both sexually assaulted.  I know what she said,

17   but --

18             THE COURT:  One was prosecuted, one was not.

19             MR. RINALDO:  Yes.

20             THE COURT:  She said she could be fair and impartial.

21   I am not going to strike her for cause.

22             MR. RINALDO:  Okay.

23             THE COURT:  All right.

24             MR. RINALDO:  I think those are the only ones I have.

25             THE COURT:  All right.  Then we will go finish jury

1    selection and then take a break.

2           MR. RINALDO:  Are you going to take the lunch break

3    when we finish jury selection?

4           THE COURT:  Probably.  What time is it now.

5           MR. RINALDO:  It is 12:30 now.

6           THE COURT:  Yeah, we will take a lunch break.

7           MR. RINALDO:  Pretty near anyway.

8           THE COURT:  So I will put six in the box.  Each of

9    you have three strikes.  If you don't strike somebody, they are

10   in, they stay in.

11          We fill back up the box.  We will go back and forth

12   and give you the opportunity to strike as we fill the box up

13   each time.  Either after you run out of strikes or --

14          MR. RINALDO:  Then you're done.

15          THE COURT:  You're done.  And then we will call four,

16   and each of you are required to strike one, and that will be

17   our six and two alternates.

18          MR. RINALDO:  I think it makes sense to do that

19   before the lunch break.  Then you can excuse everyone else.

20          THE COURT:  Yes.

21          MR. RINALDO:  That's what I thought.

22          MS. PATTERSON:  Thank you, Your Honor.

23          MR. RINALDO:  Thank you, Your Honor.

24          THE COURT:  Yes, thank you.

25          NOTE:  The side-bar discussion is concluded;

1    whereupon the case continues before the jury panel as follows:

2    BEFORE THE JURY PANEL

3         THE COURT:  All right.  Thank you all.  We are going

4    to proceed to selection of our jury at this time.

5         I assure you, we will be calling names randomly.  And

6    if you hear your name being called, please proceed to Mr.

7    Ruelas and he will tell you where to go.

8         So let's go ahead.

9         THE CLERK:  Ladies and gentlemen, as I call your

10   name, would you please come forward and have a seat in the jury

11   box as instructed by the Court Security Officer.

12        Juror number 17, Rachel Gumbel.  Juror number 11,

13   Ivan Diaz.  Juror number 13, Bridget Dwyer.  Juror number 22,

14   Johnson Huang.  Juror number 12, Angela Dodge.  And juror

15   number 7, Melinda Burney.

16        NOTE:  The lawyers exercise their strikes.

17        THE CLERK:  The following jurors may return to their

18   seats in the courtroom.  Juror number 7, Melinda Burney.  Juror

19   number 12, Angela Dodge.  Juror number 11, Ivan Diaz.

20        NOTE:  The above-named jurors return to their seats

21   in the courtroom.

22        THE CLERK:  As I call your name, would you please

23   come forward and have a seat in the jury box as instructed by

24   the Court Security Officer.  Juror number 43, Eric Wojcik.

25   Juror number 4, Jason Brownlow.  And juror number 26, Susan

88

1    Mason.

2              NOTE:  The lawyers exercise their strikes.

3              THE CLERK:  The following juror may return to their

4    seat in the courtroom.  Juror number 26, Susan Mason.

5              NOTE:  The above-named juror returns to her seat in

6    the courtroom.

7              THE CLERK:  As I call your name, would you please

8    come forward and have a seat in the jury box as instructed by

9    the Court Security Officer.  Juror number 38, Christine Swann.

10             NOTE:  The lawyers exercise their strikes.

11             THE CLERK:  The following juror may return to their

12   seat in the courtroom.  Juror number 38, Christine Swann.

13             NOTE:  The above-named juror returns to her seat in

14   the courtroom.

15             THE CLERK:  As I call your name, would you please

16   come forward and have a seat in the jury box as instructed by

17   the Court Security Officer.  Juror number 30, Bryan Plawecki.

18             NOTE:  No further strikes are taken.

19             THE CLERK:  As I call you're name, would you please

20   come forward and have a seat in the jury box as instructed by

21   the Court Security Officer.

22             Juror number 28, Curtis Melvin.  Juror number 19,

23   Brian Hobbs.  Juror number 42, Christian Willmore.  Juror

24   number 35, Mary Shannon.

25             NOTE:  The lawyers exercise their strikes.

1          THE CLERK:  Will the following jurors please return

2   to their seats in the courtroom.  Juror number 19, Brian Hobbs.

3   And juror number 28, Curtis Melvin.

4          NOTE:  The above-named jurors return to their seats

5   in the courtroom.

6          THE COURT:  Any objection to the composition of the

7   jury?

8          MS. PATTERSON:  One moment, Your Honor.

9          THE COURT:  Yes.

10          MS. PATTERSON:  No, Your Honor.

11          MR. RINALDO:  No, Your Honor.

12          THE COURT:  All right.  Thank you.

13          All right, let's swear our jury then, please.

14          THE CLERK:  Jurors, would you now stand, raise your

15   right hand, and after the oath is administered respond by

16   stating "I shall."

17          NOTE:  The jury for the case is duly sworn.

18          THE COURT:  Joe, do our jurors need to go to a

19   different courtroom and go this process again today?

20          COURT SECURITY OFFICER:  No, sir, they are good to

21   go, but they need to call the 800 number today.

22          THE COURT:  All right.  Thank you all for coming in

23   and making yourselves available for service today.

24          You know, our system of justice is the greatest in

25   the world because of the contribution you make, bringing your

1   experiences, and your common sense, and your attention to

2   considering the very serious matters that we have here on a

3   daily basis.  And I'm so thankful to each and every one of you

4   that you made yourselves available today.

5           I hope that those of you who have not served on a

6   jury to date will get the opportunity.  It's an incredible

7   experience.  It is not only of great benefit to the community,

8   but I think personally it's a difficult but a very rewarding

9   and important work that you would have the opportunity to do.

10          So I know I will hear the collective sigh of relief

11  out at the elevator that you weren't chosen today, but I hope

12  you do that the opportunity very soon to serve as jurors.

13          Thank you all so much.  You are excused at this time.

14          NOTE:  Those jurors not selected for jury duty are

15  excused and leave the courtroom.

16          THE COURT:  All right, ladies and gentlemen, I am

17  going to give you some preliminary instructions, and then we're

18  going to take a lunch recess.

19          There will be telephones in the back and restrooms,

20  and you can call anybody that you need to call and tell them

21  you won't be around this afternoon the way you hoped you would

22  be.  So I will just take a few minutes now and give you some

23  preliminary instructions, and then we will break until

24  2 o'clock.

25          The first order of business is opening statements.

1   The attorneys for both sides will have an opportunity to make

2   an opening statement outlining their case.  Neither attorney is

3   required to make an opening statement.

4         Those opening statements will explain to you what

5   they expect the evidence to be, and they do so to help you

6   understand the evidence as it is presented through witnesses

7   and documents and other exhibits.  It will make you aware of

8   any differences and conflicts that the attorneys foresee in the

9   evidence that you will hear.

10         It is important for you to keep in mind that what the

11   lawyers say in their opening statements is not evidence.  You

12   must not consider it as so.

13         After opening statements, the plaintiff will

14   introduce its evidence.  Once that is concluded, the defendant

15   has the right to introduce evidence if they so desire.  If the

16   defendant produces evidence, the plaintiff may then introduce

17   rebuttal evidence to address those issues raised by the

18   defendant.

19         At the conclusion of all the evidence the attorneys

20   may present their closing arguments to summarize and interpret

21   the evidence for you.  In their closing arguments, they will

22   refer to testimony you have heard.  But here again, what the

23   lawyers say is not the evidence.  Their arguments are based on

24   their personal recollection of the evidence.

25         It's your recollection, the jury's recollection of

1   the evidence that governs the outcome of the case.

2          At the time of closing arguments, either before or

3   after, I will instruct you on the law.  And these instructions

4   are the law that is applicable to this case.  And it's your

5   duty to follow those instructions carefully.

6          After you have heard the instructions and the closing

7   arguments, you will retire, select a foreperson, and deliberate

8   and arrive at your verdict.

9          It's important to keep in mind during your jury

10  service that you must not be influenced to any degree by any

11  personal feelings of sympathy for or prejudice against any

12  party in this suit.  Each party is entitled to the same fair

13  and impartial consideration.

14         As I indicated during voir dire, the plaintiff is

15  testifying under a pseudonym, and you're not to consider that

16  in any way either for or against either party or try and

17  speculate why that is occurring.  It's a convenience that is

18  done under my instructions, and you should not consider it any

19  further.

20         It's your duty to determine the facts from the

21  evidence and the reasonable inferences arising from such

22  evidence.  And in doing so, you must not engage in guesswork or

23  speculation.

24         The evidence from which you will find the facts will

25  consist of the testimony of the witnesses, documents, and other

1    exhibits entered into evidence and facts that the lawyers agree

2    or stipulate to or that I may instruct you on.

3           The admission of evidence is governed by rules of law

4    and evidence that have been developed over many years.  And the

5    purpose of these rules is to protect the fairness and accuracy

6    of the fact-finding process in which you are engaged.

7           From time to time it may be the duty of the lawyers

8    to make objections.  It's my duty to rule on those objections

9    and determine whether you can consider certain evidence.  You

10   must not concern yourself with any objections or hold it

11   against either attorney for making an objection.  It is their

12   duty to fully represent their client's interest.

13          You must not consider testimony or exhibits to which

14   an objection was sustained or which I have ordered stricken.

15   If an objection is overruled, treat the answer like any other.

16   If you're instructed that some item of evidence is received for

17   a limited purpose only, you must follow that instruction.

18          Statements, arguments, and questions by lawyers are

19   not evidence.  It's also important for to you keep in mind that

20   no statement, ruling, gesture, or remark that I make during the

21   course of the trial is intended in any way to indicate my

22   opinion of the facts.

23          You are to determine the facts of this case, and you

24   alone must decide upon the believability of the evidence, it's

25   weight and value.

1          You must not consider anything you have seen or heard

2     outside the courtroom.  You are to decide this case solely on

3     the evidence presented here in the courtroom.

4          There are two kinds of evidence, direct and

5     circumstantial.  Direct evidence is the direct proof of a fact,

6     such as testimony of an eyewitness.  Circumstantial evidence is

7     proof of facts from which you may infer or conclude that other

8     facts exist.  I will give you further instructions on these as

9     well at the end of the case, but keep in mind that you may

10    consider both kinds of evidence.

11         In considering the weight and value of the testimony

12    of any witness, you may take into consideration the appearance,

13    attitude, and behavior of the witness, the interest of the

14    witness in the outcome of the trial, the relation of the

15    witness to any party in the case, the inclination of the

16    witness to speak truthfully or not, the probability or

17    improbability of the witness' statement, and all other facts

18    and circumstances that are in evidence.

19         Thus, you may give the testimony of any witness such

20    weight and value as you may determine that witness' testimony

21    is entitled to receive.

22         Pay careful attention to the testimony of the

23    witnesses because, contrary to what you may have seen on

24    television, it's not possible to call a witness back or read

25    his or her testimony to you while you are deliberating.

1      This is a civil case.  The plaintiff has the burden

2   of proving their case by what's called a preponderance of the

3   evidence.  That means the plaintiff has to produce evidence

4   which considered in the light of all the facts leads you to

5   believe that what the plaintiff claims is more likely true than

6   not.

7      To put it differently, if you were to put the

8   plaintiff's and the defendant's evidence on opposite sides of

9   the scales, the plaintiff would have to make the scales tip

10   somewhat on their side.  If the plaintiff fails to meet this

11   burden, the verdict must be for the defendant.

12      Those of you who have sat in on criminal cases or

13   watched TV regarding them, you may have heard of proof beyond a

14   reasonable doubt.  That does not apply to a civil case.

15   Therefore, you should not consider it.

16      Until the case is submitted to you for deliberation,

17   you must not discuss the case among yourselves or with anyone

18   else.  And you must not remain within hearing of anyone who is

19   discussing the case.

20      To avoid the possible appearance of impropriety, I

21   strongly urge that until the case is concluded, you should not

22   talk at all with anyone connected with this case as a party,

23   witness, attorney, or me.

24      Do not read or listen to anything touching on this

25   case in any way.  If anyone should try to talk to you about it,

1    bring it to my attention promptly.  Do not try to do any

2    research or investigation of the case on your own.

3         After the case has been submitted to you, you must

4    discuss the case only in the jury room when all members of the

5    jury are present.  You are to keep an open mind and you should

6    not decide any issue in this case until the case is submitted

7    to you for your deliberation after the instructions.  Remember,

8    there are two sides to every story.

9         We will have notes and -- a notebook and pen for you.

10   If you decide to take notes, you must leave them in the jury

11   room when you leave at night.  And remember that they are for

12   your own personal use and they are not to be given or read to

13   anyone else.

14        For planning purposes, I take a morning recess of

15   15 minutes, mid-morning and mid-afternoon, and we'll take an

16   hour for lunch.  And we will go from -- well, we will talk

17   about that, but I generally go from 9 to about 5:30 in the

18   evening.

19        When you are excused for recesses, please go directly

20   to the jury room.  And as I said, there are restrooms and a

21   telephone there.  And we will make you as comfortable as we

22   can.  And any questions that you may have, Mr. Ruelas will be

23   available, and he is kind of the guy that is in charge, and any

24   questions that you have, please ask him.  We will do the best

25   we can to accommodate you while you are here.

1          I am going to require a rule on witnesses for the

2    parties.  Meaning that the witnesses will be excluded from the

3    courtroom with certain exceptions.  So that when they testify,

4    they are testifying from their own recollection and not after

5    listening to other witnesses who have testified here in the

6    courtroom while they observed it.  And they, of course, are

7    required not to discuss the testimony that has been given here

8    in the courtroom or that they are about to give with any of the

9    other witnesses prior to testifying.

10          All right.  Then that concludes my preliminary

11   instructions.  We're going to break now, we will come back at

12   2 o'clock, and we will have opening statements at that time.

13          All right, you are excused.  Thank you.

14          NOTE:  At this point the jury leaves the courtroom;

15   whereupon the case continues as follows:

16   JURY OUT

17          THE COURT:  All right.  How much time do you need for

18   opening statements?  Did I ask you that already?  I can't

19   remember.

20          MR. RINALDO:  You did not.

21          THE COURT:  How much time do you need, Ms. Patterson?

22   Are you going to give the opening?

23          MS. PATTERSON:  Your Honor, I would expect it to be

24   somewhere around 15 to 20 minutes.

25          MR. RINALDO:  Probably about the same.

1          THE COURT:  All right.

2          MR. RINALDO:  Your Honor, I have a question.

3          THE COURT:  Yes, sir.

4          MR. RINALDO:  Would the Court consider -- do you mind

5     if I ask from over here?

6          THE COURT:  Well, Mr. Linnell usually will take care

7     of you if you try that.

8          MR. RINALDO:  Okay.  Thank you, Your Honor.  I won't

9     make that mistake again.

10         Would the Court consider giving the -- remember, we

11    had a long talk about media instruction and using Facebook and

12    Snapchat and things like that.  Would the Court consider giving

13    that before they leave for the day today?  I was hoping we

14    could do it before lunch, but we should be all right there.

15         THE COURT:  I think we will be fine.  I will do that.

16    I realize --

17         MR. RINALDO:  I know I have one that I took out of

18    O'Malley, and I think you probably have one too, on using

19    those.

20         MS. PATTERSON:  We did not include one.

21         MR. RINALDO:  Oh, they did not include one.

22         THE COURT:  Certainly.  As soon as they come back I

23    will remind them, and I will remind them at the end of the day

24    as well.  As I indicated to you, I give them a good going over

25    at the end of the day and then first thing in the morning.

1          MR. RINALDO:  Because of the specific nature of this

2    case and what is available out there, I know what's available

3    out there, it would be really bad if somebody went out there.

4          THE COURT:  I understand.  I don't see that we're

5    going to get any publicity on this case.

6          MR. RINALDO:  No, but anybody who looks up that name

7    on the Internet, my client's name on the Internet, it's the

8    first thing that comes up.

9          THE COURT:  Okay.  All right, understood.  And I will

10   be happy to give that instruction when they come back and also

11   at the end of the day.

12         MR. RINALDO:  Thank you, Your Honor.

13         THE COURT:  And each day.  All right, anything else

14   before we break for lunch?

15         MR. RINALDO:  No, Your Honor.

16         MS. PATTERSON:  No, Your Honor.

17         THE COURT:  Okay.  Then we're in recess, we will come

18   back at 2 o'clock.

19         NOTE:  At this point a lunch recess is taken; at the

20   conclusion of which the case continues in the absence of the

21   jury as follow:

22   JURY OUT

23         THE COURT:  All right.  Are we ready for our jury?

24         MR. BATTLE:  Yes.

25         THE COURT:  Okay.  Joe, let's get our jury, please.

1          NOTE:  At this point the jury returns to the

2     courtroom; whereupon the case continues as follows:

3     JURY IN

4          THE COURT:  Ladies and gentlemen, I gave you a little

5     speech about deciding the case only on the evidence that you

6     hear in the courtroom and not doing any investigation, or

7     research, or speaking to anybody about it.  And that's

8     critically important, especially in this day and age when there

9     is all forms of social media available and resources to make it

10    very easy to pretty much research any issue you want or

11    investigate whatever you want.  We do it every day on a regular

12    basis.

13         You just can't do it in this case.  It will

14    fundamentally deny the parties here an opportunity to have a

15    verdict based just on the evidence that is here.

16         If disclosed, it will cause a mistrial and the case

17    will have to be tried again.  And it also can be a basis for a

18    civil contempt before me, which is not a really wonderful

19    alternative either.

20         So it's really, really important, and I appreciate

21    your taking that into consideration.

22         All right, Ms. Patterson, opening statement.

23         MS. PATTERSON:  Thank you, Your Honor.

24         THE COURT:  Please, proceed.

25         MS. PATTERSON:  May it please the Court.

1          Members of the jury, Russell needs a friend.  Ms.

2     Sarah Roe will testify that the Howards told her at her first

3     interview to be their live-in housekeeper that Russell needs a

4     friend.

5          And when Ms. Sarah Roe moved into their house as

6     their live-in housekeeper, Linda Howard told her, the most

7     important part of your job is to make Russell happy.

8          Ms. Roe didn't know what those words meant, but make

9     no mistake, the defendant, Linda Howard, knew exactly what it

10    took to make Russell Howard happy.  She knew exactly what sort

11    of friend her husband wanted.

12         And today's case is about how Linda Howard targeted

13    Ms. Sarah Roe, befriending her to be Russell's friend.  About

14    how Linda Howard recruited Sarah to work in that household so

15    that Russell Howard could rape and sexually assault Ms. Roe to

16    make him happy.

17         Members of the jury, today's case is about how Linda

18    Howard executed a plan to target and recruit Sarah Roe all in

19    order to keep Russell happy.

20         Members of the jury, as I introduced myself earlier,

21    my name is Melissa Lim Patterson.  And I, along with my

22    colleague Andres Salinas and Carter DeLorme, represent our

23    client, Sarah Roe.  Thank you again for your time and your

24    service today.

25         This is Sarah Roe.  She is from Ethiopia, which is a

1  largely Christian country in Africa.

2          Now, when Sarah was growing up, she didn't have a lot

3  of money.  And so, when she was 14, she acquired a work visa to

4  move to Sana'a, Yemen.  Sana'a is about 600 miles from Addis

5  Ababa where Ms. Roe is from.  It's a long ways for a young

6  girl, for a 14-year-old.  But Sarah had an obligation to her

7  family to take care of her mother, her father, and her two

8  younger brothers.  And so, she did it.  And over the course of

9  the next few years, she worked in Yemen.

10          When she was 20 years old she met the Howards.  She

11  met them at the U.S. Embassy in Sana'a where the defendant,

12  Linda Howard, worked.  And Ms. Roe, she was working at a

13  restaurant called Uncle Sam's on the U.S. Embassy complex.  And

14  the Howards took an immediate liking to Ms. Roe.  You are so

15  beautiful, Russell would say.  Why don't you come work for us.

16          Linda Howard would approach Ms. Roe, give her kisses

17  on the cheek, chat with her about her day.  Come work for us,

18  she said.

19          To be frank, Ms. Roe was 20, she was flattered by the

20  attention that this older, worldly couple were putting on her.

21  At the time Linda Howard was in her late '40s and Russell

22  Howard was in his 50s.

23          And while Ms. Roe was flattered, she decided to

24  reject their job offer because she had another job.  But over

25  the course of the next two years, Ms. Roe would become friends

1   with Linda Howard.  She would grow to think of Linda Howard as

2   a mother, just like Linda planned.

3         When Sarah needed a job, when she needed help

4   navigating her project at the U.S. Embassy, she turned to Linda

5   Howard, and Linda Howard was there.  She waited patiently,

6   befriending Ms. Roe, answering her call for help.  Linda Howard

7   tricked Ms. Roe into trusting her.

8         And what was there not to trust?  Linda Howard was a

9   U.S. State Department employee, a U.S. diplomat.  She was

10  older, worldly, and wise.  She was accompanied by her now

11  deceased ex-husband Russell Howard, who was an Australian

12  diplomat before he retired in the early 2000s.

13        The Howards were in Sarah Roe's eyes trustworthy.

14  She thought of them like parents.  And that's exactly how they

15  planned it.  And it's because of that trust that when 22-year

16  old Sarah once again needed a job, she turned to Linda Howard.

17        Ms. Roe had just returned from Ethiopia where she was

18  caring for her sick mother.  And when she got back to Yemen,

19  the bills were beginning to pile up.  She had lost her previous

20  job because she had to go to help her mother.  The rent was

21  due.  She had searched for weeks to find a job.  She didn't

22  know what to do.  She was desperate.  And she called Linda

23  Howard.

24        And as luck would have it, Linda Howard suddenly

25  needed a new housekeeper.  She told her, I'm out of the country

1  right now, but when I get back, let's talk.

2           Sarah was relieved.  And so, she went in to interview

3  with the Howards.  She didn't think anything was out of the

4  ordinary.  She went to the interview.  And then the Howards

5  began making demands.  Give up your apartment, they said.  You

6  have to come live with us.  They said, you need to sell your

7  things, you can't bring your things into our home.

8           Sarah was left with no choice, she needed a job.  And

9  plus, the Howards had promised that they would help her renew

10  her work visa.  They promised her that they would help her get

11  medical care.  Most importantly to Sarah, they promised her

12  that they would help her take care of her family.  So Sarah

13  accepted.

14          A few days later after Sarah had sold many of her

15  things, such as her refrigerator, her stove, and her laundry

16  machine which she was storing to bring back to her mom, she

17  moved into the Howards' home.  And on that first day Linda

18  Howard came to her and said, the most important part of your

19  job is to make Russell happy.

20          Sarah didn't really know what that meant.  But Linda

21  hour did.  And on that first day when Sarah moved in, Linda

22  Howard went to work as usual, 7 a.m. in the morning.  And she

23  left Sarah Roe alone with her husband, Russell Howard.

24          And now, the first night that Sarah was with the

25  Howards, the Howards had told her that she would need to wear a

1    uniform, and they had told her that during the interview.  And

2    Sarah wasn't surprised, that was fine.  But when she moved into

3    the home, bereft of her things, the Howards finally presented

4    her with the uniform.  And when Sarah looked at it, she saw

5    that the shirt was extremely low cut.  She saw that the skirt

6    came up to here.

7            Sarah was embarrassed.  Sarah felt as though this was

8    something she just couldn't wear.  And so, she just couldn't

9    wear it.  She thought that was the end of it.

10           But during that first week Russell Howard took her to

11   the store.  He didn't say why, but they went to the mall, and

12   Russell began picking out some clothing.  It was actually some

13   lingerie.  Sarah had assumed that this was for Russell Howard's

14   wife, Linda Howard.  But when they returned home, Russell

15   Howard gave Sarah Roe that lingerie and said, this is your

16   uniform.

17           Again, Sarah didn't know what to do.  This was her

18   boss telling her what she needed to wear.  She said, no.  She

19   made Russell his lunch and then retreated back into her room.

20           Members of the jury, Sarah will tell you that a few

21   moments later Russell followed.  He fills up her door frame.

22   And, members of the jury, you won't meet Russell Howard, but he

23   is not a small man.  Sarah comes up only to his shoulder.  And

24   as he is standing there, she can see that he is angry.  He is

25   determined.  And he's naked.

1            And as he stocks into her room, Sarah backs into a

2    corner.  She is scared, she is confused.  Russell Howard grabs

3    her.  You're so beautiful, he says.  And then he throws her

4    onto her bed.  He rips her clothes.  He pins down her arms.

5    And then he pins her down on the bed and he climbs on top.  And

6    as Sarah cries, Russell rapes her.  You'll get used to it, he

7    said.  It's part of your job.

8            Members of the jury, that day began a nearly daily

9    routine of sexual assaults and rapes for the next six months.

10   And the evidence will show that Linda Howard knew about the

11   entire -- the entire extent and scope of Russell Howard's

12   sexual assaults and rapes.

13           Ms. Roe will testify that she overheard conversations

14   between the two when Russell Howard would report to Linda

15   Howard what he was doing.  She will tell you about how he took

16   her to a hospital and forced her to get an IUD.  She will tell

17   you about how they would talk during the day and laugh about

18   it.

19           Members of the jury, the evidence today and

20   throughout the trial will show that Linda Howard was an active

21   and willing participant in this scheme.  And it will show you

22   that Linda Howard recruited and targeted Ms. Roe to be Russell

23   Howard's friend, all in violation of the Trafficking Victims

24   Protection Act, a federal statute designed to protect people

25   from sex trafficking and forced labor.

1          Now, before you hear from Ms. Roe, you will also hear

2    from a number of other witnesses.  The first witness you will

3    hear from is a Mr. Michael Meszaros, who is a former and

4    retired State Department employee.

5          Mr. Meszaros also served abroad in Yemen and knew the

6    defendants, Linda and Russell Howard.  Mr. Meszaros will tell

7    us about the culture and atmosphere in Yemen.  He will tell you

8    that he lived in the same housing complex as the Howards.  And

9    he will tell you about the Yemeni system.  And most

10   importantly, about the corruption there.

11         Mr. Meszaros will also tell you about his personal

12   interactions with the Howards.  And what is important is he

13   will tell you about how, at least in Yemen, it was uncommon for

14   people to have live-in help.

15         Finally, he will tell you about his own personal

16   observations of the Howards, particularly Linda Howard with her

17   housekeeper.  Those housekeepers, such as Jane Doe.

18         Jane Doe will also come and testify, and she will

19   tell you about her experience in the Howards' home.  She will

20   tell you about how Linda Howard -- she grew to think of Linda

21   Howard has a mother as well.  She will tell you about the close

22   relationship she had with Linda Howard, a very similar

23   relationship as Sarah Roe had.

24         Most importantly, members of the jury, as you listen

25   to Jane Doe's testimony, you will learn that Sarah Roe was not

1    the first nor the last.  Jane Doe will tell you about how

2    Russell Howard also overpowered her.  How he also sexually

3    assaulted her.  And how he also raped her while she worked in

4    his home.

5           Finally, members of the jury, before you hear from

6    Ms. Roe, you will hear from Florrie Burke, who is an expert

7    with decades of experience studying human trafficking.

8           Now, Ms. Burke has worked with the U.S. government

9    and in positions all over the country teaching about human

10   trafficking.  She's spent years interviewing victims, and has

11   decades of experience in this field.

12          And I want to you listen carefully to Ms. Burke's

13   testimony because she'll you about three very important

14   concepts.  She will tell you about coercion, control, and

15   compliance.  And those three concepts are incredibly important

16   for you to understand because it will explain the imbalance of

17   power between victims like Ms. Roe and traffickers like the

18   Howards.  And it will be key for you to understand victims'

19   behaviors.

20          Ms. Burke will come before you and she will testify

21   about the social, economic, and psychological pressures that

22   victims go through, and how traffickers exploit those

23   vulnerabilities to their own ends.

24          Ms. Burke will also tell you about the profile of

25   human trafficking victims.  And she will tell you about how

1  that very profile makes them vulnerable to predators like

2  traffickers.

3       Most importantly, Ms. Burke will tell you about how

4  human trafficking isn't about physical control, but about

5  psychological control.  She will tell you about the pervasive

6  climate of fear that traffickers create.  About how they break

7  down their victims in order to make them compliant.

8       I ask you to listen carefully as Florrie Burke

9  explains the coercive tactics that traffickers use in order to

10 control their victims and ensure their compliance so that you

11 can recognize those very tactics when Ms. Roe testifies that

12 came from the Howards.

13      And finally, Ms. Roe will testify.  When she comes

14 before you, she will tell you about everything that happened in

15 the Howards' home.  She will tell you about how she moved into

16 the home, isolated from her community and isolated from help.

17 She will tell you that when she moved in, that the Howards

18 started to verbally and physically abuse her.

19      She will tell you about how she worked for 80 and

20 90 hours a week with very minimal pay, serving at the Howards'

21 every need.  She will tell you about the interactions between

22 Russell and Linda Howard.

23      Most importantly, members of the jury, Ms. Roe will

24 tell you about the shame that she felt.  She will tell you

25 about how afraid she was.  How afraid that no one, no one,

1    especially in Yemen, would believe her word against the word of

2    two diplomats.

3              Members of the jury, today's case is about power and

4    abuse of power.  It's about how the defendant, Linda Howard,

5    targeted Ms. Roe.  How she recruited Ms. Roe.  And how she and

6    Russell Howard engaged in a scheme to force Ms. Roe into sexual

7    labor for Russell Howard's pleasure.

8              And because of that, at the end of trial in a few

9    days I will come before you again and I will ask that you find

10   Linda Howard liable for the acts that she committed and provide

11   Ms. Roe with lawful compensation.

12             We'll also ask that you find for punitive damages

13   against Mrs. Howard for her willful acts in exploiting Sarah

14   Roe.

15             Thank you.

16             THE COURT:  Thank you, Ms. Patterson.

17             Mr. Rinaldo.  Please proceed.

18             MR. RINALDO:  Thank you, Your Honor.  Good afternoon.

19             Ladies and gentlemen, Russell Howard is dead.  He

20   died on September 4, 2012.  That's an undisputed fact.  He

21   can't defend himself today against these charges.

22             Linda Howard is right here in the courtroom.  She can

23   defend herself against these charges, and that is exactly what

24   she is going to do.

25             This morning when Judge O'Grady was talking to you

1    about some of your instructions, he talked about the concept of

2    credibility.  And what he said was, if I can dare to probably

3    misquote him a bit, it was, you have to gauge the probability

4    or improbability of the witnesses' testimony.

5         That's what you, ladies and gentlemen, are going to

6    have to do today because this set of purported facts did not

7    happen.

8         What happened in this case is that Linda Howard, a

9    career diplomat with the United States State Department, had

10   gone through a number of postings, starting off with Paris in

11   the early '90s, and eventually through a number of other

12   postings ended in -- ended?  Well, it was one of her postings,

13   in Sana'a, Yemen when they arrived in about 2005, in September

14   in 2005 in fact.

15        Along the way, she met Russell Howard, a career

16   Australian diplomat, a member of the Australian Bureau of

17   Foreign Affairs and Trade, who served about 30 years with the

18   Australian government.  They met in Paris in 1991.  And they

19   were married in 1994.  They remained married until he died in

20   2012.

21        You might note that this case started with the filing

22   of a complaint, as you heard this morning.  The plaintiff in

23   this case waited a full four years after Russell Howard had

24   died before she decided to file this complaint, and that's what

25   happened.

1          What also happened in this case is that when the

2     Howards were posted to Sana'a, Yemen, they found that, like

3     everybody has, I think, that while we may be gathered here in

4     Alexandria, Virginia, in one of the wealthiest and safest

5     nations in the world, that's a lot different than in Sana'a,

6     Yemen.

7          In Sana'a, Yemen, which is the capital of what is

8     called the Republic of Yemen, members of the State Department

9     embassy in Sana'a were required to live in housing on the Hunt

10    Oil Compound, which was a guarded, gated community for security

11    purposes.

12         That compound was about 45 minutes from the embassy.

13    The State Department transported its employees, such as Mrs.

14    Howard, to and from the embassy in an armored car.  They

15    changed the route every day.  They changed the time of pick-up

16    and the time of return every day.

17         Why?  Well, I think those of us who watch the news

18    about the Middle East probably have a pretty good understanding

19    of why.  There are bombings in Sana'a, Yemen.  There are

20    roadside attacks in Sana'a, Yemen.  And the State Department

21    needed to protect its employees, and it needed to protect them

22    where they lived.

23         You didn't have an option in Sana'a in 2005 to 2008.

24    You were required to live on the Hunt Oil Compound.

25         The Ambassador, I believe, lived in the embassy, but

1    that's who got the embassy housing.  That's not the other

2    people who were working there.

3            Obviously, there were Marines there to protect the

4    embassy as well, and they lived in housing as well.

5            So let's talk about that circumstance.  What we have

6    is we have a different world.  We have a different culture.  We

7    have a different environment.  And we have different living

8    conditions.

9            Ladies and gentlemen, that wouldn't excuse any of

10   what Ms. Lim Patterson said this morning.  Nobody is claiming

11   it does.  It didn't happen.  That's what you're going to find

12   in this case, it didn't happen at all.

13           What happened in this case is that in early 2006 Mrs.

14   Howard met the plaintiff, who was working at a

15   restaurant/cafeteria at the embassy.  She was -- I don't

16   remember exactly as I stand here, she was a waitress or a

17   cashier.  The evidence will show you what position she held.

18           That's all.  They didn't become friends.  Nobody

19   targeted anybody.  And eventually what happened is the

20   plaintiff lost her job at the restaurant in the embassy.  And

21   the Howards didn't see her for several months.

22           And then Linda Howard got a call.  Yes, it was Linda

23   Howard that got a call from the plaintiff.  Not the other way

24   around.  She got a call from the plaintiff that says, I lost my

25   job, is there anything that you can do to help find me a job?

1    And Linda Howard said, yeah, I think I can.

2          She got her a job at the embassy doing an entry level

3    data entry position, which was a temporary position that

4    allowed -- that allowed the plaintiff to find employment at the

5    embassy, to get paid for it.  And by the way, she did all the

6    data entry in English, just so we can be clear about that.

7    That project lasted for two or three months.  And then the

8    project ended.

9          The Howards then were on holiday actually in France

10   when Linda Howard got another call.  Linda Howard didn't make

11   another call, she received another call.  And the call was from

12   the plaintiff.  The plaintiff told her, I can't find a job, is

13   there anything you can do to help me?

14         Well, Linda knew that the plaintiff in this case had

15   experience in restaurant work, so she checked around, but

16   couldn't find any restaurant jobs available.  What she said to

17   her was, we'll be back in Sana'a in a few days, come see me.

18   And, you know, we don't have a housekeeper right now, it's not

19   what you do, but we'll interview you and see if maybe you could

20   work for us as a housekeeper until you find something.

21         So when the Howards returned to Yemen, to Sana'a,

22   that's exactly what happened.  What happened was the plaintiff

23   came to their residence.  And let's understand, you're going to

24   know that their residence looked like by the end of this trial.

25         What the residence looked like was that there was

1    a -- essentially what amounted to a three bedroom apartment.

2    It was a two bedroom apartment with an office, a dining room, a

3    kitchen, and so forth, but it also had en suite living

4    quarters.  I didn't know what that was.  But en suite living

5    quarters are a separate bedroom, with its own bath, with a

6    separate door that locked.  And that was the quarters to be

7    used by the housekeeper that was going to live in at the

8    residence.

9           You know, there are a whole bunch of reasons why you

10   have a live-in housekeeper.  If you are a family, a husband and

11   wife where, you know, there aren't any children, you're working

12   10, 12, 14 hours a day, as Linda Howard was, and didn't know

13   when she would go and when she would come.

14          Now, by this time, by the way, Russell Howard had

15   retired as a diplomat with the Australian government.  However,

16   that didn't mean he didn't do anything.  He worked as well as a

17   consultant for the United States Embassy during this period.

18          When he needed to go to the embassy, even though he

19   was an Australian, and even though he was a consultant, they

20   sent an armored car for him too because they couldn't take the

21   chance -- you couldn't go anywhere in that area if you were an

22   American employee.

23          Now, one of the things you need to understand, by the

24   way, is you might hear some talk about the fact that most of

25   the housekeepers, in fact all of the housekeepers that the

1    Howards had, were Ethiopian.  Yep, that's right.  And there is

2    a reason for that.

3         Yemen is predominantly a Muslim country.  Yemeni

4    women as Muslim women are not allowed to be in a house with any

5    kind of a man who is not their husband.  They don't work as

6    housekeepers.

7         When Linda Howard came to Yemen in the -- and by the

8    way, they aren't allowed in restaurants either.  And by the

9    way, neither was Linda Howard allowed in a restaurant in Yemen

10   except for the western hotel restaurants, the Sheraton and two

11   others in Sana'a.  It is a different culture, it's a different

12   environment.

13        And so that you understand how the Howards found

14   their initial housekeeper, Linda went to the embassy

15   communication or Community Liaison Office that had a list of

16   people who might be available to work as housekeepers, as

17   live-in housekeepers.

18        And Linda, the evidence will show you and Linda will

19   tell you, that the list that she got, she was shown, consisted

20   entirely of Ethiopian women who were unmarried because if they

21   are married and they have a family, they're not going to be a

22   live-in housekeeper, and one or two Filipino women who were

23   living in Sana'a.  The vast majority were Ethiopian women.

24        So it is not surprising at all that anybody who had a

25   live-in housekeeper had a woman who was born in Ethiopia.

1   Nothing unusual about that in this environment, in this

2   environment.

3           So when they got back, they interviewed the

4   plaintiff.  And they gave her an explanation of what her duties

5   were.  And they sure were a whole lot different from what you

6   heard Melissa Lim Patterson tell you her duties were.  What she

7   was told was that it was her job to be the housekeeper.  She

8   was supposed to clean the house.  She was supposed to do the

9   laundry.  She was supposed to help Russell Howard with the

10  meals.

11          Why help Russell Howard with the meals?  Because the

12  evidence will show he was a gourmet chef.  And she was supposed

13  to assist, and he could teach her some things at the same time

14  about cooking as a matter of fact, about cooking.

15          And then afterwards, she was supposed to serve dinner

16  when Linda came home from work, and Russell and Linda would

17  have dinner.  She would clean up after dinner.  And she was

18  off.

19          80 to 95 hours a week?  Here is what the evidence

20  will tell you her schedule was.  She worked, she worked

21  Saturday morning through Wednesday.  Because in Yemen, the

22  weekend is Thursday and Friday, for the State Department and

23  for other people.  She worked Saturday morning through

24  Wednesday.

25          On those days, she worked from 9 in the morning to

1   lunchtime.  She had afternoons off.  She was expected to be

2   back by about 4 or so to start helping prepare dinner.  She

3   worked through the end of dinner and cleaning up.  And she

4   usually finished by about 9:30 or so.  And then she was done.

5   And she could go back to her room and watch television, because

6   she had one.  And it was an en suite with a locking door.

7          And Linda will tell you, Linda Howard will tell you,

8   she had a key to that door.  Just like she had a key to the

9   front door of the apartment.  Because one of the things she

10  could do during the daytime was she could go out to the market

11  to get vegetables and things like that.

12         Why did I say Saturday through Wednesday?  Because on

13  Thursday she worked in the morning, she worked until lunchtime,

14  and then she was off.  She had Thursday afternoon and evening

15  off.  She had Friday all day off.  She had no more duties until

16  Saturday morning at 9 o'clock.

17         And the evidence will show you that she didn't spend

18  that time in her en suite room.  She went out.  She went out

19  with her friends.  She went out to do whatever she does.  Linda

20  Howard did not ask her what she was doing when she was out.

21  Mrs. Howard will say, well, that's her personal time, that's

22  none of my business.

23         So the evidence will show you that the plaintiff

24  frequently went out in the afternoon, didn't come home on

25  Thursday night.  Or if she went out, didn't come home on

1   Friday.  And came back on Saturday.  That doesn't sound like

2   being kept locked up to me.  And you're going to have to listen

3   to the testimony.

4        Nobody is suggesting that the plaintiff in this case

5   engaged in inappropriate conduct when she was out.  Linda

6   Howard has no idea because, as Linda will tell you, it wasn't

7   her business.  It was the plaintiff's private time.  But to say

8   that she was afraid to go anywhere is just not true.

9        Now, those were her duties.  And do you know how much

10  she was paid for that?  This isn't Alexandria.  This is Sana'a,

11  Yemen.  She paid -- she was paid $150 a month.  Sounds low.  It

12  was exactly the amount that the plaintiff asked to be paid from

13  the Howards.  $150 a month.

14        And you know what?  The evidence will show that was

15  the going rate for housekeepers in Yemen at about that time.

16  And not only that, it was probably substantially more than

17  Yemeni civil servants were making.

18        And the evidence will show you that you're talking

19  about one of the poorest countries on earth where most of the

20  people are living on a dollar a day.  $150 a month, plus your

21  room, an en suite room where you don't pay any rate, plus your

22  food where you don't have to buy any food, that's not so bad.

23  That's not so bad.

24        What I'm talking about here is the claim of forced

25  labor where she is allegedly underpaid.  She did not work 80 to

1   95 hours a week.  She did not receive slave wages in Yemen.

2   She received a lot more than the average Yemeni commoner made.

3   And she had benefits on top with respect to her living

4   quarters, with respect to buying food, and from time to time

5   other things as well.

6           By the away, it's true that the Howards occasionally

7   bought clothes for her when she needed them.  They didn't buy

8   her a uniform.  In fact, there were some people who wanted to

9   wear uniforms as housekeepers.  In the first interview Linda

10  Howard specifically recalls asking the plaintiff, do you want

11  to wear a uniform or do you want to wear your own clothes?  And

12  the plaintiff said, I would like to wear my own clothes.  And

13  Linda said, fine.  That was the end, that was the end.

14          What you won't hear, you won't hear any testimony at

15  all that anybody ever saw her in a maid's uniform because it's

16  not true, it never happened.

17          Speaking of not hearing from anybody else, what else

18  you're not going to hear in this trial is you are not going to

19  hear a single witness testify that they ever saw, or personally

20  observed, or had personal knowledge of Russell or Linda Howard

21  ever acting inappropriately, sexually or otherwise, with

22  respect to this plaintiff.  There will be no testimony that

23  anybody saw anything bad in this situation.  Or inappropriate

24  at all.  You won't have any testimony about that.

25          You will have the plaintiff's testimony.  And you

121

1    will have Linda Howard's testimony.  And what you need to do is

2    you need to gauge, as Judge O'Grady said, the probability or

3    improbability of the witnesses' testimony.

4          And the improbability of the testimony leads me to

5    one of the next things that you might want to consider.

6    Russell Howard in 2005, 2007, wasn't 25 or 30 years old.  He

7    was in his sixties.

8          This is not a claim where the plaintiff says, well,

9    you know there were four or five occasions when Russell Howard

10   got drunk and sexually abused me.  Nope.  What you're hearing

11   is a plaintiff who claims that every morning right after

12   breakfast Russell Howard came in and raped her.  And then again

13   in the afternoon when she got back from her time off, he did it

14   again.  Over 200 rapes she claims in less than 200 days.  In

15   six months.  That works out to about what, if my math is right,

16   it's about 180 days.  Over 200 rapes.

17         She went out on Thursdays.  She went out on Fridays.

18   She had time off.  She didn't come back after the evenings.

19         Ladies and gentlemen, I want you to think about what

20   this plaintiff is testifying about here.  I want you to think

21   about whether you can believe that this is over the top as far

22   as trying to pin a civil liability for money damages on Linda

23   Howard.  This is called going too far in creating the story,

24   the evidence will show you.

25         You know, with respect to those things -- by the way,

1    you'll also hear testimony about the fact that occasionally the

2    Howards went out to a place called the Marine Club.  The Marine

3    Club was on the base.  It was a place where every other

4    Wednesday or so the Marines hosted personnel for barbecues.

5    They invited staff members of the embassy.  They invited people

6    who were working at the embassy who were Yemeni or Ethiopian,

7    mostly Ethiopian.  But they also invited -- so the plaintiff in

8    this case went to that sometimes.  Sometimes the Howards took

9    her because it was a social event that occurred occasionally.

10   They would have a barbecue.  There would be dancing.

11          And, you know, there aren't a whole lot of places in

12   Yemen that you can go dancing, not if you think you want to

13   return home.  So anyway, the plaintiff in this case would go

14   with them.

15          Well, the Howards, because it was a Wednesday night,

16   the Howards were tired, they usually got home -- they usually

17   left 8, 8:30, and the plaintiff used to get home later than

18   that.  Nothing wrong with that, she's younger.  She used to

19   come in, because Mrs. Howard will testify she could hear the

20   key turn 2, 3 in the morning sometimes.  Nothing wrong with

21   that.

22          But what's wrong with it is saying that she was

23   petrified, she was terrified, she didn't do anything, she had

24   nowhere to go, she was raped two times a day for six months.

25   It doesn't add up, ladies and gentlemen.  And it shouldn't add

1    up because, frankly, it's not true.

2            After about six months -- and by the way, they hired

3    her, I think I told you this before, they hired her to say

4    that, you know, you can work for us until we can find you a job

5    that you like at a restaurant.

6            Well, you know, one of the things that Russell Howard

7    did while he was also working for the embassy was he helped at

8    the Hunt Oil Compound restaurant in order to do their accounts.

9    And so, he had some contacts down there.

10           And I think the evidence will also show that he

11   tended to play cards down there with his friends.  You know,

12   you have sort of limited social opportunities when you are in

13   Sana'a, Yemen in a secured community.  So he would go down

14   there with some of his friends to play cards.

15           And eventually a job opened up.  Eventually a

16   restaurant job opened up.  And you know what, the plaintiff

17   left the employ of the Howards and she got a job at the

18   restaurant.  And you know what, the Howards helped her get the

19   job.

20           You will actually see a letter of recommendation that

21   Linda Howard wrote for the plaintiff.  Now, the plaintiff says,

22   oh, but it was written to keep me quiet.  It was written

23   because the owner of the restaurant, who knew Russell Howard,

24   and who had offered a job to the plaintiff, asked to have one

25   for his files, a recommendation with respect to this plaintiff.

1   And Linda said, sure, I will do that.  And that's exactly what

2   happened in this case.

3          Again, there won't be any witnesses here who will say

4   a thing about ever seeing Russell Howard or Linda Howard do

5   anything inappropriate.

6          But you know, here we are in the United States, as I

7   bring us back to the present.  And here we are with the

8   plaintiff sitting in this courtroom, and not in Sana'a, Yemen,

9   where people earn $150 a month and they think they are happy

10  about it.  The plaintiff here lives in Arlington.  She came

11  here with her daughter in 2014.  She came here with her

12  daughter because she claimed she was the victim of human

13  trafficking.  And because she was the victim of human

14  trafficking and wanted to come here, quote, to defend herself,

15  she came to the United States, the first place she lived was

16  right here in Alexandria, ladies and gentlemen.  And then she

17  moved to Arlington.

18         And she gets to stay here with her daughter.  She is

19  here with her daughter who is in the first grade in school in

20  Arlington, not trying to find out whether she has a school that

21  is not bombed out in Yemen or in Ethiopia.  She is here.

22  That's an undisputed fact.  She is sitting right there.

23         And here we are in 2017, and we're in a courtroom in

24  Alexandria, Virginia, and she is claiming that she was abused

25  both as to forced labor and as to sexual abuse by Russell

1   Howard, who is dead and can't defend himself.  And here we are.

2         At the end of this case, ladies and gentlemen, we're

3   going to ask you the same question I asked you a few minutes

4   ago.  You are going to need to figure out who you believe.

5   That's exactly what you're going to need to do because these

6   two stories are as far different as they could possibly be in a

7   civil trial.  There is no way, there is no way both of these

8   people are telling the truth.

9         I am going to ask you to conclude that Linda Howard

10  is telling the truth.  I am going to ask you to conclude at the

11  end of the trial that in addition to coming to the United

12  States and getting to stay here as she is, which is pretty

13  good, there is no reason to award this plaintiff massive

14  monetary damages on top of it.  Because the fact of the matter

15  is, ladies and gentlemen, this didn't happen.  And she is not

16  entitled to any damages at all.

17        Thank you.

18        THE COURT:  All right.  Thank you, counsel.

19        First witness.

20        MR. SALINAS:  Your Honor, plaintiff's first witness

21  is Mike Meszaros.

22        THE COURT:  All right.

23        NOTE:  The witness is sworn.

24        MICHAEL MESZAROS, called by counsel for the

25  plaintiff, first being duly sworn, testifies and states:

M. Meszaros - Direct

126

1          DIRECT EXAMINATION

2    MR. SALINAS:

3    Q.   Mr. Meszaros, can you please state your full name for the

4    record, please.

5    A.   Michael Meszaros.

6    Q.   Can you spell that, please.

7    A.   M-e-s-z-a-r-o-s.

8    Q.   Mr. Meszaros, do you know the defendant in this case,

9    Linda Howard?

10   A.   I do.

11   Q.   How do you know her?

12   A.   I served at the U.S. Embassy in Sana'a, Yemen from 2008,

13   January 10 of 2008 until March 30 of 2011.  So we overlapped

14   for the year of 2008.

15   Q.   And why are you here today?

16   A.   I'm subpoenaed by the Jones Day law firm.

17   Q.   Okay.  Before I get to your career with the State

18   Department, can I first ask you, when did you graduate from

19   high school?

20   A.   I graduated from high school in 1974.

21   Q.   And What did you do upon graduating from high school?

22   A.   Two weeks later I was in the Marine Corps.

23   Q.   And how long did you serve in the Marine Corps for?

24   A.   Four years, 1974 to 1978.

25   Q.   And when did you do in the U.S. Marine Corps?

M. Meszaros - Direct

127

1    A.    I was a Red Eye gunner, second Red Eye platoon.  It's an

2    anti-air missile, shoulder fired.

3    Q.    You said you served for how many years?

4    A.    Four years.

5    Q.    What did you do upon -- did you serve anywhere abroad in

6    the Marines?

7    A.    I took two floats.  I took a NATO float to Norway,

8    Denmark, and Germany.  And I took a partial Med float to Turkey

9    and Spain.

10   Q.    When were you discharged from the Marine Corps?

11   A.    June of 1978.

12   Q.    And what were the circumstances of your discharge?

13   A.    It was an honorable discharge.  I was a Sergeant.

14   Q.    What did you do upon leaving the Marines?

15   A.    College.  I went to Youngstown State University from 1978

16   to 1983.

17   Q.    Did you obtain a degree from Youngstown State?

18   A.    Political science major and a history minor.

19   Q.    And what did you do after that?

20   A.    Law school, three years at Cleveland State University,

21   1983 to 1986.

22   Q.    And you graduated from Cleveland State?

23   A.    I graduated from Cleveland State Law School in 1986.  I

24   took the Ohio Bar exam in 1986.  Passed the Ohio Bar exam.  I

25   later decided I wanted to see maybe if there were some career

M. Meszaros - Direct

128

1   horizons opened up, so I took the Pennsylvania Bar exam in

2   1990.  And I got a high enough score I could waive into D.C.

3           So I was licensed to practice law in Ohio, currently

4   inactive; Pennsylvania, inactive; and D.C., active.

5   Q.   And when did you join the State Department?

6   A.   I joined the State Department in 1986.

7   Q.   In what position did you start out as?

8   A.   I started out with the Diplomatic Security Service.

9   Q.   Can you explain, Mr. Meszaros, what the Diplomatic

10  Security Service is.

11  A.   That is the branch of the State Department that provides

12  security to overseas embassies.  And they also do a lot of work

13  in regard to passport fraud and visa fraud.

14  Q.   And where did you first start working when you began that

15  job?

16  A.   I was working as a paralegal for the Diplomatic Security

17  Service.  And I later found another job with the Bureau of

18  Consular Affairs at the State Department as an attorney

19  advisor.  And I got that position in December of 1990.  And I

20  basically was in that position until I retired at the end of

21  2016.

22  Q.   So you worked at the Bureau of Consular Affairs for how

23  long?

24  A.   1990 to 2016.  That's about 26 years.

25  Q.   What is the Bureau of Consular Affairs?

M. Meszaros - Direct

A.   The Bureau of Counsel Affairs is a division within the State Department that issues passports, issues visas, takes care of American citizens abroad.

Q.   So did you serve abroad while you were working for the Bureau of Consular Affairs?

A.   I served abroad on several occasions.  I had excursion tour, which I have already mentioned, in Yemen from January of 2008 until the end of March in 2011.

I had four assignments as the head of the Consular Section at the U.S. Embassy in Monrovia, Liberia, that was 1995, 1998, 2003, and 2004.

I had three temporary assignments in the Consular Section of the embassy in Dhaka, Bangladesh.  One time I was heading the section, and two times I was helping them out.

I served for a month helping out the embassy in Baghdad, Iraq in 2005.

I also took part in several missions regarding assisting Americans overseas in crisis situations.

In 1995 I went to Cali, Colombia to assist the survivors and help relatives with the remains of the deceased in the airplane crash in Cali, that was an American Airlines flight.

In 1998 I went to Halifax, Nova Scotia to assist the relatives of the people in the Swiss Air flight.

Let's see, I was also -- oh, in 1996 I went to Dakar,

M. Meszaros - Direct

1   Senegal to evacuate, help evacuate the embassy in Monrovia,

2   Liberia.  Because it was a shipment point, people were

3   evacuating from Liberia and going to Dakar, Senegal.  And we

4   helped with their papers there.

5           In 1997 I was almost three months as head of the

6   Consular Section in Almaty, Kazakhstan.

7           I also assisted in 1991 at the U.S. Embassy in

8   Port-au-Prince, Haiti during a coup there.

9           And there is some others, but I'm having a hard time

10  recalling them.

11  Q.   And so, when you weren't serving these assignments abroad,

12  where were you working for the State Department?

13  A.   I was an attorney advisor in the Consular Bureau.  I

14  drafted guidelines, regulations, answered questions on

15  acquisition of citizenship.  I dealt with loss of citizenship.

16  Arrest of Americans abroad.  Enforcement of judgments abroad.

17  Service of process abroad.  A myriad of legal issues that

18  Americans encounter overseas.

19  Q.   And where were you based out of when you weren't serving

20  all of these assignments?

21  A.   Washington, D.C.

22  Q.   And when did you say you retired from the State

23  Department?

24  A.   That would be December of 2016.

25  Q.   And during the course of your career, did you receive any

M. Meszaros - Direct

131

1    meritorious honors?

2    A.    I have one Superior Honor award, five Meritorious Honor

3    awards, at least five Group Meritorious Honor awards, three

4    Franklin awards, three quality step increases, performance pay

5    increases, and I have an award from the Canadian government.

6    Q.    What is a Superior Honor award?

7    A.    The Superior Honor award is the highest award the State

8    Department -- well, there is a hierarchy.  The Franklin award

9    is lowest, Meritorious is next, and then there is Superior.

10   And then there is some awards that are actually a little higher

11   than Superior, but Superior is generally the highest.

12           And Superior was -- that was awarded for my, I went

13   to Liberia in 2003 and served there during the siege of

14   Monrovia, the embassy was taking mortar fire and rifle fire.  I

15   helped evacuate Americans out of there.

16   Q.    Okay.  So, Mr. Meszaros, now I would like to talk a little

17   bit about Yemen.  How were you assigned to serve in Sana'a?

18   A.    They had a position open and I volunteered in 2007.

19   Q.    Why did you volunteer?

20   A.    I thought it would be a good position for me.  They had

21   danger pay, and that attracted me.  I thought it would be a

22   good fit.  The embassy needed real help in the Consular

23   section.

24   Q.    And when in 2017 did you volunteer?

25   A.    That would probably be in the spring of 2017.  As I

M. Meszaros - Direct

132

1    recall, I was serving on the passport task force.  We had a

2    big -- and they currently are doing this right now.  They had a

3    big push to issue passports because they lacked personnel to

4    issue passports.  And I remember I was on the passport task

5    force when I was apprised of this and took the opportunity.

6          And I attended a number of training courses in the

7    fall before I went.

8    Q.   Okay.  Can you talk a little bit more about those training

9    courses.

10   A.   That would be visa processing.  Consular fraud.  Consular

11   interviewing.  There were about -- Consular systems.  There

12   were about four or five others.

13   Q.   And so, are these courses teaching you how to perform

14   those functions?

15   A.   Some of these functions I already knew, but, yeah, they

16   are teaching you, yes.

17   Q.   Was there any training specific to Yemen prior to the

18   assignment?

19   A.   No, there really wasn't any training specific to Yemen.

20   The only training specific to Yemen that I had was in 2010

21   before I left Yemen, I went through what they call the

22   crash/bang course.  Which is basically defensive driving and

23   counterterrorism, anti-counterterrorism.  Basically you ram --

24   you learn how to ram a car.  You learn the defensive maneuvers,

25   which is basically reversing out to get away if the bad guys

M. Meszaros - Direct

133

1   are chasing you.

2   Q.   So prior to your arrival in Yemen, did you do any research

3   about the country?

4   A.   I did a lot of research about the country.

5   Q.   What did you learn?

6   A.   It's a very corrupt society.  There is corruption at all

7   levels of government.  The government was at the time

8   inherently unstable.  And since then it's even worse because

9   the U.S. Embassy has suspended operations there in the midst of

10  a civil war.  It's a very difficult and challenging

11  environment.

12  Q.   What's the culture like?

13  A.   This is Arabic --

14          THE COURT:  His personal experience?

15          MR. SALINAS:  Sure.  Sorry.

16          THE COURT:  Let's limit him to his personal

17  experience now.  All right.

18  BY MR. SALINAS: (Continuing)

19  Q.   What did you learn about the culture?

20  A.   There is corruption in all levels of society.  It's

21  unusual -- it's one of the most unusual countries I have ever

22  been to.  About 2 o'clock in the afternoon every day the whole

23  country starts chewing khat, which this is mildly narcotic

24  drug.  And basically they are, they are zoned out for quite

25  awhile.

M. Meszaros - Direct

134

1          I mean, stores and shops are open, but sometimes you

2    go into a shop, like one of the shops right next to the

3    embassy, they would have an assistant for each aisle, an

4    employee who was in charge of each aisle, and he would be

5    sitting on the floor chewing khat.

6          So it was an interesting place.  It was -- there is a

7    lot of narcotics there, they are chewing khat.  There is -- the

8    government just -- it always just seemed to barely function.

9    There was continuous danger, the government might be

10   overthrown.

11         Of course, we were attacked three times in 2008 when

12   I was there.  The first attack was they fired mortar at the

13   embassy compound.  And I believe it hit a wall, and it also hit

14   a girl's school.  And I have read differing reports, it may or

15   may not have killed a girl.

16         The second attack I believe was, if I remember

17   correctly, was in April of 2008, and they attacked us on the

18   housing compound.  And it was another -- it was another mortar

19   fire.  They fired a mortar and they hit, I believe they hit the

20   building that we had the restaurant in, and it hit the side of

21   the building and left a hole like that.

22         And then the third attack, the big attack was in

23   September of 2008.  And that was when -- I have read differing

24   accounts, either 18 or 19 people were killed at the gate.

25         Seven terrorists, apparently they stole Yemeni Army

M. Meszaros - Direct

135

1    uniforms from a dry cleaner, and they got -- they rigged bombs

2    from propane tanks and they drove up to the gate of the

3    embassy.  And the guard wouldn't let them in.  And I am trying

4    to recall this brave fellow's name, and I can't.  But when he

5    wouldn't let them in, they shot him.  And they did get in, and

6    they drove their truck up to the wall and they blew off part of

7    their bombs.

8         And it didn't -- from what I recall, what had

9    happened was they blew the gate off its hinges, but they didn't

10   realize it.  And the surviving people, the surviving

11   terrorists, they were armed with AK-47s, they killed again like

12   18 or 19 people.  But then they didn't, they either didn't have

13   the sense to push in the gate, and they probably could have

14   climbed over the wreckage to get at us, but they didn't do

15   that.  They just blew themselves up against the gate.

16        Usually there is a big Yemeni Army contingent that is

17   supposed to provide security, but they all ran away when the

18   attack happened.  And if I remember correctly, our Regional

19   Security Officer was out of the embassy visiting the British

20   Embassy for a meeting, and he came to the embassy during the

21   attack and there were some Yemeni Army troops nearby, and he

22   tried to rally them, and they just ignored him.

23        But again, that's indicative of the inherent

24   instability and the danger in the country.

25   Q.   Okay.  So let me go back a little bit.  When did you

M. Meszaros - Direct

1    actually arrive in Yemen?

2    A.    I believe the date was January 10, 2008.

3    Q.    What was your job at the embassy upon arriving?

4    A.    I was the deputy chief of the Consular section.  And over

5    the course of the three years, I ended up as the acting chief

6    for a good bit of that time.

7    Q.    Can you just provide a brief description of what your

8    responsibilities would be then.

9    A.    Basically I was in charge of the American citizen

10   services, issuing the passports.  There was a big trade in what

11   we call the consular report of births abroad, which is a

12   document we issue to newly born American citizens who were born

13   overseas.

14         We would issue, at the time we issued extra pages for

15   passports.  I would also work on the immigrant visas.  I mainly

16   answered congressional inquiries on the immigrant visas.  I did

17   some of the non-immigrant visas.

18         The main duty that I can recall that I did was I

19   would make sure that the Yemeni Army people who needed to be

20   trained in the United States got their proper non-immigrant

21   visas.

22   Q.    As part of your job, did you have to deal with the legal

23   system in Yemen at all?

24   A.    Yes.  We would often, when an American was arrested, we

25   would often attend the court proceedings, make sure that they

M. Meszaros - Direct

137

1  weren't being discriminated against simply because of -- on the

2  basis of their American citizenship.

3           So I did observe a number of Yemeni court

4  proceedings.

5  Q.   What were your impressions of the Yemeni court system?

6  A.   Chaotic, unfocussed.  I was told it was corrupt.  I didn't

7  see any evidence of corruption itself, but it was most

8  interesting.  The lawyers wear robes.  There seemed to be

9  considerable -- it was hard to focus on what was going on even

10  when the judge was sitting there.

11  Q.   Why is that?

12  A.   Because it was chaotic.  There was a lot of voices going

13  in, there were people going in and out.  It was not on

14  organized proceeding.

15  Q.   How did the system treat foreigners, in your observation?

16  A.   It's difficult to say.  I didn't really think that

17  Americans were actually discriminated against simply because

18  they were Americans, but it seemed that they were targeted,

19  particularly for -- alcohol was readily available in a number

20  of outlets, but a lot of the Americans would get caught

21  drinking alcohol.  I can't explain that.  They would usually

22  get a fine, or they actually would give them a caning.

23  Q.   Did you observe how the system treated women?

24  A.   It is one -- Yemen is one of the worst countries there is

25  for treatment of women.  One of the big issues out of Yemen is

M. Meszaros - Direct

138

1    child marriage.  And people as -- women as young as 14 were

2    made to take part in arranged marriages.

3           And we actually saw several of them at the embassy.

4    And I asked for guidance sometimes.  And usually it was a girl

5    who had been married at 14, and she was now 19 and she already

6    had a couple of kids.  And we would wonder, well, is this

7    marriage legal?  Is this thing something we can -- we would

8    have problems with.  And usually the answer was, well, no,

9    let's treat this child as an American citizen.

10          There was discussion as to whether the marriage was

11   void for all purposes from the inception, but we really didn't

12   want to go that route.  We treated them as American citizens.

13   There was a --  I am drawing a blank on it, but there was a

14   really prominent case at the time I was there of a girl who was

15   11 and was a victim of a forced marriage.  And she made world

16   headlines, is my recollection, because she was able to get a

17   divorce there.

18          So that's basically -- it's pretty -- as far as

19   treatment of women, it's pretty backwards.

20   Q.   Okay.  Let's talk a little bit about the embassy then.

21   How many people worked at the embassy in Yemen when you arrived

22   in 2008?  About how many?

23   A.   I was -- I kept track of what they called the F77, which

24   keeps track of the official Americans there.  And my

25   recollection is there could have been 150 to 175 official

M. Meszaros - Direct

1    Americans and their dependents.

2           Now, the embassy would, the embassy employment would

3    have been much larger because the largest core contingent at

4    any embassy is the locally engaged staff.  And we had a large

5    locally engaged staff.  The biggest numbers of those would be

6    the security guards and the drivers.  And so there was -- there

7    were many more than the number of official Americans were

8    employed as locally engaged staff.

9    Q.   When you say official Americans, can you just explain what

10   that means.

11   A.   That would be an American who is under Chief of Mission

12   authority who is directly working with and responsible to the

13   embassy.

14   Q.   And so, of that number, how many did you say earlier did

15   you think official Americans there were?

16   A.   150, 180.

17   Q.   Of that number, about how many do you think worked for the

18   State Department at the time?

19   A.   My impression was always that the State Department was

20   maybe half or a little under a half because there were a lot of

21   other agencies there that were working at the U.S. Embassy in

22   Sana'a.

23          The Legat, which is the FBI, had a strong contingent.

24   The Agency for International Development had a large group.

25   DoD, Department of Defense, defense attaché, that was another

M. Meszaros - Direct

140

1    large group.

2    Q.   So can you try to give a rough estimate of how many State

3    Department people there would have been then?

4    A.   80, 80 or 90.  It is hard to keep -- to remember the

5    numbers.  I'm just giving a rough estimate.

6    Q.   How would you describe the State Department community at

7    that time in 2008 when you arrived?

8           MR. RINALDO:  Objection, Your Honor.  I don't know

9    what that means.

10          THE COURT:  Yeah.  Why don't you rephrase the

11   question.

12   BY MR. SALINAS: (Continuing)

13   Q.   Well, did you socialize with the State Department

14   community often when you were there?

15   A.   I had friends -- well, I had friends in the State

16   Department, yes.  And I had friends in the rest of the DoD and

17   such, yes.

18   Q.   Did people get along in the State Department community?

19   A.   Yemen was probably one of the more cliquish places that I

20   have been to.

21          I use as an example, 2003 in Liberia when I went in

22   there, I mean, all those guys are all my friends, friends for

23   life.

24          Yemen, despite the three attacks, it was more people

25   didn't really bond as much together.  They had some social

M. Meszaros - Direct

141

1    activities.  Like every Wednesday -- well, not every Wednesday

2    night, but on some Wednesday nights at the Marine house -- and

3    we also had on Thursdays, we had a social gathering that they

4    called Blind Pirates.  Where they would -- we would go to the

5    embassy on Thursday -- weekends in Yemen were Thursday and

6    Friday at the time.  And we would go to the embassy on Thursday

7    and play volleyball and drink beer.

8    Q.   I think you said you called it cliquish.  What were some

9    of the cliques within the State Department community?

10   A.   Consular, guys in the Consular section hung around.  The

11   political section.  Even though there was a political position

12   that rotated in the Consular section, there was people -- they

13   generally stayed together.

14          And it probably is better to say embassy community.

15   Because your socializing with everybody who is employed at the

16   embassy.  There is some groups that were pretty -- you really

17   couldn't break into them.

18   Q.   Would you say that you were a member of one of those

19   cliques?

20   A.   Well, I was in the-- yeah, the Consular group most

21   definitely.  And we would have some Wednesday evenings after a

22   particularly tough week, we would have a consular bottle of

23   scotch.  Yeah.

24   Q.   In your observation, were the Howards a member of one of

25   the cliques?

M. Meszaros - Direct

142

1   A.    Linda and Russell tended to -- while they would go to the

2   Marine house, they tended to socialize with people in the Hadda

3   Compound who worked for Hunt Oil?

4   Q.    Okay.  So let's talk about that then.  What is the Hadda

5   Compound?

6   A.    The Hadda Compound is our -- was a place where a lot of

7   the official Americans lived.  They built a brand new embassy

8   with a lot of security features, a big wall, and they placed it

9   at one end of the capital city Sana'a.

10         And the Hadda Compound, which was one of the only

11   appropriate and secure housing facilities -- it was an

12   apartment complex.  And if I remember right, it was owned by

13   a -- by people from the United Arab Emirates.  The Hadda

14   Compound was at the other end of the town, necessitating a long

15   drive to work, which at times could be very dangerous.

16         The State Department housing, they made

17   determinations for housing based on how secure it is.  The

18   Hadda Compound was -- it had very high fences with iron spikes

19   on top of it.  It had two entrances, one to the main street in

20   Hadda -- Hadda is like the Beverly Hills of Sana'a.  And they

21   had a rear entrance that most everybody used on the back.

22         And what the State Department determined is that this

23   is a secure housing facility that would provide some protection

24   against any terrorist attack.

25         Now, there were -- the embassy also provided homes

M. Meszaros - Direct

143

1    for people.  Most of the homes were in another compound.

2    Again, it had very secure facility, very big walls and spikes

3    on top of the walls and restricted access.  I guess we would

4    call it a gated community.  It is probably more accurate to

5    refer to it as a fortified community that really restricts

6    access.

7              And again, the main consideration is security.  And

8    these determinations were made, these properties were purchased

9    and leased -- well, leased in almost every case long before we

10   came to Yemen.

11   Q.   And so, where did you live?

12   A.   I lived in the Hadda Compound.

13   Q.   And where did Linda and Russell Howard live, do you know?

14   A.   They lived in the Hadda Compound.

15   Q.   Where in relation to your apartment was their apartment?

16   A.   I am not quite sure.  I heard it was on the ground floor.

17   Again, I probably -- it had a jogging track that went around it

18   made of stone, so I probably went past there.  I never went to

19   their apartment or socialized with them in their apartment.

20   Q.   How did you decide to live on the Hadda Compound?

21   A.   The housing board, of which I later became a member, makes

22   a determination based as -- mainly as to rank of the

23   individual, and relying somewhat on individual preference as to

24   where they will place the individual.

25              And at the time, I didn't feel like I really wanted a

M. Meszaros - Direct

144

1    house.  And they said, oh, well, there is a small, two-bedroom

2    apartment available in Hadda.  And I said, yeah, that sounds

3    good to me.

4    Q.   How was your apartment paid for?

5    A.   State Department paid for all the housing.

6    Q.   Do you know approximately how many embassy employees and

7    their families lived on the compound in 2008?

8         THE COURT:  In Hadda, in the Hadda Compound?

9    Q.   Yes.

10   A.   I am not sure.  I mean, well, we had Linda Howard.

11   Clayton Beatty and his wife right in my particular building.

12   The Assistant -- I was on the second floor, and the Assistant

13   Regional Security Officer, she was on first floor.

14        I would say there was at least ten units were embassy

15   employees.

16   Q.   Did other people live on the compound as well in addition

17   to embassy employees?

18   A.   Yes.  That compound was mainly rented out to a lot of ex-

19   patriots.  Hunt Oil were there.  There was another oil company,

20   I think their name was Schlumberger who was there.  There were

21   several ex-patriot groups.  And there were some, some somewhat

22   well off Yemenis who lived in there.

23   Q.   What was your apartment like?

24   A.   It was a two bedroom that would probably be a little

25   bigger than a standard American two-bedroom apartment.  The key

1  thing that sticks in my mind is the whole complex was very

2  brown.  The big walls were brown, the buildings were brown, the

3  tile on the floor in the rooms were brown, the doors were

4  brown.  It was a very brown establishment.

5         They had an air conditioner, and it is one of these

6  air conditioners, it's a European type air conditioner that is

7  up close to ceiling.

8         Most of the people would open the windows, keep the

9  windows open a lot.  It was a rather temperate climate.  If you

10  opened the windows at all though, you got a lot of dust and

11  sand.

12  Q.   Do you know if all the apartments were the same?

13  A.   I'm pretty sure from my time in the housing compound that

14  they weren't the same.  Some varied, two bedroom, three

15  bedroom.

16  Q.   Do you know how the housing board assigned particular

17  employees particular apartments?

18  A.   Again, it would be rank and given some consideration to

19  the personal preference.  I remember quite well one meeting

20  where we assigned, it was the new person to head the Agency for

21  International Development.  And he, because he was expected to

22  do some entertaining, he got, I believe it was -- this was

23  already a leased property of the United States government.  It

24  actually had an indoor swimming pool and I think it had six

25  bedrooms.

M. Meszaros - Direct

146

1  Q.   What other amenities did the compound have?

2  A.   The compound did have a swimming pool.  It had a gym.  It

3  had a small restaurant.  If I remember right, the restaurant

4  was in building B7.  And we referred to the restaurant, I think

5  it was just as B7.  The food was terrible.  But I would go

6  sometimes out of self-defense.  And I liked the waitress and

7  the waiter there, and I would give them extra tips.

8  Q.   Was there a grocery store on the compound?

9  A.   No.

10  Q.   Where did you go to the grocery store?

11  A.   The most common place was right across the street, it was

12  called Jondul.  And it was fairly popular with the ex-patriot

13  community.  Down the street there was a place that was roughly

14  the equivalent of the WalMart of Yemen, and I can't recollect

15  the name of that.  Usually you could accomplish what you needed

16  just shooting over to Jondul.

17  Q.   And is Jondul the one right across the street?

18  A.   Jondul is the one right across the street.

19  Q.   What type of security did the Hadda Compound have?

20  A.   The Hadda Compound at the beginning and throughout 2008

21  had a private security force that the owner of the Hadda

22  Compound paid for.  I think they -- I don't think they were

23  armed with anything, although I could be wrong.  Usually the

24  local guards at the U.S. Embassy had billy clubs.  I can't

25  recall if the Hadda guards had any armament.

M. Meszaros - Direct

1   Q.   Did the security guards at the Hadda Compound every lock

2   it down for security reasons?

3   A.   No.

4   Q.   Was it safe to leave the compound?

5   A.   Sometimes it wasn't.  I will tell you about that.  And

6   it's quite -- in my profession of Consular Affairs, it is quite

7   an important topic.  We have what we call a no double standard

8   law.  I'm drawing a blank on the complete citation.

9           But basically this is a law that was enacted after

10  PanAm 103 which, if I remember correctly, was approximately

11  1989.  And this law says that if there is any threat to the

12  official American community that is specific, credible, and

13  non-counterable, then you have to inform all the American

14  community, and that's the unofficial community in that country.

15          And usually the way we would do that is via a Warden

16  Message.

17          So, for instance, if the Regional Security Officer,

18  the RSO, I'm sorry about these acronyms, but that's the

19  government and they exist.  If the RSO said, came and said,

20  look, we've got some idea that you shouldn't go out, there

21  might be something at Jondul or along Hadda Street, you really

22  couldn't just tell that to only the American community.  You

23  have to go to the Consular section, and we have to get with

24  Washington, and then we have to decide whether to issue the

25  Warden Message based on those three factors.

M. Meszaros - Direct

148

1        And if it is a specific threat that is credible and
2    non-counterable, we're going to tell the other Americans.
3        So there is no -- there is no just well, there might
4    be something dangerous to you guys, we're going to lock down
5    the compound.  That's not how it worked.
6    Q.   So security warnings that were sent out were sent out to
7    both embassy personnel and other Americans living in Sana'a?
8    A.   At that time, yes.
9    Q.   Was it the same message to both groups?
10   A.   Yes, it would be.  The law specifically requires that.
11   Q.   And so, did the embassy ever warn people not to leave a
12   place like the Hadda Compound?
13   A.   What the embassy did was, and this -- my recollection is
14   this happened after the Howards left, at least that's my
15   recollection, we had a shuttle that would take the employees of
16   the embassy from the Hadda Compound to work in the morning.
17   And they determined -- I had my own private vehicle at the
18   time.  And they determined that if you drove and left before --
19   and arrived at the embassy before 6 o'clock in the morning and
20   stayed until after 6, then you could drive your private
21   vehicle.
22        Otherwise, you had to take the shuttle.  And usually
23   the shuttle left at varying times because we always had to vary
24   our routes and times.  And even driving like -- for instance,
25   it would be a 20-minute ride at 5:30 in the morning, but I

M. Meszaros - Direct

149

1    couldn't go at 5:30, sometimes I would go at 5, sometimes I

2    would go at 5:15 because you always want to throw the bad guys

3    off.

4            And the shuttle would also be scheduled.  For

5    instance, one shuttle would leave at 6:45.  And the next

6    shuttle would leave at like 9.  And then the next day one

7    shuttle would leave at 7:15 and the next one would leave at

8    8:30.

9            So there was always, there was always a big threat.

10   And that's one of the main reasons why they ceased operations

11   there because they felt they couldn't sustain -- and they were

12   actually trying to build housing at the embassy.  But they felt

13   that they couldn't sustain the danger during the civil war of

14   transporting the staff from the housing to the embassy.

15   Q.   Were you ever required to take the shuttle?

16   A.   When my car was first there, I took it for about three or

17   four months, I think it was about four months before my vehicle

18   arrived.

19   Q.   Just to clarify, when you say it, do you mean the shuttle?

20   A.   Yes.

21   Q.   So you took the shuttle when you first arrived?

22   A.   When I first arrived, definitely.

23   Q.   And then you said -- when did your car arrive?

24   A.   It was about four months into the tour.

25   Q.   And after your car arrived, were you ever required to take

1    the shuttle by the State Department?

2    A.   There were a few times, yes.  There were a few

3    intermittent times.  I can't remember the specific dates.

4    Q.   And did the embassy ever prohibit you or the other embassy

5    personnel from leaving the Hadda Compound altogether?

6    A.   Not to my knowledge.

7    Q.   Mr. Meszaros, at some point during your time in Yemen did

8    you meet the plaintiff in this case, Sarah Roe?

9    A.   Yes, I did.

10   Q.   How did you meet her?

11   A.   She was a waitress at the little B7 restaurant.

12   Q.   How would you describe your relationship with her?

13            THE COURT:  I'm sorry, now that you're going into a

14   new topic here, why don't we take our mid-afternoon break.  So

15   let's take 15 minutes, 17 minutes, we will come back at

16   4 o'clock and we will continue the testimony.

17            All right, you are excused.  Thank you.

18            NOTE:  At this point the jury leaves the courtroom;

19   whereupon the case continues as follows:

20   JURY OUT

21            THE COURT:  All right.  So you're in the middle of

22   your testimony, so please don't discuss it with anyone during

23   our break.

24            And anything we need to talk about before we recess?

25            MR. RINALDO:  I don't think so.

M. Meszaros - Direct

1           THE COURT:  All right.

2           MS. PATTERSON:  No.

3           THE COURT:  All right, then we're in recess.  We will

4     come back at 4 o'clock.

5           NOTE:  At this point a recess is taken; at the

6     conclusion of which the case continues in the absence of the

7     jury as follow:

8     JURY OUT

9           THE COURT:  Ready for our jury?

10          All right, Joe, let's get our jury, please.

11          NOTE:  At this point the jury returns to the

12    courtroom; whereupon the case continues as follows:

13    JURY IN

14          THE COURT:  Please be seated.

15          Please continue, Mr. Salinas.

16    BY MR. SALINAS:  (Continuing)

17    Q.   Mr. Meszaros, before we took our break we were talking

18    about how you met the plaintiff in this case, Ms. Roe.

19          Where did you say that you met her?

20    A.   I met her at the little restaurant on the Hadda Compound.

21    It is B6 or B7, I can't remember the exact number, but it's one

22    of those numbers.  It was the little restaurant on the

23    compound.

24    Q.   How would you describe your relationship with her?

25    A.   She worked there with a waiter called Mohamad.  I would

M. Meszaros - Direct

152

1   talk to them.  I particularly liked those two, I gave them

2   extra tips.

3   Q.   Do you remember around when this was?

4   A.   This would be around 2008.

5   Q.   And do you maintain a relationship with Ms. Roe today?

6   A.   I reconnected with her on Facebook because I have seen a

7   lot of my friends from Yemen, and I believe that would be

8   around 2012.  I am not sure whether -- I think I was -- I think

9   I did see her on one of my friend's -- as one of my friend's

10  from Yemen's friends, and I sent her a friend request.

11  Q.   Okay.  Do you see her often nowadays?

12  A.   I have, since she came to the United States, I took her to

13  an Ethiopian restaurant one time.  I took, me and my wife took

14  her to an Italian restaurant.  I attended a couple of her

15  girl's, her little girl's birthday parties.

16          Yeah, I have seen her socially.

17  Q.   So would you describe you as friends?

18  A.   Social friends, yes.

19  Q.   Mr. Meszaros, you said earlier that the State Department

20  paid for your apartment in Yemen.  Did the State Department

21  provide you a stipend for housekeeping or anything like that?

22  A.   They did not.

23  Q.   In your observation, was it common for embassy personnel

24  in Yemen to have a housekeeper?

25  A.   I remember the initial briefing with another acronym, the

M. Meszaros - Direct

153

1    CLO, which is the Community Liaison Officer.  And she said,

2    yes, most people have a housekeeper.  They do not have live-in

3    housekeepers.  They have housekeepers that will come in for the

4    day.

5            There was a very popular young lady who worked in the

6    cafeteria, Ethiopian, her name was Katy Mamo, and she knew a

7    lot of housekeepers, and I eventually hired her sister to come

8    in on Thursdays, which is the equivalent of Saturdays in the

9    States.

10   Q.   So you hired her as a housekeeper?

11   A.   I hired her as a housekeeper, the sister, yes.

12   Q.   Did she live in your apartment?

13   A.   No.

14   Q.   And how often did you say she came?

15   A.   She would come by once a week.

16   Q.   How much did you pay her?

17   A.   I would usually -- I think the base pay was like $40 a

18   visit, but I would pay her like 50, 60, or a little more.  She

19   suffered from migraine headaches, and I wanted to make sure she

20   got good medical care.

21           And plus, she would do little things that really

22   pleased me.  Like one time I had a pair of stretch warm-up

23   pants and the draw string came out, and she put it back in.

24   And I think gave her $60 for that.

25           She also darned the socks.  You know, little holes in

M. Meszaros - Direct

1    the socks, and she would fix them.  She was very good at that

2    stuff.  So I would give her extra money.

3    Q.   And so each visit, do you know how long she would stay in

4    the apartment?

5    A.   Sometimes I would just take off right early in the morning

6    and go to work or probably go to the gym and then go to work

7    even though it was the off day, and I would come back, she

8    would stay for about eight hours.

9    Q.   And you would pay her how much for those eight hours?

10   A.   40, 50, 60, sometimes a little more.  Sometimes I also

11   through Katy Mamo, I also connected with her, with Katy Mamo's

12   cousins and my housekeeper, and her name escapes me, but

13   sometimes the housekeeper, sometimes Katy's cousin Howi would

14   cook for me, and they catered for parties I threw.

15   Q.   In your observation, was it common for people on the

16   compound to hire a live-in housekeeper?

17   A.   The Howards were the only ones I knew who did that.  I

18   can't rule out that somebody else did it and I might not have

19   known about it.  But the Howards were the only ones I knew who

20   had a live-in housekeeper.

21   Q.   And they were the only ones on the compound that you knew?

22   A.   They weren't the only ones on the compound, but they were

23   the only ones that had a live-in housekeeper, yeah.  There is a

24   possibility maybe somebody in one of the bigger houses had a

25   live-in housekeeper.  I didn't hear of it.  I'm pretty sure

M. Meszaros - Direct

155

1    that the CLO would have mentioned that to me.

2          The policies of the State Department and the

3    conditions --

4          THE COURT:  Wait for your next question.  You have

5    answered the question based on the facts as you know them.

6          Ask your next question, please.

7    Q.   Mr. Meszaros, now I would like to talk a little more about

8    the Howards.  When was the first time you met them?

9    A.   I probably met Linda through a meet and greet and take you

10   around the embassy.  The first real social interaction that I

11   recall was at a trivia night.  The Public Affairs Officer, his

12   name was Ryan Gleha, he held trivia nights.  They picked teams,

13   and I ended up on the Howards' team.

14   Q.   Were both Linda and Russell Howard there that night?

15   A.   They were?

16   Q.   Were they accompanied by anyone else?

17   A.   They had their maid with them.

18   Q.   How do you know that woman was their maid?

19   A.   Linda and Russell told me.

20   Q.   Was that live-in -- was that housekeeper Ms. Roe?

21   A.   No, it wasn't.

22   Q.   What was your initial reaction to seeing the Howards with

23   this woman?

24          MR. RINALDO:  Objection, Your Honor.

25          THE COURT:  What's the relevance of this?

1          MR. SALINAS:  Your Honor, we will keep it brief, Your

2   Honor, but we --

3          THE COURT:  Move on to the next question.  Go ahead.

4   BY MR. SALINAS: (Continuing)

5   Q.   Did other people bring guests to this event?

6   A.   No.

7   Q.   How did Russell Howard act at this event?

8   A.   He was boisterous.  Boisterous, opinionated, talkative.

9   Q.   Did you like him?

10          MR. RINALDO:  Objection.  How is that relevant, Your

11   Honor?

12          THE COURT:  The question is did you watch him, is

13   that what you --

14          MR. SALINAS:  Did you like him.

15          MR. RINALDO:  He asked did you like him.

16          THE COURT:  Did you like him?  Well, you don't have

17   any foundation for that.  Did he have conversations with him?

18   Were they personal friends?  Ask him whether --

19          MR. SALINAS:  Your Honor, he said he was on the same

20   trivia team as him and that they interacted that night.

21          THE COURT:  Well, I will sustain the objection.  Lay

22   a foundation as to whether he has an opinion as to whether he

23   liked him or not.  Or just I saw him one time, I didn't like

24   him, is that what he is going to say?

25          MR. SALINAS:  I will rephrase the question, Your

M. Meszaros - Direct

1    Honor.

2              THE COURT:  Thank you.

3    BY MR. SALINAS: (Continuing)

4    Q.   You interact with Linda or Russell Howard at this event?

5    A.   Yes.

6    Q.   What did they say to you?

7    A.   I can't recall the questions asked regarding the trivia.

8    I think we were losing fairly badly.  It ended up there is a

9    real schism there.  All the old people were on one side with me

10   and the Howards, and all the younger people were on the other

11   side.

12             I was asked -- I asked who the maid was, and they

13   told me her name.  I can't, I can't remember it.  I asked, what

14   is she doing here?  And she goes, oh, that's our full-time

15   maid.

16             And I said something to the effect of, does Russell

17   work?  And Linda said, no, he doesn't.

18             And I knew that they lived in the compound.  And I

19   go, he stays in the compound all day with the maid?  And Linda

20   said, yeah.  I said, okay.

21   Q.   Did you ever see that housekeeper from the trivia night

22   again?

23   A.   I did not.

24   Q.   Do you know what happened to her?

25             MR. RINALDO:  Objection.  I would like a foundation

M. Meszaros - Direct

158

1    for that.

2              THE COURT:  Yeah.

3              MR. SALINAS:  I don't need to ask the question, Your

4    Honor.

5              THE COURT:  Okay.  Sustained.

6    BY MR. SALINAS: (Continuing)

7    Q.   Did you ever see Linda or Russell Howard with another one

8    of their housekeepers?

9    A.   Yes, I did.

10   Q.   Is this housekeeper the woman you understand is being

11   called Jane Doe in this case?

12   A.   Yes, it was.

13   Q.   Who did you see with Jane Doe?

14   A.   Linda Howard.

15   Q.   Where would you see them?

16   A.   I saw them at the little gym on the Hadda Compound at

17   least five or six times, and they were working out together.

18   Q.   How would Linda act when you saw her with Jane Doe?

19   A.   She was a big -- all smiles.  Hi, how are you doing?

20   Q.   How did you observe Jane Doe acting?

21   A.   She didn't want to be on the treadmill.  She was -- she

22   was following along, basically.

23   Q.   Did you ever see Jane Doe without Linda in Yemen?

24   A.   I really don't think so, no.

25   Q.   Did you ever speak with Linda or Russell Howard about one

1    of their housekeepers aside from the trivia night?

2           MR. RINALDO:  Objection, Your Honor.  Could we have a

3    time frame?

4           THE COURT:  Yeah.  Let's have a time frame.

5           MR. SALINAS:  I will rephrase, Your Honor.

6    BY MR. SALINAS: (Continuing)

7    Q.   While you were in Yemen, did you ever speak with Linda or

8    Russell about their housekeepers?

9    A.   One other time, yes.

10   Q.   Was this with Linda or Russell?

11   A.   Both.

12   Q.   And what did they say to you?

13   A.   We were at the Marine house, and they were telling about

14   how they took one of the housekeepers on their vacation to

15   Italy with them.  And they were in a crowd, I can't recall what

16   town they were in, but they were in a crowd, and the

17   housekeeper ran away.  And they were calling her name, which I

18   don't recall, and whatever it was, and she just took off and

19   ran away.

20   Q.   How did Linda and Russell seem to you when they told you

21   this story?

22   A.   They were --

23          MR. RINALDO:  Objection, Your Honor.  I am not sure I

24   understand what seemed to --

25          MR. SALINAS:  I will rephrase, Your Honor.

1          THE COURT:  Yes, sir.

2    BY MR. SALINAS: (Continuing)

3    Q.   How were they acting when they were telling you the story?

4    A.   Well, we were at the Marine house, we were drinking beer.

5    They thought it was funny.  At the time I thought it was funny.

6    Q.   Did you talk to Russell Howard again after that

7    interaction?

8    A.   I can't recall.  Maybe not.  I understand that we had,

9    after these series of attacks, we had what is called an

10   authorized departure.  Then we had an ordered departure.  So

11   non-essential personnel and dependents actually left the

12   embassy.

13          So he was probably gone for some period of time.  I

14   didn't keep a diary, and this is just come from my memory.  So

15   he could have been gone on one of those for a lengthy period of

16   time.

17   Q.   So can you estimate roughly how many times you interacted

18   with him?

19   A.   There was the trivia night.  The conversation at the

20   Marine house night.  And then there was the one time at the

21   swimming pool at the embassy, I had a little conversation with

22   him about something inane.

23   Q.   Mr. Meszaros, briefly going back to the housekeeper from

24   the trivia night.  What did she look like?

25   A.   She was very attractive.  She was Ethiopian.  She wore

M. Meszaros - Direct

1   kind of a stylish blue dress.

2   Q.   How could you tell that she was Ethiopian?

3   A.   After you have been -- traveled around and been to East

4   Africa and West Africa, you can see that there is distinctive

5   features.  Ethiopians are known as the beautiful people of

6   Africa.  They particularly have a striking forehead.  You see

7   this in some of their paintings.

8   Q.   How old did the housekeeper look?

9   A.   Early twenties.

10  Q.   Mr. Meszaros, in 2008 in your time in Yemen, did you

11  observe whether the Howards had a particular reputation in the

12  embassy community?

13          MR. RINALDO:  Objection.  How does one observe a

14  reputation?

15          THE COURT:  Well, approach the bench, please.

16          MR. RINALDO:  Yes, Your Honor.

17          NOTE:  A side-bar discussion is had between the Court

18  and counsel out of the hearing of the jury as follows:

19  AT SIDE BAR

20          THE COURT:  Okay.  Where are we going with this

21  testimony?  You want to establish the Howards' reputation in

22  the community at the embassy; is that correct?

23          MR. SALINAS:  Yes.

24          MR. RINALDO:  Through this gentlemen?

25          THE COURT:  Well, he hasn't laid a foundation yet.

M. Meszaros - Direct

162

1          MR. RINALDO:  No.

2          THE COURT:  But do you have foundation questions you

3    were prepared to ask about, has he spoken with anybody else

4    about the Howards?

5          MR. SALINAS:  I can certainly ask those questions,

6    Your Honor.

7          THE COURT:  They are required questions before you

8    can get an opinion about their reputation.  You have to get him

9    to say that I have spoken to other people and I am aware of

10   their reputation.  Not based on his personal view of the world.

11         MR. SALINAS:  Understood, Your Honor.

12         MR. RINALDO:  All that would be hearsay too.

13         THE COURT:  That's what opinion testimony is all

14   about.

15         MR. RINALDO:  But he is not an expert.  He can't

16   express an opinion.

17         THE COURT:  It is not an expert opinion.  That

18   doesn't require expert testimony.

19         MR. RINALDO:  At the very least we need to talk about

20   the fact that he has to talk about that in '08.  We can't be

21   talking about what he may have learned since.

22         THE COURT:  That's fair.

23         MR. RINALDO:  Before he left Yemen.  It can't be --

24   if he talked to somebody in '11 or '12, that doesn't matter.

25         MR. SALINAS:  I would obviously limit -- I would lay

1   a foundation that limits it to --

2              MR. RINALDO:  '08.

3              MR. SALINAS:  Well, it is '08 because he wasn't there

4   in '07.

5              THE COURT:  While they were there.  I will allow

6   that.  And your exception is noted.

7              MR. RINALDO:  Depending upon the foundation, I may

8   renew an objection.

9              THE COURT:  Correct.

10             NOTE:  The side-bar discussion is concluded;

11  whereupon the case continues before the jury as follows:

12  BEFORE THE JURY

13             THE COURT:  Sorry for that horrible noise.  It's

14  obviously intended to distract you as we're discussing matters

15  at the sidebar.  And I don't know why music or Muzak or

16  something else doesn't play.  I have been working on that.  I

17  hope to do better in the future.

18             All right, please proceed.

19  BY MR. SALINAS: (Continuing)

20  Q.   Mr. Meszaros, in 2008 did you have conversations with

21  people at the embassy about the Howards?

22  A.   Yes.

23  Q.   In 2008, did you have conversations with people from the

24  State Department about the Howards in Yemen?

25  A.   Yes.

M. Meszaros - Direct

164

1   Q.   Did you have conversations with people at the compound in

2   2008, the Hadda Compound in 2008 about the Howards?

3   A.   I can't recall any off the top of my head at the compound.

4   Q.   So where would these conversations have been taking place?

5   A.   Embassy.

6   Q.   So you had these conversations at the embassy?

7   A.   At the embassy.

8   Q.   Who were some of the people that you would have these

9   conversations with?

10  A.   Paul Blankenship, the Admin Officer.  Nelson Rodriquez,

11  the Facilities Maintenance Officer.  Sheldon Haney, the Finance

12  Officer.  Several others.  Clayton Beatty, the husband of the

13  Office Management Secretary -- Office Management Specialist.

14  Q.   So based on those conversations, in your opinion did the

15  Howards have a particular reputation within the embassy

16  community?

17  A.   Linda got an award for her service, and I think several of

18  us -- I thought, how did that happen?  And Paul Blankenship

19  said, well, I thought she did good work.  He was the Admin

20  officer and obviously the driving force behind that.

21       I think as to -- they weren't -- I think there was a

22  feeling that Linda was not --

23       MR. RINALDO:  Your Honor, objection.

24       THE COURT:  You can ask him about general reputation

25  in the community.  You can't ask him about specific incidents.

M. Meszaros - Cross

165

1           What are you trying to --

2           MR. SALINAS:  I haven't asked about a specific

3    incident.

4           THE COURT:  Well, he is getting into specific matters

5    because of the open-ended nature of the question.

6           MR. SALINAS:  Understood.

7    BY MR. SALINAS: (Continuing)

8    Q.   Mr. Meszaros, without getting into any specific incidents,

9    based on these conversations that you have had with various

10   embassy personnel in Yemen, in your opinion did Linda or

11   Russell Howard have a reputation within the embassy?

12   A.   Some of us felt Linda was not the best information

13   management person.  And a lot of people thought Russell was

14   argumentive, a little off-putting, and not -- that he did not

15   like too many people at the embassy.

16          THE COURT:  All right, let's move on.

17          MR. SALINAS:  I have no further questions, Your

18   Honor.

19          THE COURT:  Okay.  Thank you.

20          All right, cross-examination.

21          MR. RINALDO:  Yes, Your Honor.

22      CROSS-EXAMINATION

23   BY MR. RINALDO:

24   Q.   Good afternoon, Mr. Meszaros.

25   A.   Good afternoon.

Q. Let me sort of straighten this out a bit, I have enough bad angles.

I would like to begin with something you said after the break that I think would be very helpful to clarify for all of us. You mentioned the words "authorized departure" and "ordered departure." Okay.

Now, you are involved in security, right?

A. No, I was involved in Consular Affairs.

Q. Well, but Consular Affairs, but you are familiar with terms "authorized departure" and "ordered departure," right?

A. Yes, I am.

Q. You know what they mean?

A. I know what they mean.

Q. Well, some of us may not. So perhaps you could help us. Based on your experience in Yemen and your experience with the State Department, could you define for us what authorized departure means?

A. I am sorry for that omission and lack of clarification.

Q. You don't have to be --

THE COURT: Stop. Don't speak over the witness, we can't transcribe that, one at a time has to speak. So finish your answer.

A. An authorized departure is triggered by a security incident whereby the Chief of Mission in consultation with the State Department in Washington, D.C. determines that conditions

M. Meszaros - Cross

1    are dangerous at the particular post and that they will allow

2    on a voluntary basis for non-essential employees to go back to

3    the United States.

4              An ordered -- and authorized departure used to be

5    called voluntary departure, and sometimes I slip back into that

6    terminology.

7              An ordered departure is triggered by a security

8    incident or specific credible threat where the Chief of

9    Mission, usually the Deputy Chief of Mission who actually runs

10   the embassy and makes the critical decisions, is going to tell

11   people that they have to go back to the United States.  And

12   they are provided -- it's basically an evacuation or draw-down

13   of the embassy personnel.

14             THE COURT:  Go ahead.

15   BY MR. RINALDO: (Continuing)

16   Q.   Thank you.  That was helpful.  Did I understand you to say

17   that you arrived in Yemen on January 10, 2008?

18   A.   Yes, sir.

19   Q.   And you described three bombings that year.  I am going to

20   get to that in a minute.  But there was an authorized departure

21   that year, wasn't there, in early '08?

22   A.   Yes, there was.

23   Q.   So that would be non-essential personnel were authorized

24   to leave, correct?

25   A.   Correct.

M. Meszaros - Cross

1   Q.   And then there was an ordered departure in 2008 as well,

2   wasn't there?

3   A.   Correct.

4   Q.   And so, non-essential personnel had to leave?

5   A.   Correct.

6   Q.   That ordered departure took place in March, didn't it?

7   A.   I believe so.

8   Q.   So --

9   A.   No, it might have taken place in April.

10  Q.   All right.  I guess we can probably figure that out.  But

11  regardless, it was no later than April, was it?

12  A.   Correct.

13  Q.   All right.  Because that was when the second attack took

14  place at the compound, right?

15  A.   Correct.

16  Q.   And when did the first attack take place at the embassy?

17  A.   I believe it took place in March.

18  Q.   In March, yep.  And was that the one where the embassy was

19  attacked and you said there was a girl killed?

20  A.   I have read differing reports.  There was -- the mortar

21  landed on a girl's school and there might have been a girl

22  killed, one of the students.

23  Q.   Would it refresh your recollection to think about whether

24  there might have been 12 girls killed at that school, or do you

25  know?

1    A.    I'm pretty sure there weren't 12.

2    Q.    Okay.  There was an embassy attack, the mortars landed in

3    the embassy, right?

4    A.    One landed on the wall of the compound.

5    Q.    Right.  Did you know that Linda Howard was at the embassy

6    when that motor hit?

7    A.    Yes.  I was at the embassy too.

8    Q.    So you both were there.  So you both experienced that,

9    didn't you?

10   A.    Yes, we did.

11   Q.    And do you know that Russell Howard left via an ordered

12   departure at the end of March 2008?

13   A.    I am not -- I can't remember the dates when he left.

14   Q.    But he left within a couple of months of your arrival,

15   didn't he?

16   A.    Yes.

17   Q.    Along with the other non-essential personnel?

18   A.    I don't specifically recall it, but, yes, he probably did.

19   Q.    All right.  And that would have been an ordered departure?

20   A.    The ordered -- yeah, the ordered departure came later,

21   after the second attack.

22   Q.    And the second attack, did I -- am I correct, took place

23   in April?

24   A.    Correct.

25   Q.    And the second attack, that one hit the compound?

M. Meszaros - Cross

1   A.   That one hit the Hadda Compound.

2   Q.   Right, where you lived?

3   A.   Where I lived.

4   Q.   Where Linda Howard lived?

5   A.   Where Linda Howard lived.

6   Q.   How close did the shells come to your building?

7   A.   I think I was about 25 yards away.

8   Q.   25 yards?

9   A.   Yeah.  I think it was the next building over.

10  Q.   How close did you live to the Howards?  Because it hit the

11  next building over to the Howards too, didn't it?

12  A.   I'm not sure.  The compound is -- there are just several

13  buildings fairly close together.

14  Q.   During the direct examination, before the break you

15  described the restaurant on the Hunt Oil Compound as B7.  After

16  the break you said it might have been B6 or B7.  Can we agree

17  that it was probably B6?

18  A.   It was B6.

19  Q.   All right, fine, good.  Then we won't have any confusion

20  with that.  Okay.  And you used to go there to eat at the Hunt

21  Oil Compound, right?

22  A.   I would, yes.

23  Q.   By the way, while you were in Yemen in the first part of

24  '08 -- well, you had to have been after the first part of '08,

25  but were you there alone?

1    A.    Yes.

2    Q.    So I don't know if you were married at the time?

3    A.    Married.

4    Q.    But your wife was not there?

5    A.    Correct.

6    Q.    Okay.  So she wasn't involved in an authorized or an

7    ordered departure?

8    A.    Correct.

9    Q.    So you lived in an apartment yourself by yourself?

10   A.    Yes.

11   Q.    Is that right?

12   A.    Yes.

13   Q.    Okay.  So with respect to your needs for a housekeeper or

14   cooking or anything else, you ate out a lot, did you?

15   A.    I did.

16   Q.    Yep.  And you were a single person, right?

17   A.    Correct.

18   Q.    Okay.

19   A.    I was married.  My wife is the United States.

20   Q.    Well, no, no, no.  You were a single person as far as

21   living in Yemen.  I didn't mean to imply anything else.

22          So you didn't have your wive's clothes on the floor

23   or sometimes the wash because she was in U.S., you just had

24   your own?  That's what I was getting at.

25   A.    True.

M. Meszaros - Cross

172

1   Q.   You essentially were by yourself as a resident in the Hunt

2   Oil Compound?

3   A.   In the Hadda Compound.

4   Q.   Okay.  It was owned by Hunt Oil, wasn't it.

5   A.   No.

6   Q.   Are you sure?

7   A.   Positive.  It was owned by -- I believe it was a guy from

8   Abu Dhabi.

9   Q.   Okay.  Well, with respect to your experiences there, one

10  of the things you mentioned on direct examination was that you

11  spent some time at the Marine house; is that right?

12  A.   Yes, I did.

13  Q.   Okay.  Could you tell us, just sort of for clarification

14  purposes, what the Marine house was.

15  A.   Okay.  The Marine house is basically where -- the Marines

16  provide the security, one of the security components at an

17  embassy.  And there was usually about six to eight Marines at

18  the U.S. embassy in Sana'a.  Their primary function is access

19  control at Post 1, which is the main controlling area for

20  entering the embassy and securing classified material.

21        The Marine house is the Marines' residence, and it is

22  also at most embassies abroad the primary social area where the

23  Marines will have like, for instance, they have a bar and you

24  can go there and socialize and drink beer.

25  Q.   And it wasn't just the Marines that got to go, I think I

M. Meszaros - Cross

173

1  understood your testimony to be that on like, not every

2  Wednesday, but on several Wednesdays a month they would invite

3  others over on Wednesday evening?

4  A.   It was sporadic, sometimes two Wednesdays a month.

5  Q.   That's fair.  And during those meetings, there were people

6  other than the Marines who came over?

7  A.   Yes.

8  Q.   Okay.  It wasn't unusual to see people who weren't Marines

9  there on Wednesday evening?

10  A.   Yes.

11  Q.   Yes, it was unusual?

12  A.   No, it wasn't unusual.

13  Q.   That was my --

14  A.   My mistake, sorry.

15  Q.   So there was beer available there?

16  A.   There was beer available there.

17  Q.   All right.  There was food available there?

18  A.   Sometimes.  Not so good, but there was sometimes food

19  available there, cheese and such.

20  Q.   Sometimes they would have a barbecue maybe?

21  A.   Sometimes they would have a barbecue, yes.

22  Q.   Was there ever dancing there?

23  A.   Later at night there was dancing.

24  Q.   Later at night?

25  A.   Yeah.

M. Meszaros - Cross

174

1   Q.   About what time would that start?

2   A.   9:30, 10.

3   Q.   9:30 or 10.  And what you testified to was, in answer to

4   one of Mr. Salinas' questions about whether you sometimes were

5   ordered not to leave the compound, and you said you didn't

6   remember such an occasion -- is that a fair characterization of

7   your testimony?

8   A.   That's fair.

9   Q.   Okay.  You didn't arrive until January of '08, right?

10  A.   That's correct.

11  Q.   So you have no idea whether there had been an order that

12  you can't leave the compound in '07?

13  A.   I might have had an idea, but I don't specifically recall

14  it because I was following the events closely.

15  Q.   Well, it would have been from a distance away because you

16  weren't there, right?

17  A.   It would have been a distance away.  But if they had sent

18  out a Warden Message based on those conditions, I might have

19  been aware of it.

20  Q.   But you can't be sure?

21  A.   I can't be sure.

22  Q.   Fair enough.  When you reconnected with the plaintiff in

23  this case, did I understand you to say that was probably in

24  sometime in 2012?

25  A.   It could be 2011 or 2012, I am not sure.

1  Q.   Well, I thought your testimony --

2  A.   2012 seems most plausible to me.

3  Q.   And I just want to make sure that I understand how the

4  connection happened.  Did you reach out to some of your friends

5  from Yemen on Facebook?

6  A.   Yes, I did.  I saw some of my friends from Yemen, yes.

7  Q.   And when you reached out to them, some of them reached

8  back to you, correct?

9  A.   Yes.

10 Q.   Okay.  And did I understand you to say that when some of

11 them reached back to you, you saw the plaintiff's identifier,

12 I'm not a Facebook guy, so whatever you call it, as a friend of

13 a friend?

14 A.   I believe that's what happened, yes.

15 Q.   That's how you resumed contact with her?

16 A.   Yes.

17 Q.   And at that point you contacted her and she responded,

18 right?

19 A.   I believe that's how things happened, yes.

20 Q.   Okay.  Did I understand you to say you attended the

21 plaintiff's daughter's birthday party?

22 A.   Yes, I did.

23 Q.   And what year was that?

24 A.   That would be 2016 and 2015.

25 Q.   And where were she living at the time?

1    A.    She was living in Alexandria, Virginia off of Edsall Road.

2    Q.    Both years?

3    A.    I believe it was the same apartment both years, yes, sir.

4    Q.    All right.  And can you describe that apartment for me,

5    please.

6    A.    It was older.  I believe it was a two-bedroom apartment.

7    I specifically -- we had a lot of Ethiopian food.  One of my

8    favorites is the raw meat, she somehow managed to get it.  It

9    was a larger -- it was two bedrooms.  There was a big screen

10   TV.  I guess you would call it a garden style apartment.

11   Q.    Garden style.  Which means what?  To me it means you have

12   like a balcony or a patio?

13   A.    They did have a balcony, yes.

14   Q.    Two-bedroom apartment, with a big screen TV, a balcony,

15   right?

16   A.    Yes.

17   Q.    Do you how many bathrooms it had?  Well, obviously at

18   least one.

19           MR. SALINAS:  Objection, Your Honor.  How is this

20   relevant?

21           MR. RINALDO:  Well, I think it is relevant.

22           THE COURT:  I will allow it.  Overruled.

23   A.    I don't recall using the bathroom there.

24   BY MR. RINALDO: (Continuing)

25   Q.    How many times did you visit that apartment?

1   A.   Couple of times.  Those two occasions.

2   Q.   Vacations?

3   A.   Those two occasions.

4   Q.   Occasions.

5   A.   I am sorry for mispronouncing.

6   Q.   I just didn't hear you.  Were those two birthday parties

7   the only times you went to that apartment?

8   A.   Yes, they were.

9   Q.   Do you know whether the plaintiff works?

10  A.   I know at one point she had a job at Red Robin in West

11  Falls Church.

12  Q.   West Falls Church?

13  A.   I believe it is West Falls Church, yes, sir.

14  Q.   Do you know when that was?

15  A.   That was definitely, I believe she mentioned that during

16  the first -- before the first birthday party.

17  Q.   When you were at that birthday party, were there other

18  people there, other guests?

19  A.   Yes, it was quite crowded.

20  Q.   Did you know any of the people who were there?

21  A.   Yes.

22  Q.   Can you tell me who they were?

23  A.   Katy Mamo, who was at the embassy.  Jane Doe was at that

24  part -- she was at the last -- she was at one of the parties.

25  Q.   Do you remember if it was '15 or '16?

M. Meszaros - Redirect

178

1   A.   It might have been '15.

2   Q.   Do you remember what time of year that was?

3   A.   Summer.

4   Q.   Summer.  So June, July, August, somewhere in there?

5   A.   July/August, something in there.

6   Q.   All right.  Anybody else you recognized?

7   A.   No.

8          MR. RINALDO:  That's all I have, Your Honor.

9          THE COURT:  All right.  Thank you.

10         Any redirect?

11         MR. SALINAS:  Yes, Your Honor.

12      REDIRECT EXAMINATION

13   BY MR. SALINAS:

14   Q.   Mr. Meszaros, during your time in Yemen, did you socialize

15   with people who had a spouse with them in Yemen?

16   A.   Yes.  Yes.

17   Q.   Did any of those people have a live-in housekeeper, to

18   your knowledge?

19   A.   Not to my knowledge.

20         MR. SALINAS:  No further questions, Your Honor.

21         THE COURT:  All right.  May this witness be excused?

22         MR. SALINAS:  Yes, Your Honor.

23         MR. RINALDO:  As far as I am concerned, Your Honor.

24         THE COURT:  Thank you, sir.  Thank you for coming in

25   today and testifying.  You are excused at this time, free to

1   go, free to sit in the courtroom if you would like, but you are

2   not free to discuss your testimony with anyone else until our

3   trial is over.  All right?

4           THE WITNESS:  Understood, Your Honor.

5           THE COURT:  All right, thank you.  Have a good day.

6           NOTE:  The witness stood down.

7           THE COURT:  All right, next witness.

8           MS. PATTERSON:  Yes, Your Honor.  We can call our

9   next witness, but because of the time, we don't believe that we

10  will finish the testimony of that witness.

11          THE COURT:  That's fine, let's get rolling.

12          MS. PATTERSON:  No problem, Your Honor.  We will call

13  Florence Burke at this time.

14          THE COURT:  All right.

15          NOTE:  The witness is sworn.

16          THE COURT:  Please proceed.

17          Good afternoon, ma'am.

18          THE WITNESS:  Good afternoon, Your Honor.

19          FLORENCE BURKE, called by counsel for the plaintiff,

20  first being duly sworn, testifies and states:

21      DIRECT EXAMINATION

22  BY MS. PATTERSON:

23  Q.   Good afternoon.  Could you please introduce yourself to

24  the jury.

25  A.   My name is Florence Burke.

F. Burke - Direct

180

1   Q.   Could you tell us a little bit about your educational

2   background.

3   A.   Yes.  I have a Bachelor's degree in deaf education.  A

4   Master's degree in special education.  And a Master's degree in

5   clinical psychology.  And all but dissertation in a Ph.D.

6   program in clinical psychology.

7   Q.   Where did you go for the clinical psychology degree?

8   A.   For the Master's program I went to John F. Kennedy

9   University in California.  And in the Ph.D. program I was at

10  the Professional School of Psychology in San Francisco,

11  California.

12  Q.   Could you tell us about your professional experience.

13  A.   Yes.  My first career was as a teacher of deaf students in

14  California.  And I did that for about 14 years.

15          After that, I got the Master's in clinical psychology

16  and became a mental health therapist where I worked at the

17  University of California San Francisco Medical Center.

18          After that I moved to New York City where I was the

19  executive director of the Lexington Center for Mental Health.

20          And after that I was a consultant for a few programs.

21          And then started the anti-trafficking program at Safe

22  Horizon in New York City.  And I was there until 2007 when I

23  left.

24          And I have been an independent consultant ever since.

25  Q.   You mentioned before this consulting job you had another

F. Burke - Direct

181

1    consulting job.  What was that field?

2    A.   I was consulting in the survivors of torture and war

3    trauma program at Safe Horizon.

4    Q.   What did you do there?

5    A.   I did psych assessments for asylum seekers, and I provided

6    counseling to survivors of torture.

7    Q.   Did you have any training before you started that

8    consulting work?

9    A.   Yes.

10   Q.   What sort of training did you do?

11   A.   I went to the New York University International Trauma

12   Studies Program, which was a certificate program for a year.

13   Q.   Did you receive a certificate from that program?

14   A.   I did.

15   Q.   Did you have any other training before the consulting job

16   at Safe Horizon?

17   A.   I have had training my whole life.  I did extensive

18   training in trauma and abuse, starting in the mid-'70s and

19   continuing until now.

20   Q.   Did you have training in specific types of trauma or

21   abuse?

22   A.   Generalized trauma reactions.  And I had specialized

23   training in sexual abuse survivors, domestic violence

24   survivors, victims of crime, war trauma.

25   Q.   So after that consulting job at Safe Horizon, what was

F. Burke - Direct

182

1   your next position?

2   A.   I started working full-time at Safe Horizon, and I started

3   the anti-trafficking program there in 2001.  And that work got

4   interrupted by the events of 9/11.  And at that time I

5   developed a community response program for people affected by

6   9/11 in New York City, first responders and just everyday New

7   Yorkers.

8   Q.   With respect to the anti-trafficking position at Safe

9   Horizon, what did you do there?

10  A.   It was one of the first programs in the country.  The

11  government started funding programs for victims of human

12  trafficking in 2001, 2002, 2003, they started funding programs.

13  And we were one of the first, Safe Horizon was one of the first

14  programs funded.  And we -- I started out by building the

15  program, hiring staff, developing a model of response that

16  included case management, referrals to other programs, doing

17  assessments, counseling, et cetera.

18  Q.   Did that program provide any training to other

19  organizations?

20  A.    Yes.  One of the mandates of that program and of a grant

21  that we had from the Office for Victims of Crime at the

22  Department of Justice was to train other community

23  organizations in how to work with survivors of this crime.  To

24  train other service providers so that they might know what to

25  expect when we referred our clients for services.  We also

F. Burke - Direct

1   provided training to law enforcement in the area and beyond.

2   Q.   Was there any other work that you did at Safe Horizon

3   besides the two you just outlined?

4   A.   Once the program got well established and fully staffed, I

5   supervised the direct service staff and continued to do the

6   bulk of the training and became involved in both governmental

7   and non-governmental organizations that were also responding to

8   this crime.

9   Q.   So you said that you supervised the direct service staff.

10  What did this direct service staff do for victims?

11  A.   When victims were referred to our program, the direct

12  service staff, which consisted of social workers, case

13  managers, and immigration attorneys at the time, would assess

14  victims' needs, and then either provide those services directly

15  or refer out to the appropriate program or organization that

16  could provide those services.

17  Q.   When you say needs, what are you talking about?

18  A.   Well, victims of this crime would come in and they would

19  just recently have either been rescued or escaped from a

20  situation, and often had no financial resources, had no place

21  to live, had maybe very little personal items, such as

22  clothing.  And they had emotional needs, some had medical

23  needs, certainly they had legal needs.

24          So the assessment was to take a period of time to

25  really look at the situation of the person and what was

F. Burke - Direct

184

1   required to help them with their stability.

2   Q.   You mentioned legal needs.  What sort of legal needs did

3   your program help these victims with?

4   A.   Mostly with immigration needs.  At the beginning of our

5   program for the first number of years we were mandated to

6   provide services to individuals from other countries who had

7   been brought into our country and trafficked in this country.

8          And most of them had no legal status.  So the legal

9   staff would work together with law enforcement and immigration

10  officials to try to remedy that.

11  Q.   Did you help or did your organization help victims acquire

12  visas?

13  A.   I did not personally, but my staff assisted in the

14  process.  The visa that trafficking victims are eligible for

15  are known as T visas.  And it's know as a, what's called a

16  self-petitioning visa.  Which means the person applies on his

17  or her own.

18          So any assistance that the staff gave was to help

19  gather the corroborating information from law enforcement, from

20  maybe mental health therapists, from physicians, anybody who

21  had been a part of that particular victim's case.

22  Q.   After you worked at Safe Horizon, where did you go next?

23  A.   On my own.

24  Q.   What do you do on your own now?

25  A.   Since 2007 I've done a number of things.  I've done quite

F. Burke - Direct

185

1   a bit of international training on the subject of gender

2   violence, human trafficking, working exploitation.

3           I was part of the global training team at the U.N.

4   out of Vienna.  And I have worked on several contracts with the

5   Department of State to provide training to other governments,

6   to attorneys, judges, law enforcement, police, community

7   members, NGOs, other government people.  So I have done a lot

8   of that international training and workshops.

9           I have been involved with NGOs, non-governmental

10  organizations, in the U.S. to help build capacity, build

11  programs to provide services to this population.

12          I've participated in writing training curricula, and

13  continue to do training.  I have worked with multidisciplinary

14  groups at the government level.  And I have served as an expert

15  witness on a number of cases.

16  Q.   How many cases have you served as an expert witness?

17  A.   I don't know exactly.  I haven't counted recently, but

18  between 30 and 35 cases since 2007.

19  Q.   Do you teach human trafficking?

20  A.   Pardon me?

21  Q.   Do you teach in the field of human trafficking?

22  A.   Well, I consider the training that I do a form of

23  teaching, yes.

24  Q.   Do you teach at any universities as well?

25  A.   Not currently.  I have taught cross-cultural counseling at

F. Burke - Direct

186

1    New York University.  And I think that's all in this related

2    field.

3              MR. RINALDO:  Your Honor --

4              THE COURT:  Yes, sir.

5              MR. RINALDO:  In an effort to expedite the process, I

6    think I told you I might do this, we are willing to stipulate

7    that Ms. Burke, based on her education, her training, and her

8    experience under Rule 702 should be permitted to offer opinion

9    testimony in the case.  There is no need to draw it out.

10             But the opinion testimony would be limited to what

11   you said she would be permitted to testify to.

12             THE COURT:  Right.

13             MR. RINALDO:  Which are characteristics,

14   characteristics of those who are victims of human trafficking.

15             THE COURT:  Relevant to our case?

16             MR. RINALDO:  Yes.

17             THE COURT:  All right.  Thank you, sir.

18             All right.  Ms. Burke will be qualified as an expert

19   in the field of human trafficking as it relates to the -- well,

20   why don't you characterize what you want her to testify to.

21             MS. PATTERSON:  Absolutely, Your Honor.  We would

22   tender her as an expert on the patterns and practices of human

23   trafficking, including victim profiles, perpetrator profiles,

24   or any sort of trafficking behaviors.

25             THE COURT:  All right.  And that's what I ruled on

1    previously.  So she will be permitted to testify in those

2    areas.

3              MR. RINALDO:  As patterns.

4              THE COURT:  Yes.

5              MS. PATTERSON:  Your Honor, we would like to admit

6    Ms. Burke's curriculum vitae, which is Plaintiff's Exhibit 13

7    into evidence as well.  I can lay the foundation.

8              THE COURT:  Any objection to that?

9              MR. RINALDO:  Your Honor, might I take a look at it?

10             THE COURT:  Sure.  Well, let's have Ms. Burke take a

11   look at it and make sure it is her latest CV.

12             MS. PATTERSON:  It is tab 13.  Sorry, tab 12.

13             MR. RINALDO:  I was going to say there is nothing in

14   tab 13.

15             MS. PATTERSON:  Tab 12.

16             COURT SECURITY OFFICER:  There is nothing in tab 13.

17             MS. PATTERSON:  Tab 12.

18             MR. RINALDO:  Your Honor, I think I am going to

19   object to this on several grounds.  One being that I think it

20   is -- unless you don't want me to say.

21             THE COURT:  Why don't we just -- why don't we hold it

22   for now.  And I will give you an opportunity to talk about this

23   after our jury leaves, and I will rule at that time.

24             So your motion to admit it is pending.  We will

25   discuss it further.  We just won't admit it at the present

F. Burke - Direct

188

1   time.  I don't think you need it for the testimony purposes.

2   So why don't you move on to the testimony.

3            MS. PATTERSON:  Yes, Your Honor.

4            THE COURT:  All right.

5   BY MS. PATTERSON: (Continuing)

6   Q.   Ms. Burke, you mentioned earlier that you supervised

7   people who help victims submit T visas; is that right?

8   A.   Yes.

9   Q.   I want to go back to that.  You mentioned that the T visa

10  is -- can you explain again what a T visa is.

11  A.   Well, I'm not an attorney.  The best of my understanding,

12  a T visa is granted to people who are deemed to be victims of a

13  severe form of trafficking.

14           And the victim petitions, sends a petition to

15  adjudicators at the Vermont Service Center.  It's not a

16  criminal procedure, it's not adversarial, but there are strict

17  standards of evaluation that a board of adjudicators looks at

18  to evaluate.

19           THE COURT:  All right.  This is outside of her

20  expertise as she has just admitted, so let's move on.

21           MS. PATTERSON:  Your Honor, may I ask her questions

22  about her experience with supervising the T visas and her

23  understanding of T visas?

24           THE COURT:  Supervising -- how did she supervise --

25  she is supervising people who have those visas?

189

1           MS. PATTERSON:  No, Your Honor.  She testified

2    earlier that she supervises people who help, as direct

3    services, victims of human trafficking submit T visas.

4           If I may proffer, Your Honor --

5           THE COURT:  No, let's approach the bench.

6           MS. PATTERSON:  Yes, Your Honor.

7           THE COURT:  I am sorry for the noise again.  Please

8    feel free to stand up and stretch any time you want.

9           NOTE:  A side-bar discussion is had between the Court

10   and counsel out of the hearing of the jury as follows:

11   AT SIDE BAR

12           THE COURT:  So I don't want her going into the

13   decision-making process that her group is going through to

14   determine who gets a visa and who doesn't get a visa under

15   these circumstances.

16           So what's the relevance then?

17           MS. PATTERSON:  Yes, Your Honor.  We were merely

18   going to ask her about, to best of her understanding, what

19   components there are to a T visa.  For example, you have to

20   file the T visa application along with the Supplemental B Form.

21   And whether her understanding is, in her direct experience, if

22   in every situation she submits the T visa application along

23   with the Supplemental B, and her understanding of how many T

24   visas there are.

25           Which is in her -- I can lay additional foundation,

1    but it's within her knowledge that she knows how many T visas

2    there are and her understanding given her expertise and

3    experience in the area how many are granted.  Not the

4    decision-making process, but just the pure numbers.

5              MR. RINALDO:  But, Your Honor -- go ahead, I'm sorry.

6              THE COURT:  What are the numbers?

7              MS. PATTERSON:  So the numbers, Your Honor, is that

8    in the last 15 years there have been 6,300 granted.  And I

9    can't remember what she said, but there is a maximum number

10   that are permissible, and that the U.S. government rarely meets

11   that number.  They have met maybe 900 a year filed and 400 are

12   granted.

13             This is something she knows through her experience as

14   a human trafficking expert.  I will not ask her about why those

15   T visas are granted.  Just pure statistics.

16             MR. RINALDO:  But how is that relevant to this case,

17   Your Honor?  And how is it within her area of qualification

18   that we just did?

19             MS. PATTERSON:  Respectfully, Your Honor, Mr. Rinaldo

20   raised the issue of my client's T visa.  And so it's -- we

21   should be permitted to explore what the T visa is and what the

22   statistical numbers are.

23             MR. RINALDO:  No.  She already -- she has already

24   said what a T visa is, she has explored it.  But to go on and

25   say, well, you know, lots of people apply, but only some get

F. Burke - Direct

1    granted, and she got granted, that is like vouching for the

2    validity of it.

3              MS. PATTERSON:  Your Honor, we will not ask her to

4    vouch for --

5              THE COURT:  That's what the numbers do.  When you get

6    into the numbers of those that are admitted, those that aren't,

7    and the other criteria, and the application process is vouching

8    for her testimony.

9              So I am going to exclude it.  Your exception is

10   noted.

11             MS. PATTERSON:  Yes, Your Honor.

12             THE COURT:  As far as the CV is concerned, it is a

13   very detailed CV, awards, publications.  And I don't know

14   whether you want to highlight anything with her testimony about

15   anything that you believe is relevant to her credentials in the

16   CV.  And we're going to go beyond tonight with her testimony,

17   so look at that tonight.

18             MS. PATTERSON:  Yes, Your Honor.

19             THE COURT:  But I am not going to allow -- I am not

20   going to admit the entire CV given its extensiveness.  And it's

21   not all relevant to what she is testifying about today.  So

22   look at what you want to highlight.

23             MS. PATTERSON:  Sure.

24             THE COURT:  And work it in that way.  Okay?

25             MR. RINALDO:  Thank you.

F. Burke - Direct

192

1          MS. PATTERSON:  Absolutely, Your Honor.  Just so Your

2     Honor knows, we expect that her testimony will last at least

3     another hour or more.

4          THE COURT:  Right.  I think we will go until 5:30

5     today, I mentioned that to the jury, and stop there.  And then

6     that's when we will look to finish in the evenings.  So we will

7     start at 9 o'clock tomorrow.

8          MS. PATTERSON:  Okay.

9          MR. RINALDO:  We will start at 9 tomorrow?

10         THE COURT:  Does that work for everyone?

11         MS. PATTERSON:  Yes, Your Honor.

12         MR. RINALDO:  That's fine.

13         NOTE:  The side-bar discussion is concluded;

14    whereupon the case continues before the jury as follows:

15    BEFORE THE JURY

16         THE COURT:  All right, thank you.

17         Please proceed.

18         MS. PATTERSON:  Thank you, Your Honor.

19    BY MS. PATTERSON: (Continuing)

20    Q.   Ms. Burke, I would like to direct you back to some of the

21    experience you mentioned previously.  Have you ever interviewed

22    human trafficking victims?

23    A.   Yes, I have.

24    Q.   What are some of the challenges in interviewing human

25    trafficking victims?

1  A.    It depends on the person.  I've interviewed hundreds of

2  victims, and each person is different, has a different

3  experience before the trafficking, during, and after.

4         The challenges for me can be language and culture.

5  So I often use an interpreter when I'm interviewing.  And the

6  opportunities to interview are usually not, in my capacity are

7  usually not extensive.  I mean, when I was at an agency, they

8  were.  But working on my own as a consultant, I might interview

9  a person for several hours.  So that can be a challenge.

10        People have good days and bad days, and certainly

11 victims of trafficking by and large have suffered a crime that

12 can leave them in various states of distress.  I often

13 interview people several years after they have been in the

14 trafficking situation.  There can be something that is known as

15 interview fatigue if it involves an interview of a person who

16 is going through a legal process, an immigration process, and

17 has been interviewed repeatedly by different people.  There can

18 be interview fatigue.

19        Trauma plays a major part in any kind of interaction,

20 if there is evidence of trauma, and how that plays out and how

21 that affects both my questioning or having a dialog with

22 someone in an interview.  And it certainly affects the person

23 who is responding to me.

24        So those are some of the immediate challenges that

25 come to mind.

F. Burke - Direct

194

1    Q.   In your experience interviewing victims and through your

2    experience with human trafficking, are there common

3    characteristics for human trafficking victims?

4    A.   Well again, everyone is an individual, and we're talking

5    about people who are -- trafficking victims can be of any age,

6    can be of any gender, can be of any nationality, any ethnicity,

7    any religious background, et cetera.

8         I would say the common characteristics are that

9    victims of trafficking have been exploited, and they have been

10   exploited so that someone else could gain from that

11   exploitation.

12        Another characteristic are vulnerabilities, and those

13   differ according to the person.  But I would say a common

14   vulnerability is that a person is in need of something, usually

15   in need of the opportunity to work, to earn money, to have a

16   better life, to support a family.

17        And these vulnerabilities then make it easier for

18   people to exploit them for their own gain.

19   Q.   Is there a common victim profile for victims of human

20   trafficking?

21   A.   A profile?  I think I would have break that down into the

22   type of trafficking.

23   Q.   Sure.

24   A.   So, for instance, if we're looking at trafficking into

25   agriculture, it's both men and women.  I think there are

F. Burke - Direct

195

1    currently more men being trafficked into agriculture.  Probably

2    these victims don't have a high educational level.

3           And for victims of other kinds of trafficking, a

4    certain skill might be prevalent.  For victims of domestic

5    servitude, domestic worker trafficking, we see mostly women, by

6    and large from Asia, Africa, Central America, Latin America.

7    The age varies, but I would say the bulk of victims that I have

8    seen in many trafficking cases is somewhere between 20 and 45.

9    There are outliers on both ends.

10          So I would say those would be characteristics, not

11   necessarily a profile.

12   Q.   Is there victim characteristics for victims of sex

13   trafficking?

14   A.   I think it's similar to other kinds of trafficking, that

15   people are vulnerable because they are in need of opportunity,

16   they are in need of financial resources, in need of something

17   that they are not able to attain where they currently are and

18   are easily then exploited into sex trafficking.

19          We see younger people that seem to have particular

20   vulnerabilities, that don't have a stable home life perhaps,

21   who find themselves homeless and can be exploited by people who

22   are promising them.  I mean, that happens in every case, that

23   someone is being promised something, and that promise becomes

24   something else.

25   Q.   What about perpetrators of human trafficking, are their

F. Burke - Direct

196

1    common characteristics among perpetrators?

2    A.   I would say that there is some greed involved, that people

3    find a way to exploit vulnerabilities so that they can benefit

4    from the work of others.  No matter if that work is compelled

5    labor or commercial sex.

6         But there is no real profile.  Perpetrators can be

7    family members, can be organized crime, can be gangs, can be

8    the people next door, can be government officials, can be

9    clergy, can be anybody.

10   Q.   So you mentioned that there are vulnerabilities that make

11   these victims susceptible to trafficking.

12        Based on your experience, how are people brought into

13   domestic servitude trafficking?

14   A.   Individuals, mostly women in this case of domestic

15   servitude, are seeking employment.  These women probably don't

16   have a lot of skills because of where they come from perhaps.

17   And there are many people around the world who are looking for

18   domestic workers and offer jobs of doing domestic work,

19   housecleaning, being a nanny, et cetera.  And people accept

20   these jobs.

21   Q.   How do perpetrators keep the domestic workers after they

22   have been trafficked?

23   A.   How do they keep them?

24   Q.   Yeah.

25   A.   Well, trafficking is based on force, fraud, or coercion.

F. Burke - Direct

197

1  And those same elements are used to hold onto, to control a

2  person in a domestic worker situation.

3         So that can take many forms.  It can take the form of

4  physical force, physical abuse, threats, sexual assault

5  threats, threats to one's reputation.  It can take the form of

6  psychological control, manipulation where a domestic worker is

7  confined pretty much to a house.

8         You need to think about it in terms of domestic

9  workers being among the most hidden members of a society often,

10 just inside a home, and the only people that know them are the

11 people that come and go in that home.

12        So different kinds of surveillance, whether it be a

13 formal form of surveillance or informal because someone is

14 living in the same house as the employer.  Threats to maybe

15 expose someone's immigration status to law enforcement, or

16 threats to harm someone, or harm someone's family.

17        Reputational threats are quite prevalent.  Employers

18 will often say, you know, if you try to escape or if you talk

19 to people about what's going on here, we will tell your family

20 what you've been doing.

21        So a lot of stigma around some of the situations

22 within a domestic worker's environment.  And it's not the

23 domestic work itself that's terrible, it's the situation and

24 the circumstances of what goes on in addition to that work.

25 Q.   You mentioned that domestic workers are some of the most

F. Burke - Direct

198

1   hidden members.  What do you mean by that?

2   A.   Well, it's very common for people who have a domestic

3   worker to just keep the person in the home.  And if they are

4   exploiting that domestic worker, that is especially true.  The

5   only time that people would see them, they wouldn't see the

6   exploitation.  People would see normal activities.

7            If someone is taken out of the home, they wouldn't

8   see any lack of payment, they wouldn't see any document

9   withholding, they wouldn't see any abuse because that is taking

10  place in the home.  And generally employers would not exhibit

11  those behaviors in front of other people.

12           So that's what I mean, that they are in someone's

13  private dwelling.

14  Q.   Do domestic workers have any sort of special

15  vulnerabilities compared to other types of workers?

16  A.   Well, I think the isolation.  I think the dependency on

17  the employers.  I mean, they are living in the employer's home.

18  So they are dependent upon them for housing, for food, for

19  other things.  Complex relationships develop among employers

20  and their domestic workers.

21           And there is a power imbalance between the employer

22  and the worker that makes them very vulnerable.

23  Q.   So I want to follow up on a couple of those issues.  First

24  you mentioned that a complex relationship develops.  What do

25  you mean by that?

F. Burke - Direct

1    A.   Well, again, each case is different, but depending on what

2    the relationship is to begin with between an employer and their

3    domestic worker, are they known to them beforehand, are they

4    family members who then have these domestic workers.  Are they

5    other people that somebody told them about?  Or are they

6    strangers?

7          So all of that plays into then what kind of

8    relationship develops once someone is in a situation where

9    there is exploitation.

10         So if you know someone and you thought this was going

11   to be a good situation, and you were told that you would do X,

12   Y, and Z, and you would get this much money, and then it

13   becomes quite different, that's deception.

14         And I think depending upon the relationship with the

15   employer, that can have a greater effect or a lesser effect on

16   someone.  If you are deceived by someone you trusted, the

17   result is usually more severe.

18   Q.   What results are you talking about?

19   A.   I'm talking about how a worker, the impact on a worker,

20   the emotional, physical, psychological well-being of a worker.

21         THE COURT:  Ms. Patterson, why don't we stop there

22   for the day.  Does that work?  If you want to ask a couple of

23   additional questions to finish this topic, please, go ahead,

24   and then we'll finish for today.

25         MS. PATTERSON:  Yes, Your Honor.  If I may just ask

F. Burke - Direct

200

1    one question.

2              THE COURT:  Sure.

3    BY MS. PATTERSON: (Continuing)

4    Q.   Ms. Burke, you mentioned also that there was a power

5    imbalance.  What did you mean by that?

6    A.   Well, the people that employ domestic workers, they have

7    more money.  They have probably a better standing in the

8    community.  They probably have more education.  They probably

9    have jobs.  They are more successful.

10             And the domestic worker has very little of any of

11   those things, and they are dependent on the employer.

12   Q.   And how does that impact that relationship?

13   A.   It makes it very difficult for a domestic worker to assert

14   herself, to complain, to ask to leave, to ask to make changes.

15             And in many cultures it's just not appropriate.

16   Someone wouldn't even think about questioning their employer

17   because of this power and cultural imbalance.

18             MS. PATTERSON:  No further questions for today, Your

19   Honor.

20             THE COURT:  All right.  Thank you, Ms. Patterson.

21             All right, Dr. Burke, we're going to excuse you for

22   tonight and we will begin again at 9 o'clock tomorrow morning.

23   All right?

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  And I will excuse you at this time until

F. Burke - Direct

201

1   9 o'clock tomorrow morning.

2          Please remember how important it is that you not

3   discuss the testimony you have heard with anyone tonight, not

4   do any investigation, not do any research.  Enjoy the evening,

5   and first thing I will ask you in the morning is whether you

6   have heeded my request.

7          So does 9 o'clock work for everybody?  Is that good?

8   Okay.

9          Thank you all, you are excused, and we will see you

10  tomorrow morning at 9 o'clock.

11         NOTE:  At this point the jury leaves the courtroom;

12  whereupon the case continues as follows:

13  JURY OUT

14         THE COURT:  All right, please have a seat.

15         So you are in the middle of your testimony, so please

16  don't discuss the testimony that you have already given here

17  today.  You are certainly allowed to consult with counsel about

18  issues not already raised if you so choose.  All right.

19         THE WITNESS:  Thank you.

20         THE COURT:  All right, thank you.  You are excused.

21         NOTE:  The witness stood down.

22         THE COURT:  Anything we need to discuss at this time

23  before we break until tomorrow morning?

24         MS. PATTERSON:  Not from us, Your Honor.

25         THE COURT:  Mr. Rinaldo?

```
 1              MR. RINALDO:  Not from me, Your Honor.

 2              THE COURT:  All right.  Then we'll see you all at 9

 3    o'clock tomorrow morning.

 4              Look at the CV and see what else you want to put in

 5    there.  There is just so much that isn't focused on the human

 6    trafficking expertise.  With the objection, it's well-founded.

 7              So you look at that and see what you want to do with

 8    identifying any specific other achievements, awards, honors

 9    that you believe you would like to address with Dr. Burke.  All

10    right?

11              MS. PATTERSON:  Yes, Your Honor.

12              THE COURT:  All right.  Good then.

13              All right, thank you all.  We are in recess.

14              NOTE:  The July 25, 2017 portion of the case is

15    concluded.

16         --------------------------------------------------

17

18

19

20

21              I certify that the foregoing is a true and

22         accurate transcription of my stenographic notes.

23

24
                        /s/  Norman B. Linnell
25                    Norman B. Linnell, RPR, CM, VCE, FCRR
```