UNITED STATES DISTRICT COURT?
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
SARAH ROE,                    :
            Plaintiff,        :
                              :
    -vs-                      :     Case No. 1:16-cv-562
                              :
                              :
LINDA HOWARD, et al.,         :
            Defendants,       :
                              :
------------------------------:
```

V O L U M E   2 of 5

TRIAL TRANSCRIPT

July 25-28 & 31, 2017

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

Melissa L. Patterson, M. Carter DeLorme, and Andres C. Salinas,
Counsel for the Plaintiff

Richard F. Rinaldo and Timothy J. Battle,
Counsel for Defendant Linda Howard

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| FLORENCE BURKE | | |
| | DIRECT | 206 |
| JANE DOE | | |
| | DIRECT | 226 |
| | CROSS | 251 |
| SARAH ROE | | |
| | DIRECT | 271 |

1          NOTE:  The July 26, 2017 portion of the case begins

2    in the absence of the jury as follows:

3    JURY OUT

4          THE COURT:  Good morning.  I see all counsel and the

5    parties are present.  Good morning to each of you.

6          Any preliminary matters that we need to discuss

7    before we bring Dr. Burke back in?

8          MS. PATTERSON:  Not from us, Your Honor.

9          MR. RINALDO:  No, Your Honor.

10          THE COURT:  All right.  Then, Joe, let's get our

11    jury, please.

12          NOTE:  At this point the jury returns to the

13    courtroom; whereupon the case continues as follows:

14    JURY IN

15          THE COURT:  All right.  Please be seated.

16          Good morning, ladies and gentlemen.  Thank you for

17    working your way back in here with all this traffic this

18    morning.

19          Let me start out by asking whether you all listened

20    to my admonitions and didn't do any research, or investigation,

21    or speak to anybody about the case?  If I could have a nod of

22    heads that you listened and obeyed the commandments, I guess I

23    would call them.  Thank you, it's really important.

24          All right, let's get Dr. Burke back on the stand.

25          Good morning.

F. Burke - Direct

206

1          THE WITNESS:  Good morning, Your Honor.

2          THE COURT:  All right.  Please proceed, Ms.

3    Patterson.

4          MS. PATTERSON:  Absolutely.

5          FLORENCE BURKE, having been called by counsel for the

6    plaintiff, and having been previously duly sworn, continues to

7    testify and state as follows:

8     DIRECT EXAMINATION

9    BY MS. PATTERSON: (Continuing)

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   I want to take a step back and talk to you a little bit

13   about some of your other credentials.  Have you received any

14   awards for your work in human trafficking?

15   A.   Yes, I have.

16          MR. RINALDO:  Excuse me, Your Honor, objection.

17   Aren't we past her credentials?

18          THE COURT:  No.  As we talked yesterday, if she wants

19   to -- do you have any objection to the CV going in?

20          MR. RINALDO:  Well, I haven't seen the revised one

21   that you suggested that they prepare.

22          THE COURT:  Yeah, I didn't suggest revising it.  I

23   just suggested that Ms. Patterson be allowed to highlight

24   portions of it if she wanted to go back and do that.

25          So I am going to permit that.  Or if you want the CV

207

1    to go in --

2           MR. RINALDO:  If that's an alternative to the CV

3    going in, then I will be fine with that.

4           THE COURT:  All right.  Then the CV will be

5    Exhibit 12; is that right?  Maybe I didn't understand you.

6           MR. RINALDO:  Should I come over, Your Honor?

7           THE COURT:  Yes.

8           MR. RINALDO:  What I said, Your Honor, was in terms

9    of them proceeding this morning with further qualifications of

10   Ms. Burke, that if that's an alternative to the CV going in, I

11   really don't object.  If it's both, then I do object because

12   it's cumulative.

13          THE COURT:  So you would rather have Ms. Patterson

14   ask --

15          MR. RINALDO:  I am sorry.

16          THE COURT:  -- specific questions that she wants to

17   highlight?

18          MR. RINALDO:  I think that's better, rather than the

19   CV itself.

20          THE COURT:  Okay.  Thank you.  Then you may proceed.

21          MS. PATTERSON:  Thank you, Your Honor.

22   BY MS. PATTERSON: (Continuing)

23   Q.   Ms. Burke, we were talking about if you had received any

24   awards or honors for your work in human trafficking.

25   A.   Yes.  In 2007 I received the Victim Service Award from the

F. Burke - Direct

1    Office for Victims of Crime out of the Department of Justice.

2    I was also honored by the Department of Labor Wage and Hour

3    Division.

4            And in 2013 I was extremely honored to be presented

5    with the first Presidential Award for extraordinary efforts in

6    combatting human trafficking, and that was presented by

7    Secretary of State John Kerry at a Cabinet level meeting.

8    Q.    Thank you, Ms. Burke.  Are you familiar with the Freedom

9    Network?

10   A.    Yes, I am.

11   Q.    What is it?

12   A.    I was one of the founders of the Freedom Network in 2001.

13   The Freedom Network is a national network of organizations,

14   individuals, academics, advocates, attorneys, and service

15   providers, all of whom spend at least half of their work time

16   devoted to issues of human trafficking.

17   Q.    Does the Freedom Network put on any conferences?

18   A.    It puts on a yearly conference.  I think we have had 15 or

19   16, I should know that.

20   Q.    And what do you cover at these conferences?

21   A.    These conferences are really training conferences.

22   Two-and-a-half, three-day conferences that cover a multitude of

23   topics related to human trafficking and draw a multi-

24   disciplinary audience from around the country and some

25   international attendees as well.  And it's made up of panels

F. Burke - Direct

1   that are also multidisciplinary, presenting emerging issues,

2   basic how to deliver services, updates on immigration remedies,

3   a variety of topics.

4   Q.   And do you present at these conferences?

5   A.   I have, yes.

6   Q.   I want to take a step back.  What is human trafficking?

7   A.   Well, the way that I explain it in everyday terms is --

8          THE COURT:  This is as Dr. Burke defines it?

9          MS. PATTERSON:  Yes, Your Honor.

10          THE COURT:  All right, go ahead.

11   A.   It's a scheme in which people are exploited by another

12   person or persons for purposes of compelled labor or commercial

13   sex.  And this exploitation takes place through force, fraud,

14   and coercion.

15   BY MS. PATTERSON: (Continuing)

16   Q.   Do you find in your experience that there are

17   misconceptions about human trafficking?

18   A.   Misconceptions?

19   Q.   Yes.

20   A.   Yes, I think there are many, particularly to the general

21   public.  We are a society that relies a lot on the media and

22   media portrayals of human trafficking are often very

23   sensationalized and depict people that are chained up, locked

24   up, beaten, and often depict victims who have been forced into

25   prostitution.

F. Burke - Direct

1              When in fact there are many types of labor which are

2    represented in human trafficking.  And it's a much more subtle

3    hidden crime than that that is portrayed and understood by the

4    general public.

5    Q.   In your experience with victims of human trafficking, do

6    they understand what human trafficking is?

7    A.   I don't think I've ever met a victim who at the time they

8    were in the situation or right after would define it with those

9    words.  Most people don't understand that that is what's going

10   on.

11             When I meet survivors years after, they know the term

12   because they have been receiving some kind of assistance and

13   they have learned that that is what was going on in their

14   situation.

15   Q.   I want to go back to some of what you were talking about

16   both just now and yesterday, and you talked about force, fraud,

17   and coercion.  Let's talk about force first.

18             What do you mean when you talk about force?

19   A.   Well, again, if you go to the subject of what is the

20   general understanding, people would jump to the physical force,

21   but there are many factors in the crime of human trafficking

22   that are not physical in nature, but can be more subtle forms

23   of compelling somebody to do something, through threats,

24   through psychological pressures, through other kinds of

25   pressures.  And there are times when physical force does come

F. Burke - Direct

211

1    into play in these cases.

2           And fraud, I'm referring to, at the onset before

3    someone accepts a job or a certain kind of work, they have a

4    certain understanding of what that will be.  Whether they are

5    given a formal contract or not, they are promised certain

6    things, a job is described to them, these are the duties that

7    you will have, these are the hours you'll work, some general

8    kinds of things like that.

9           And then if someone gets into the situation and it

10   becomes a trafficking scheme, it's quite different.  So there

11   is deception involved.  So there is fraud in the way it is

12   presented to them, is the way I describe it.

13          And coercion can be many things.  I look primarily in

14   my work at the psychological coercion, which are the subtle

15   ways that employers, subtle and not so subtle ways that

16   employers control their workers.  Again using threats,

17   withholding basic necessities, freedom, things like that.

18   Q.   So before we get into the psychological pressures that you

19   mentioned, you said that there are also other pressures.  What

20   other pressures are there?

21   A.   Pressures involved in what?  If you could repeat that.

22   Thank you.

23   Q.   Sure.  You were talking about how when you're talking

24   about force, there are psychological pressures and there are

25   other types of pressures as well that keep the victims in

F. Burke - Direct

1   trafficking situations.

2           What were you talking about when you said there are

3   other pressures?

4   A.   Well, I think when we're looking at people who leave a

5   country of origin to take a job in another country, there is

6   tremendous pressure on them to succeed at the job, to earn

7   money in order to help their family, to maintain their

8   reputation.  It's a tremendous loss, actually, to leave

9   someone's country of origin and leave behind everything that is

10  familiar and to go into a situation that is not familiar.  And

11  yet there is this pressure to succeed and provide from people

12  back in their country who might not understand what it is they

13  are facing in this new situation.

14  Q.   You also talked about fraud, that people have a certain

15  understanding of what that job might be.  Can you give some

16  examples of the types of deception that a trafficker would use

17  to induce a victim.

18           MR. RINALDO:  Your Honor --

19           THE COURT:  Yes, sir.

20           MR. RINALDO:  I take it, it is her experience?

21           THE COURT:  In your experience.

22           MS. PATTERSON:  Of course, Your Honor.

23           THE COURT:  Thank you.

24  A.   Yes.  In my experience with hundreds of cases of human

25  trafficking, there are many kinds of deception.  When we're

F. Burke - Direct

1    talking about or describing the kinds of work that someone

2    agrees to do, that work can be outlined as far as these are the

3    duties you'll have, these are the hours you'll work, these are

4    the days you'll have off, and this is the amount of money that

5    you will earn, and these are the conditions of your employment,

6    and where you live, and what you have -- if you have to wear a

7    certain uniform or not.  All of those things that come into

8    play with a position of employment are what is set out and

9    promised.

10          And the deception is when someone finds themselves in

11   a very different situation, which is what happens in

12   trafficking cases.

13   BY MS. PATTERSON: (Continuing)

14   Q.   Finally, we talked about coercion and the psychological

15   pressures, so I want of kind of unpack and that and go step by

16   step.

17          You talked about threats.  Are those threats

18   physical?

19   A.   In my experience, the threats can run the gamut from

20   physical harm, physical harm toward the worker, physical harm

21   toward the worker's family, physical harm toward the worker's

22   acquaintances.

23          The threats can also be against the worker.  If you

24   try to leave, if you try to report what's happening, you will

25   be arrested, I will see that you are arrested, or deported.  No

F. Burke - Direct

1  one will believe you, you don't speak the language, you don't

2  have any documents to show.  You're not from here.

3          Law enforcement is often used as a threat.  If you

4  try to go to law enforcement and report this, they in turn will

5  punish you.

6          Other threats are increasing the workload.  There is

7  just the conditions of employment can be exacerbated in a

8  negative way.

9  Q.   Going back to the physical harm.  How severe is the

10  physical harm that you have seen in your experience?

11  A.   Again, it runs the gamut, depending upon the case.  I have

12  seen extreme physical harm that necessitated ongoing medical

13  attention and people needed to be hospitalized, been emergency

14  situations.  To subtle physical harm.

15  Q.   What sort of subtle physical harm?

16  A.   Trying to restrain a person.  For example, if someone is

17  asking for a day off and the employer says no, you can't have a

18  day off, and there is this kind of holding on.

19          It runs the gamut.  It's very hard to describe in

20  such general terms.

21  Q.   With respect to physical violence, in your experience have

22  you seen sexual violence being used?

23  A.   Yes, I have.

24  Q.   In what sort of circumstances?

25  A.   I have seen sexual violence being used as a means of

F. Burke - Direct

1   control, to keep a worker in a situation.  I have seen it used

2   as part of the whole scheme where someone is ultimately in both

3   labor servitude and sexual servitude.

4           Sexual assault in non-commercial sex trafficking is

5   more common than people realize.

6           So, yes, I have seen it.

7   Q.   When you say non-commercial sex trafficking, what do you

8   mean by that?

9   A.   Human trafficking is often sort of divided into labor

10  trafficking and forced commercial sex.  So I'm talking about

11  people who are forced into prostitution, that is commercial

12  sex, when there is a financial gain from the sexual acts that

13  someone is being forced to do.

14  Q.   So what is the opposite of that?  When you say

15  non-commercial sex trafficking, what are you referring to?

16  A.   When it's non-commercial, I'm referring to the sexual

17  assault of workers as part of the labor that they are involved

18  in, but it's not commercial sex.

19          So, for example, if someone is a domestic worker and

20  they are also being sexually assaulted, that's non-commercial.

21  Q.   You also talked yesterday a little bit about surveillance.

22  I want to go back to that.

23          In what ways do traffickers surveil their victims?

24  A.   Again, there are many examples.  There are cases where

25  there is a formal means of surveillance, cameras, cameras in a

F. Burke - Direct

216

1   work site, cameras in a home.

2            There are less formal means of surveillance, just

3   someone always having an eye on the worker, seeing where they

4   are, what they're doing, if they're working, what they're doing

5   when they're not working.

6            There might be surveillance used by cell phone use.

7   If someone has a cell phone and the worker is free to leave the

8   work site, but they are always on the other end of the cell

9   phone with the employer checking up how long they're gone,

10  where they went.

11           All of those are the forms of surveillance that I'm

12  referring to.

13  Q.   In your experience with respect to domestic workers, is

14  the surveillance the kind of more formal mechanisms of

15  surveillance or are these more informal methods?

16  A.   In my experience -- well, I've seen both.  So I don't know

17  if I can quantify except to say I think for the most part in

18  domestic work you're talking about someone who is living in the

19  home.  So naturally they are part of the home and it's easier

20  to keep an eye on people.

21  Q.   And you mentioned that domestic workers are in the home.

22  I think you talked about that yesterday with respect to they're

23  isolated from people.

24           In what way does that isolation impact their

25  situation?

F. Burke - Direct

217

1    A.   I think being isolated in someone's home limits the

2    opportunity to develop a social network, social structure of

3    support, friendships, outside activities that would be common

4    for someone of whatever age the worker is.  Any kind of

5    cultural activity, religious activity might be limited because

6    of this isolation.

7           Also, it limits the ability to be aware of

8    institutional support, organizations that might be of help if

9    someone is seeking help.

10   Q.   What other sort of psychological pressures do traffickers

11   use in your experience to control their victims?

12   A.   In my experience, one of the things that happens to people

13   who are trafficked is sort of a gradual erosion of one's

14   self-esteem because of lack of freedom, freedom to make their

15   own choices about things, freedom to have their own schedules,

16   freedom to have enough time off from a job to have the social

17   supports that I described, or the institutional supports,

18   religious, cultural supports.

19          And if a worker is in a situation where they are

20   being demeaned by what they are asked to do or by any kind of

21   verbal putting down of the person, this can weaken someone's

22   self-esteem, and it sort of adds to a kind of compliance where

23   people go along with what's happening because they can't find a

24   way out of it.

25   Q.   You talked about this gradual erosion of self-esteem.  In

F. Burke - Direct

1    your experience, do victims leave the home of their traffickers

2    if presented with the opportunity?

3    A.    Are you referring to just domestic workers?

4    Q.    Yes, just with domestic workers.

5    A.    No, my experience --

6              MR. RINALDO:  Your Honor --

7              THE COURT:  Your objection?

8              MR. RINALDO:  To the form of the question, Your

9    Honor.

10             THE COURT:  Overruled.  She has qualified the

11   question, and I will permit that question.  All right.

12   A.    In my experience, domestic workers, even when presented

13   opportunities to come and go in a home, will find it very

14   difficult to leave a situation permanently.  And the reasons

15   for that are things that I have mentioned before in that there

16   might not be a common language.  A person does not know where

17   to access help or who to trust to help them.  Particularly if

18   the entity, such as local law enforcement, have been used as a

19   threat, then someone is not going to see them as an avenue of

20   help.

21             Often these workers don't have their identity

22   documents, so that will prevent them from leaving.  And a lack

23   of financial resources, where will they go, what will they do,

24   how will they manage it.

25             So there are cases where people have been alone for

F. Burke - Direct

219

1    any number of hours, days, months, and have an opportunity to

2    leave, but can't.  It's an avenue of escape that doesn't have a

3    reality to it for these workers.

4    BY MS. PATTERSON: (Continuing)

5    Q.   When you say avenue of escape that doesn't have a reality,

6    what do you mean by that?

7    A.   I mean that even if they can walk out the door, the

8    reality for them is then what?  So because of what they know of

9    their circumstances or what they don't know about the

10   environment out there, it's not realistic to think that they

11   could leave.

12   Q.   Are there any other sort of threats that perpetrators of

13   human trafficking use against their victims?

14   A.   I think the threat of exposing a worker to law enforcement

15   by saying, you know, you don't have papers, or I can have you

16   arrested or jailed, is a major threat.

17         If someone has been threatened that the employers

18   will give certain personal details to the family of the

19   worker's that will harm their reputation both with their family

20   and with other community members of their ethnic communities,

21   that can be a very strong threat.

22   Q.   I want to step back and talk to you a little bit about

23   identifying victims of human trafficking.

24         Do you have any experience with training or otherwise

25   with identifying victims of human trafficking?

F. Burke - Direct

220

1    A.    Yes.

2    Q.    What are those experiences?

3    A.    Well, in the training activities that I have been involved

4    in that I mentioned yesterday, mainly training as part of a

5    multidisciplinary team, so it's usually myself and an attorney,

6    maybe an immigration attorney, and a prosecutor to talk about

7    the various parts of this crime, and in those trainings we

8    describe certain indicators or red flags that might indicate

9    that trafficking is going on.

10   Q.    What are those red flags?

11   A.    Well, there is kind of a long list of them.  And

12   individually, they can be things that you say, well, you know,

13   this happens all the time, but it's when you look at a whole

14   constellation of factors.

15         So you're looking at a work situation, is someone

16   free to come and go from a work situation?  Do they have to

17   live on site?

18         You're looking at, is the remuneration, is the pay

19   commensurate with what the work is?  Are people given

20   sufficient time off?

21         Does there appear to be an element of fear present?

22   Does the person have possession of their own identity

23   documents?

24         Those are some of the indicators.

25   Q.    Are those indicators -- are there outward manifestations

F. Burke - Direct

1    of the relationship between the victim of human trafficking and

2    the perpetrator of human trafficking?

3    A.    Can you repeat the question?

4    Q.    Sure.  I guess what I'm asking is, when somebody is on the

5    outside looking at a victim of human trafficking, and the

6    perpetrator of human trafficking, can the average person see

7    these red flags?

8    A.    Certainly not all of them.  But I think that the one

9    indicator that I mentioned about does there appear to be a high

10   level of fear.  So if someone is constantly looking over their

11   shoulder to see who is looking at them, or if they are looking

12   very fearful -- maybe I could use an example.

13        If someone is in -- goes to a clinic for something,

14   but they're accompanied by another person who speaks for them,

15   and when the medical personnel are trying to ask the person who

16   came in with the problem, the other person is speaking for

17   them, and they look fearful of that person, that's a red flag.

18   That might be something apparent.

19        But a lot of these things are going on all around us

20   and we don't know.  There are hotel workers who are in

21   trafficking schemes.  We see them doing their job, but we don't

22   know.

23        So it's a very -- it is known as a hidden crime, and

24   that's one of the reasons.

25   Q.   In your experience, do the victims make it obvious that

F. Burke - Direct

1    they are a victim of human trafficking?

2    A.    No, on the contrary.

3    Q.    What do you mean by that?

4    A.    Well, many victims aren't -- don't have occasion or much

5    occasion to make it obvious or not to outsiders what's going

6    on.

7              But when they do, because of all the factors that I

8    have already mentioned, the psychological fear, the climate of

9    fear that's engendered in the situation, it's too risky to show

10   that.  There is fear of recrimination, retribution.

11             So people, the workers in this kind of one-down

12   situation and the power imbalance, proceed without manifesting

13   outward signs.  So they might just appear to be doing their

14   job.

15   Q.    In your experience, do victims of human trafficking report

16   to the authorities immediately?

17   A.    No.  In my experience, there is usually a lengthy time

18   between a worker getting out of a situation and when they

19   report to law enforcement.

20   Q.    In your experience, why is that?

21   A.    I think there is a number of reasons.  One is how do you

22   report something that you don't know how to describe?  How do

23   you report something that has -- that you don't know is wrong?

24   You don't know what laws are.  You don't know what protections

25   there are.  You don't know the language around what has

1    happened to you.  Who do you report it to?

2            Many victims don't want to speak of what went on.  So

3    the idea of reporting it means they have to speak about it.

4            And I guess the biggest factor that I have found is

5    people don't know where and how.

6    Q.   What do you mean by where and how?

7    A.   Where to report, how to do this, who to trust.  They

8    thought they trusted an employer, and it turned out to be not

9    so.

10           And so, many victims leave these situations with an

11   inability to trust people in authority.

12   Q.   In your experience, what sort of impact does being the

13   victim of human trafficking have on those victims?

14           MR. RINALDO:  Objection, Your Honor, ambiguous.  I

15   don't know what she means by impact in the question.

16           THE COURT:  Let's rephrase the question, please.

17           MS. PATTERSON:  Sure.

18   BY MS. PATTERSON: (Continuing)

19   Q.   Do victims of human trafficking need any social services,

20   in your experience?

21   A.   Yes.  Victims need practical supports with housing, food,

22   clothing.  They might need services to address immigration

23   needs, look for immigration remedies according their current

24   status.

25           They need emotional, psychological supports to deal

224

1  with the effects that the trafficking situation had on them,

2  which can be for some symptoms of post-traumatic stress.  For

3  others, depression, low self-esteem.  There have been victims

4  who have been suicidal, who feel in some way that things have

5  been their fault, that they are a failure, that they can't

6  provide for their families in a way that they thought they

7  could when they entered the situation.

8  Q.   Do all victims respond the same way to trafficking?

9  A.   Absolutely not.

10  Q.   What are some of the common ways that you've seen them

11  respond to being a victim of human trafficking?

12  A.   The common way that I have seen, and this has gone across

13  all forms of human trafficking and whether it be men or women,

14  is a sense of shame.  Shame that they believed something and

15  they were duped.  They felt they were promised an opportunity,

16  they took it, and it crashed.  So that's a very common, common

17  thing.

18        The other thing is people react in many different

19  ways.  Some people internalize and get depressed.  Some people

20  externalize and get angry.  So those are both very common

21  reactions.

22        I would say those are the most common.

23  Q.   Out of the cases of human trafficking that you have either

24  studied or been a part of, how many of them have had witnesses

25  to the crime?

F. Burke - Direct

225

1   A.   I didn't hear the first words.

2   Q.   Out of all of the cases that you have been involved in or

3   studied, how many of them have had witnesses to the abuse?

4   A.   In all forms of trafficking?

5   Q.   Just with respect to domestic servitude.

6   A.   Okay.  Domestic worker cases, there have been no

7   witnesses, no witnesses that would formally support a victim's

8   story.  Such as in a setting like this.

9        Witnesses, they might have had people who saw what

10  was going on, but those people are usually extended family

11  members of the employers, or people that the domestic worker

12  might meet, other domestic workers, who would not agree to be

13  witnesses because of their own situation, their own immigration

14  status, their own employment situation.

15       So it's very rare.

16  Q.   You said it's rare, but have you seen any examples where

17  there has been a family member willing to come forward to

18  testify or, just during your investigations, willing to be a

19  witness against the perpetrator?

20  A.   No, no, I have not.

21       MS. PATTERSON:  No further questions, Your Honor.

22       THE COURT:  All right, thank you.

23       Cross-examination.

24       MR. RINALDO:  I have no questions for Dr. Burke.

25       THE COURT:  All right.  Thank you.  May Dr. Burke be

J. Doe - Direct

226

1   excused?

2           MS. PATTERSON:  Yes, Your Honor.

3           THE COURT:  All right.  Dr. Burke, you are excused

4   with our thanks.  Please don't discuss the testimony you have

5   given with anyone until our trial is over.  All right?

6           THE WITNESS:  Yes.  Thank you, Your Honor.

7           THE COURT:  All right, thank you.  Have a good day.

8           THE WITNESS:  Thank you.

9           NOTE:  The witness stood down.

10          THE COURT:  All right, next witness.

11          MR. SALINAS:  Plaintiff's next witness, Your Honor,

12  is Jane Doe.  And Jane Doe will be using an interpreter.

13          THE COURT:  All right, let's please have Ms. Doe come

14  into the courtroom.

15          And let's have our interpreter come forward.

16          NOTE:  The interpreter is duly affirmed.

17          THE COURT:  Come forward, Ms. Doe.

18          NOTE:  The witness is duly affirmed.

19          THE COURT:  All right.  Please proceed, Mr. Salinas.

20          MR. SALINAS:  Thank you, Your Honor.

21          JANE DOE, called by counsel for the plaintiff, first

22  duly affirming, testifies and states through an interpreter as

23  follows:

24      DIRECT EXAMINATION

25  BY MR. SALINAS:

J. Doe - Direct

227

1  Q.   Ms. Doe, is Jane Doe your real name?

2  A.   I don't know what I have to say.

3  Q.   Are you using a fake name in this case?

4  A.   Correct.

5  Q.   But it's okay if I address you as Ms. Doe during this

6  examination?

7  A.   Okay.

8  Q.   Ms. Doe, do you know the defendant in this case, Linda

9  Howard?

10  A.   Correct.

11  Q.   How do you know her?

12  A.   She was my employer in Yemen.

13  Q.   Ms. Doe, going back a little bit, briefly.  Where were you

14  born?

15  A.   Ethiopia.

16  Q.   Where in Ethiopia?

17  A.   Negele Borana.

18  Q.   What was your child like in Ethiopia?

19  A.   It was very good.  My father was a man in the military.

20  Because he was in Jordan in the military, I was then brought up

21  in an adoption home.

22        THE COURT:  Can you all hear her testimony?  Okay.

23  Please keep your voice up.

24        THE INTERPRETER:  Okay.

25  BY MR. SALINAS: (Continuing)

S. Doe - Direct

228

1  Q.   Did you go to school in Ethiopia?

2  A.   I did finish elementary.

3  Q.   Did you go to school after elementary?

4  A.   I did not continue.

5  Q.   Ms. Doe, why did you decide to go to Yemen?

6  A.   To work.

7  Q.   Why did you need to work in Ethiopia?  I mean, sorry, why

8  did you need to work in Yemen?

9  A.   Just like anybody else would go abroad, to work, to get a

10  better paying job.  And that's what I did, I went abroad to

11  change my life.

12  Q.   Did you have a family in Ethiopia?

13  A.   Yes.

14  Q.   Did they go to Yemen with you?

15  A.   They did not.

16  Q.   Why didn't they go to Yemen with you?

17  A.   I wanted to go work, make some money, help my children, my

18  husband, help change their life, and then eventually move back

19  to live with them.

20  Q.   Ms. Doe, now I want to talk about the Howards.  How did

21  you first learn about the job in their home, the job

22  opportunity in their home?

23  A.   I was working at the guest house at the time, and the

24  guest house got shut down.  I then asked my friend to see if

25  she knew of any job opportunities.  She told me that there is

J. Doe - Direct

229

1  this Indian restaurant, I may be able to ask if they have or

2  they know people that are offering jobs.

3  Q.   And so, was it someone at this Indian restaurant who told

4  you about the Howards?

5  A.   This person told my friend about the job opportunity and

6  then my friend told me about that.

7  Q.   Do you remember what year this was?

8  A.   2008.

9  Q.   How old were you in 2008?

10 A.   30, 31.

11 Q.   Were you interested in the job at the Howards' house?

12 A.   Correct.

13 Q.   Why were you interested in it?

14 A.   As the person who referred me to the job told me that they

15 are good people, that I would be happy working there.

16 Q.   Did the Howards interview you for the job?

17 A.   Yes, her husband talked to me.

18 Q.   What did the Howards say your job duties would be?

19 A.   Clean the house.  To do laundry, to iron clothes.  To cook

20 meals with him.  To go shopping.  To shop for groceries that

21 are written on the list.

22 Q.   Did they have any requirements for you if you were to take

23 the job?

24 A.   That I would be, I would be taken off once a week.

25 Q.   Did they allow you to live in your own house?

1    A.   No, that I would be staying with them overnight, but I

2    would be able to go off on my days off.

3    Q.   Did you want to live in the Howard's house?

4    A.   Well, the nature of jobs in the Arab country requires

5    living in.  So the jobs sort of come with the stipulations you

6    either live in or you can work as -- during the day you can go

7    spend the night elsewhere.  So these requirements come with the

8    job.

9    Q.   Did you take the job with the Howards?

10   A.   Correct.

11   Q.   Why did you decide to take the job?

12   A.   Because the man that referred me to the job gave me very

13   good feedback about them, how good of a family they were.  And

14   that was very important to me.

15        Also, the person that referred me to this job was

16   very friendly.  And I needed a job, so I took it.

17   Q.   How long did you work for the Howards in Yemen?

18   A.   I do not remember.

19   Q.   Was it more than a year?

20   A.   It's been a long time.  I don't quite remember how long it

21   was.

22   Q.   Okay.  Was Russell Howard in Yemen the entire time you

23   worked for them?

24   A.   No, he was only there for 15 days or so.  I was with her

25   for the majority of the time.  I'm sorry, three weeks.

J. Doe - Direct

231

1   Q.   So about three weeks after you started, Russell Howard

2   left?

3   A.   Correct.

4   Q.   And for the remaining time in Yemen, were you alone with

5   Linda Howard?

6   A.   That is correct.

7   Q.   Did you like working for the Howards in Yemen?

8   A.   Yes, I was very happy because they looked at me as a

9   family.

10  Q.   What was your relationship with Linda Howard like in

11  Yemen?

12  A.   We were very close.  In fact, on my days off, I used to go

13  to church to study.  Because she was alone, I would instead

14  stay home with her.

15  Q.   Ms. Doe, did you leave Yemen at some point?

16  A.   Yes.

17  Q.   Why did you leave Yemen?

18  A.   Because my employer informed me that they are moving to

19  Japan, and she asked me to move with them.  That's the reason

20  why I left.

21  Q.   So when you say employer, you mean Linda Howard?

22  A.   That is correct.

23  Q.   Do you remember when Linda Howard told you she was moving

24  to Japan?

25  A.   Sorry, I don't remember.

J. Doe - Direct

232

1   Q.   Can you estimate how long you had been working for her

2   before she told you?

3   A.   Sorry, I don't remember.

4   Q.   When the Howards first asked you to move to Japan, did you

5   want to go?

6   A.   I didn't respond right away.  I said instead, let me think

7   about it, consult with my family, and then I will let you know.

8   Q.   Did you have concerns about going to Japan?

9   A.   No.

10  Q.   Were you afraid of going to Japan?

11  A.   I was not scared.

12  Q.   Did your family want you to go?

13  A.   Well, my family, when I consulted them, they asked me if

14  my employers are good people, if they treat me well, if they

15  will take care of me.  And I told them that so far they have

16  been good.  They are like family, and that's not an issue.

17  Q.   Did the Howards want you to work for them in Japan?

18  A.   That is correct.

19  Q.   Why did they say they wanted you to work for them in

20  Japan?

21  A.   They told me that I am a good person, that I am hard

22  worker, and they would like to keep me to continue to work for

23  them.

24  Q.   Did the Howards make any promises to you if you went with

25  them to Japan?

J. Doe - Direct

233

1    A.    That is correct.

2    Q.    What did they promise you?

3    A.    When I was in Yemen, I was making $200 a month.  They told

4    me they would pay me $300 a month if I go to Japan with them.

5          They also promised me to get me health insurance.

6    They also promised that I would be able to finish my contract,

7    the three-years contract I had with them, in good terms.

8    Q.    Did they show you a contract?

9    A.    She did bring documents for me to sign.  I did sign.  But

10   it didn't specify about the insurance coverage.

11   Q.    So how did they tell you that they would promise insurance

12   coverage?

13   A.    I didn't have an idea of what health insurance was.  They

14   told me that they would be able to get one for me, so I can

15   stay in good health.

16   Q.    How long did you say the contract was for?

17   A.    Three years.

18   Q.    Did they make any promises to you if you completed the

19   three years in the contract?

20   A.    That I would return back to my country in peace.

21   Q.    Did you decide to take the job with them in Japan?

22   A.    Yes, correct.  And I was happy.

23   Q.    And why did you decide to take the job?

24   A.    Because the working condition in Yemen, my relationship

25   with them was great, and they were good people to me.  And that

J. Doe - Direct

234

1    was very important to me.

2              Going to Japan meant that I would be going into

3    another country, but I would still be working for good people.

4    So that didn't make a difference about moving to another

5    country.

6    Q.   After you arrived in Japan, did you immediately move in

7    with the Howards?

8    A.   That is correct.

9    Q.   What did they say your responsibilities would be in Japan?

10   A.   I was told that the duties will be exactly the same as

11   before, no changes.

12   Q.   Ms. Doe, did you speak Japanese?

13   A.   I did not.

14   Q.   Did you know anyone else in Japan?

15   A.   I did not.

16   Q.   When you arrived in Japan, did the Howards keep their

17   promise about the health care?

18   A.   They did not.

19   Q.   Was it important to you that they keep their promise about

20   the health care?

21   A.   Yes, I think it was important.

22   Q.   Why was it important?

23   A.   Because I have had kidney issues.  Often times I was sick

24   and I needed medical attention.

25   Q.   Did you get sick in Japan?

J. Doe - Direct

235

1    A.    That is correct.

2    Q.    How did you get sick?

3    A.    I was very sick.  They didn't take me to the hospital.

4    They gave me pain killer.

5    Q.    Did you want to go to the hospital?

6    A.    Only they would be able to take me.  Since they did not

7    take me, I didn't go.

8    Q.    Ms. Doe, did you have time off in Japan?

9    A.    Yes, I did.

10   Q.    How much time off did you have?

11   A.    It was, I think it was Saturday and Sunday.  But since I

12   was always home, I would be doing some type of work.

13   Q.    Were you allowed to leave the house by yourself?

14   A.    I didn't go anywhere because I didn't know anybody.

15   Q.    Ms. Doe, did Russell Howard have a job in Japan?

16   A.    He did not.

17   Q.    While you were working in the Howards home during the

18   days, was Russell there too?

19   A.    That is correct.

20   Q.    Where was Linda Howard?

21   A.    She would be at work during the day.

22   Q.    What was your relationship with Russell like?

23   A.    In the beginning it was like a family.  After 15 days or

24   so, things began to change.

25   Q.    How did they change?

J. Doe - Direct

236

```
 1   A.   He began to tell me some of the abuse that he did, or some

 2   the ways he abused his former employees.

 3   Q.   How did he abuse those former employees according to him?

 4              MR. RINALDO:  Your Honor, may we approach?

 5              THE COURT:  Yes, sir.

 6              NOTE:  A side-bar discussion is had between the Court

 7   and counsel out of the hearing of the jury as follows:

 8   AT SIDE BAR

 9              THE COURT:  Yes, sir.

10              MR. RINALDO:  Well, Your Honor, I am objecting to

11   this question and the line of questions on a couple of grounds.

12              THE COURT:  Go ahead.

13              MR. RINALDO:  Number one, it is hearsay.  Mr. Howard

14   is dead, so he can't counter it.

15              Number two, even if it were marginally not hearsay,

16   it would be unfairly prejudicial to my client under the

17   circumstances of this case and Mr. Howard's estate.  And Mr.

18   Howard is not a party either.

19              So I really object to this because this is really

20   unduly prejudicial.  I don't think she was allowed to testify

21   under your ruling to things that he said happened to other

22   housekeepers.  You said she could testify about what happened

23   to her.  And I didn't hear you say that she could do this.

24              And this is hearsay and unfairly prejudicial to my

25   client.
```

1          THE COURT:  Okay.  Do you want to respond?

2          MR. SALINAS:  On the hearsay issue, we allege a

3   conspiracy between Linda Howard and Russell Howard.  So in that

4   sense, it's a statement by a co-conspirator.  We believe that

5   it's not hearsay.

6          I think we could have a longer discussion about what

7   the scope of your order was under 404(b)(3).  We can't --

8   404(b)(2), I guess.

9          MR. RINALDO:  But, Your Honor, two other things.

10          THE COURT:  Yes, sir.

11          MR. RINALDO:  First of all, as far as a statement by

12   a co-conspirator is concerned, it doesn't have to do with this

13   case.  It has to do with a different case.  I don't mean case

14   necessarily, but a different time, different person.  You have

15   got a different continent.  And it's not a statement by a

16   co-conspirator in furtherance of the conspiracy.

17          And I just don't see how this is admissible.  That's

18   hearsay.

19          THE COURT:  I'm not sure, is it offered for the truth

20   of the matter or for leading up to what occurred after --

21          MR. SALINAS:  It certainly has a lead-up effect, and

22   we're going to get there.  But we think it's admissible for the

23   truth of the matter too because --

24          MR. RINALDO:  But why do they need to lead up to it?

25          THE COURT:  Well, let me back up.  I think it is

J. Doe - Direct

238

1    admissible as a co-conspirator statement.  I have already ruled

2    that her testimony is admissible under 404 as we discussed

3    yesterday, and under 415.  And 404 applies in civil as well as

4    criminal cases.  If I have didn't make that clear yesterday, I

5    do now.

6           And as far as Mr. Howard being unavailable, I think

7    certainly 804 kicks in here as far as the declaration of

8    somebody who is now deceased.

9           So even if it's hearsay, the bigger question that you

10   have raised is the prejudice.  I think that we're talking about

11   the specifics of not just Ms. Doe's abuse, but those prior to

12   that.  And we did not specifically talk about that, and I did

13   not know that, I don't think, that that was an issue that you

14   would be bringing into her testimony.  Unless there is some

15   pleading that I missed where we were talking about the

16   parameters of her testimony, I didn't include this.

17          Even if not offered for the truth of it, but just as

18   the lead-up, I think it is even more prejudicial than the

19   testimony that she is providing that I have admitted.

20          So let's -- you know, I will permit the question that

21   she started to answer.

22          MR. SALINAS:  That was answered.

23          THE COURT:  That was answered.  But let's move

24   forward now and not get into the particulars of about what he

25   said about any prior incidents of assault.

J. Doe - Direct

239

1          Ms. Patterson.

2          MS. PATTERSON:  Your Honor, just a quick

3    clarification.  To the extent that Mr. Howard used these as

4    inducement for Ms. Doe to continue with those sexual acts, are

5    we allowed to elicit that testimony?  Not the specifics of what

6    he said, but that he used them to induce her to engage in those

7    sexual acts.

8          THE COURT:  So this is, why aren't you complying, the

9    other people did comply?

10          MS. PATTERSON:  Exactly.  It is part of the pattern

11    and scheme that he used, both in our situation and with Doe, to

12    induce the acts.

13          THE COURT:  Is Ms. Roe going to testify to that as

14    well?

15          MS. PATTERSON:  Yes, Your Honor.

16          THE COURT:  That's what I understood.

17          MR. RINALDO:  She is going to testify to prior --

18          THE COURT:  She is going to say --

19          MR. RINALDO:  This came after.

20          THE COURT:  I understand that.  And I have admitted

21    this notwithstanding the timing because of the proximity, as we

22    discussed previously.  And I think in your opening you referred

23    to Ms. Roe's statement to that effect.

24          So I will allow you to ask those questions or elicit

25    the responses that Mr. Howard gave as reasons why she should

1    submit herself.  And your exception is noted.

2            MR. RINALDO:  You are now allowing further questions

3    on this?

4            THE COURT:  I am going to allow them -- if she is

5    going to testify that as to the persistence of Mr. Howard in

6    sexual advances, and he said why aren't you complying, others

7    did, I said I am going to allow that because I think it is

8    consistent with Ms. Roe's testimony, the same MO.

9            MR. RINALDO:  I understand that you are going to

10   allow that question.  And I understand that my exception is

11   noted.  But I assume we are not going much further with the

12   descriptions.

13           THE COURT:  Right.

14           MR. RINALDO:  It's only for inducement purposes,

15   period?

16           THE COURT:  Correct.

17           MR. SALINAS:  Understood.

18           THE COURT:  Understood?

19           MS. PATTERSON:  Yes.

20           THE COURT:  Before I forget, we looked at your

21   defense exhibits, and they have her real name.

22           MR. RINALDO:  I know that.  And I already talked to

23   Andres this morning.

24           MR. SALINAS:  We discussed that this morning.

25           MR. RINALDO:  The jury won't get that.  And to the

J. Doe - Direct

241

1    extent that --

2             THE COURT:  Okay.

3             MR. RINALDO:  The one recommendation letter, which is

4    Exhibit, what, A, that has her name on it.

5             THE COURT:  The first one.

6             MR. RINALDO:  It is the same as theirs.  And theirs

7    says:  Sarah Roe.  So I had told Andres that I would be using

8    his with when I get there.

9             MR. SALINAS:  I said that would be fine.

10            THE COURT:  As long as it doesn't get to the jury.

11            MR. RINALDO:  I will make sure that doesn't happen.

12   So you and the clerks have it.  I didn't redact it when I gave

13   it to you and the clerks.

14            THE COURT:  Okay.  I understand.

15            NOTE:  The side-bar discussion is concluded;

16   whereupon the case continues before the jury as follows:

17   BEFORE THE JURY

18            THE COURT:  All right, please proceed.

19   BY MR. SALINAS: (Continuing)

20   Q.   Ms. Doe, we were talking about how Russell Howard had told

21   you that he had abused former people -- people who had formally

22   worked for him.  Did he ever abuse you?

23   A.   That is correct.

24   Q.   Did he ever touch you sexually?

25   A.   Correct.

J. Doe - Direct

242

1    Q.    How would he touch you?

2    A.    When I was working around the house, he would hit me on my

3    behind.  And he wouldn't just allow me to work.  And he would

4    touch me in different places.

5    Q.    What places were those?

6    A.    On my chin.  Chin area, sorry.

7              THE INTERPRETER:  The interpreter just lost the word,

8    I apologize.

9    A.    On my thigh.

10             THE INTERPRETER:  Sorry.

11   Q.    Did he make sexual advances to you when he touched you?

12   A.    In the beginning, that's all that took place.  And the

13   sexual advances began to occur later.

14   Q.    How did it make you feel when Russell Howard touched you

15   like that?

16   A.    That I was his sex slave, not just a worker, a domestic

17   worker.

18   Q.    Ms. Doe, did Russell Howard ever rape you?

19   A.    Correct.

20   Q.    Do you remember when he first did that?

21   A.    I do not remember exactly, but I was sleeping.  It was

22   after she was gone.

23   Q.    Was it in the morning?

24   A.    Correct.

25   Q.    You said you were sleeping.  Were you in your bedroom?

J. Doe - Direct

243

1   A.   Yes.

2   Q.   And what did Russell Howard do?

3   A.   He came, he choked me, and then he raped me.  I wrestled

4   with him, I tried to slip under him, but I couldn't.

5   Q.   Did he say anything when he walked into the apartment --

6   into your bedroom?

7   A.   He didn't say anything.

8   Q.   Did you say anything to him?

9   A.   Besides the fact that I said to let me go, but he still

10  choked me and raped me.

11  Q.   After he was done raping you, what did Russell Howard do?

12  A.   He went to his bedroom.  I didn't have any option, so I

13  went and took a shower and continued about my work.

14  Q.   How did you feel?

15  A.   I didn't know what to say.  I couldn't believe what was

16  happening because these are the people I trusted to go to a

17  place I had never been before.  So it was unbelievable that I

18  have been betrayed.

19       I referred to them as a family, and at the time my

20  biological father had passed away, so I was going through some

21  emotional issues.

22  Q.   Ms. Doe, after Russell raped you, why didn't you leave?

23  A.   I didn't have any option.  I didn't know where to go.  I

24  am new to this country.  I didn't know what to do.

25  Q.   Did Russell ever rape you again?

J. Doe - Direct

244

1   A.   Yes, multiple times.  I don't quite remember how many

2   times.

3   Q.   Were each of those times like the last, the first time?

4   A.   It would be usually when I am sleeping and he would come

5   over and rape me.

6   Q.   Ms. Doe, was Linda Howard ever there when Russell Howard

7   raped or assaulted you?

8   A.   No.

9   Q.   Where was she?

10  A.   Work.

11  Q.   Did Linda know what Russell was doing?

12          MR. RINALDO:  Objection, Your Honor, foundation.

13          THE COURT:  Lay a foundation, if you would.

14  BY MR. SALINAS: (Continuing)

15  Q.   Did you tell Linda Howard what Russell Howard was doing to

16  you?

17  A.   I did not.

18  Q.   Did Russell Howard tell you whether she knew?

19          MR. RINALDO:  Objection, Your Honor.

20          THE COURT:  Overruled.

21  BY MR. SALINAS: (Continuing)

22  Q.   I will repeat the question.  Did Russell Howard ever tell

23  you whether Linda Howard knew what he was doing to you?

24  A.   Correct.

25  Q.   What did he say?

J. Doe - Direct

245

1   A.   He told me that there is nothing he hides from his wife.

2   That she is aware of everything that is happening.

3   Q.   Ms. Doe, when Russell first began raping you, did you tell

4   anybody about what was going on?

5   A.   In the beginning, I didn't tell anyone.

6   Q.   Why not?

7   A.   I had been betrayed by the people I trusted the most, and

8   I felt that there is probably no one else I can trust again.

9   Q.   Were you afraid of what would happen if you told anyone?

10  A.   Yes, in the beginning I did.  I thought in fact the abuse

11  would get even worse if I were to tell anyone.

12  Q.   Why did you think that?

13  A.   Because I didn't know anybody.  And if I were to tell

14  someone, I was afraid that they might go back and tell them

15  about what I said.

16  Q.   And what do you think they -- what did you think they

17  would do -- what did you think Russell Howard would do if he

18  learned that you had told somebody?

19  A.   Sometimes I think he might kill me to hide the abuse.

20  Sometimes I think the abuse might get escalated if he finds

21  out.

22  Q.   Did he say that he would do those things?

23  A.   No.

24  Q.   Did he make other threats to you?

25  A.   No.

1   Q.   Ms. Doe, did you believe that the rapes were part of your

2   job?

3   A.   I did not.

4   Q.   Why didn't you think that?

5   A.   Because I know that there is no such type of employment.

6   It's just the work that I was assigned to do in the beginning,

7   that made sense to me, that it would be a more appropriate part

8   of my duty.

9   Q.   Did Russell Howard ever talk to you about raping you?

10  A.   Yes, he did.  He said that this is part of my job, the

11  duties around the house and also the sexual activities.  Unless

12  I do those things, that he would deport me.

13  Q.   What did Linda say your job was?

14  A.   At that time she didn't say anything.

15  Q.   Did she ever say anything to you about what your job was?

16  A.   When I was walking out one time, she told me to make sure

17  that I please him, and that's my primary job, that she didn't

18  want him to be mad.  And if I keep that, that when I return

19  back to my country, she would set me up with a coffee shop.

20  Q.   Did Russell Howard ever make comments about your

21  appearance?

22  A.   Yes.

23  Q.   What did he say?

24  A.   That I am very beautiful.

25  Q.   Ms. Doe, did there come a time when you decided you needed

J. Doe - Direct

247

1   to leave the Howard's house?

2   A.    I never made a decision to leave.

3   Q.    Did you leave at some point?

4   A.    Correct.

5   Q.    When you left their apartment, what was the first thing

6   that you did?

7   A.    That time when I left, it wasn't based on a calculated

8   decision about what my next destination was going to be.  That

9   day a number of events occurred.  First, Russell told me that

10  if he finds me here the next morning, that he would deport me,

11  and to pack my bag and leave.

12          And I then asked Linda at that time, Mrs. Howard,

13  excuse me, will you just listen and watch him deport me?  You

14  are responsible for me.  I got hired through you.

15          And she said that she is going to listen whatever her

16  husband wants to do, and she is not going to do anything

17  different.

18          So that evening I just walked out of the apartment in

19  the middle of the night.  I didn't know where I was going.

20  Q.    When you left that night, where did you go?

21  A.    It was very dark and raining very heavy.  I changed -- I

22  was wearing a flip-flop, I changed that to shoes.  And I was

23  wearing a traditional sort of mini-blanket.  And I just walked

24  out and I walked the streets the whole night.

25  Q.    What happened next?

1   A.   I was walking and crying in the dark, raining.  I didn't

2   know where I was going.  As the sun began to come out, I came

3   across an Ethiopian lady with a child.  And I asked her if she

4   would allow me to stay with her.

5   Q.   Did she allow you to stay with her?

6   A.   That is correct.

7   Q.   Did she help you?

8   A.   Correct.

9   Q.   Ms. Doe, do you know if you received a visa to come to the

10  United States?

11  A.   Correct.

12  Q.   Do you know what kind of visa you received?

13  A.   I think it was T visa.

14  Q.   A T visa?

15  A.   Yes, T visa.

16  Q.   Do you know what a T visa is?

17  A.   The person that processed the application for me informed

18  me that it's for trafficking visa.

19  Q.   Ms. Doe, do you know the plaintiff in this case, Sarah

20  Roe?

21  A.   Yes.

22  Q.   Did you meet her in Yemen?

23  A.   Correct.

24  Q.   Do you know what year that was?

25  A.   2008.

S. Doe - Direct

249

1    Q.    How would you describe your relationship Ms. Roe in Yemen

2    in 2008?

3    A.    Our relationship was to greet each other whenever we see

4    each other, to say hi and bye.  That was the extent of it.

5    Q.    Were you close?

6    A.    No.

7    Q.    How would you describe your relationship with Sarah Roe

8    now?

9    A.    We don't have a very close relationship.  Since she is an

10   Ethiopian fellow of mine, I knew her in Yemen, just like I

11   would befriend anyone that is Ethiopian.  That's the extent of

12   our relationship.

13   Q.    You said earlier that you left Yemen.  After you left

14   Yemen, when was the next time you saw Ms. Roe?

15   A.    We met at this organization called Polaris for Christmas

16   party.  I saw her twice, two Christmas parties there, and I saw

17   her for her daughter's birthday as well.

18   Q.    Do you remember what year the first Christmas party was

19   in?

20   A.    I don't quite remember, but I think it was three years

21   ago.

22   Q.    At the time you saw her at the first Christmas party, had

23   you spoken to Ms. Roe since 2008?

24   A.    No, I did not.  When I saw her at the first Christmas

25   party, we greeted each other.  I told her that I live here now.

1    That was the extent of our conversation.

2    Q.   Had you seen Ms. Roe since you had been in Yemen -- let me

3    go back.

4         When you saw her at that Christmas party, had you

5    seen her since you had been in Yemen?

6    A.   Never.  We never seen each other in between those times.

7    We had never spoken to each other.

8    Q.   Have you ever spoken to Ms. Roe about what happened to you

9    in the Howards' home in Japan?

10   A.   Never.

11   Q.   Has Ms. Roe ever told you about what happened to her when

12   she was working in the Howards' home?

13   A.   She never told me.

14        MR. SALINAS:  No further questions.

15        THE COURT:  All right.  Why don't we take our

16   mid-morning break at this time.  We will take 15 minutes and we

17   will come back for cross-examination.

18        All right, you are excused.  Thank you.

19        NOTE:  At this point the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22        THE COURT:  All right.  Ms. Doe, please don't discuss

23   the testimony you've given so far with anyone until we come

24   back into court.  Okay?

25        THE WITNESS:  Okay.

J. Doe - Cross

1          THE COURT:  Okay.  Anything we need to discuss before

2    break?

3          All right, let's take 15 minutes, then we will come

4    back with cross-examination.

5          We're in recess.

6          NOTE:  At this point a recess is taken; at the

7    conclusion of which the case continues in the absence of the

8    jury as follows:

9    JURY OUT

10         THE COURT:  All right.  Ready to proceed?

11         MR. RINALDO:  Yes, Your Honor.

12         THE COURT:  All right, Joe, let's get our jury.

13         NOTE:  At this point the jury returns to the

14   courtroom; whereupon the case continues as follows:

15   JURY IN

16         THE COURT:  All right.  Please be seated.

17         Mr. Rinaldo, cross-examination, sir.

18         MR. RINALDO:  Yes, Your Honor.

19      CROSS-EXAMINATION

20   BY MR. RINALDO:

21   Q.   Good morning, Ms. Doe.  I have a few questions for you

22   this morning.  If you don't understand a question, by all

23   means, let me know.

24   A.   Okay.

25   Q.   I would like to take you back to your time in Yemen in

1  2008, if I may.

2  A.   Okay.

3  Q.   Before you went to with work for the Howards, Ms. Doe, did

4  I understand you to say that you were working at a guest house?

5  A.   That is correct.

6  Q.   Could you tell us, please, what your duties were at the

7  guest house.

8  A.   My job just cleaning.  After cleaning, I would be able to

9  go home.

10  Q.   So you did not live in at the guest house, did you?

11  A.   That is correct.

12  Q.   And did I understand you as well to say that the guest

13  house closed and that's why you lost your job?

14  A.   That is correct.

15  Q.   And did I also correctly understand you to say that you

16  asked some friends in Yemen if they knew of any employment

17  opportunities?

18  A.   That is correct.

19  Q.   And how did you -- how did you come to make the connection

20  with the Indian restaurant I told you about?

21  A.   I didn't have the slightest idea about the Indian

22  restaurant.  One of my friends told me about it.

23  Q.   That's what I was asking, did your friend tell you about

24  the Indian restaurant?

25  A.   That is correct.

J. Doe - Cross

253

1   Q.   And what do you remember your friend telling you about the

2   Indian restaurant?

3   A.   Nothing else besides that.  She told me the manager at the

4   Indian restaurant knows about some job opportunities.  And if I

5   knew people that are looking for work, to relate that

6   information.

7   Q.   Where was the Indian restaurant located?

8   A.   Right in front of the compound.

9   Q.   Was it inside the -- we're talking about the Hunt Oil

10  Compound?

11  A.   Where they lived, right across from their residence.

12  Q.   Where the Howards lived?

13  A.   That is correct.

14  Q.   But you didn't know the Howards at that time, did you,

15  before you went to work for them?

16  A.   That is correct.

17  Q.   So you first learned of the Howards from the manager of

18  the Indian restaurant; is that correct?

19  A.   That is correct.

20  Q.   And how did you contact the Howards?

21  A.   I went to the restaurant with my friend, and the manager

22  told us when I would be able to meet with him.  And that once

23  he provided me the date and time to come, I went according to

24  that.

25  Q.   And who did you meet first?  Did you meet Russell Howard

J. Doe - Cross

254

1   first or Linda Howard first?

2   A.   I met him first.

3   Q.   You met Russell Howard first?

4   A.   That is correct.

5   Q.   Did you meet him at the restaurant?

6   A.   Correct.

7   Q.   And what do you remember about that conversation?

8   A.   The conversation was involving that they were good people,

9   that I would be able to work for them.  That was the extent of

10  it.

11  Q.   Did Russell Howard during that first interview with you at

12  the restaurant describe the duties that you would be expected

13  to have in Yemen?

14  A.   Correct.  I was expected to clean.

15  Q.   At some point before you accepted the position, did you

16  meet Linda Howard?

17  A.   No.

18  Q.   When did you first meet Linda Howard?

19  A.   After I accepted the employment and I started to work on

20  the first day.

21  Q.   So you met her on the first day on the job; is that

22  correct?

23  A.   That is correct.

24  Q.   And when you accepted the job as the housekeeper for the

25  Howards, you knew how much you would be paid, correct?

J. Doe - Cross

255

```
1    A.    Correct.
2    Q.    And that was 2008, and you received the sum of $200 a
3    month; is that correct?
4    A.    Correct.
5    Q.    And that was satisfactory to you, wasn't it?
6    A.    If you were to go according to the standard of the
7    country, yes.
8    Q.    And you were familiar with the standard of the country at
9    the time, correct?
10   A.    Correct.
11   Q.    So $200 was consistent with the standard of the country at
12   the time, wasn't it, for housekeepers?
13   A.    Yes, according to the other domestic workers and the
14   things -- how things were done there, that was considered okay.
15   It wasn't very good, at least in my opinion, but it was
16   acceptable.
17   Q.    So it was acceptable to you, and you knew what your
18   compensation would be when you started work, correct?
19   A.    Correct.
20   Q.    Well, in addition, did I understand you -- well, I think
21   we all know, you were a live-in housekeeper, you lived at the
22   residence during the time that you were employed by the Howards
23   in Yemen, correct?
24   A.    Correct.
25   Q.    Just so there is no confusion, right now I'm just talking
```

J. Doe - Cross

256

1    about the time in Yemen.  Okay?

2    A.   Okay.

3    Q.   Okay.  So in addition to the monetary compensation that

4    you agreed was acceptable when you accepted the employment, you

5    also had your own quarters in the apartment, your own living

6    quarters?

7    A.   Correct.

8    Q.   And am I correct that those living quarters consisted of a

9    separate bedroom for you, plus I think it's a bathroom, some

10   people call en suite?  I don't know if you do.

11   A.   Correct.

12   Q.   And that en suite quarters with your bedroom and the

13   separate bath had a door, didn't it?

14   A.   This is about Yemen, right?

15   Q.   Yes.

16   A.   Correct.

17   Q.   So it had a door in Yemen?  We're talking about Yemen.

18   A.   Yes.

19   Q.   And the front door of the apartment had a door as well,

20   right?  The edge of the apartment had a front door, correct?

21   A.   Correct.

22   Q.   And you had a key to both of those, didn't you?  You had a

23   key to the front door and to your en suite?

24   A.   My bedroom did not have a key.

25   Q.   You did not have a key to the bedroom at that time?

J. Doe - Cross

257

1   A.   No.  There was no set of key that I can lock when I leave,

2  but there is -- it's possible to close the door from inside.

3   Q.   Ahh.  So you could lock it from inside, correct?

4   A.   Yes, my bedroom, yes.

5   Q.   All right.  And that included the separate bathroom,

6  right?

7   A.   I don't --

8   Q.   That was a bad question.  To get to your living quarters,

9  there was a door which you could lock from the inside, correct?

10  A.   Correct.

11  Q.   Let's go back to the duties that you were expected to have

12  as the housekeeper in Yemen.  Okay?

13  A.   Okay.

14  Q.   You were expected to clean the apartment, correct?

15  A.   Correct.

16  Q.   You were expected to do laundry, correct?

17  A.   Correct.

18  Q.   Were you expected to do shopping at the grocery?

19  A.   Correct.

20  Q.   And did you shop for groceries?  Did I understand you to

21  say that the groceries would be on a list?

22  A.   Correct.

23  Q.   And who provided you with that list?

24  A.   He did.

25  Q.   Russell Howard did?

J. Doe - Cross

258

1  A.   Yes, because I was not very good at English.  He would

2  verbally tell me, and I would write it in my language.

3  Q.   And then you would take the list and go do the grocery

4  shopping, correct?

5  A.   Yes.  Sometimes he goes along with me.

6  Q.   But not always, correct?

7  A.   That is correct.  I'm not sure.

8  Q.   All right.  Now, Russell Howard was only present in Yemen

9  for about three weeks after you started your employment,

10 correct?

11 A.   That is correct.

12 Q.   So after Russell Howard left, you continued your

13 employment with Linda Howard, right?

14 A.   That is correct.

15 Q.   And did you continue to do the grocery shopping?

16 A.   Correct.

17 Q.   And did you continue to receive lists, but now from Linda

18 Howard?

19 A.   Yes.  And sometimes I would go and purchase things that I

20 think are appropriate for the house.

21 Q.   Would it be fair to say that Linda Howard paid for the

22 groceries, or Russell?

23 A.   Correct.

24 Q.   And the groceries included your own food too, right?

25 A.   Correct.

J. Doe - Cross

259

1   Q.   And let's talk about your schedule of work in Yemen while

2   you were there.  Did you have Thursday afternoons and all day

3   Friday off?

4   A.   Correct.

5   Q.   And during that time, was that your own personal time?

6   A.   Yes.  That was my day off.  That was set at the beginning

7   of the agreement.  So on my days off, I would go to my home.

8   Q.   To your home?

9   A.   Correct.

10  Q.   And you were able to do that, weren't you, the whole time

11  that you were in Yemen?

12  A.   Correct.

13  Q.   And during the days when you actually were expected to

14  perform duties as the housekeeper, I would like to talk about

15  your regular hours of work on those days.  Okay?

16  A.   Okay.

17  Q.   Would it be fair to say that you were expected on a

18  workday to work from about 9 until after lunch?

19  A.   No, all day.

20  Q.   You were working all day?

21  A.   Yes.

22  Q.   Until after dinner?

23  A.   That is correct.

24  Q.   Now, during the time that Russell Howard was not there,

25  you did the grocery shopping, did you not?

J. Doe - Cross

260

1  A.   Correct.

2  Q.   And you wouldn't do that necessarily only on a Thursday

3  afternoon or your day off?  You wouldn't in fact, would you?

4  A.   That is correct.

5  Q.   So you would do grocery shopping when?  Generally in the

6  afternoon; is that right?

7  A.   Well, I may go in the middle of the day to go grocery

8  shopping.  There is no specific time or day that I would go

9  grocery shopping.

10  Q.   Well, you wouldn't go after dark, would you?

11  A.   No.

12  Q.   And you probably wouldn't go before breakfast, would you?

13  A.   No.

14  Q.   Now, with respect to duties that you might have had with

15  respect to cooking, when Russell Howard was there, before he

16  left about three weeks after you started your employment, did

17  Russell Howard do most of the cooking?

18  A.   He doesn't always cook by himself.  Normally we would be

19  cooking together.  He would show me what to do, and I would

20  follow his directions.  But there were times when he cooked a

21  meal entirely on his own.

22  Q.   He was, based on your experience, Mr. Howard was a fairly

23  experienced cook?  He didn't look lost in the kitchen, did he?

24  A.   That is correct.

25  Q.   And when he was cooking, you assisted, right?

J. Doe - Cross

261

1    A.   Correct.

2    Q.   And he would show you how he preferred to have things done

3    in preparation of the meal, correct?

4    A.   Correct.

5    Q.   So basically you were an assistant in the kitchen when he

6    was cooking, correct?

7    A.   That is correct.  There were times also that I would

8    prepare a meal that I think they would like.

9    Q.   And that would be done -- you would do that on your own,

10   right?

11   A.   Correct.

12   Q.   All right.  And was that while Mr. Howard was there in

13   Yemen?

14   A.   Both, while he was there and while he was gone.  I was

15   taking good care of her.

16   Q.   You were taking good care of Mrs. Howard, correct?

17   A.   That is correct.

18   Q.   One of the things that you said earlier today was that in

19   an Arab country, being a housekeeper requires living in, do you

20   remember that?

21   A.   When I said that, I was referring to the employers having

22   different requirements or preferences.  Some employers would

23   prefer a live-in housekeeper.  Some would prefer you come to

24   work during the day, you go home to spend the night.

25            So the choice would be totally up to me what, you

J. Doe - Cross

262

1   know, the job style I would accept, whether it is a live-in or

2   live at home and commute to work.

3   Q.   But you were aware that there were other live-in

4   housekeepers doing work in Sana'a in 2008 and even before then,

5   right?

6   A.   Correct.  And I did work.

7   Q.   I'm sorry.  I couldn't hear the translator's answer.

8   A.   Correct, I did work.

9   Q.   My question was whether you were aware that others worked

10  in the same circumstances as live-in housekeepers?

11  A.   Yes, I do.  And I am just adding to that, I did work as

12  well.

13  Q.   All right.  Thank you.  With respect to that time in

14  Yemen, did I understand you to say that you thought you had a

15  very good relationship with Mr. Howard before he left?

16  A.   Correct.

17  Q.   And that was for only about three weeks though, correct?

18  A.   Correct.

19  Q.   But your time with Mrs. Howard was considerably longer,

20  wasn't it, in Yemen?

21  A.   That is correct.

22  Q.   So was it a matter of a number of months?

23  A.   I apologize, I don't remember quite how many months

24  because it was a long time ago.  But I know it was a lengthy

25  time.

J. Doe - Cross

263

1  Q.    Thank you.  That's fine.  Your relationship with Mrs.

2  Howard the whole time you were in Yemen, would it fair to

3  characterize it as friendly?

4  A.    That is correct.

5  Q.    Would you, in your experience with Mrs. Howard,

6  characterize her as a good employer?

7  A.    I did.

8  Q.    I am sorry?

9  A.    I did.

10 Q.    And would it be fair to say that during the time you were

11 in Yemen, that you were satisfied completely with your working

12 conditions; is that right?

13 A.    Very much.

14 Q.    During the time that you were in Yemen, for example, did

15 you receive -- you were promised $200 a month which you

16 accepted.  Were you paid promptly?

17 A.    Correct.

18 Q.    Did I understand you to say that during the time that you

19 were in Yemen until you left Yemen to go to Tokyo, you did not

20 know the plaintiff in this case?

21 A.    I did not say I did not know her until I moved to Tokyo.

22 I knew her when I was in Yemen.

23 Q.    Ahh, maybe I misunderstood then.  Thank you.  So you knew

24 the plaintiff in this case before you left for Tokyo; is that

25 right?

J. Doe - Cross

264

```
1    A.    Yes, I did.  And we would exchange greetings whenever I
2    would see her.
3    Q.    How did you first meet her?
4    A.    She worked at the restaurant.
5    Q.    Which restaurant?
6    A.    The one across from their house.
7    Q.    The Indian restaurant?
8    A.    No.
9    Q.    It was a different one?
10   A.    There is another restaurant there.
11   Q.    And when you met her at that restaurant, had she already
12   finished working for the Howards?
13   A.    That is correct.
14   Q.    So this was, she was working at a restaurant after she
15   concluded her employment with the Howards when you met her,
16   correct?
17   A.    Correct.
18   Q.    During the time that you were working for the Howards as
19   their housekeeper before you left Yemen, do you know whether
20   the plaintiff in this case knew you were working for the
21   Howards?
22              THE INTERPRETER:  The interpreter needs repetition.
23              MR. RINALDO:  Your Honor, may we have the question
24   read back?  Is that all right?
25              THE COURT:  Yes, that is fine.
```

J. Doe - Cross

1              MR. RINALDO:  Thank you.

2              NOTE:  The court reporter read back the question as

3    requested.

4    A.   Correct.

5    BY MR. RINALDO: (Continuing)

6    Q.   She knew, correct?

7    A.   Correct.

8    Q.   And how did she know that?

9    A.   She would see me when I'm going in and coming out.  The

10   restaurant is right across from the place.

11   Q.   From?  From the residence of the Howards; is that right?

12   A.   That is correct.

13   Q.   By the way, when you worked for the Howards in Yemen, what

14   floor was their apartment on?

15   A.   First floor.

16   Q.   First floor.  During the time that you worked for the

17   Howards in Yemen, did they entertain?  Did they have people

18   over for dinner from time to time?

19   A.   I only remember that they had one event.  I don't remember

20   if they had any more events.  I don't remember also who was

21   present, whether he was there or not.

22   Q.   Ahh, okay.  So you don't remember whether Russell Howard

23   was there at all?

24   A.   I do not remember.

25   Q.   All right.  Let's move to Tokyo for a minute.  When you

J. Doe - Cross

266

1   moved -- when you agreed to move with the Howards to Tokyo,

2   that was Linda Howard that requested it; is that correct?

3   A.   Both asked me.

4   Q.   Mr. Howard was already in Tokyo, was he not?

5   A.   No.

6   Q.   Well, if he left in March of 2008, and he was only there

7   for about two or three weeks, and you continued working for

8   Linda Howard, are you telling me that Russell Howard came back?

9   A.   No.  He asked me over the phone.  She was present.

10  Q.   Oh, so she was present with you in Yemen, and Russell

11  Howard made the request by telephone from somewhere else; is

12  that right?

13  A.   That is correct.  So the question came from both.

14  Q.   Thank you for the clarification.  And at that time you

15  were very happy with your relationship between yourself and the

16  Howards, correct?

17  A.   That is correct.

18  Q.   And you agreed to go to Tokyo, correct?

19  A.   That is correct.

20  Q.   And when you went to Tokyo, your salary went up to $300 a

21  month, correct?

22  A.   Correct.

23  Q.   And that was also satisfactory to you, was it not?

24  A.   I wasn't worried about that.

25  Q.   I listened to your testimony this morning about the change

1    in your conditions and the change in circumstances in Tokyo,

2    and I just have a few questions about that.

3            Now, did I understand your testimony correctly to be

4    that Linda Howard was working at the embassy?

5    A.   Correct.

6    Q.   And that Mr. Howard was home all or most of the day,

7    correct?

8    A.   That is correct.

9    Q.   And you testified about some, what you say is Mr. Howard's

10   misconduct during this period, and I would like to talk to you

11   about that a minute.

12   A.   Yes, correct.

13   Q.   If I understood your testimony correctly, you told us --

14   it's still morning -- you told us this morning that Linda

15   Howard was never there when he raped you, correct?

16   A.   That is correct.

17   Q.   So the only times the kind of conduct you talked about

18   this morning took place was when you and Mr. Howard were alone

19   in the house; is that right?

20   A.   That is correct.

21   Q.   And if I understood your testimony correctly this morning,

22   you testified this morning that you never told Linda Howard

23   about Mr. Howard's misconduct?

24   A.   That is correct.

25   Q.   But you also said this morning that Mr. Howard told you

J. Doe - Cross

268

1    that Linda Howard knew everything, correct?

2    A.   That is correct.

3    Q.   Well, as to that statement, you have no idea as you sit

4    here today whether Mr. Howard was telling you the truth, do

5    you?

6    A.   I am very sure.

7    Q.   You're very sure he was telling you the truth?

8    A.   Correct.

9    Q.   I understand you're saying that's what he said to you?

10   A.   Yes.

11   Q.   You never repeated that to Linda Howard, did you?

12   A.   No, I did not.

13   Q.   You never told Linda Howard that Russell Howard had raped

14   you, did you, ever?

15   A.   I did not tell her.

16   Q.   All right.  And when you left the Howards, when you left

17   the Howards, I heard this morning you talking about you leaving

18   and walking in the evening.  And another Ethiopian lady took

19   you in; is that right?

20   A.   That is correct.

21   Q.   Well, eventually you left Tokyo, correct?

22   A.   What do you mean?

23   Q.   Well, at some point after you left the Howards' employ,

24   you left Japan to return somewhere else, correct?

25   A.   I did not.

J. Doe - Cross

269

1    Q.   Perhaps I'm not being clear.  Perhaps my question is

2    unclear.  You must have left Japan sometime because you're here

3    today.

4    A.   That is correct.

5    Q.   All right.  So let's -- maybe I will try to be a little

6    more clear.  When did you leave Japan?

7    A.   December 2009.

8    Q.   December 2009.  And was that -- about how many months was

9    that after your employment with the Howards ended?

10   A.   I apologize, I'm having a difficult time remembering

11   dates, months, and years.  I have gone through so many other

12   things in my life, that is causing some forgetfulness.

13   Q.   Let me try it another way.  When you left Japan -- in

14   2009, was it?

15   A.   It was December 3, 2009.

16   Q.   Where did you go?

17   A.   I came to America.

18   Q.   At some point before you left Japan, did you go to the

19   American Embassy?

20   A.   That is correct.

21   Q.   And when you were at the American Embassy, did you get a

22   plane ticket?

23   A.   I took a picture at the embassy.  The tickets and all the

24   other documentations were provided to me at the airport.

25   Q.   Ahh, you got them at the airport, right?

J. Doe - Cross

270

1    A.    Yes.

2    Q.    Did you also receive a sum of money?

3    A.    They did give me $1,500 because of the breach in our

4    contract.

5    Q.    Essentially -- do you know where that money came from?

6    A.    They did tell me that the money was taken from them.

7    Q.    That the Howards paid you the $1,500, right?

8    A.    That is correct.

9    Q.    And did I understand you to say it was because you hadn't

10   completed -- they hadn't permitted you to complete the

11   three-year contract; is that right?

12   A.    Yes.  The contract specifies that there is a penalty of an

13   amount, and that's why they paid.

14   Q.    And that was the amount?

15   A.    That is correct.

16   Q.    Did I understand you came from Japan to the United States?

17   A.    That is correct.

18   Q.    And you have been here ever since, correct?

19   A.    That is correct.

20         MR. RINALDO:  Thank you, Your Honor.  I have no

21   further questions of this witness.

22         THE COURT:  Redirect?

23         MR. SALINAS:  We don't have anything, Your Honor.

24         THE COURT:  All right.  May Ms. Doe be excused?

25         MR. SALINAS:  Yes.

S. Roe - Direct

271

1      THE COURT:  Your testimony is over.  You are free to

2 go.  Please don't discuss the testimony you have given with

3 anyone until our trial is over.  All right?

4      THE WITNESS:  I want to thank you, Your Honor, for

5 giving me an opportunity to share my story in your courtroom.

6      THE COURT:  All right.  Thank you.

7      NOTE:  The witness stood down.

8      THE COURT:  All right, next witness.

9      MS. PATTERSON:  Yes, Your Honor.  The plaintiff calls

10 Sarah Roe.

11      THE COURT:  All right.

12      NOTE:  The plaintiff is duly affirmed.

13      SARAH ROE, the plaintiff herein, called in her own

14 behalf, first duly affirming, testifies and states through and

15 interpreter as follows:

16      DIRECT EXAMINATION

17 BY MS. PATTERSON:

18 Q.   Good morning.  Could you please introduce yourself to the

19 jury using your pseudonym.

20 A.   My name is Sarah Roe.

21 Q.   How old are you?

22 A.   I am 31 today.  I will be 32 tomorrow.

23 Q.   Ms. Roe, do you speak English?

24 A.   I'm not fluent like the natives.

25 Q.   Do you use an interpreter for other sort of daily

S. Roe - Direct

272

1    activities?

2    A.    No.

3    Q.    Do you use an interpreter when you go to school

4    conferences for your daughter?

5    A.    Yes, the school provides interpreters.

6    Q.    When you get communications from the school, what language

7    do you receive those communications in?

8    A.    In Amharic and in English.

9    Q.    Ms. Roe, why are you here today?

10   A.    I want justice.

11   Q.    What do you mean by that?

12   A.    I want the people to understand what happened to me in

13   their home, and I want the government to know the truth and the

14   mistreatment that I have endured.

15   Q.    Now, before we get there, I want to talk to you a little

16   bit about your background.  Where did you grow up?

17   A.    Addis Ababa.

18   Q.    What country is that in?

19   A.    Ethiopia.

20   Q.    What was your family like?

21   A.    Six children in our household.  Correction, four children

22   and two parents.

23   Q.    What was it like growing up in Ethiopia?

24   A.    We were considered very poor.

25   Q.    What do you mean you were considered poor?

S. Roe - Direct

273

1    A.    We didn't have anything.

2    Q.    Can you describe the house that you grew up in.

3    A.    Yes.  My mother had a home, we were born and we grew up

4    there.

5    Q.    How big was the home?

6    A.    Very small.

7    Q.    Can you tell the jury a little bit about Ethiopian

8    culture.  What are some of the most important beliefs?

9    A.    Yes.  Before anything else, respect has a great place in

10   our community.  And then faith.

11   Q.    What faith was your community?

12   A.    Orthodox.

13   Q.    Orthodox what?

14   A.    Christian.

15   Q.    You said that respect and faith are important.  In what

16   way were they important to your family?

17   A.    I would like for the question to be repeated.

18          MS. PATTERSON:  If the court reporter could repeat

19   back the question so that our interpreter can interpret.

20          NOTE:  The court reporter read back the question as

21   requested.

22   A.    Respect meaning the view that you have of yourself, your

23   family, the views of other people about you, that they hold,

24   and the responsibility that you carry to provide for family

25   members.

S. Roe - Direct

274

1  Q.   Can you describe the responsibility to care for family

2  members.

3  A.   Yes.

4  Q.   Please do.

5  A.   Our culture calls for parents to care for their children

6  until they are a certain age.  And then the children to provide

7  for their parents when in need.  In most cases they are in

8  need.

9       So there is that burden of responsibility, children

10  caring for their parents and the whole family members.

11  Q.   And I think you mentioned women specifically there.  Do

12  women have any special responsibilities in Ethiopian culture?

13  A.   In our culture, women don't have -- they are not

14  acknowledged to do big things.  They are sort of in the

15  background.  But their responsibility sort of falls on them to

16  care for family members and parents.

17  Q.   Can you explain the role of women in Ethiopian culture and

18  how they are viewed.

19  A.   Yes.  Women are sort of looked down.  They are sort of not

20  in the forefront of things.  They are looked down at.

21       Currently the government is initiating conversations

22  to get women to be involved and to be looked at as men and be

23  respected as the respect that men get.  But the reality is that

24  although the conversation is taking place, deep in the people's

25  heart that is not happening yet.

S. Roe - Direct

1           They are also expected to be caregivers to their

2   family.

3   Q.   Ms. Roe, are there taboo topics or things that you can't

4   talk about in Ethiopian culture?

5   A.   Yes.

6   Q.   What are some of those topics?

7   A.   For example, women are not able to discuss openly about

8   their relationship with men, and that is sort of a taboo.

9           Especially my parents, they come from a region called

10  Gunder, they are extremely conservative, and these things do

11  not get discussed.

12  Q.   Ms. Roe, if information came out about what happened to

13  you in the Howards' home, how would the community react?

14          MR. RINALDO:  Objection, Your Honor.

15          THE COURT:  Overruled.

16  A.   The community, first of all, would point fingers at my

17  family and be a talking topic of such thing.  And they would be

18  ashamed and they would want to hide from the community and be

19  secluded.

20          And as I mentioned, the background of my parents

21  being extremely conservative, in that region they can go to the

22  extent of killing people that have gone through such things.

23          The other thing is because this is a disgrace to the

24  family and they want to -- they want to preserve their respect

25  and the name of the family, even though I am the victim, I

S. Roe - Direct

1  would be considered someone that brought shame into the home,

2  and the people would point fingers at me and say that I asked

3  for this.

4  BY MS. PATTERSON: (Continuing)

5  Q.   Would you be blamed for what happened?

6  A.   Yes, they would definitely do that.  That would cause me

7  to want to hide, to want to not be visible.

8           THE COURT:  Ms. Patterson, make it clear that this is

9  what she believes would happen.

10           MS. PATTERSON:  Absolutely, Your Honor.

11  BY MS. PATTERSON: (Continuing)

12  Q.   Is this based on your perception, Ms. Roe, of your

13  community?

14  A.   Well, this is not just my perception, but it's also the

15  culture of the country and the way in which the community

16  reacts to such things.

17           MR. RINALDO:  Objection, Your Honor.

18           THE COURT:  No, I'll allow it.  Well, why don't you

19  rephrase the question so that -- ultimately this is her opinion

20  of how the community would react, that's the way I take her

21  testimony.

22           MS. PATTERSON:  Yes.

23           THE COURT:  And if you're going to elicit anything

24  else beyond that, then ask a different question.  But ask her

25  again, what she has just testified is based on what she

277

1    believes is the way the community would react.

2           MR. RINALDO:  That would remove my objection, Your

3    Honor.

4           THE COURT:  All right, thank you.

5    BY MS. PATTERSON: (Continuing)

6    Q.   Ms. Roe, everything you just told us, is that based on

7    your understanding of how the community would react?

8    A.   Well, not quite because this is not just my understanding,

9    this is something, recently something that happened to my

10   family because of it.

11   Q.   And that's based on your personal experience though; is

12   that correct?

13   A.   No.  Because I know how the community reacts and I know

14   what happened to myself and my family.  So this is something

15   that happened, not just opinion.

16   Q.   So it's something that happened to you though?  Or your

17   family?

18   A.   Yes, yes.

19   Q.   Ms. Roe, I want to go back to your background.  Did you go

20   to school?

21   A.   Yes.

22   Q.   For how long?

23   A.   Up until seventh grade.

24   Q.   Did you do any schooling after the seventh grade?

25   A.   No, I couldn't go because I took on the responsibilities

S. Roe - Direct

278

1   to take care of my family.

2   Q.    How did you take on the responsibilities to take care of

3   your family?

4   A.    My aunt used to live in Yemen, she took me to Yemen.

5   Q.    Did you go to Yemen to work?

6   A.    Yes, to work.

7   Q.    Did you get a work visa?

8   A.    Yes.

9   Q.    What was your first job when you arrived in Yemen?

10  A.    Because I was very young, I didn't know the language, I

11  stayed with my aunt for sometime.

12  Q.    And what was your first job in Yemen?

13  A.    I worked as a housekeeper at a Yemeni household.

14  Q.    Do you remember what you were paid in that household?

15  A.    At that time they were paying about 100, $150.

16  Q.    And how many hours were you working in that household?

17  A.    From morning to evening.

18  Q.    Did you have any days off?

19  A.    Yes.

20  Q.    How many days off?

21  A.    I would take off Thursday afternoon and return to work on

22  Saturday.

23  Q.    What was your next job?

24  A.    I found a job at a place where they served tea.  My job

25  included cleaning office desks.

S. Roe - Direct

279

1    Q.    And just going back to your job as a housekeeper in the

2    Yemeni household.  You said you got paid $150.  $150 per week,

3    month, or day?

4    A.    I wasn't exactly sure if it was 100 or 150, but I was paid

5    monthly.

6    Q.    So you said you worked cleaning an office after the Yemeni

7    household; is that right?

8    A.    It was a company where they sold phones, it's called

9    Spestel.

10   Q.    What did you do at the company?

11   A.    To make teas for the managers and clean their office area.

12   Q.    Did the cleaning involve vacuuming?

13   A.    Yes, vacuum, clean the bathrooms in the morning, making

14   teas and coffees.

15   Q.    Where did you go after that?

16   A.    The manager at this company said, why am I working here.

17   He then spoke with another manager who was a friend of him that

18   worked at the Sheraton Hotel.  He spoke to him about me.

19   Q.    Why did he, if you know, why did he talk to the other

20   manager about you?

21   A.    He used to encourage me and wish that I would get an

22   education, better my life.  He would say, I'm too young, I need

23   to look at avenues to advance myself.

24   Q.    Did you get a job at the Sheraton?

25   A.    I did.

S. Roe - Direct

280

1  Q.   What was your job at the Sheraton?

2  A.   I originally went to Sheraton to work as a waiter.  But

3  since my English wasn't so well, they hired me as a

4  housekeeper.

5  Q.   What did you do as a housekeeper at the Sheraton?

6  A.   Clean hotel rooms, between eight to nine hotel rooms in a

7  day.  We would clean the bathroom, I would vacuum the rooms,

8  and I would make the bed.

9  Q.   How long did you stay at the Sheraton?

10 A.   Nine or ten months.

11 Q.   Where did you go after that?

12 A.   They had said that if my English, if I improved, that they

13 would go ahead and give me a waiter position.  But that didn't

14 happen.  And I thought my English was much better at that time.

15        At that time I found a job at the American Embassy.

16 Q.   Where did you work at the American Embassy?

17 A.   At the Uncle Sam's burger place.  My English was much

18 better at that time, so they gave me a cashier position.  And

19 they have another side of that restaurant, also a cafe, but

20 only the Yemenis normally went to the cafe.

21 Q.   Okay.

22 A.   Sorry, correction, cafeteria.

23 Q.   How long did you work at Uncle Sam's?

24 A.   It was a long time, but less than a year.  And I had to

25 quit in the middle to go back to Ethiopia.

S. Roe - Direct

281

1           I went back to Ethiopia hoping to return in two

2    weeks.  And the reason for my travel was my mother was ill and

3    I needed to go see her.  But I ended up staying for two months

4    because I needed to take care of her.

5    Q.   When you came back from Ethiopia, did you still have a job

6    at Uncle Sam's?

7    A.   No.  Because I didn't return in two weeks, they had

8    already filled it with another person from India.

9    Q.   You mentioned that Uncle Sam's was on the embassy.  Can

10   you describe where on the embassy Uncle Sam's was?

11   A.   Yes.  Uncle Sam's was --

12           THE INTERPRETER:  The interpreter needs a

13   clarification.

14   A.   Uncle Sam's was inside the embassy, within the compound.

15   Right next to Uncle Sam's there was a gym.  And usually the

16   America people, people in the military would come to dine

17   there.

18   Q.   After you came back from Ethiopia, what was your next job?

19   A.   Would you please repeat the question.

20   Q.   Sure.  When you came back from Ethiopia to take care of

21   your mom, what was your next job?

22   A.   After I returned, I was looking for a job for sometime, I

23   couldn't find a job.  So I called Mrs. Howard.

24   Q.   Where did you work after that?

25   A.   Inside the American Embassy at the American Embassy

S. Roe - Direct

282

1    office.

2    Q.   You said you were working inside the American Embassy?

3    A.   Yes, I began to work at the American Embassy as a data

4    entry person.

5    Q.   Was that data entry in English?

6    A.   Yes.

7    Q.   How would you characterize your English at that point?

8    A.   I would listen.  But in terms of writing, my skills were

9    zero.

10   Q.   So how were you able to enter the data for the project?

11   A.   The job didn't require me to contribute anything.  Just it

12   was copy and paste or type what I was looking at, which was

13   laid out there.

14   Q.   Was that job a permanent job?

15   A.   No, it was temporary, only for six months.

16   Q.   Where did you go after that?

17   A.   I did not finish the six-months term.  I moved on to work

18   for a hotel named Mövenpick.

19   Q.   What hotel is that?

20   A.   Mövenpick.

21   Q.   What did you do there?

22   A.   The hotel was always very busy and they always hired

23   temporary workers.  So I was a hostess there for sometime.

24   Q.   About how long were you a hostess at the Mövenpick?

25   A.   I don't quite remember.  I worked a little bit, it might

S. Roe - Direct

283

1    have been eight, nine.  I don't have a good recollection.

2    Q.    When you say eight, nine, do you mean months?

3    A.    Yes.  It might have been seven, eight, I'm not sure.

4    Q.    Where did you go after that?

5    A.    I called her again to ask her to help find a job for me

6    because I believed she was a good person, she would help me.

7    Q.    Okay.  Before we get to that, I want to talk to you about

8    a few other things, and then we can talk about your

9    relationship with the Howards.

10   A.    Okay.

11   Q.    I want to talk to you a little bit about your life today.

12   Where are you living now?

13   A.    Arlington.

14   Q.    Can you describe your apartment.

15   A.    I live in a low income apartment.

16   Q.    How much do you pay for rent?

17   A.    I pay $135 a month plus utilities, electricity.

18   Q.    How big is the apartment?

19   A.    Very small, two-bedroom apartment, enough for myself and

20   my daughter.

21   Q.    How old is your daughter?

22   A.    She is six today.  She will be seven day after tomorrow.

23   Q.    When did you first arrive in the U.S., what year?

24   A.    2014.

25   Q.    When you moved here in 2014, where did you live?

S. Roe - Direct

284

```
1   A.    I did not come to live here.

2   Q.    But where did you reside when you came here?

3   A.    I was in Philadelphia, and then I came to D.C. for

4   sometime.

5   Q.    Did you live in an apartment when you came to D.C.?

6   A.    I came to the U.S. at that time only for 23 days.  So I

7   stayed with people.

8   Q.    And when did you come back to the U.S.?

9   A.    September 23, 2014.

10  Q.    When you came back in 2014, was it -- did you move here to

11  the U.S.?

12  A.    Yes, second round, I came.

13  Q.    Where did you live that time?

14  A.    For three or four days I stayed with some people.  And

15  then I roomed with Hispanic family.

16  Q.    How many roommates did you have?

17  A.    They were a couple.  They rented one room for me to sleep

18  in with my daughter.

19  Q.    How long did you live there?

20  A.    One year.

21  Q.    Where did you move after that?

22  A.    I started working, and then I decided to rent a

23  two-bedroom apartment so my daughter can have her own room.

24  Q.    Did you start working?

25  A.    Red Robin Restaurant.
```

1    Q.   How long did you work there?

2    A.   Around 11 months.

3    Q.   Why did you stop working at Red Robin?

4    A.   It was 11 months.  I started around May, I think I stopped

5    around April, I don't quite remember.

6    Q.   Why did you stop working?

7    A.   I decided to pursue education.  I want to improve my

8    language skills.  And until things were settled down, I wanted

9    to be available for my daughter, dropping her off, picking her

10   up, and spending after-school hours with her.

11   Q.   Do you receive any food stamps or other public assistance?

12   A.   Yes.  Even at that time after I stopped working, I was

13   looking for a part-time job.

14   Q.   Were you able to find one?

15   A.   I did, but the jobs required working odd ours like working

16   evenings or night shifts, and I didn't have anybody else to

17   take care of my daughter.  The schedules were not working out

18   well with mine.

19   Q.   So going back, do you receive any public assistance?

20   A.   I did receive TANF at that time, $180 a month.

21   Q.   What is TANF?

22   A.   They sent me checks for six months, it was the same as or

23   similar to food stamp benefits.

24   Q.   Do you know if it's for your daughter?

25   A.   Yes.

S. Roe - Direct

286

1   Q.   Ms. Roe, do you have a job now?

2   A.   No, I am not working at this moment because I'm sick.

3   Q.   Does your sickness prevent you from working?

4   A.   Yes.

5   Q.   Ms. Roe, do you understand what a T visa is?

6   A.   I didn't know before, but I have an understanding of what

7   it is now.

8   Q.   What is your understanding now?

9   A.   At this moment I understand that T visa is a visa provided

10  for human traffic victims.  Prior to this understanding, I

11  thought everyone got the same visa to travel.

12  Q.   Did you submit an application for a T visa?

13  A.   Yes.

14  Q.   Did you do that by yourself?

15  A.   No, I did not.

16  Q.   Did you receive help?

17  A.   Yes, but at that time I didn't know the details of it.

18  Q.   What do you mean by that?

19  A.   My understanding now is much better.  Whereas before when

20  I first applied, I really did not have knowledge of -- or I

21  didn't understand exactly what entailed T visa.

22  Q.   Did lawyers help you fill out a T visa application?

23  A.   Yes.

24  Q.   Did they explain to you what a T visa was?

25  A.   Yes.

S. Roe - Direct

1  Q.   And before -- and when did they explain that to you?

2  A.   Prior to processing the application, they did explain what

3  the visa was about.  But I didn't quite grasp the idea of it

4  until now that I'm in the system, now I've been living here,

5  I'm learning the things -- how things work.  That now looking

6  back, things are clearing up and I'm getting an understanding

7  of how that was done.

8  Q.   Do you remember when you submitted your T visa?

9  A.   Yes, I think it was a year-and-a-half, a year or two years

10 after I came here.  Might have been one year.

11 Q.   When you say after you came here, do you mean the first

12 time that you came here or the second time?

13 A.   The second time around because the first time I was only

14 here for 23 days and I went back.

15 Q.   When you and the lawyers were filling out the T visa, did

16 you provide the information to fill it out?

17 A.   Yes.

18 Q.   Did you and your lawyers review that T visa in Amharic?

19 A.   No, it was in English.  I did understand the questions

20 that they were asking.

21 Q.   When you say no, do you mean when they were filling out

22 the T visa, they did not explain it in Amharic?

23 A.   It was in English, but I understood.

24 Q.   Do you remember being interviewed by the government as

25 part of your T visa?

S. Roe - Direct

288

1            THE COURT:  Let me see counsel at the sidebar for a

2    moment.

3            NOTE:  A side-bar discussion is had between the Court

4    and counsel out of the hearing of the jury as follows:

5    AT SIDE BAR

6            THE COURT:  Where are we going with this?

7            MS. PATTERSON:  Your Honor, I am trying to establish

8    foundation about her familiarity with the T visa and the

9    Supplemental B.  And we intend on, as we have discussed with

10   Mr. Rinaldo, submitting the T visa application and the

11   Supplemental B in evidence.

12           MR. RINALDO:  And I have objected to that.

13           MS. PATTERSON:  We are obviously not able to come to

14   an agreement.

15           MR. RINALDO:  Right.

16           THE COURT:  Why do you think it's relevant at this

17   stage?  Is it the timing of it?  What's relevant about

18   submitting the application itself?

19           MS. PATTERSON:  Absolutely, Your Honor.  With respect

20   to the application, it's certainly about timing.  Mr. Rinaldo

21   has alleged in his opening statement that Ms. Roe came to the

22   United States by making up allegations related to trafficking.

23           We have established her knowledge of the T visa and

24   the timing of when she came to the U.S.

25           Furthermore, in the T visa itself she makes

S. Roe - Direct

1    representations about when she first had contact with the

2    investigators, telling them about her story, which was back in

3    2009.

4            And both of those are relevant and important for the

5    jury to understand in addressing Mr. Rinaldo's allegations.

6            MR. RINALDO:  Actually, Your Honor, my opening

7    statement may have implied it.  I most certainty didn't say it.

8    But I am not going to deny that I implied that she had multiple

9    reasons for coming to the United States.

10           And I said -- what I said was she had reasons to come

11   to the United States, and she has a T visa.  But there is

12   another reason why this shouldn't be permitted, the T visa.

13   She is making representations in there about what happened to

14   her.  And she can't -- now they're talking about, well, you

15   were interviewed by the U.S. government, now we're going to

16   have the U.S. government vouching for her position.  The same

17   way we couldn't have Ms. Burke do it.

18           THE COURT:  It certainly is relevant if you impeach

19   her on matters of when she came up with the story, when these

20   matters came to a head, why didn't she tell the authorities.

21           MR. RINALDO:  Well, Your Honor --

22           THE COURT:  I expect the likelihood that it's going

23   to come in is pretty high.

24           MR. RINALDO:  But I haven't impeached her on it yet.

25           THE COURT:  Well, you haven't, that's right.

1              MR. RINALDO:  Not only that, but there are other

2    reasons why she could have not told people, which Ms. Patterson

3    already has explored about her culture and so forth.

4              So it is not necessarily true that, you know, that I

5    am going to open that door.  So I think this is at worse

6    premature.

7              MS. PATTERSON:  So we're establishing the foundation

8    for it.  If you would like us to wait to submit the T visa

9    until later, we are happy to do so.

10             And then with respect to the Supplemental B --

11             MR. RINALDO:  The same thing.

12             MS. PATTERSON:  We believe that that's also

13   admissible.

14             THE COURT:  All right.  You can establish a

15   foundation for it, but let's wait.  I think it's premature to

16   just -- well, for the reasons that we talked before about,

17   about you -- it's not admissible at this stage.

18             I mean, her testimony about what happened to her is

19   the relevant testimony now.  And if she is impeached on it,

20   then redirect is the time to get into the substance of when and

21   what she said back in an earlier day, if it becomes relevant.

22             Now, let's break for lunch.

23             MS. PATTERSON:  Sure.

24             THE COURT:  I have a quick -- I think a quick plea,

25   you never know, at 1:45.

S. Roe - Direct

1              MS. PATTERSON:  Okay.

2              THE COURT:  So I will get the jury to come back about

3      five minutes after 2.

4              And here is a plug.  You all need to meet and spend

5      some time, maybe 10 or 15 minutes after you get back from

6      lunch, talking about jury instructions.

7              I want you to designate somebody -- you may be the

8      only one at your table, but designate somebody to be the

9      spokesperson for the jury instructions.

10             MR. RINALDO:  Are we going to do a charging

11     conference this afternoon before we start back?

12             THE COURT:  No.  But I want a preliminary exchange of

13     information, what you agree on, what you object to.

14             MR. RINALDO:  Okay.

15             THE COURT:  So that we can pinpoint where our areas

16     of disagreement are.

17             MR. RINALDO:  Fine, Your Honor.

18             THE COURT:  If you can get that done in 15 minutes --

19     if not, get as far as along as possible.  We are not going to

20     finish the testimony today, or likely not.

21             MR. RINALDO:  I don't think so.  I don't know how

22     long they have.

23             THE COURT:  Right.

24             MR. RINALDO:  And you don't have any other witnesses?

25             MS. PATTERSON:  We don't have any other witnesses.

S. Roe - Direct

292

1          MR. RINALDO:  So they may rest today.

2          THE COURT:  And I want to get the process moving.

3    This is the last thing that always happens, and we wind up

4    having the jury sit around for three hours while we are messing

5    around with jury instructions.  I don't want that to happen.

6          MR. RINALDO:  Fair enough.

7          MS. PATTERSON:  Yes.

8          THE COURT:  Thank you.

9          MR. RINALDO:  So we are breaking now?

10          THE COURT:  We are going to break now.

11          NOTE:  The side-bar discussion is concluded;

12    whereupon the case continues before the jury as follows:

13    BEFORE THE JURY

14          THE COURT:  All right.  We are going to break now for

15    lunch.  How is the temperature?  Everybody has got a different

16    internal thermometer.  I am always frozen.  I notice that

17    perhaps one of the jurors is a little bit on the chilly side.

18          Talk about it over lunch.  And if you want me to

19    raise the temperature -- nothing happens instantly, but over a

20    little period of time if it is a little too cool, we can raise

21    it up a little bit.  I don't want it so warm that we all go to

22    sleep.  So let me know what you think about that.

23          We are going to take -- I have a brief matter at

24    1:45.  So if you would come back at five minutes after 2, I

25    think we will be ready to resume testimony.  All right?

1          So enjoy your lunch.  Obviously, don't discuss the

2    testimony that we've heard with anybody while you are gone.

3          Thank you, you are excused now.

4          NOTE:  At this point the jury leaves the courtroom;

5    whereupon the case continues as follows:

6    JURY OUT

7          THE COURT:  All right.  Ms. Roe, you're in the middle

8    of your testimony, so don't discuss the testimony you've given

9    with anyone until you return this afternoon.  Okay?

10          You're free to discuss other matters with your

11    attorney, just don't the testimony you've given already.

12          THE WITNESS:  Okay.

13          THE COURT:  All right, good.

14          All right, we'll see you all at five minutes after 2.

15          We are in recess.

16          NOTE:  At this point a lunch recess is taken; at the

17    conclusion of which the case continues as follows:

18    JURY OUT

19          THE COURT:  I had a chance at the break to look at

20    the T visa issue a little further and whether it comes in under

21    801(d)(2) or not.

22          And I also did a little -- we did a little research,

23    and I'm not sure where you were going, but I think that clearly

24    801(d)(2) anticipates a defense.  And just to read it:

25    Declarant's prior or witness' prior statement is admissible to

S. Roe - Direct

294

1    rebut an express or implied charge that the declarant recently

2    fabricated it or acted from a recent improper influence or

3    motive in so testifying.

4            So the denial that it ever happened at all is

5    certainly a situation where the truthfulness of her testimony

6    has been put at issue, even in the opening statements.

7            But the other protections that are required for that

8    are that the motivation for the earlier statement has to be

9    different from the motivation for her testimony today.  I don't

10   know whether you were prepared to go down that road or not.

11   That's something that you can consider.

12           I certainly think that, as I stated at the sidebar,

13   that if she is impeached, then it is certainly admissible to

14   rehabilitate her testimony on direct.

15           So that's where I stand on the issue.  And if we need

16   to discuss it further during further testimony at sidebar, we

17   can do it then.  All right?

18           Anything else we need to discuss before we bring our

19   jury in?

20           MS. PATTERSON:  One other thing, Your Honor, with

21   respect to the T visa.  The Supplemental B we believe also

22   comes in as a public record.  If we look at the public record

23   exception, Your Honor, it specifically allows for investigative

24   files in these sort of cases.  And we believe that this meets

25   those standards for the Supplemental B if not for the entire T

S. Roe - Direct

295

1    visa application.

2             THE COURT:  Okay.  I realize it's a public record,

3    but doesn't it also have to fit within the admissibility rules?

4             Do I have these documents in the exhibit book?

5             MS. PATTERSON:  Yes, Your Honor.

6             THE COURT:  Okay.  What exhibits are they?

7             MS. PATTERSON:  They should be exhibit tab 9.  The

8    first part of the documents is her T visa application starting

9    on -- starting on page ROE87, that's the law enforcement

10   Supplemental B declaration.

11            THE COURT:  So this is March of 2015.  And when was

12   this lawsuit filed?

13            MS. PATTERSON:  This lawsuit was filed May 2016, Your

14   Honor.  Furthermore, Your Honor, in the Supplemental B it does

15   state that the investigation began in 2009.

16            THE COURT:  2009.  Okay.  Do you want to respond,

17   sir?

18            MR. RINALDO:  I certainly do, Your Honor.  This T

19   visa application, this is a government record that was not --

20   if you look at what they say, what the application says on

21   page 88, ROE88 under section 2.

22            THE COURT:  Yes.

23            MR. RINALDO:  I mean, we're at -- the plaintiff is

24   asking the jury to come to exactly that same conclusion that

25   the United States allegedly already came to, but didn't -- and

S. Roe - direct

296

1    there has been no criminal events filed.  This is extremely and

2    unfairly prejudicial to my client.  This isn't a prior --

3             THE COURT:  This is an application, right?

4             MR. RINALDO:  Yeah, but, Your Honor, if you look

5    at -- if you look at page 91.

6             THE COURT:  Right.  Okay.  In the attestation it

7    states:  Based on the investigation.

8             MR. RINALDO:  Right.

9             THE COURT:  Okay.

10            MR. RINALDO:  That's a law enforcement officer

11   vouching for her credibility.  He's not here.

12            THE COURT:  Well, we can get to the admissibility of

13   the documents themselves, I think it's a separate issue than

14   the testimony that in fact the application was filed and that

15   she made the allegations back in 2009, which is the rationale

16   behind 801(d)(2) --

17            MR. RINALDO:  Well, there is --

18            THE COURT:  -- when her statement has been impeached

19   or put in question, right.  So you're arguing the document

20   shouldn't come in?

21            MR. RINALDO:  The documents clearly shouldn't come

22   in.  And I don't believe there has been testimony as to when

23   she first made the allegations or when she didn't yet.

24            THE COURT:  Well, this is evidence, the application

25   and the supplement is certainly evidence that she in fact did

1   so back in 2009.

2          MR. RINALDO:  Right, Your Honor.  But what I'm saying

3   is that I haven't tried to impeach it.

4          THE COURT:  You denied that any of this occurred.

5          MR. RINALDO:  Right.  I'm sorry.  I deny that it

6   occurred.

7          THE COURT:  Right.

8          MR. RINALDO:  But I don't deny when she made the

9   allegation.  If the allegations are false, they were false

10  then, they are false now.

11         THE COURT:  Right.

12         MR. RINALDO:  I'm not saying that she didn't first

13  say something in 2009.  There has been no evidence of that.

14  And I haven't crossed her yet, so I couldn't.

15         THE COURT:  Well, your theory from opening statement

16  on was that none of this ever happened and she is here in court

17  trying to collect a purse that she is not entitled to.

18         MR. RINALDO:  Well, my theory in opening, Your Honor,

19  was that it never happened, and it still is.

20             To the extent that I may have implied that other

21  thing in the opening, there are lots of reasons why she might

22  be here.  That isn't any -- the fact is, she could very well

23  have made the allegations in 2009 and then subsequently decided

24  to come to the United States.  But that's not -- that doesn't

25  make this admissible at this time.

S. Roe - Direct

298

1          THE COURT:  All right.  Well, I'm going to adhere to

2    my prior ruling.  But the likelihood that this is coming in in

3    redirect, at least for the basis of the time that she made the

4    first allegation, is a virtual certainty.

5          MR. RINALDO:  Well, Your Honor --

6          THE COURT:  Yes, sir.

7          MR. RINALDO:  I'm not so sure that on direct Ms.

8    Patterson has asked her when she made the first allegation.

9          THE COURT:  I'm going to let her lay --

10          MR. RINALDO:  I'm --

11          THE COURT:  Well, she hasn't asked -- did you ask on

12    the date that received the help to fill the form out?

13          MS. PATTERSON:  Yes, Your Honor.  I had not gotten to

14    when she first discussed these allegations with federal

15    investigators yet, but I certainly intend to.

16          THE COURT:  All right.  Well, are you going to go

17    into the fact that she did so in 2009 when she left, or not?

18    Because you already asked when she was, when she left Japan,

19    and that she came to the United States after that, right?

20          MS. PATTERSON:  Your Honor, that was the witness Jane

21    Doe that came from Japan.  My client never left Yemen.

22          THE COURT:  Okay, I'm sorry.  You are right.  When

23    was the first T visa applied for?

24          MS. PATTERSON:  Her first T visa applied for?  It was

25    in, I want to say, 2015.  I can double-check the date, Your

S. Roe - Direct

299

1   Honor.

2          MR. RINALDO:  Your Honor, I think it might have been

3   '14, but that's not really a material difference.

4          THE COURT:  Okay.  And when did she make the first

5   allegation that forced labor or sexual abuse had occurred?

6          MS. PATTERSON:  She will testify, Your Honor, that

7   she did speak with some other people about those allegations in

8   2007.  However, the first time she told federal investigators

9   about it was in 2009 when those investigators came and asked

10   her questions about it.

11          THE COURT:  Okay.  All right.  I understand better

12   now.  I'm going to allow you to ask questions about when she

13   went to any authority, and not the substance of what she said

14   until we get further down the road.

15          MS. PATTERSON:  Obviously, Your Honor.

16          THE COURT:  Okay.  And your exception is noted.

17          All right, let's get our jury.

18          NOTE:  At this point the jury returns to the

19   courtroom; whereupon the case continues as follows:

20   JURY IN

21          THE COURT:  All right, please be seated.

22          We have adjusted the temperature a little bit up.  If

23   it's uncomfortable moving forward, please let me know.

24          And I'm sorry for the delay, my criminal matter went

25   longer than I had expected.  So I apologize.

1          Let's have Ms. Roe come back to the stand and

2     continue our direct.

3     BY MS. PATTERSON: (Continuing)

4     Q.   Good afternoon, Ms. Roe.  Before we broke for lunch we

5     were talking a little bit about your job history.

6     A.   Yes.

7     Q.   While you were in Yemen, did you send any money home to

8     your family in Ethiopia?

9     A.   Yes, every month.

10    Q.   How much money did you send home?

11    A.   Whatever I had, 150, 200, 300.

12    Q.   Now I want to turn your attention to the defendant, Linda

13    Howard, and talk to you about how you met them.

14    A.   Okay.

15    Q.   When did you first meet Linda or Russell Howard?

16    A.   September 5 at the American Embassy.

17    Q.   Do you remember what year it was?

18    A.   2005.

19    Q.   Where at the American Embassy did you meet them?

20    A.   The place where I was working.

21    Q.   Where was that?

22    A.   Uncle Sam's.

23    Q.   Which one of the Howards or both of them did you meet at

24    Uncle Sam's?

25    A.   I first met her husband where I was working at the Uncle

S. Roe - Direct

301

1    Sam's next to -- there was an alcohol shop, that's where he was

2    working.  And then I met her the second day -- I met her on the

3    same day.

4    Q.   How old were you in 2005?

5    A.   Around 2005 I was 20 or 21.

6    Q.   What was your first impression of the Howards?

7    A.   Very friendly, welcoming, very lovely people to talk to.

8    They sort of give you attention to be close to them.

9    Q.   You said that you met Russell Howard first?

10   A.   Yes.

11   Q.   Did you speak with him that first day?

12   A.   Yes.  He came and greeted me.  He said I'm beautiful.

13   Where are you from?  You have a nice shape.  And I told him.

14   And I said, thank you.

15   Q.   Did he say anything else?

16   A.   He asked me to go and work for them in their home.  And I

17   really liked the job I had at that time, and I said, no.

18   Q.   Ms. Roe, did Russell Howard ask you to work for them that

19   first day that you met him?

20   A.   Yes.

21   Q.   How did you meet Linda Howard?

22   A.   She used to work out at the compound, she used to run.

23   And he called her in and introduced me to her.

24   Q.   Can you describe that first interaction with Linda Howard.

25   A.   She is a very loving person.  She said that I am beautiful

S. Roe - Direct

302

1   and she liked my complexion.

2   Q.   Did she say anything else to you?

3   A.   She also asked me to work for them in their home.  And I

4   told them, no, I like the job I have now.  I like the fact that

5   I get tips, it helps me provide for my family.

6   Q.   Sarah, when you first were speaking with them, what was

7   their demeanor like?

8   A.   Very easy people to talk to.  They appeared to be happy,

9   especially her.  She speaks in a loving way.

10  Q.   Do you remember what she was wearing?

11  A.   Yes.

12  Q.   What was she wearing?

13  A.   A white top, orange shorts, and she had water in her hand.

14  Q.   What kind of shorts were they?

15  A.   Orange.

16  Q.   Were they workout shorts?

17  A.   Yes, it was a workout short.

18  Q.   Did you see them after that?

19  A.   Yes, quite often, because I worked right close to where

20  she usually goes jogging.  And I would stay late working, and

21  she would stop by, hug me and greet me.

22  Q.   How many times would you say a week did you see Linda

23  Howard?

24  A.   Three or four times.

25  Q.   What about Russell Howard, how frequently did you see him?

1  A.   I can almost every day because he works right next to me

2  at the alcohol shop, and he gives some movies to watch.  Except

3  Saturday and Sunday.

4  Q.   When you say he gives movies to watch, did he give movies

5  to you to watch?

6  A.   Not to me.  To other employees at the embassy.  I don't

7  know if the movies were coming from the U.S. for them to watch,

8  I don't know if he was renting them.  I just used to see movies

9  being taken by people.  There were T shirts and hats in that

10 store.

11 Q.   Did you interact with Russell Howard?

12 A.   Yes.  In fact, he used to tell me, if you don't want to

13 work for us, help me find a young beautiful woman like yourself

14 to work in my home.

15 Q.   Did he say anything else?

16 A.   No, that was it.  I helped him find someone else to work

17 for him.  At that time people, Ethiopian people or people from

18 Philippines, sought highly of this type of work, working for

19 foreigners, because they paid what was assumed to be good.

20 Q.   What was your understanding of the pay?

21 A.   In my experience, that if you work for white people, the

22 American people especially, the pay was considered to be good.

23 It was between 400 to 500.  And so, people, including myself,

24 sort of sought those kind of positions.

25 Q.   Sarah, was it for positions -- these positions with

1    Americans that you sought, were they for live-in help or were

2    they for other types of jobs?

3    A.   In my experience, it's very rare, almost to none,

4    positions in American home or white people home requiring

5    someone to live in with them.  It's usually the other

6    foreigners that sought after live-in workers.

7              We considered that the Americans were advanced in

8    their thinking.  We wanted to work for them instead of the

9    people from Arab nations.

10   Q.   Sarah, you said that you would interact with Linda Howard

11   about three or four times a week; is that right?

12   A.   Yes.

13   Q.   How long would you speak with her each time?

14             THE COURT:  Objection?

15             MR. RINALDO:  I'm not sure, Your Honor.  There hasn't

16   been a time frame for any of this.  So I'm not sure I am doing

17   it as an objection, but I think it would be clearer if we could

18   figure out what years we're talking about.

19             THE COURT:  Sure.  It was identified earlier, but why

20   don't you ask again what time frame we're talking about.

21   BY MS. PATTERSON: (Continuing)

22   Q.   While you were working at Uncle Sam's, how frequently did

23   you see Linda Howard?

24   A.   As I mentioned earlier, since I worked late and there were

25   only two people working at that restaurant at the time, myself

S. Roe - Direct

305

1   and another Yemeni person, after work she would get off and jog

2   at the embassy, she would usually stop by, admire me, greet me.

3   And then that occurred quite often.

4   Q.   How long would you speak with her?

5   A.   Not very long.  She would just say my name, she would

6   greet me, how are you, and she would leave.

7   Q.   After you left Uncle Sam's, when was the next time you

8   spoke with Linda Howard?

9   A.   Two months or so after I returned from Ethiopia.

10  Q.   What year was that?

11  A.   I am not quite sure.  I think it was 2006 since I was

12  working elsewhere in 2005.

13  Q.   And what did you speak with her about?

14  A.   Since she presented herself to me to be a very good woman,

15  appeared to be very helpful to other people, I decided to ask

16  her about my need for another job.  I knew a lot of people, but

17  she seemed to be a lot closer.

18  Q.   How did you get her phone number?

19  A.   She gave me her phone number because I helped find someone

20  else to work in their home.

21  Q.   When you called Linda Howard to ask for help to find a job

22  after you came back from Ethiopia, did she help you?

23  A.   She told me at that time she didn't know of any openings,

24  but she would keep me updated if she heard of any.  At a later

25  time she told me that there is a job position available, and if

1    I like, to go ahead and apply.

2    Q.    What job was that?

3    A.    Data entry.

4    Q.    Where was the data entry?

5    A.    At the embassy.

6    Q.    What year was this?

7    A.    2006.

8    Q.    Did you apply for this job?

9    A.    Yes.

10   Q.    Did you get the job?

11   A.    Yes.

12   Q.    Do you know if Linda Howard helped you get the job?

13   A.    She told me about the job opening.  She brought the

14   application for me.  After the application was filled out, I

15   gave it back to her.

16          I was very scared that I may not get it because I

17   didn't have any such experience, but I received a phone call.

18   Q.    Who was this phone call from?

19   A.    From the embassy HR for an interview.

20   Q.    How did the interview go?

21   A.    It was good.  They interviewed four people, myself and

22   other Yemeni.

23   Q.    How many people got a job?

24   A.    Myself and another older person.

25   Q.    Did Linda Howard do anything after that to help you with

S. Roe - Direct

307

1   that database job?

2   A.   Yes.

3   Q.   What did she do?

4   A.   I don't remember in details, but I remember her calling me

5   to her house to show me how to do the data entry because I

6   never have any experience with computers besides opening and

7   closing e-mails.  She used her own computer in her home to show

8   me how to do it.

9   Q.   Was this the first time you went to the Howards' home?

10  A.   No.  The first time I saw it was when I helped them gain

11  an employee, they told me where they lived, and I went to see

12  it.

13  Q.   At this database entry job, what you were required to do?

14  A.   She prepared a small area for me by her office, and then

15  they gave me papers on how to do the data entry.  There was

16  nothing that I needed to contribute, I followed that

17  instruction.

18  Q.   You mentioned that another person was hired for this job.

19  Did you guys work in the same room?

20  A.   No, it was not.

21  Q.   Where was your office located at the embassy?

22  A.   At the lower level with the other Yemenis.  She told me

23  this is her office, and she prepared a space for me.

24  Q.   Where was her office?

25  A.   The Americans worked upstairs, but she would come

308

1    downstairs to supervise because she was the boss and she would

2    sometimes sit there.

3    Q.    Do you know what the other Yemeni people were doing in

4    your area where you worked?

5    A.    The nature of the job is different.  I do somehow remember

6    some names.

7    Q.    Do you remember if any of those Yemeni employees were your

8    direct supervisor?

9    A.    At the time I thought everybody else was my supervisor.  I

10   wasn't sure.  But she would come downstairs, she would help me

11   and then she would go.

12   Q.    What would she help you do?

13   A.    She would stop by to see how I have completed the task

14   that I am given, how I have entered it into the computer, to

15   make sure that it has been entered correctly.  And she would

16   also tell one of the Yemenis, I remember one name specifically

17   Rhoda, to help me.

18   Q.    Did you speak to Linda Howard besides that while you were

19   at this database entry job?

20   A.    Yes, she would -- she used to tell me that she was happy

21   with the new person that I helped hire and that she cooked very

22   good meals for them.  And that she appreciated me.  And I

23   thought it was very nice.

24   Q.    Do you remember the name of this other housekeeper?

25   A.    Yes.

1  Q.    What was her name?

2  A.    Sabha.

3  Q.    Do you remember how old Sabha was?

4  A.    It is very difficult to say exactly how old, but I think

5  she was a little bit older than me.

6  Q.    Do you think that she was under 30?

7  A.    Yes.  I think she might have been 28, 29, 30.

8  Q.    Was Sabha Ethiopian?

9  A.    Yes.

10  Q.    Did you ever speak to Linda Howard on the telephone while

11  you were working at this job?

12  A.    Yes.

13  Q.    What did you speak with her about?

14  A.    She would talk to me about her hair.  These places that

15  she wanted me to take her.  Our conversations were like two

16  friends talking.

17  Q.    Where did she want you to take her?

18  A.    To see if I know of any hair salons.  I did take her to

19  the Ethiopian hair salon before.

20  Q.    How many times did you take her to the Ethiopian hair

21  salon?

22  A.    I took her one time, she did not like it.  She got mad.

23  She normally gets her haircut.

24  Q.    What do you mean she got mad?

25  A.    I think she didn't quite like the way her hair was cut or

S. Roe - Direct

310

1    styled.  She never went back since.

2    Q.   How could you tell that she was mad?

3    A.   She was telling me the difference between the way she used

4    to have her hair cut and now at that time it was very obvious

5    that she was mad.

6    Q.   Did you ever call her to ask her questions about your

7    database entry job?

8    A.   Yes, I use to call her because I used to be very scared of

9    messing up.  So I would want to be sure that I did the job

10   right, so I would call for help.

11   Q.   Sarah, did you know what Linda Howard's job was at the

12   embassy?

13   A.   I don't know.  The office that she placed me in used to be

14   called ITC.

15   Q.   Do you know if she was like a boss at the embassy?

16   A.   Yes.  I knew that the Yemeni worked there had their own

17   specific jobs and they had a boss.

18   Q.   Was Linda Howard that boss?

19   A.   Yes, she was their supervisor.

20   Q.   Sarah, if Linda Howard was the boss, why did you ask her

21   for help?

22   A.   By that time she had presented herself to me as a friend,

23   someone very easy to talk to, someone with a very good heart.

24   So she was very approachable to me to ask for help.

25   Q.   After your job with the database entry project ended, when

1    was the next time you either spoke with Linda or Russell

2    Howard?

3    A.    We talked, they told me that the person I helped find to

4    work for them, that they said she was a thief, she had stolen

5    some money from them, that they had fired her, and that they

6    hired someone else.

7    Q.    Which maid was it that they had fired?

8    A.    After they asked me and I refused to work, the person that

9    I helped get hired.

10   Q.    Was that Sabha?

11   A.    Yes.

12   Q.    Did you know the new maid that they hired?

13           THE INTERPRETER:   I'm sorry.

14   Q.    I believe the question was, did you know the new maid that

15   they had hired?

16   A.    I did not, but they introduced me to her.

17   Q.    What was her name?

18   A.    Brhan.

19   Q.    When they introduced you to Brhan, what year was it?

20   A.    I don't remember.  It was during a party that the embassy

21   had thrown for the Marines, that they sent out an e-mail

22   regarding this party, and I got invited.  I went to that party.

23   And that's where they had brought her, she was wearing a very

24   nice evening dress, and that's when they introduced me to her,

25   and they were very happy.

S. Roe - Direct

312

1   Q.   Do you remember what time of year it was?

2   A.   Not quite, because in Yemen it's usually warm.  It gets

3   kind of cold in October.

4   Q.   Do you remember how many months after your database entry

5   job ended that you met Brhan and the Howards?

6   A.   I don't quite remember the exact date, but I think it was

7   in 2006.

8   Q.   When was the next time you spoke with the Howards after

9   this party?

10  A.   Well, since I was working at a temporary job at that time,

11  I have always looked forward to getting a phone call from her

12  to get about job opportunities.

13  Q.   Did she call you about job opportunities?

14  A.   She did promise she was going to help me find a job.  And

15  she would just tell me, hang on, wait, I'm looking.  And I was

16  very sure that she was going to help me.

17  Q.   Why were you sure that she was going to help you?

18  A.   My understanding at that time, she really liked me.  And

19  the other Yemenis used to tell me, she really likes you, she's

20  a good person.

21  Q.   Before we move on, you mentioned that you met Brhan.  Do

22  you know about how old Brhan was?

23  A.   I don't remember exactly, but it appears to me that she is

24  very close to my age.  She was very young.

25  Q.   Do you know if Brhan was Ethiopian?

313

1   A.   Yes, her name is very obvious Ethiopian name.

2   Q.   You just mentioned that you were working at the Mövenpick.

3   Did you get a job after the Mövenpick?

4           THE INTERPRETER:   The interpreter would like a

5   repetition.

6           MS. PATTERSON:   Could the court reporter --

7           THE COURT:   Let's all take a deep breathe and get a

8   little more energy going, and it's mid-afternoon and it happens

9   every day about this time.

10          So let's reask the question, and let's speak a little

11  louder, and I think we'll all benefit from that.   Thank you.

12  BY MS. PATTERSON: (Continuing)

13  Q.   Sarah, did you get a job after the Mövenpick?

14  A.   I called her.

15  Q.   Do you remember when you called her?

16  A.   I think it was in 2007 when I called her.  I believe she

17  was in Germany at that time.

18  Q.   Did you call her specifically to ask for a job?

19  A.   Yes, I did.  When I called her, I didn't know she was

20  abroad, I thought she was still there.  And I didn't know her

21  phone worked or got international receptions.

22  Q.   When you called her, what did Linda Howard say?

23  A.   She said Brhan run away.  At the time I didn't know what

24  run away was.  And she kept saying that she run away.  Since I

25  didn't understand, I just said, okay.

S. Roe - Direct

314

1   Q.   When she told you that Brhan ran away, what was her

2   demeanor like?

3          MR. RINALDO:  Your Honor, wasn't this in a phone

4   call?

5          THE COURT:  Yes.  Sustained.  Reask the question.

6   Make it clear, please.

7          MS. PATTERSON:  Sure.

8   BY MS. PATTERSON: (Continuing)

9   Q.   When Linda Howard told you that Brhan ran away, what was

10   her tone like?

11   A.   She sounded upset.  She said that she will talk to me when

12   she gets back.  And I said, okay.

13   Q.   Did you talk to her when she got back?

14   A.   Yes, we did meet after she called me.

15   Q.   About how long after your first phone call did Linda

16   Howard call you?

17   A.   She had said that I will come back on Monday, I will call

18   you on Wednesday.

19   Q.   Did she call you on Wednesday?

20   A.   Yes.

21   Q.   What day did you go in to see her?

22   A.   The same day she called me.

23   Q.   When you went in to see her on Wednesday, did you know --

24   did she tell you whether she needed somebody to work in her

25   household?

S. Roe - Direct

315

1   A.    I was not expecting that there was a job opening at her

2   home.   When I went to meet her, I was under the impression that

3   she had found another job for me elsewhere.

4   Q.    When you went to meet her, did she tell you about another

5   job?

6   A.    No.   In the beginning they began to tell me how Brhan

7   disappeared, and they were very sad.   And they were showing me

8   her toothbrush and telling me that she didn't even take her

9   toothbrush.   She was crying because they really liked her.

10  Q.    You said they.   Who do you mean?

11  A.    Her and her husband.   When they told me that she ran away,

12  I was very mad.   I was thinking to myself, why would she run

13  away, they are such good people.

14  Q.    At what point did they tell you that they needed a new

15  housekeeper?

16  A.    That same day.   I was there until evening.

17  Q.    Did you interview with them, with the Howards?

18  A.    He kept asking, why don't you work for us?   You don't have

19  a job, you should work for us.   And I said, okay.

20  Q.    Did you discuss what your job duties would be at this

21  meeting?

22  A.    At the time she -- he started asking questions.   She

23  brought a paper and pen and she started writing down things.

24  And they told me some of the things that they will do for me,

25  they made promises.

S. Roe - Direct

316

1  Q.   You said he started asking questions.  What questions did

2  Russell Howard ask?

3  A.   Because I had said that I am desperately looking for a

4  job, I will even consider taking housekeeping in someone's home

5  because I know the pay will be worth it.  He was extremely

6  happy, he hugged me.  And he looked happy.

7           MR. RINALDO:  Your Honor, I know we have a

8  translator, and maybe we have a language problem, but the

9  question I thought was what kind of questions did Russell

10  Howard ask.  And the answer is completely non-responsive.  So I

11  would like it struck.

12           THE COURT:  All right.  It wasn't exactly on point.

13           Let's try and translate verbatim.  And if you have a

14  problem making that translation, then let us know.  And if

15  certain words are not equivalent, you know, Ms. Patterson will

16  reask the question a different way.

17           Go ahead, ask your next question.  I am not going to

18  strike the last answer.

19  BY MS. PATTERSON: (Continuing)

20  Q.   What did Linda or Russell Howard say were your job duties?

21  A.   Yes, they explained it to me.

22  Q.   What did they say your job duties would be?

23  A.   Cleaning, washing, drying, and cooking.  She did tell me

24  that he cooks very often, and that I can assist him with that.

25  And that I can cook some Ethiopian dishes sometime.

317

1  Q.   What did they offer you in return?

2  A.   She knew that I had worked at the embassy previously, and

3  she knew the pay was good.  She told me that if I was to work

4  for them, she would pay me $150.  They only have one year left

5  in that country, and they will be transferring to Germany, and

6  if I am interested, they would take me with them.

7  Q.   Did they make any other promises?

8  A.   At that time they asked more questions about my family.

9  Q.   And you said that they said they would pay you $150.  $150

10  per what interval?

11  A.   Monthly.

12  Q.   Was this more or less than what you made previously?

13  A.   A lot less because when I was working at the embassy, the

14  other works, the restaurant, I was also taking home some extra

15  money in tips.  So that was very helpful.

16  Q.   Did they promise you anything else?

17  A.   Yes.  I told them about the sickness I have in one of my

18  eye.  They promise they will get medical treatment for me

19  started while we were there.  That they will help my family

20  back home.

21       So I made a determination, if they are willing to do

22  these, especially help my family, and that's the reason for my

23  work, I was okay with everything else.  And so, I trusted them.

24  Q.   Did you have a work visa at this time?

25  A.   Yes.  Normally I would have to renew my work visa

S. Roe - Direct

318

1   annually, and at that time the visa was getting to expire.

2   Q.   Did they make any promises related to your work visa?

3   A.   Yes, they did say that they will take on and help renew

4   that.  And they showed me a contract, but I didn't get to sign

5   it or I didn't have a copy.

6   Q.   Did the Howards have any other requirements of you before

7   you could be their housekeeper?

8   A.   Yes.

9   Q.   What were those?

10  A.   Yes.  She told me that Russell is usually at home, he

11  needs a friend.  And I said, okay.  And in our culture, it's

12  very acceptable to be a friend of an older person.

13         And she -- also she knew that I had a desire to

14  improve my language skills, my English language skills, she

15  told me that he is very good and he can help me with that.

16  Q.   Did they ask you to do anything else?

17  A.   They asked me whether I was dating, if I had a boyfriend,

18  if I was married.  And then they found out that I was single.

19  Q.   Did they require you to live in their house?

20  A.   Yes.  And going back to that, when I told them that I was

21  not seeing anyone, he was really happy.  And I thought maybe he

22  was thinking that I am too young for this, and he was trying to

23  protect me as a father figure.

24  Q.   Did you want to live in the Howard's home?

25  A.   No.  When they asked me that I would have to live with

S. Roe - Direct

319

1    them, I told them that I currently have an apartment of my own.

2    I have items that I have purchased to send back home to my

3    mother, and I will need to keep my apartment.

4    Q.   How did they respond to that?

5    A.   Even though I promised that I will be coming in on time

6    and I would leave on time with all the duties completed, they

7    refused.  They told me that you can either sell the stuff or

8    throw it way.  If you are not willing to live with us, you

9    won't get the job.

10   Q.   What sort of things did you need to sell?

11   A.   I had a fridge.  Stove where I did the cooking.  I had a

12   laundry machine.  And some other items.

13   Q.   What were you going to do with these items?

14   A.   I eventually sold them because I needed the job.  And they

15   knew that I needed that job.  I sold these items to some of the

16   employees that worked there at the embassy.

17          MR. RINALDO:  Your Honor, could I hear the previous

18   question read back?

19          THE COURT:  What did you do with the items?  It's

20   responsive.

21          MR. RINALDO:  I must have misheard the question.

22          THE COURT:  Okay.

23   BY MS. PATTERSON: (Continuing)

24   Q.   Did they require anything else of you?

25   A.   They gave me Friday off, I could leave Friday morning,

S. Roe - Direct

320

1    come back Friday night or return Saturday morning.

2    Q.   Did they say what your hours would be?

3    A.   Yes.

4    Q.   What were those?

5    A.   She told me that she goes to work early in the morning.

6    She doesn't want me to start working until 9 a.m. in the

7    morning because he likes to sleep in.  If I started working

8    before he wakes up, I would disturb him and wake him up.

9    Q.   What time did they say your duties would end?

10   A.   Until the evening.

11   Q.   Did the Howards say what time in the evening?

12   A.   It would be after she comes home from work.  She sometimes

13   comes 5 or 6 or 9 p.m.

14   Q.   Did they require you to wear a uniform?

15   A.   Yes, they did say I will have to wear a uniform.  And I

16   agreed because in my past experience working in a Yemeni home,

17   I had to wear a uniform, and the uniform was acceptable.

18   Q.   Did you see the uniform at that interview?

19   A.   No, I did not.  Since they told me I would be wearing a

20   uniform, I didn't ask to see what kind it was.

21   Q.   Did Linda or Russell Howard say anything else to you

22   during this first meeting?

23   A.   I don't understand.  I don't understand the question.

24   Q.   Did Linda or Russell Howard say anything to you at that

25   meeting that you haven't already told us about?

S. Roe - Direct

321

1   A.   She did specify that the main part of this job is to make

2   Russell happy.  And I took it as doing my job, cleaning, doing

3   everything else was what was going to make him happy.  I didn't

4   think anything outside of that.

5         I thought that would be the key element to make him

6   happy.  I didn't think anything opposite from that.

7   Q.   Sarah, why did you take the job?

8   A.   I trusted her.  I trusted them based on my relationship

9   with them thus far.  Especially the fact that she made a

10  promise that she was going to help my family back home and that

11  my future was going to be bright.  I trusted that they will

12  fulfill those promises.

13        THE COURT:  Do you want to finish up on this, or --

14  we are going to take a mid-afternoon break whenever is good for

15  you, Ms. Patterson.

16        MS. PATTERSON:  This is actually a perfect spot.

17        THE COURT:  Okay.  All right, let's take our

18  mid-afternoon break, approximately 15 minutes.  We will try and

19  come back around 4 o'clock.  And we will go until 5:30 or

20  thereabouts.

21        All right, you are excused.  Thank you.

22        NOTE:  At this point the jury leaves the courtroom;

23  whereupon the case continues as follows:

24  JURY OUT

25        THE COURT:  All right, let's take 15 minutes.  We are

S. Roe - Direct

322

1    in recess.

2              NOTE:  At this point a recess is taken; at the

3    conclusion of which the case continues as follows:

4    JURY OUT

5              THE COURT:  All right.  Any preliminary matters

6    before we bring the jury in?  No?  All right.

7              Joe, let's get our jury, please.

8              All right, Ms. Roe, please come back to the stand.

9              NOTE:  At this point the jury returns to the

10   courtroom; whereupon the case continues as follows:

11   JURY IN

12             THE COURT:  Ms. Patterson, please proceed.

13   BY MS. PATTERSON: (Continuing)

14   Q.   Ms. Roe, how soon after the interview did you move into

15   the Howard home?

16   A.   I believe it was one day or two days, because I needed

17   time to pack my items.

18   Q.   When you moved into the home, did you see your room?

19   A.   They did show me the room.

20   Q.   How big was your room?

21   A.   It was very small.

22   Q.   Can you estimate about how large it was.

23   A.   Yes.  There was a queen bed in the room.  Maybe about the

24   size of this corner here.  It was very small.

25   Q.   Did you have your own bathroom?

S. Roe - Direct

323

1   A.   Yes.

2   Q.   Did the door have a lock?

3   A.   No.  I did ask.

4   Q.   What did you ask for?

5   A.   When I moved in, I realized that the door didn't have key,

6   so I asked for it.

7   Q.   What did you need the key for?

8   A.   To lock the door when I leave and when I sleep.

9   Q.   So could the door be locked from the inside of the room?

10  A.   No.  It would close, but it would not be locked without a

11  key.

12  Q.   If you had a key, could you lock your door?

13  A.   Yes.

14  Q.   Did you have a key?

15  A.   No, they told me didn't have key.

16  Q.   Ms. Roe, you mentioned earlier that there was a uniform

17  that you would be required to wear.

18  A.   Yes.

19  Q.   Did you see that uniform?

20  A.   Not at the day of the interview.

21  Q.   Did you see it once you moved into the Howards' home?

22  A.   Yes, both brought the uniform to me.

23  Q.   What did the uniform look like?

24  A.   She told me that she had made this outfit.  And once I

25  looked at it, I noticed that the skirt was very short.  So I

S. Roe - Direct

324

1    refused to wear the skirt.  But I took the blouse.

2    Q.    What did the blouse look like?

3    A.    It was green color.

4    Q.    What was the neckline like?

5    A.    It didn't appear to me as a uniform.  To me it looked like

6    something you would wear to -- when you go out.

7    Q.    Did the Howards provide you with another uniform?

8    A.    After they give me that uniform, I refused to wear it.  He

9    then took me to the mall.

10   Q.    What did you do at the mall?

11   A.    At the time we went to the mall, he purchased some

12   pajamas, underwear with a string, and some dress.  He didn't

13   tell me those items were for me at the time.

14   Q.    Can you describe the pajamas that he bought.

15   A.    The pajama was a blue color.  It was very revealing.  And

16   the underwear were the ones that has a string and many holes.

17   Q.    Was the shirt see-through?

18   A.    The pajama was one-piece, and it was very revealing.  And

19   it opens in the front.  And the underwear was the one with one

20   tiny string.  It looked like it would be a T-shirt because the

21   material sort of ends by the thigh area.

22   Q.    Who did you think this clothing was for?

23   A.    Obviously for her.  I couldn't have thought it would be

24   for me because I am just their housekeeper.

25   Q.    Who do you mean -- by her, do you mean Mrs. Howard?

S. Roe - Direct

325

1    A.    Yes, his wife.

2    Q.    When you returned home, did Russell Howard give you that

3    clothing?

4    A.    Once we returned, he gave them to me.  And he asked me to

5    show him -- he asked me to put them on and show him what it

6    looks like.

7    Q.    Did you put it on?

8    A.    No, I refused.

9    Q.    What did you do?

10   A.    I said, I will not wear them.  I sat them down, and I went

11   to prepare lunch for him.

12   Q.    After you prepared lunch for him, what did you do?

13   A.    I need a moment.

14         I went to my room to use the bathroom.

15   Q.    When you went into the room to use your bathroom, were you

16   alone?

17   A.    Yes.

18   Q.    What happened next?

19   A.    He came into the room naked.  I'm sorry.

20   Q.    Sarah, about how tall was Russell Howard?

21   A.    Very tall.

22   Q.    How far up on his body did you come?

23   A.    Around his waist.

24   Q.    About how wide was Mr. Howard?

25   A.    He wasn't heavy set, but he had a tummy.

S. Roe - Direct

326

1    Q.   Was he bigger than you?

2    A.   Yes.

3    Q.   When he came into your room naked, what did you do?

4    A.   I was very shocked.  And I couldn't believe my eyes.  At

5    that time I was much smaller than I am now.  And so, I ran to

6    the corner to escape.

7    Q.   What happened then?

8    A.   He came, he grabbed my hands, and pushed me on the bed.

9    Q.   Sarah, do you need a minute?

10   A.   Yes.

11   Q.   Sarah, after he pushed you on to the bed, what happened

12  next?

13   A.   Then he jumped on me.

14   Q.   Did he say anything to you?  Did Russell Howard say

15  anything to you?

16   A.   Yes.

17   Q.   What did Russell Howard say?

18   A.   He told me how much he likes me and how beautiful I am.

19   Q.   Sarah, how did you respond to Russell Howard's words?

20   A.   I begged him to leave me alone.

21   Q.   Did he say anything in response?

22   A.   No, he did not.

23   Q.   Sarah, what did you do next?

24   A.   I hated myself.  I lost hope.

25   Q.   Sarah, what did Russell Howard do next?

S. Roe - Direct

327

1   A.   He said I will get used to it.  And he left.

2   Q.   Sarah, did Russell Howard rape you?

3   A.   Yes.

4   Q.   Sarah, why didn't you leave?

5   A.   Where can I go?  I don't have a home.  Who can I go to?

6   Q.   After that first rape, did Russell Howard rape you again?

7   A.   Yes.

8   Q.   Did he say -- did Russell Howard say anything about those

9   rapes?

10  A.   I was crying, and he told me that this was part of my job

11  duty.

12  Q.   Did you try to resist Russell Howard?

13  A.   Yes.

14  Q.   What did you do?

15  A.   I tried to kick him with my feet, and trying to get him

16  off.

17  Q.   Did that work?

18  A.   No, it did not work.  He ripped the clothes I had on

19  apart.

20  Q.   After the first rape, did you try to resist the further

21  rapes?

22  A.   After that, it became a routine part of the job.  He would

23  come, rape me.  Since I would not have any desire, it would be

24  very painful.  And he would leave.

25  Q.   Sarah, did you do anything to try to stop him?

328

1    A.   No.  I tried.  He wasn't very happy with me because I

2    wasn't doing what he wanted.

3    Q.   When you say that you tried to resist him, what did you

4    do?

5    A.   I would tell him I don't have any desires, to leave me

6    alone.  I began to tell him that I had been a victim of

7    mutilation.  And he told that to Dr. Piet.

8    Q.   Who is Dr. Piet?

9    A.   One of their friends.

10   Q.   Sarah, did you do anything else to try to prevent Russell

11   Howard from entering your room?

12   A.   When I used to go to sleep, I used to put my luggage under

13   the door.

14   Q.   Did that prevent Russell Howard from entering your room?

15   A.   It did not.

16   Q.   Sarah, did Russell Howard do anything else to you?

17   A.   He would yell at me for days that he wouldn't be able to

18   do that to me when I'm on my period.

19   Q.   What would he say when he yelled at you?

20   A.   About myself, how there is no food in my country.  And he

21   would say that how privileged I am to be in Yemen and to be in

22   their home.

23   Q.   Did Russell Howard say anything else to you when you tried

24   to resist him?

25   A.   He used to say if I ever tell what's going on to someone

S. Roe - Direct

329

1    else, he would have me arrested and thrown into jail, and he

2    would tell my family back home.

3    Q.   How did those threats make you feel?

4    A.   I felt that I would be his slave in order for my family

5    not to find out and not to be victimized any further.

6    Q.   Sarah, did Russell Howard tell Linda Howard what he was

7    doing?

8    A.   Yes, I know she does.  He told me that he told her.

9    Q.   Did you ever hear him -- did you ever hear Russell Howard

10   tell Linda Howard what he was doing to you?

11   A.   Yes.  They talk on the phone all the time.  He would tell

12   her that I wasn't like Brhan, the first employee.

13   Q.   Did he say anything else?  Did Russell Howard say anything

14   else to Linda Howard?

15   A.   He would tell her what took place on a daily basis.  There

16   were two phones in the home, one in their bedroom, one in the

17   kitchen.  So I would sometimes ear drop -- I meant to say an

18   office in the house, not the bedroom.

19   Q.   Did you hear Linda Howard on the other side of the line?

20   A.   Yes, I did hear them conversate one time.  Other than

21   that, I would hear him tell her about the daily activity from a

22   different room because he speaks very loud.  And during those

23   instances I would hate myself and just cry.

24   Q.   Sarah, did Russell Howard do anything else to you?

25   A.   Yes.  He had my passport in his possession, and that was

S. Roe - Direct

330

1   to renew whatever needed to be done.

2   Q.   Did Russell Howard ever take you to a hospital?

3   A.   Yes, after two weeks, the second week.

4   Q.   What were you doing at the hospital?

5   A.   Now I know to be an IUD.  He told me that she has one for

6   eight years, that's the reason why.

7   Q.   What do you mean, that's the reason why?

8   A.   He told me once we arrived at the hospital that the reason

9   he took me to the hospital was to have an IUD put in me.  And

10  he told me that she has one that lasts for eight years as well.

11  Q.   And by she, do you mean Linda Howard?

12  A.   Yes.

13  Q.   Sarah, did you have the IUD put in?

14  A.   Yes, with a Russian doctor.

15  Q.   Did Russell Howard tell Linda Howard?

16  A.   Yes.  During the procedure it was painful and I was

17  crying.  He was telling her what was going on over the phone.

18  Q.   Sarah, did the Howards allow you to leave the house alone?

19  A.   I would -- he would be mad if I do leave.  And I would

20  tell her to -- in order to get her help, that eventually I want

21  to get married, I want to have children of my own.

22  Q.   When you say he, do you mean Russell Howard?

23  A.   Yes.

24  Q.   And when you say her, do you mean Linda Howard?

25  A.   Yes.

S. Roe - Direct

331

1   Q.   Sarah, did you go to the grocery store by yourself?

2   A.   Yes, I did.  I did go with both of them.  I used to go

3   with him, just me and him.  Whenever I'm going to the grocery

4   store with him when other Ethiopian people see me with him,

5   they would call me names.

6            MR. RINALDO:  Your Honor, can we approach for a

7   second?

8            THE COURT:  Yes, sir.

9            NOTE:  A side-bar discussion is had between the Court

10  and counsel out of the hearing of the jury as follows:

11  AT SIDE BAR

12            THE COURT:  Yes, sir.

13            MR. RINALDO:  Okay.  Your Honor, I know we have a

14  translator, and I know that's a problem, but the problem when

15  you have a translator, I am not blaming the translator at all,

16  but you can't tell sometimes when it goes from English to the

17  translator to the witness, back to the translator, and back to

18  English, what is the cause of the non-responsiveness to the

19  question.

20            The question was, did you ever go to the grocery

21  store alone?  And she is talking about going with Russell

22  Howard and other Ethiopians seeing her.  The question was, did

23  you ever go alone?  And I am trying not to object to this.

24            There have been a number of those.  And I know we are

25  getting tired, and maybe I am just getting crotchety, but

S. Roe - Direct

332

1    that's way far out from the question that is being asked.

2         I am not moving to strike or anything else like that.

3    I am just suggesting that perhaps we could be as careful as we

4    possibly could to make sure the answers are responsive.  Then

5    you can ask another question and elicit the next answer you

6    want.

7         THE COURT:  Well, that's what she's been doing.

8         But go ahead, Ms. Patterson.

9         MS. PATTERSON:  Your Honor, I was going to say, Ms.

10   Roe did answer the question, she said yes.  And she was

11   providing an explanation.

12        I know that there is sometimes a language barrier,

13   but she is doing the best she can to respond.

14        MR. RINALDO:  I am not saying that she is doing it on

15   purpose or anything like that.

16        THE COURT:  You have allowed some leading to occur.

17        MR. RINALDO:  I have.

18        THE COURT:  And that has been helpful, actually.

19        MR. RINALDO:  Well, not to me.

20        THE COURT:  But it is going to come out one way or

21   the other.

22        MR. RINALDO:  Sure.

23        MS. PATTERSON:  It will take much longer.

24        THE COURT:  You know, all I can say is -- repeat what

25   I said an hour ago, let's try to be careful to get the

1   translation correct, and please listen to the question, and

2   answer the question.

3            MR. RINALDO:  Answer it directly, yes.

4            THE COURT:  I will do that.

5            MR. RINALDO:  Thank you, Your Honor.  I am not asking

6   you.  You are in charge, I am just saying that was my

7   observation.

8            THE COURT:  Got it.

9            MR. RINALDO:  Okay, thanks.

10           THE COURT:  Let's keep moving along.  Thank you.

11           NOTE:  The side-bar discussion is concluded;

12   whereupon the case continues before the jury as follows:

13   BEFORE THE JURY

14           THE COURT:  All right.  As we spoke a little earlier

15   this afternoon, let's listen to the question that you get from

16   Ms. Patterson, and do your best answer -- to translate it

17   verbatim.

18           Ms. Roe, you listen carefully to the translation and

19   answer the question that's been asked.  Is that understood?

20   Everything okay there?  Sometimes a little bit of the question

21   gets lost I am thinking in translation and then going back.

22           So let's try and listen for the question, translate

23   it as accurately as you can.  And then, Ms. Roe, you try and

24   answer the question that has been asked as closely as you can.

25   Okay?

1              THE WITNESS:  I apologize.  It's just very

2    overwhelming.

3              THE COURT:  I understand.  There is no apology

4    necessary.  I know you are doing the best you can.

5              All right, let's proceed, please.

6              MS. PATTERSON:  Yes, Your Honor.

7    BY MS. PATTERSON: (Continuing)

8    Q.   Sarah, we were talking about whether you were allowed to

9    leave the home by yourself.  Were you allowed to go outside the

10   Howards' home without either Linda or Russell Howard?

11   A.   Yes, on my days off.

12   Q.   When you went outside the Howards' home by yourself, did

13   you stay in contact with Linda or Russell Howard?

14   A.   I don't quite understand.

15   Q.   Did Russell or Linda Howard call you when you were away

16   from their home?

17   A.   Yes, when I go to the supermarket to do grocery shopping,

18   on my way back I would have to take multiple breaks because I

19   have too many bags in my hands, I may have water and a lot of

20   grocery items, he would call and yell at me, why are you taking

21   too much time away.

22   Q.   Were you allowed to stay overnight away from the Howards'

23   home?

24   A.   Yes, on my days off I would do that sometimes.

25   Q.   Sarah, how many months did -- for how many months did

S. Roe - Direct

335

1    Russell Howard rape you?

2    A.   I don't know exactly.  I have a hard time saying a certain

3    number.  There were times that he didn't rape me when I was on

4    my period or when I was not home.

5    Q.   When did you start working at the Howards' home?

6    A.   I think it was 2007.

7    Q.   What month was it?

8    A.   I have a difficult time remembering.

9    Q.   Do you remember if it was June of 2007 when you started

10   working at the Howards'?

11   A.   Yes, now I remember, it was in June because it was my

12   birthday -- my birthday was approaching, since my birthday is

13   in July.

14   Q.   Sarah, do you know what month you stopped working for the

15   Howards?

16   A.   I think after we celebrated a Christmas holiday, two weeks

17   or a month later is when he kicked me out.  I am referring to

18   Christmas as sort of a time frame.

19   Q.   And from June to Christmas, did Russell Howard rape you

20   throughout that entire duration?

21   A.   Yes.  Yes, repeatedly, besides the days I was on my period

22   and on my days off.

23   Q.   Sarah, you said that Russell Howard kicked you out of the

24   house.  Can you please describe for us what happened.

25   A.   Yes.

S. Roe - Direct

336

1   Q.    Please do.

2   A.    He raped me that morning.  And then that afternoon I went

3   to the grocery store to buy some chicken.  She was at work.  He

4   wanted to do it again.  And I told him I was on my period.

5   Q.    How did Russell Howard react to that?

6   A.    He was very angry.  He started breaking things.  And he

7   told me to leave.  It was already evening.

8   Q.    Did you leave?

9   A.    I didn't have anywhere to go.  He opened the door, he put

10  me out.  I sat in the door and waited for her inside the

11  compound.

12  Q.    By her, do you mean Linda Howard?

13  A.    Yes.

14  Q.    Why were you waiting for Linda Howard?

15  A.    She already knew, and I wanted her to do something about

16  it.

17  Q.    What do you mean she already knew?

18  A.    When she came, she told me, you know him, he's crazy.  And

19  she started to sort of console me.

20  Q.    By she, do you mean Linda Howard?

21  A.    Yes.

22  Q.    Did Linda Howard say anything else to you?

23  A.    She said she will find another job for me.

24  Q.    Did Linda Howard find you another job?

25  A.    Yes.

S. Roe - Direct

1  Q.   Where did she find you another job?

2  A.   In the same compound, there is a restaurant.

3  Q.   What was the name of the restaurant?

4  A.   B6.

5  Q.   When you got the job at the compound, did Linda Howard

6  write you a letter of recommendation?

7  A.   Well, the restaurant asked me to provide a reference

8  letter within two weeks of my hiring date.  So I asked her if

9  she would write one for me.

10 Q.   Did Linda Howard agree to write you a letter of

11 recommendation?

12 A.   Yes.

13 Q.   Did she tell you why?

14 A.   She did not.  She knew --

15       MR. RINALDO:  Excuse me, Your Honor.  The witness

16 answered the question, then there was a pause, and now we're

17 going on with something else.

18       THE COURT:  She has done that several times.  I am

19 going to permit that.  We are using translators, and she is

20 getting part of the answer out and then going further.  So

21 overruled.

22 A.   Mr. Abdul, the supervisor, knew Ms. Linda Howard, so she

23 wrote the recommendation letter.

24 BY MS. PATTERSON: (Continuing)

25 Q.   Did you have a job at B6 before Linda Howard wrote the

S. Roe - Direct

338

1  letter of recommendation?

2          THE INTERPRETER:  The interpreter needs

3  clarification.

4  A.   There is a B6 restaurant inside the embassy.  She told him

5  that I -- about the need for a job that I have.  They then

6  hired me.  The name of the restaurant is Intracs.  She spoke to

7  them about me.

8  Q.   After you got the job at B6, did Linda Howard write you a

9  letter of recommendation?

10  A.   Yes.

11  Q.   Ms. Roe, if you could turn to tab 2 in your binder.  Joe

12  is going to grab that for you.

13          Sarah, do you recognize this document?

14  A.   Yes.

15  Q.   What is it?

16  A.   The recommendation letter that she wrote to B6.

17  Q.   With the exception of your name being changed, is this a

18  fair and accurate copy of that letter of recommendation?

19  A.   Yes.

20          MS. PATTERSON:  Your Honor, at this time we would

21  move to admit into evidence Plaintiff's Exhibit 2.

22          THE COURT:  Any objection?

23          MR. RINALDO:  No objection.

24          THE COURT:  All right, it is received.

25  BY MS. PATTERSON: (Continuing)

S. Roe - Direct

339

1   Q.   Sarah, did you ever speak with Russell Howard again?

2   A.   Yes, he used to come to B6.

3   Q.   What would Russell Howard say to you?

4   A.   He came, he ordered food, he gave me $40, and he said, zip

5   your mouth otherwise you would be thrown into jail that you

6   will never get out of.

7   Q.   Sarah, did Russell Howard say anything else?

8   A.   Because he knew my weakness and my commitment to my

9   family, he used to tell me that you'll never be able to help

10  your family.

11  Q.   Sarah, did Russell or Linda Howard have any information

12  about your family in Ethiopia?

13  A.   They did.  In the beginning they asked me in case of an

14  emergency, if I am sick, we need to contact someone.  And I

15  trusted them, and I gave them phone numbers for my family.

16  Q.   When Russell Howard made those threats against you, were

17  you afraid?

18  A.   Yes, I was very scared.  And I know he would do it.

19  Q.   Did you speak with Linda Howard again?

20  A.   Yes, she used to come to that restaurant.

21  Q.   Did Linda Howard say anything to you?

22  A.   She did bring one of her workers to introduce me one time.

23  Q.   Sarah, did you and Linda or Russell Howard ever talk about

24  what happened in their home?

25  A.   You mean about my case or someone else?

S. Roe - Direct

1          MR. RINALDO:  Excuse me, Your Honor.  I'm not sure

2    this is necessarily an objection, but --

3          THE COURT:  I am going to ask her to rephrase the

4    question.  Thank you, sir.

5          MR. RINALDO:  All right, thank you.

6          THE COURT:  Let's narrow the question down.

7    BY MS. PATTERSON: (Continuing)

8    Q.   Sarah, after you stopped working at the Howards' home, did

9    you speak with Russell or Linda Howard about the rapes?

10         MR. RINALDO:  Your Honor, by way of a low key

11   objection, that's a compound question, Linda or Russell.

12         THE COURT:  If she can answer it, I am going to allow

13   it.  Your exception is noted.

14   A.   No, we never did.  The last time I had that conversation

15   with him was when he came to the restaurant and made those

16   threats.

17   BY MS. PATTERSON: (Continuing)

18   Q.   Sarah, did you ever tell anyone about the rapes that

19   occurred in the Howards' home?

20   A.   Is that before I left their home or after I left their

21   home?

22   Q.   Before you left Yemen.

23         THE COURT:  Well, she is looking for guidance as to

24   whether it was before she left the home or after.  So ask that

25   question first.

S. Roe - Direct

341

1              MS. PATTERSON:  Sure.

2    BY MS. PATTERSON: (Continuing)

3    Q.   Sarah, did you tell anyone about the rapes that occurred

4    in the Howards' home before you left their home?

5    A.   Yes.

6    Q.   Who did you tell?

7    A.   His name is Dan.

8    Q.   Who is Dan?

9    A.   I do not know his last name, but he worked at the embassy

10   at the time.

11   Q.   How did you know Dan?

12   A.   She introduced me to him when we went to the Marine party.

13   Q.   Why did you feel like you could trust Dan?

14   A.   At the time he would call me and text me.  Now, looking

15   back, I think he was trying to reach out to me to get

16   information.

17   Q.   What do you mean, he was trying to reach out to you to get

18   information?

19              MR. RINALDO:  Your Honor, objection.

20              THE COURT:  Overruled.  Well, let's not answer that.

21   Come to the bench, please.

22              NOTE:  A side-bar discussion is had between the Court

23   and counsel out of the hearing of the jury as follows:

24   AT SIDE BAR

25              THE COURT:  So is she going to say that there was an

S. Roe - Direct

342

1  investigation already going on about the Howards?  I wouldn't

2  think that would be possible because of the timing of Doe

3  versus Roe.

4          MS. PATTERSON:  I don't believe so, Your Honor.  I am

5  not sure what she is referring to.

6          THE COURT:  You are not sure what she is going to

7  say?

8          MR. RINALDO:  That's the problem, now she thinks he

9  was reaching out to get information.  She can't know that.

10  That is pure speculation.

11          THE COURT:  Well, I don't know whether it is

12  speculation or not, but let's move on and not ask further

13  questions about that.  If you don't know the answer and she

14  blurts out that there was an investigation going on, then you

15  -- well, you don't know anything about it.  You don't know

16  anything about it.  And it's taking us in a direction that

17  nobody had anticipated.

18          So I just see that as getting us into all kinds of

19  potential problem issues, whether it's discovery related or

20  not.

21          So let's move on from that question.  Okay?  All

22  right.

23          NOTE:  The side-bar discussion is concluded;

24  whereupon the case continues before the jury as follows:

25  BEFORE THE JURY

1        THE COURT:  All right, thank you.  Please ask your

2   next question.

3   BY MS. PATTERSON:  (Continuing)

4   Q.   Sarah, did you tell anyone else about what happened in the

5   Howards' home before you left the Howards' home?

6   A.   Yes.

7   Q.   Who?

8   A.   Dan.

9   Q.   Besides -- did you tell anyone else besides Dan about what

10  happened in the Howards' home before you left the home?

11  A.   No.

12  Q.   Did you tell anyone after you left the Howards' home about

13  what happened in the Howards' home?

14  A.   Yes.

15  Q.   Who did you tell?

16  A.   Geremy.

17  Q.   Who was Geremy?

18  A.   He worked at the American Embassy.

19  Q.   Do you know what Geremy did?

20  A.   I am not really sure.  I think he was an RSO.

21  Q.   What is RSO?

22  A.   I am not quite sure.  I have heard some conversations.  I

23  think they are the department that provides protection for

24  them.

25  Q.   Sarah, at any point after you left the Howards' home did

S. Roe - Direct

344

1    anyone reach out to you to ask you questions about what

2    happened in the Howards home?

3    A.    Yes.

4    Q.    Who reached out to you?

5    A.    Geremy and another woman.

6    Q.    Do you know why they reached out to you?

7    A.    He called me and he told me over the phone, and I agreed

8    to tell my story.

9    Q.    What year was that?

10   A.    I think it was around 2009, if I'm not mistaken, or '10.

11   Q.    Did you go in and tell Geremy and this other woman your

12   story?

13   A.    Yes.

14   Q.    Where did you go to tell them your story?

15   A.    It was at a coffee shop.  I don't remember the exact name

16   of the coffee shop, but there is this one coffee shop that the

17   foreigners go to to hang out.

18   Q.    Sarah, did you tell anyone else besides Geremy and this

19   other woman and Dan about what happened to you?

20   A.    Yes.

21   Q.    Who?

22   A.    Mike.

23   Q.    Was there anyone else that you told?

24   A.    No.

25   Q.    When you told Mike -- when did you tell Mike about what

S. Roe - Direct

1    happened to you?

2    A.   I told him in 2014.

3    Q.   And who is Mike?  Who is the Mike that you are referring

4    to?

5    A.   I don't remember his last name.  He was one of my

6    customers at B6 back then.  And we were Facebook friends.

7    Q.   Was it the same Mike that testified yesterday in your --

8    in this case?

9    A.   Yes.

10   Q.   Sarah, how did you feel about Linda Howard before you

11   moved into her home?

12   A.   Very, very good person.  She was different.

13   Q.   She was what?

14   A.   She was different.

15   Q.   And how do you feel about Linda Howard now?

16   A.   Very, very bad person.  She is two different persons.  She

17   is different in her home and she is different outside.

18   Q.   Sarah, how has what happened in the Howards' home impacted

19   your life?

20   A.   Lost hope.  To hate myself.  To be ashamed of myself.  And

21   to lose confidence.

22   Q.   How have you dealt with those feelings?

23   A.   It's very, very hard.  I wasn't this type of person I am

24   today.  I was the hope for my family.

25            MS. PATTERSON:  No further questions, Your Honor.

S. Roe - Direct

346

1          THE COURT:  All right.  Cross-examination.

2          MS. PATTERSON:  Your Honor, may we approach?

3          THE COURT:  Yes.

4          NOTE:  A side-bar discussion is had between the Court

5   and counsel out of the hearing of the jury as follows:

6   AT SIDE BAR

7          MS. PATTERSON:  Your Honor, we understood from Mr.

8   Rinaldo's statements in opening that he might call our client

9   as a witness in his defense.

10         MR. RINALDO:  It was in voir dire actually.

11         THE COURT:  Right.

12         MS. PATTERSON:  In voir dire, that he might call

13  Sarah Roe as part of his defense.  If he intends to

14  cross-examine Ms. Roe now, we request that he not be able to

15  have two bites at the apple and be able to call her again as

16  part of his case.

17         MR. RINALDO:  My response, Your Honor?

18         THE COURT:  Yes, sir.

19         MR. RINALDO:  I will give the same one that I gave

20  them in the hall.  If I get objections that are sustained on

21  the grounds that my cross is outside the scope of direct, then

22  I most assuredly get to call her as part of my case in chief.

23         THE COURT:  Yeah.

24         MR. RINALDO:  I understand, I have been trying cases

25  for a while, I understand that I am not going to be able to

S. Roe - Direct

347

1    bite twice with the same type of apple.  If I want to go into

2    an area in my case in chief that isn't part of the direct or

3    cross, I think I am entitled to do that.

4         I haven't really, to tell you the truth, until I hear

5    all the rest of this, I haven't decided whether I am going to

6    call her.  But I don't think I should be precluded right now.

7         THE COURT:  So you're finished with your direct

8    examination?

9         MS. PATTERSON:  Yes, Your Honor.

10        THE COURT:  Okay.  Well, you know, it pretty much

11   depends on what culture the Court has.

12        MR. RINALDO:  Yep.

13        THE COURT:  And I will let it go either way.  Do you

14   want to let him go into areas beyond cross-examination?

15        MR. DeLORME:  You mean beyond direct?

16        THE COURT:  Beyond direct, excuse me.

17        MS. PATTERSON:  We would be fine with that.

18        THE COURT:  All right.  She may be a rebuttal

19   witness, I don't know that either.  I certainly wouldn't

20   preclude her from being --

21        MR. RINALDO:  She wouldn't be my rebuttal witness,

22   that's the problem.

23        THE COURT:  So which one do you want to do?

24        MR. RINALDO:  Well, I'm certainly going to cross her.

25   But I was basically thinking that my cross is going to stay

S. Roe - Direct

348

1    within the scope of direct.  I think I am allowed to do that.

2            THE COURT:  I see some shaking heads.  You don't

3    think he can do that?

4            MR. DeLORME:  Not in my 20 years in this court, Your

5    Honor, would we have a witness come back.  That's the whole

6    purpose of having this conversation --

7            MR. RINALDO:  She is a party --

8            MR. DeLORME:  Excuse me, Mr. Rinaldo.  Let me get my

9    15 words that I am allowed to speak in this trial from our

10   associates.

11           There is not any reason in the world why Mr. Rinaldo,

12   if we have given him our representation that we are not going

13   to object to him asking questions beyond the scope of direct,

14   that he should have an opportunity to bring her back up here

15   again.  That just flies in the face of judicial economy.

16           You told these nice people we were going to finish

17   the trial this week.  In fact, you told us we were going to

18   finish it Thursday, which I can't help but notice is tomorrow.

19           So I see no reason to allow him to sort of vacillate

20   back and forth between what he wants to do.

21           MR. RINALDO:  Well, how about this, Your Honor?

22   Could I suggest a compromise?  They've finished their direct.

23   You had talked to us about talking about items or points for

24   charge.  It's 5:15.  I am not going to finish this cross,

25   especially if I'm not limited by the scope of direct, in 15 or

S. Roe - Direct

349

1    20 minutes.

2          It's probably even better, I don't mean to be

3    presumptuous, but it might even be better for the witness if

4    she is done with direct and we haven't started cross, that we

5    could talk this afternoon about some of the points for charge,

6    and I could start first thing in the morning.

7          THE COURT:  All right.  Let's just finish this

8    conversation.  I don't disagree with you that perhaps starting

9    with ten minutes left before breaking doesn't make a lot of

10   sense.

11         But I want you to examine her both on

12   cross-examination and also on the additional topics that you

13   have intended to bring to light in your own case in chief.  And

14   the representation is that there will be no objection to that.

15   And I think that certainly is the way we should proceed given

16   the type of case it is.

17         MR. RINALDO:  Your Honor, I am fine with that as long

18   as I am starting in the morning.

19         THE COURT:  All right.

20         MR. RINALDO:  Well -- thank you for the courtesy.

21         THE COURT:  I almost took it back.  You get a little

22   bit more aggressive and I won't let you come to the sidebar.

23         MR. RINALDO:  Tim will make me --

24         THE COURT:  Tim will take over for you.  All right.

25   All right.  So we will end for tonight, we will talk about jury

S. Roe - Direct

350

1    instructions, and I will let them go.

2              MR. RINALDO:  Thank you, Your Honor.

3              THE COURT:  9 o'clock tomorrow morning, does that

4    work for everybody?

5              MR. RINALDO:  Yes.  By the way, if that's true, my

6    cross of her, and Linda would be my only witness.

7              THE COURT:  All right, good.

8              NOTE:  The side-bar discussion is concluded;

9    whereupon the case continues before the jury as follows:

10   BEFORE THE JURY

11             THE COURT:  All right.  Ladies and gentlemen, we're

12   going to end for today.  To begin cross-examination with just

13   ten minutes left, we're better off starting tomorrow fresh.

14             So let's come back at -- does 9 o'clock work tomorrow

15   morning?  All right.

16             Please remember, no research, no investigation, no

17   communication with anybody about the case in whatever form.

18             And I don't know whether there is going to be any

19   press coverage in paper versus online, but just make sure you

20   don't run into either of those.  And if there is something in

21   the paper, which I don't think there will be, but I never know,

22   then please stop reading as soon as you realize what it is.

23             Have a good evening, and we will see you at 9 o'clock

24   tomorrow morning.  All right, you are excused.  Thank you.

25             NOTE:  At this point the jury leaves the courtroom;

```
 1    whereupon the case continues as follows:

 2    JURY OUT

 3              THE COURT:  All right, have a seat.

 4              MS. PATTERSON:  Your Honor, may Ms. Roe may be

 5    excused for the day?

 6              THE COURT:  Oh, I am sorry.  Yes, please, you are

 7    excused and may come down and take your seat.

 8              NOTE:  The plaintiff stood down.

 9              THE COURT:  What's that old saying, Mr. Rinaldo,

10    snatch defeat from the jaws of victory.  Is that the way that

11    expression goes?

12              MR. RINALDO:  With all due respect, Your Honor, I

13    came pretty close today.

14              THE COURT:  I agree.  We agree on that.  All right.

15              How far did we get on jury instructions?

16              MR. SALINAS:  Your Honor, we did not discuss this

17    afternoon because our understanding was that there was not

18    going to be a charging conference this evening.  We planned to

19    discuss it this evening.

20              Is that an accurate representation of what happened,

21    Mr. Rinaldo?

22              THE COURT:  All right.  So you never got a chance to

23    meet at lunch just to talk generally about where the objections

24    were?

25              I mean, my reading of the instructions is you're
```

352

1    close on general instructions, just a question of which ones

2    we're going to use or not use.  I will give you an opportunity

3    to be heard on that, but I think you know what I am going to

4    with those, and you can make your exceptions to those.

5            The specific instructions on the claims are very

6    different, and you have the style where you're including

7    evidence in the instructions themselves after you give the

8    statutory construction of 1595, et seq.

9            You have, on the other hand, done the skeletal

10   instructions.

11           And so, you need to talk about those, see if you can

12   reach any kind of compromise on those.  If not, I will rule on

13   those in the morning.  But there very much needs to be an

14   exchange of information on that and a position provided to me

15   first thing in the morning.

16           And I will give you a chance to be heard on why you

17   believe that yours are appropriate.  And I don't know whether

18   we will do that first thing -- you're going to stay here and

19   talk about the instructions, is that --

20           MR. RINALDO:  I think that's right, Your Honor.  If

21   that's okay with you.

22           MR. SALINAS:  Yes.

23           THE COURT:  That's what I would prefer.

24           MR. RINALDO:  All right.

25           THE COURT:  But I won't --

353

1          MR. RINALDO:  May we use the courtroom?

2          THE COURT:  Yes.

3          MR. RINALDO:  You know what, if the room outside is

4     available, maybe we could go out and use one of the attorney

5     conference rooms.

6          THE COURT:  The attorney rooms will be available, and

7     I don't think anything will be locked up until 6.  So that

8     should give you time.

9          And then why don't we be prepared to state our

10    positions at -- how about 8:50 tomorrow morning for the record.

11    And I will decide what I am going to do after I hear from

12    counsel.

13         MR. RINALDO:  When you say state positions, Your

14    Honor, identify the ones that we haven't agreed on is, that

15    what you are talking about basically?

16         THE COURT:  Have not agreed on, and the reasons why

17    you believe yours should be the one chosen.  And let's focus on

18    the substantive instructions, as I just alluded to.

19         Okay?  All right.  Anything else we need to talk

20    about tonight?

21         MR. RINALDO:  Not from me, Your Honor.

22         MR. SALINAS:  No, Your Honor.

23         MR. RINALDO:  I am not taking any more chances.

24         THE COURT:  These are full days, so I fully

25    understand a little bit of fatigue, et cetera.

354

1          Ms. Roe, you are in the middle of your testimony, and

2    you will be on the stand again tomorrow morning.  So don't

3    discuss the testimony you have given so far with anyone.  All

4    right?  You can discuss other matters with your counsel, but

5    just not the subject of your testimony that you have given so

6    far.  Okay?

7          MS. ROE:  Okay.

8          THE COURT:  All right.  Thank you.  Have a good

9    evening everyone.

10         We're in recess.

11         NOTE:  The July 26, 2017 portion of the case is

12   concluded.

13      -------------------------------------------------

14

15

16

17

18

19         I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

                     /s/  Norman B. Linnell
23                   Norman B. Linnell, RPR, CM, VCE, FCRR

24

25