UNITED STATES DISTRICT COURT?
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
SARAH ROE,                    :
            Plaintiff,        :
                              :
    -vs-                      :      Case No. 1:16-cv-562
                              :
                              :
LINDA HOWARD, et al.,         :
            Defendants,       :
                              :
------------------------------:
```

V O L U M E   3 of 5

TRIAL TRANSCRIPT

July 25-28 & 31, 2017

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

Melissa L. Patterson, M. Carter DeLorme, and Andres C. Salinas,
Counsel for the Plaintiff

Richard F. Rinaldo and Timothy J. Battle,
Counsel for Defendant Linda Howard

356

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| SARAH ROE | | |
| | CROSS | 368 |
| | REDIRECT | 416 |
| | RECROSS | 420 |
| LINDA HOWARD | | |
| | DIRECT | 425 |
| | CROSS | 494 |
| | REDIRECT | 526 |

COURT'S JURY INSTRUCTIONS

| THE COURT | 539 |
|---|---|

1              NOTE:  The July 27, 2017 portion of the case begins

2      in the absence of the jury as follows:

3      JURY OUT

4              THE COURT:  Good morning.  I see all counsel and the

5      parties are present.  Good morning to everybody.

6              I appreciate your having gotten together and

7      submitted your objections in a written format, which I have

8      looked at.

9              Ms. Patterson, do you want to start?

10             MS. PATTERSON:  Actually, Mr. Salinas, will be

11     handling that.

12             THE COURT:  Yes, sure.  Mr. Salinas.

13             MR. RINALDO:  Your Honor, just so we are all clear,

14     and we have agreed on this, the places where we don't have

15     objections to your general instructions and the like, we met

16     last night, I am sure you will agree although there may be some

17     differences in the phrasing of our various ones, we agreed that

18     as to all the ones where we don't have objections, even though

19     there are differences, whatever the Court chooses to give as an

20     instruction on that, whether it's one or the other or your own,

21     we are not going to object.

22             THE COURT:  All right.  Thank you, Mr. Rinaldo.

23             Yes, Mr. Salinas.

24             MR. SALINAS:  Good morning, Your Honor.  As you can

25     see from that table, the parties have a few outstanding

1    disputes about the proposed jury instructions.  The first

2    implicates many of the specific instructions.

3            As Your Honor mentioned yesterday, the two parties

4    took very different approaches to the specific instructions,

5    and last night we were not able to come to an agreement about

6    how to deal with those instructions.

7            In plaintiff's view, defendant's proposed

8    instructions do not provide the jury with sufficient guidance

9    to make these determinations after their instruction regarding

10   Count 1, the defendant doesn't even break the statutory

11   requirements into separate elements.

12           The defendant does not sufficiently state what all

13   the important statutory terms mean and what the statutory

14   requirements are.  And their instructions do not connect the

15   statutory requirements to even hypothetical evidence that could

16   be raised in a generic case involving claims of this nature.

17           We believe that plaintiff's instructions provide the

18   jury with important guidance regarding what kind of evidence

19   they should consider, and our instructions provide clarity to

20   issues where the statutory language and the elements may be

21   ambiguous.

22           So we think defendant's instructions simply don't

23   provide enough guidance on that.

24           The second dispute, the next couple disputes are more

25   discrete.  The first one involves plaintiff's proposed

1   instruction, I believe it's 29, and that's the substantive

2   conspiracy instruction.

3          I will make sure I have the number right.  Yes.

4          The parties are in disagreement over whether the

5   conspiracy count under section 1594 should have a -- should

6   include an overt act element.  In plaintiff's view, the clear

7   language of section 1594 omits an overt act requirement, and

8   the case law suggests that when a specific conspiracy statute

9   is written in such a manner, courts are to presume that

10  Congress did not intend to include an overt act requirement.

11         Defendant's instruction incorporates the elements of

12  the general conspiracy statute, 18 U.S.C. section 371.  The

13  language of that statute is substantially different than the

14  language of this statute.  And the Supreme Court has said that

15  in determining whether a specific conspiracy statute includes

16  an overt act element, courts should compare the language of

17  section 371 and the specific conspiracy statute at issue.

18         And we think that exercise here leads to the

19  conclusion that there is no overt act requirement in section

20  1594.

21         And then I think the last dispute involves

22  plaintiff's proposed instruction number 20, which is about

23  conspiracy liability.

24         I will allow Mr. Rinaldo to explain exactly what his

25  objection is to this instruction.  But in plaintiff's view,

1    because one of the counts is a substantive conspiracy

2    allegation under section 1594, the jury should be instructed

3    about this theory of conspiracy liability and how a conspiracy

4    can be used to find liability under other substantive counts.

5            So if Your Honor doesn't have any questions --

6            THE COURT:  No, I don't.  I think I understand your

7    position.

8            It's your -- on the conspiracy instruction, it's your

9    instruction --

10           MR. SALINAS:  It's plaintiff's proposed instruction

11   number 20, right after our attempt instruction.

12           THE COURT:  Okay.  So your 29 and defendant's 25 in

13   the conspiracy, right?  Unless I'm looking at the wrong set of

14   the instructions.

15           MR. SALINAS:  That should be correct.

16           THE COURT:  And then conspiracy liability,

17   plaintiff's 20?

18           MR. SALINAS:  Yes.

19           THE COURT:  Good, got it.  Thank you.

20           All right, Mr. Rinaldo.

21           MR. RINALDO:  Yes, Your Honor.

22           Your Honor, as you can see, last night we reached

23   agreement, although I originally didn't agree, we reached

24   agreement that as far as if the Court decides to give the

25   actual statutory language for each of those counts as part of

1    the instruction, that that's up to the Court, and I am fine

2    with it if you decide that you want to do that.

3           So that's why you will see that the disagreements are

4    in like alternate numbers.

5           THE COURT:  Right.  I understand.  And I am going to

6    give the --

7           MR. RINALDO:  All right, I figured I would.  I

8    would like to begin, Your Honor, with my objection on the

9    commercial sex trafficking, which Mr. Salinas did not address

10   specifically.

11          THE COURT:  Give me --

12          MR. RINALDO:  I believe that's his number 27.

13          THE COURT:  Okay.

14          MR. RINALDO:  I disagree, by the way, generally with

15   -- that's why we couldn't come to agreement with 23, 25, 27,

16   29, as to the amount of detail that is in those instructions.

17   But there is a separate element in number 27 that is a basis

18   for objection.

19          You will see that their instruction talks about

20   proving the following essential elements, three essential

21   elements, except, Your Honor, that there is a fourth one.

22          If the Court would look at their instruction 26,

23   there is something missing from their number 27.  And it's

24   right at the end.  They have it in 26, which is why I am not

25   referring you to specifically to the statute, it is easier just

1   to look here.

2          If you look down, the last line says:  Shall be

3   liable for commercial sex trafficking.

4          THE COURT:  Yes.

5          MR. RINALDO:  I ask the Court to look right above it

6   where I says:  Such means will be used to cause the person to

7   engage in a commercial sex act.  That's a requirement under

8   1591, Your Honor, and it's not in their number 27.  That's an

9   express requirement.  They neither mention it nor define it.

10         THE COURT:  Well, doesn't their second prong of their

11  27 include that?  Did so knowing that means of force or any

12  combination of such means would be used to cause --

13         MR. RINALDO:  To engage in a commercial sex act.

14         THE COURT:  Yes.

15         MR. RINALDO:  Right.  But there is no definition of a

16  commercial sex act at all, what that means.

17         MR. SALINAS:  Your Honor --

18         MR. RINALDO:  And, Your Honor --

19         THE COURT:  One at time.  Let Mr. Rinaldo finish.

20         MR. RINALDO:  Your Honor, I was listening very

21  carefully yesterday when Florrie Burke testified.  Florrie

22  Burke testified, and my notes are quite clear because I took it

23  down, that -- and she is clearly an expert.  Now, I know she is

24  not opining on the ultimate issues in the case, but what she

25  said yesterday was that domestic worker sexual abuse is part of

1    the forced labor.  It is not a commercial sex act.  She said

2    that specifically.

3              THE COURT:  Well, I didn't hear that, that she said

4    anything that specific.  She may have -- well, I'm not going to

5    argue about the testimony.

6              MR. RINALDO:  Okay.

7              THE COURT:  Neither of us remember exactly what she

8    said, and we were both taking notes.  So we can discuss that.

9              But your problem is there is no definition of

10   commercial sex act in the instructions?

11             MR. RINALDO:  That's right, Your Honor.

12             THE COURT:  All right.  My point is that -- okay.

13   All right.

14             Mr. Salinas, why don't you respond to that so I don't

15   get lost.

16             MR. RINALDO:  Would you like me to move, Your Honor,

17   while he does?

18             THE COURT:  Yes, I guess so.

19             MR. SALINAS:  Your Honor, I would just direct you to

20   the bottom of the first page of proposed instruction 27.  It's

21   page 40 in our proposed instructions.  We say:  With regard to

22   the second element, the statute defines commercial sex act.

23             And then we quote the definition from the statutory

24   provision.

25             THE COURT:  All right.  I understand the argument.

1   All right.  I think that the elements are properly laid out in

2   26 and 27.  My problem is going to be the additional verbiage.

3        But let me have you continue now, Mr. Rinaldo.

4        MR. RINALDO:  Thank you, Your Honor.  With respect,

5   Your Honor, to the other areas where we disagree.  Frankly,

6   except for the conspiracy, which I will address in a minute,

7   except for that, my problems were the additional verbiage in

8   all of the others.

9        So whatever the Court decides on how the Court wishes

10  to address the question of the amount of detail in those, to

11  which I have objected, that's where we are.

12       THE COURT:  Yeah.

13       MR. RINALDO:  On the conspiracy count, we disagree

14  about the overt act.  I understand their position.  I have

15  cited authority.  They say the statute shows it's different.

16  I, frankly, disagree with them.  But the Court is going to make

17  that decision.

18       THE COURT:  All right.  And when I put my final

19  instructions together, I will give you all a final opportunity

20  to object formally to the final batch that I decide on.

21       MR. RINALDO:  I understand, Your Honor, because

22  that's the appropriate time to make the objection.  So this

23  isn't the time to do that.

24       THE COURT:  No, but I appreciate having the argument

25  now so that I can understand your positions and move forward

1    accordingly.

2              MR. RINALDO:  Thank you, Your Honor.

3              THE COURT:  All right.  Anything else on the

4    instructions?  Okay.

5              Joe, how is our jury?

6              COURT SECURITY OFFICER:  I have to check, sir.

7              THE COURT:  All right.  Why don't we take a brief

8    recess, and then we will make sure we have got all the members

9    of the jury.  And are we ready to go without other preliminary

10   matters?

11             MR. RINALDO:  There is one preliminary matter, Your

12   Honor.  It will only take a second.

13             THE COURT:  Sure, let's deal with that now.

14             MR. RINALDO:  Your Honor, as I am sure the Court

15   anticipates, at some point in this trial the defendant is going

16   to present motions under Rule 50(a).

17             THE COURT:  Yes.

18             MR. RINALDO:  You specifically envisioned that in

19   your order of July 13 as to one of them.  I read Rule 50(a)(2)

20   last night.  And 50(a)(2) says that those are to be presented

21   any time before the case is submitted to the jury.

22             I just want to make sure that the Court is aware that

23   I intend to make them.  I would like to make them at the end

24   before it's submitted to the jury after all the testimony is

25   in.

1          THE COURT:  Certainly.  I will give you the

2    opportunity to make it after plaintiff's case is concluded and

3    then at the end of the case as well.

4          MR. RINALDO:  Frankly, Your Honor, I would prefer to

5    reserve them until at the end.

6          THE COURT:  Reserve them until the end.

7          MR. RINALDO:  Yes.

8          THE COURT:  All right.

9          MR. RINALDO:  But I want to make sure that doesn't

10   constitute a waiver.

11          THE COURT:  I don't think it does.

12          MR. RINALDO:  I don't think so either.  Maybe what I

13   will do is stand up and say that we will reserve the right to

14   present our Rule 50 motions at the end of all the evidence.

15          THE COURT:  That's fine.

16          MR. RINALDO:  Thank you, Your Honor.

17          THE COURT:  Well, no, you've done sufficient -- you

18   have put us on notice, and that's fine, your motion is granted

19   to delay it, and that you won't suffer any prejudice as a

20   result.

21          MR. RINALDO:  All right.  Thank you, Your Honor.

22          THE COURT:  All right, thank you.

23          COURTROOM SECURITY OFFICER:  We are minus one juror.

24          THE COURT:  One juror.  All right, then let's take a

25   brief recess, and we will wait for our juror and come back in

1    and get rolling.

2              All right, we're in recess.

3              NOTE:  At this point a recess is taken; at the

4    conclusion of which the case continues in the presence of the

5    jury as follow:

6    JURY OUT

7              THE COURT:  All right.  Ready for our jury?

8              MR. RINALDO:  Yes, sir.

9              MS. PATTERSON:  Yes, Your Honor.

10             THE COURT:  All right, Joe.

11             NOTE:  At this point the jury returns to the

12   courtroom; whereupon the case continues as follows:

13   JURY IN

14             THE COURT:  Please have a seat.

15             Good morning, ladies and gentlemen.  The first

16   question, did you heed my request that you not do any research,

17   investigation, speak to anybody about the case?  Terrific.

18   Thank you very much.

19             All right.  Let's have Ms. Roe come back to the

20   witness chair, and Mr. Rinaldo will begin cross-examination.

21             Please proceed.

22             MR. RINALDO:  Thank you, Your Honor.

23             SARAH ROE, the plaintiff herein, called in her own

24   behalf, having previously duly affirmed, continues to testify

25   and state through an interpreter as follows:

```
 1        CROSS-EXAMINATION
 2   BY MR. RINALDO:
 3   Q.   Good morning, Ms. Roe.
 4   A.   Good morning.
 5   Q.   Ms. Roe, I would like to begin sort of at the beginning of
 6   where you began yesterday on direct examination.  So I just
 7   want to take you back there, if I can.
 8   A.   Okay.
 9   Q.   When did you first arrive in Yemen?
10   A.   2003.
11   Q.   Thank you.  Did I understand you to say yesterday that
12   your first job in Yemen was a housekeeper for a Yemeni family?
13   A.   Yes.
14   Q.   And you were paid between 100 and $150 per month, correct?
15   A.   Yes.
16   Q.   Could you tell me what your duties were with the Yemeni
17   family.
18   A.   Yes, cleaning, taking care of their children, babysitting,
19   and washing dishes.
20        MR. RINALDO:  Your Honor, just one second, I don't
21   have a pen with me.
22        THE COURT:  All right.
23        MR. RINALDO:  Sorry about that.
24        THE COURT:  That's okay.
25   BY MR. RINALDO: (Continuing)
```

S. Roe - Cross

369

1    Q.    How long did you work for that family?

2    A.    I don't remember.  It's been a long time.

3    Q.    Was it more than a year?

4    A.    It's very difficult to recall.

5    Q.    Did you work for them for say longer than one month?

6    A.    Yes.

7    Q.    More than six months?

8    A.    I don't think so.  I am not sure.

9    Q.    Your next job was in a place where tea was served; is that

10   right?

11   A.    Yes.

12   Q.    And what were your duties there?

13   A.    Make tea, serving tea, and cleaning the office.

14   Q.    When you say cleaning the office, was this a restaurant?

15   A.    No.  It's a company where they sold phones, ATM.  And

16   that's where the company was.

17   Q.    So the company you worked for was a company that sold

18   phones, but your obligation was to make tea and clean the

19   office, correct?

20   A.    Yes, they actually sold SIM cards too.

21   Q.    But those were your duties, correct?

22   A.    Yes.

23   Q.    Do you remember how much you were paid there?

24   A.    I don't quite remember.  I think it was 100, 150 in Yemen

25   currency, rial.

1  Q.    A month?

2  A.    Yes.

3  Q.    And you went from there to the Sheraton; is that right?

4  A.    Yes, the manager recommended that I work there.

5  Q.    The manager of the phone company or the manager of the

6  Sheraton?

7  A.    The manager that worked at the phone place.

8  Q.    And how long did you work at the phone place?  We tried

9  that, but you couldn't remember, right?

10  A.    I think I worked there about a year, because I liked my

11  manager, he was a good person.

12  Q.    So if you arrived in 2003 and you worked for the Yemeni

13  family for about a year -- is that right?

14  A.    I did not work for one year at the Yemeni house.

15  Q.    How long did you work there?

16  A.    I do not remember.

17  Q.    When did you begin working at the Sheraton?  It was about

18  2005, wasn't it?

19  A.    I'm not for sure.  It might have been 2005 or 2004.

20  Q.    How long did you -- well, let's start with what were your

21  duties at the Sheraton when you worked there at that time?

22  A.    Housekeeping.

23  Q.    Housekeeping.  Yesterday you said you also served as a

24  waitress; is that correct?

25  A.    Yes, but my first job at the Sheraton was housekeeping.

S. Roe - Cross

371

1    Q.    So you began as a housekeeper and then you worked as a

2    waitress, correct?

3    A.    No, I did not continue as a waitress.

4    Q.    When did you work as a waitress at the Sheraton then

5    during that period?

6    A.    I think it was 2008 after I had left the lady's home.

7    Q.    So you were not a waitress at the Sheraton in 2004 or

8    2005, you were a housekeeper?

9    A.    Yes, that is correct.  After I worked at the SIM card

10   company, I went to the Sheraton to work as a housekeeper.

11   Q.    And the Sheraton was a hotel.  As a housekeeper for the

12   hotel, it was your duty to clean guest rooms; is that correct?

13   A.    Yes, the first time I got hired at the Sheraton, that was

14   my duty.

15   Q.    And how long did you work for the Sheraton the first time?

16   A.    I think I worked at the Sheraton for 11 months.  When they

17   first hired me, I was supposed to be a waitress, but because my

18   English was not good, they ended up hiring me as a housekeeper.

19   And I was supposed to be promoted to become a waitress, but

20   that didn't happen.  So I left to go work for the embassy.

21   Q.    That's where I was going.  Your next job was at the United

22   States Embassy, correct?

23   A.    Yes, at the embassy through another company.

24   Q.    When you say through another company, could you tell us

25   what you mean by that.

S. Roe - Cross

372

1   A.   The first time I was hired at the embassy was through YCS

2   Company, and they catered food at the embassy inside the

3   compound.

4   Q.   Were you an embassy employee or were you an employee of

5   YCS Food?

6   A.   I was employed by the YCS, but we served food to the

7   American community.

8   Q.   YCS had a contract with the embassy to serve food in the

9   embassy premises, correct?

10  A.   Yes, that is correct.

11  Q.   Just so I understand, you were working in the embassy

12  itself, I heard you yesterday say that you worked at the Uncle

13  Sam's restaurant; is that right?

14  A.   Yes, the company named -- the restaurant called Uncle

15  Sam's, that was also under YCS.

16  Q.   There was also a cafeteria in the embassy, wasn't there?

17  A.   Yes, in the building downstairs.

18  Q.   And you also worked there, didn't you?

19  A.   No.  I was employed to work at the Uncle Sam's.  The other

20  cafeteria was, mainly they had employees from -- Yemeni

21  nationals.  But we had the same supervisors, the cafeteria and

22  the restaurant was managed by the same company.

23  Q.   So is it your testimony you never worked at the cafeteria,

24  you always worked at the Uncle Sam's?

25  A.   I may have went there to help out, but my assignment was

1    at the Uncle Sam's restaurant.

2    Q.   That's what I'm trying to clarify.  In addition to your

3    work assignment at the Uncle Sam's, you also helped out from

4    time to time at the cafeteria restaurant, didn't you?

5    A.   My assignment is mainly at the Uncle Sam's, but since the

6    cafeteria had the restaurant, the kitchen, we, myself and

7    another person that works at the Uncle Sam's, would go to the

8    cafeteria to the kitchen to take stuff that we need to the

9    restaurant.

10   Q.   Did you ever work in the cafeteria itself as, for example,

11   a cashier or a waitress?

12   A.   No, I don't.  Since it's owned by the same company, I

13   don't recall.  I may have done so.

14   Q.   And what were your duties at the Uncle Sam's, Ms. Roe?

15   A.   My duty was focussed around lunch.  So I would go early in

16   the morning to prepare what we will serve for lunch, a burger

17   or steak, so that would allow me to go to the kitchen to

18   prepare meals to be served for lunch.

19   Q.   So you worked in the kitchen?

20   A.   Since Uncle Sam's did not have their own kitchen or

21   fridge, we would have to go to the cafeteria kitchen to prepare

22   food that would need to be served at the Uncle Sam's.  And we

23   would return whatever was leftover that we didn't use.

24   Q.   So what did you actually do at the Uncle Sam's, on the

25   Uncle Sam's premises?

1   A.   Cashier.

2   Q.   You were a cashier?

3   A.   Server.  And I was also responsible for supervising the

4   other person that was working with me.

5   Q.   There was another person working for you or with you?

6   A.   Yes, there was another person working with me from -- a

7   Yemeni person.  I would normally take the orders and he would

8   prepare the meals.

9           THE COURT:  Let me see counsel at sidebar, please.

10          NOTE:  A side-bar discussion is had between the Court

11   and counsel out of the hearing of the jury as follows:

12   AT SIDE BAR

13          THE COURT:  Why is any of this relevant?

14          MR. RINALDO:  Well, because I am establishing that

15   the witness didn't stay in one place very long.  She went from

16   job to job.  And now she left this job to go to Ethiopia.  And

17   that's when she started talking to Mrs. Howard.  So I am done

18   with it anyway.

19          THE COURT:  Well, you know --

20          MR. RINALDO:  I understand.

21          THE COURT:  Let's move along.  We don't need to know

22   whether she picked up tea cups versus coffee cups.  So let's

23   focus on important matters.

24          MR. RINALDO:  There is a disagreement, Your Honor,

25   about how she was introduced to the Howards, and that's why

S. Roe - Cross

375

1   this is relevant.  She wasn't working.  My client is going to

2   testify they met at the cafeteria, not at the Uncle Sam's.  And

3   that all goes to credibility and recollection too.  So I am

4   done with that part of it anyway.

5            THE COURT:  All right, let's move.

6            NOTE:  The side-bar discussion is concluded;

7   whereupon the case continues before the jury as follows:

8   BEFORE THE JURY

9            THE COURT:  Go ahead, proceed, please.

10  BY MR. RINALDO: (Continuing)

11  Q.   When you left the Uncle Sam's, you left to return to

12  Ethiopia, correct?

13  A.   I was told that my mother was sick and to go visit her.

14  And so, I left for an emergency.

15  Q.   And that was the end of your employment at the Uncle

16  Sam's, correct, or at the embassy itself?

17  A.   I took -- I talked to my supervisor, and he gave me two

18  weeks off.  And he said if I don't return in two weeks, that he

19  would hire someone else because they would be busy.  And I

20  agreed to that, and I left.

21  Q.   And you did not return in two weeks?

22  A.   Yes, I did not return because my mother was sick, and she

23  needed someone to take care of her.

24  Q.   When did you actually return to Yemen from the time you

25  were in Ethiopia there?

S. Roe - Cross

376

1   A.    After two months.  And I began to look for a job.

2   Q.    And that would have been 2006, correct?

3   A.    Yes.

4   Q.    All right.  And that's when you called Linda Howard

5   looking for a job, isn't it?

6   A.    Yes, I did call her.  Even though I knew a lot of people

7   at the embassy, I chose to call her because she was a good

8   person to me.

9   Q.    And when you called her, you told her you couldn't find a

10  job and you asked her to help, correct?

11  A.    Yes, I called her to help me find a job, hoping that she

12  will find a job for me at a white household, because I didn't

13  want to work for the Yemeni, it's a bit difficult to work for

14  them.

15  Q.    She did help you find a job, didn't she, when you called

16  her?

17  A.    She told me she will help me look for a job.

18  Q.    And as a result of her telling you she was going to help

19  you find a job, she did help you find a job doing the entry

20  level data entry position at the embassy, didn't she?

21  A.    Yes, she did.  Often times jobs are posted in newspapers

22  and different places.  I didn't have access to that, so she

23  provided me with the job announcement.

24  Q.    And she told you who to call, didn't she?

25  A.    Would you repeat the question.

S. Roe - Cross

377

1   Q.   I will rephrase it to make it easier.  She told you who to

2   contact and that you could you submit an application for a

3   position, correct?

4   A.   No, that's not what she said.

5   Q.   What did she say?

6   A.   She asked me if I'm interested, there is this position at

7   the embassy office related to computer work.  And I told her I

8   have no idea, I don't know how to do that.  And she called me

9   and I went over to her house to get the application.

10  Q.   Is it your testimony, Ms. Roe, that you were inside the

11  residence of Russell and Linda Howard in 2006 with respect to

12  computer and data entry work?

13  A.   Yes, I did, because I had helped them to find the

14  housekeeper, they were like friends, especially Linda, to me.

15  So it was easy to speak with her and be invited to their house.

16          MR. RINALDO:  Excuse me, Your Honor, could we

17  approach a second?

18          THE COURT:  No.  Reask the next question.  Your

19  question was totally confusing and not responsive to the answer

20  she gave to the previous question.  So I think if you want to

21  clear up any confusion, please ask your next question.

22          MR. RINALDO:  My question -- my --

23          THE COURT:  No, please.  Move forward.

24          MR. RINALDO:  Okay, fine.

25  BY MR. RINALDO: (Continuing)

S. Roe - Cross

378

1   Q.   Before you came to interview as a housekeeper with the

2   Howards in 2007, were you only in their residence that one

3   time, according to your testimony?

4   A.   No.  I've been to their house once to take the housekeeper

5   that I helped find, to provide -- to help interpret things

6   that -- to help communicate with each other.  And another time

7   I was invited to their home.

8   Q.   How long did you do the data entry position?

9   A.   I think it was three or four months.

10  Q.   And the job ended, correct?

11  A.   Yes, the job ended because it was temporary and I had to

12  go.

13  Q.   And you went from there to the Mövenpick Hotel?

14  A.   Yes, the hotel was new, they were busy, so they were

15  constantly hiring people.

16  Q.   And at some point you called Linda Howard and you told her

17  you were out of work again, and you asked her for a job, or if

18  she could help you with a job, correct?

19  A.   Yes, I did call her, because I was interested in working

20  with foreigners instead of for the Yemeni, and I have noticed

21  the difference.  And since I had prior experience working at

22  the embassy, I figured she would be able to help me.

23  Q.   Were you unemployed when you called her the second time?

24  A.   That is correct.  At the hotel where I was working, since

25  the busy season had ended, they started laying off their

S. Roe - Cross

379

1   temporary employees and telling us that they would call us.

2   Even though they showed interest for me to stay, but the pay

3   wasn't that great, so I decided to find another job.

4   Q.   And when you called Linda Howard the second time to ask

5   her a second time to help you find a job, she was out of the

6   country, wasn't she?

7   A.   Yes.

8   Q.   And when she was out of the country, what did she tell you

9   about a job possibility?

10  A.   I was always telling her that I needed a job, I am willing

11  to work even at someone's home.  She said that she was

12  currently in Germany, and she would call me, and that Brhan had

13  run away.  And that was the first time I heard run away.

14  Q.   Did she tell you she would call you back when she got back

15  to Yemen?

16  A.   Yes.  She did say she would call me back when she gets

17  back to Yemen.

18  Q.   And when she got back to Yemen, she called you, didn't

19  she?

20  A.   That is correct.

21  Q.   And she told you you could interview for a position as

22  their housekeeper, correct?

23  A.   No, she didn't ask me that question over the phone.

24  Q.   At some point you interviewed for the position of a

25  housekeeper in the Howards' home, didn't you?

S. Roe - Cross

380

1   A.   When she called me, it was sort of evening, and I went

2   over to their house.  I was under the impression it was for

3   another job.  I didn't realize it was to work for them until I

4   got there.

5   Q.   And when you got there, they discussed with you the

6   possibility of working as a housekeeper for them, correct?

7   A.   The first conversation was about Brhan, and how she ran

8   away, and how she left her toothbrush, and she was crying, they

9   were upset.

10  Q.   Did you interview -- did you talk to them about becoming

11  their housekeeper during that conversation?

12  A.   Yes.  After that discussion, since I was looking for a

13  job, they told me about the opportunity and asked me to work

14  for them.

15  Q.   That same night?

16  A.   Yes, that same day, but this question was presented to me

17  the first time I met him in my workplace.

18          MR. RINALDO:  Excuse me, Your Honor, non-responsive.

19          THE COURT:  Okay.  So the question was, did they

20  offer you a position as a housekeeper that same night, the

21  first night that you went over to the Howards'.  And the answer

22  was different.

23          So let's again do the best you can to interpret the

24  exact question that is being asked.

25          And, Ms. Roe -- and communicate this to her.  Let's

S. Roe - Cross

381

1   listen carefully to the question that has been asked and try

2   and answer that question.

3             THE WITNESS:  The question is a bit confusing.  I

4   wanted to answer the question in order of the way the job

5   opportunity was presented to me first and second time.

6             THE COURT:  Okay.  I understand.  And if you think

7   that a question is confusing, then ask to have it reasked

8   again.  And say you're confused by the question.

9             THE WITNESS:  Okay.

10            THE COURT:  Okay.  All right.  Please proceed.

11            MR. RINALDO:  Thank you, Your Honor.

12   BY MR. RINALDO: (Continuing)

13   Q.   The question on the floor was, did they discuss with you

14   serving as their housekeeper that night, at that same night at

15   the interview?

16   A.   Yes.

17   Q.   And during that discussion they told you what your duties

18   would be expected to be, didn't they?

19   A.   Yes.

20   Q.   And the duties would be cleaning and doing the laundry,

21   correct?

22   A.   Yes, but that wasn't all.

23   Q.   Assisting with the cooking with Russell Howard?

24   A.   Could you ask the question again?

25   Q.   During the interview when your job duties were being

1    described to you that evening, your duties included assisting

2    with the cooking in the Howard household, correct?

3    A.   Yes, cooking and helping to cook.

4    Q.   And you also -- you also were expected to help serve the

5    food and to clean up after, correct?

6    A.   Yes.

7    Q.   And that was satisfactory to you, wasn't it?

8    A.   Correct, it was work.

9         MR. RINALDO:  I'm sorry, I couldn't hear the

10   interpreter's answer.

11        THE COURT:  Correct, it was work.

12        MR. RINALDO:  Thank you.

13   BY MR. RINALDO: (Continuing)

14   Q.   And at that point your salary was discussed, wasn't it?

15   A.   Correct.

16   Q.   And it was $150 a month, right?

17   A.   Correct.

18   Q.   And that was also satisfactory to you?

19   A.   No, that was not satisfactory.

20   Q.   Did you ask for more?

21        THE COURT:  That same evening?

22   Q.   That same evening.

23   A.   They made promises to help me in other ways that made it

24   okay for me to accept it.

25   Q.   You accepted the salary offer, correct?

S. Roe - Cross

383

1    A.   Yes.

2    Q.   In fact, you are the one who suggested $150 a month as an

3    appropriate salary, aren't you?

4    A.   That is not correct.  This is wrong.

5    Q.   The $150-a-month salary, Ms. Roe, was as much or more than

6    you received at the Yemeni family, correct?

7    A.   I don't think this has anything to do comparing with the

8    Yemeni family and foreigners.  It's understood that the Yemenis

9    pay less than the foreigners.

10            MR. RINALDO:  Your Honor, non-responsive.

11            THE COURT:  Yeah, let's listen to the question and

12   answer the question.

13            THE WITNESS:  Okay.

14            THE COURT:  Go ahead.

15            MR. RINALDO:  Your Honor, do you mind if I reask that

16   question?

17            THE COURT:  Yes, go ahead.

18   BY MR. RINALDO: (Continuing)

19   Q.   In fact, $150 a month was as much or more than you

20   received as a monthly salary from the Yemeni family, correct?

21   A.   Correct.

22   Q.   And at that interview that evening the Howards told you

23   that you would be expected to be a live-in housekeeper,

24   correct?

25   A.   Yes.

S. Roe - Cross

384

1    Q.   Did you see your quarters that you would be provided with

2    that evening at the interview?

3         I'm sorry, do you understand the question?  I am

4    talking to the interpreter.

5         THE INTERPRETER:  No, the interpreter does not quite

6    understand quarters.

7         MR. RINALDO:  Quarters.  I will rephrase, Your Honor.

8         THE COURT:  All right, thank you.

9    BY MR. RINALDO: (Continuing)

10   Q.   There were housekeeper quarters where the housekeeper

11   would be expected to live in the Howard residence, correct?

12   A.   Yes.

13   Q.   During that interview that evening, did you see those

14   quarters?

15   A.   Correct.

16   Q.   And it consisted of a bedroom and a bathroom itself in the

17   housekeeper quarters, correct?

18   A.   Correct.

19   Q.   During that interview, you also discussed your hours that

20   you would be expected to work, correct?

21   A.   Yes.

22   Q.   And you would be expected to start work at 9, correct?

23   A.   Correct.

24   Q.   And you were expected to work through lunch, correct?

25   A.   No.

S. Roe - Cross

385

1   Q.   You were expected to serve the dinner, correct?

2   A.   Yes.

3   Q.   You were expected to be back in the Howards' residence by

4   about 4 o'clock if you left, correct?

5   A.   Not correct.

6   Q.   If you left the Howards' residence during the day, on a

7   workday for you, you were expected to be back in time to help

8   start preparing dinner, correct?

9           THE COURT:  Ms. Patterson --

10          MS. PATTERSON:  Yes, Your Honor, asked and answered.

11          THE COURT:  No, I will allow some latitude on

12   cross-examination.  Thank you though, there is repetition.

13          Do you remember the last question?

14          THE INTERPRETER:  Yes.

15          THE COURT:  Okay.

16   A.   I'm not exactly sure.  Would you be able to provide

17   reasons why I would leave the house during the workday.

18          THE COURT:  You didn't ask whether she left the house

19   during the workday, and so she is confused.

20          MR. RINALDO:  Fair enough.  I understand the problems

21   we're having.  So I will try to help, I will try to do that

22   better.

23   BY MR. RINALDO: (Continuing)

24   Q.   Ms. Roe, would there be occasions during the day when you,

25   on a workday when you would leave the house?

S. Roe - Cross

386

1   A.   I don't have any reasons I would leave.  I'm a bit

2   confused.  Would you be able to provide reasons why I would

3   leave.

4   Q.   Ms. Roe --

5        THE COURT:  So the question is, does she recall that

6   on occasion she left the house during the week in the

7   afternoon?  And she can answer that yes or no.

8        THE WITNESS:  I don't quite remember.  I may have

9   been to the supermarket.

10  BY MR. RINALDO: (Continuing)

11  Q.   Let me help with that.  That included going to the

12  grocery, right?  You testified during direct examination that

13  you went to the grocery during the afternoon, the grocery

14  store, correct?

15  A.   Correct.

16  Q.   And if you went out to go to the grocery, you were

17  expected to be back in time to prepare dinner, correct?

18  A.   Yes.  There was no curfew time set when I would need to

19  return back home, but I would return as soon as possible.

20  Q.   In time to prepare dinner?

21       THE COURT:  She has answered the question.

22       MR. RINALDO:  Fair enough.

23       THE COURT:  Let's move on.

24  BY MR. RINALDO: (Continuing)

25  Q.   Now, was this discussed with you at the initial interview?

S. Roe - Cross

387

```
 1              THE COURT:  What?  Whether she could go out in the

 2    afternoon to get groceries --

 3              MR. RINALDO:  Fair enough, it was a bad question.  I

 4    will withdraw it.

 5              THE COURT:  Let's try again.

 6              MR. RINALDO:  All right, I will try it again.

 7    BY MR. RINALDO: (Continuing)

 8    Q.   During the interview, did the Howards discuss with you

 9    that you would be shopping for groceries from time to time?

10    A.   Yes.

11    Q.   Did they also tell you that you would have Fridays off?

12    A.   Correct.

13    Q.   And that's what happened, wasn't it?

14    A.   Yeah.  Yes, but they didn't quite keep the promise

15    entirely.

16    Q.   At least most Fridays you had off, didn't you?

17    A.   Correct.

18    Q.   And that was discussed at the interview?

19    A.   Correct.

20    Q.   And you accepted the position as a live-in housekeeper at

21    that time, did you not?

22    A.   I did accept the job, but not the live-in condition.  Not

23    the part that --

24              THE INTERPRETER:  The interpreter needs to reiterate.

25    A.   I did accept the job, except the fact that they wanted me
```

S. Roe - Cross

388

1    to live in with them.

2    Q.    You took the job?

3    A.    I did.

4    Q.    And you became their housekeeper, correct?

5    A.    Could you repeat the question?

6    Q.    You became their housekeeper, correct?

7    A.    Are you asking if I became the housekeeper at the day of

8    the interview or prior --

9              MR. RINALDO:  Fair enough.  Your Honor, I will change

10   the way I ask it.

11             THE COURT:  Well --

12             MR. RINALDO:  I am trying to --

13             THE COURT:  You're skipping all around.  You're

14   confusing the witness.  And her reactions are perfectly natural

15   given the circumstances here.  You're asking whether she

16   accepted the position.  She said not the live in part of it.

17   And then you didn't follow up with that, you went on to

18   something completely different, and of course she got confused.

19             We are not going to spend three days doing

20   cross-examination on this minutia.  And so, ask the questions

21   in an order where you want to get answers from her, and let's

22   try again.

23   BY MR. RINALDO: (Continuing)

24   Q.    How long after the interview did you move into the

25   Howards' residence?

S. Roe - Cross

389

1    A.    I think one or two days.  I needed time to pack my stuff.

2    Q.    During direct examination you said that you had some

3    personal things of your own, such as a refrigerator, a stove,

4    and laundry machines, do you remember that testimony?

5    A.    Yes, those were the main items of belongings I had.  I had

6    some small items, like clothing bags and so on.

7    Q.    Those main items, the refrigerator, the stove, the laundry

8    machines, on direct testimony yesterday you said you wanted to

9    send those to your mother in Ethiopia, correct?

10   A.    Correct.

11   Q.    And during direct examination yesterday you also said that

12   the Howards told you that you couldn't bring the refrigerator,

13   the stove, and the laundry machines to their residence,

14   correct?

15   A.    Correct.

16   Q.    But you didn't send them to your mother, did you?  You

17   sold them?

18   A.    Yes, I didn't have any options.

19   Q.    And you moved into the Howards' apartment over the next

20   couple of days?

21   A.    Would you consider one or two days as a couple?

22   Q.    Yes.

23   A.    What was the question?

24   Q.    I asked whether she moved into the Howards' apartment in

25   the next couple of days.  You asked whether one or two was a

1    couple.  And I said yes.

2    A.    That is correct.

3    Q.    Yesterday, Ms. Roe, you said that you went out with

4    Russell Howard and sometimes alone to the mall.  I remember the

5    use of the term "mall" several times yesterday.

6            THE INTERPRETER:  The interpreter would like the

7    question to be repeated.

8            MR. RINALDO:  Actually, it probably wasn't one.

9            THE COURT:  Yes.  What is the question?

10           MR. RINALDO:  It wasn't one.

11   BY MR. RINALDO: (Continuing)

12   Q.    My question was first, do you recall that testimony about

13   going out to the mall either with or without Russell Howard?

14   A.    Yes.

15   Q.    What mall was there in Sana'a, Yemen?

16   A.    I don't remember at this particular moment, but if I have

17   a moment, I may be able to think.  I think it was Yemen Mall or

18   something like that.

19   Q.    I am sorry, did the witness say Yemen mall?

20   A.    Yes.

21   Q.    And was it your testimony yesterday that you sometimes

22   went with Russell Howard and sometimes you went on your own?

23   A.    What do you mean?  To where?  Could you repeat the

24   question?

25           THE COURT:  Repeat the question.  She can't -- let's

S. Roe - Cross

1    narrow it down.  Where were you talking about?

2           MR. RINALDO:  I was talking about going to the mall

3    she was talking about, Your Honor.

4           THE COURT:  She talked about going to the lingerie

5    store.  If that's what you are referring to, then ask it that

6    way.  Go ahead.

7           MR. RINALDO:  Your Honor, that wasn't the only thing

8    she said about going to the mall.  I wasn't asking about the

9    lingerie store.

10          I will ask the question, Your Honor.

11          THE COURT:  If you're just going to ask her

12   open-ended questions about what her answers on direct

13   examination testimony were, I will stop you.  If you have got

14   points to make to make on cross-examination, please ask them.

15          MR. RINALDO:  I will, Your Honor.  There is going to

16   be testimony there is no mall in Sana'a, Yemen.  That's why I

17   made the point.

18          THE COURT:  I understand that.  And move on to your

19   next question.

20          MR. RINALDO:  All right.

21   BY MR. RINALDO: (Continuing)

22   Q.   Let's go back to your duties at the Howards' residence.

23          THE COURT:  When?  Are we about the first meeting?

24   Are we talking about when she started?

25          MR. RINALDO:  Fair enough, Your Honor.

1    BY MR. RINALDO: (Continuing)

2    Q.   When you first started your work at the Howards'

3    residence, that would be one or two days after you moved in,

4    were the duties consistent with what had been explained to you?

5    A.   The hours of the work was consistent with what I was told

6    at the interview.

7    Q.   All right.  And at some point, at some point early on did

8    I understand your testimony to be that the question of wearing

9    a uniform was discussed?

10   A.   Correct.

11   Q.   And in fact, didn't Mrs. Howard tell you -- didn't she ask

12   you, would you prefer to wear a uniform or would you prefer to

13   wear your own clothes?

14   A.   She did not give me a choice.  I was told, you will wear a

15   uniform.

16   Q.   You didn't wear a uniform --

17   A.   And I agreed.

18   Q.   But you didn't wear a uniform while you were there, did

19   you?

20   A.   I did not.

21   Q.   You wore your own clothes?

22   A.   Yes, I had my own reasons.

23   Q.   I'm sorry, I couldn't hear the last part.

24        THE INTERPRETER:  Yes, I had my own reasons.

25   Q.   On your days off on Friday, from the beginning, were you

S. Roe - Cross

393

1    permitted to go out on your own?

2    A.   Yes, I would leave, I would catch a cab and leave on my

3    own.

4    Q.   And you went to visit friends sometimes?

5    A.   What do you mean sometimes?  Are you saying any given day

6    of the week or on my days off?

7    Q.   I am talking about Fridays.

8    A.   Yes, I would go on Fridays to visit my friends.

9    Q.   And that was consistent with what the Howards told you

10   your work schedule would be during the interview, wasn't it?

11   A.   Yes, except the times were different.

12   Q.   On Fridays?

13   A.   Correct.

14   Q.   What were the times that were different on Friday?

15   A.   I expected my days off to start Friday morning, but I

16   would instead work around the house, make breakfast, serve

17   breakfast, do the dishes, by then it would be 10 or 11 a.m.

18   Q.   At that point at 10 or 11 a.m. you were free to leave the

19   house on your day off, correct?

20   A.   Yes, except that the agreement was I would be off starting

21   early Friday morning, and that was not the case.

22   Q.   During the time that you were employed by the Howards

23   between June and December of 2007, did you occasionally go with

24   the Howards to a place called the Marine Club?

25   A.   Yes, they would take me whenever they go.

S. Roe - Cross

394

1   Q.   And that would have been on a Wednesday, correct?

2   A.   Correct.

3   Q.   One or two Wednesdays a month?

4   A.   I don't know for sure how many times a month.  I just

5   remember whenever there was a party, whenever they take me, I

6   would go.

7   Q.   To the Marine Club?

8   A.   Correct.

9   Q.   And at the Marine Club, that was a social event, was it

10  not?

11  A.   Would you be able to explain that to me?

12  Q.   I will try.  At the Marine Club, there was dinner served?

13  There were other people there?

14          THE COURT:  Has she answered yes or no?

15  A.   There might have been a lot of things going on at that

16  event.  There might have been barbecues or things of that

17  nature.  I don't know all that was going on.  I just used to

18  attend whenever they take me.

19  Q.   Could you describe -- maybe it is easier this way.  Could

20  you describe for us a typical evening at the Marine Club during

21  one of these events.

22  A.   Okay.  At the Marine party, people would normally invite

23  their friends, whoever they want to invite.  There would be

24  drinking, and dancing, and talking, playing pool.

25  Q.   Have you completed your answer?

1    A.   Yes.

2    Q.   And you were able to participate in as many of these

3    things as you wanted to, correct?

4    A.   What are you trying to say?  I don't understand.

5         THE COURT:  A poor question.  Ask her whether she was

6    free to -- ask a more specific question.

7         MR. RINALDO:  All right, I will try to be clearer.

8    BY MR. RINALDO: (Continuing)

9    Q.   Ms. Roe, when you attended the Marine Club functions,

10   could you do whatever you wanted as far as those activities

11   were concerned?

12   A.   Are you saying if I want to eat, I can eat?  If I want to

13   meet people, if I want to talk to people, if I want to dance, I

14   could do any of these activities?

15   Q.   Exactly.

16   A.   Yes.

17   Q.   All right.  And from time to time when you were at the

18   Marine Club, did you leave the event later than the Howards?

19   A.   Never, they would never leave without me.

20   Q.   So your testimony is that you left at exactly the same

21   time as the Howards every time you went to the Marine Club,

22   correct?

23   A.   That is correct.

24   Q.   And did the Marine Club events continue on those various

25   Wednesdays throughout the six-month time period that you were

396

1    employed by the Howards?

2    A.   I have no knowledge of whether they had the functions or

3    not.  My only knowledge was to go whenever there is an event

4    with the family.  I don't have any additional knowledge.

5    Q.   All right.  Did you attend events at the Marine Club in

6    say August or September or October of 2007?

7    A.   I can't say what months I attended.  I can't remember that

8    far back.  Whenever they go, that's when I went.  Whenever

9    there is a pool party or anything like that, if they attended,

10   I would attend.

11   Q.   I am sorry, did you say pool party?

12   A.   Yes, pool party.  I am trying to tell you that the only

13   function we went wasn't just the Marine party.

14   Q.   So you went to other functions as well?

15   A.   Yes, whenever they would go, for example, to the pool

16   during the day, they would ask me to swim, but I don't know how

17   to swim.

18   Q.   Well, when you say they would go, Linda Howard's work

19   schedule took her to the embassy every day but Thursday and

20   Friday, correct?

21           THE INTERPRETER:  Could you repeat the question for

22   the interpreter?

23   Q.   Sure.  Linda Howard worked at the embassy except on

24   Thursdays and Fridays, which were her weekends, correct?

25   A.   Correct.  But she would sometimes work on Thursday as

S. Roe - Cross

1   well.

2   Q.   So when you say you attended the pool parties and other

3   functions, would that have been on Linda's day off?

4   A.   It could have been on her days off, I don't quite remember

5   everything exactly.

6   Q.   I will move to another area now, Your Honor.

7              THE COURT:  All right.

8   Q.   Let's begin talking about what you claim are areas of

9   Russell Howard's misconduct.  I just want to let her know where

10  I am going.

11  A.   Okay.

12  Q.   Did I understand your testimony to be during direct

13  examination that that sexual misconduct occurred within the

14  first two or three weeks after you started your employment?

15  A.   No, I didn't say two or three weeks after I started

16  working.  I said within the first week.

17  Q.   Fair enough.  So let's go back to within the first week.

18             THE INTERPRETER:  The interpreter needs clarification

19             THE COURT:  Well, is she adding to the answer that

20  she just gave?

21             THE INTERPRETER:  Yes.

22             THE COURT:  Go ahead.

23             THE INTERPRETER:  It is still not clear to the

24  timeline, Your Honor.

25             THE COURT:  Oh.

S. Roe - Cross

398

1          THE INTERPRETER:  Yeah, it's not clear about the

2     timeline.

3     A.   Within the first seven days.

4     BY MR. RINALDO:  (Continuing)

5     Q.   All right, let's start there.  I understand that your

6     testimony is that within the first seven days of your

7     employment as a live-in housekeeper Mr. Howard, Russell Howard

8     came into your bedroom and raped you; is that correct?

9     A.   Correct.

10    Q.   And at the time you say that occurred, Linda Howard was

11    not at home, was she?

12    A.   Correct.

13    Q.   And the next time he raped you, according to your

14    testimony, was within how long after the first occasion?

15    A.    I can't say exactly how many days the second one happened

16    after the first one.  I just know that it was a continuous

17    thing.

18    Q.   Could you please give me your best recollection as to how

19    long it was between the time you say Mr. Howard raped you the

20    first time and the time you say he raped you the second?

21          Your Honor, before the translation, that's a mighty

22    long answer for that question.  Okay.

23          THE COURT:  Let's hear the answer.

24    A.   After the first rape occurred, I'm guessing the second one

25    may have took place the following week.  Since the first rape

S. Roe - Cross

399

1    occurred towards the end of my first week, I'm assuming it

2    could have been Wednesday, but perhaps it was on Thursday or

3    Friday.

4    Q.   All right.  And did I understand your testimony on direct

5    examination to be that eventually the rapes became a daily

6    occurrence?

7    A.   Yes.  After the first rape he told me that it was part of

8    my duty, and that I would get used to it.  And it was every

9    morning, in the mornings that happened.

10   Q.   Did I understand your testimony correctly yesterday to say

11   that the mornings when that occurred, it usually occurred at

12   about 9:30 in the morning?

13   A.   I did not say 9:30.

14   Q.   What time did it occur in the mornings?  If there was a

15   regular, fairly regular time.

16   A.   In the morning he usually wakes up at 9 in the morning,

17   and the first thing he does is he would come to my room.  So I

18   can't say whether it was 9:15, 9:30, 9 o'clock, but that would

19   be the first thing he does in the morning.

20   Q.   And I understood your testimony on direct examination

21   yesterday to say that you were also raped in the afternoon?

22   A.   Yes, that is correct, afternoons also.

23   Q.   And if I remember your testimony correctly, you said that

24   took place at about 3:30 in the afternoon?

25   A.   I don't recall saying 3:30.  I think my testimony was in

S. Roe - Cross

400

1    the afternoon.  I don't know where you get the 30s from.

2    Q.   The transcript will say.  So is it your testimony that you

3    were often raped more than once a day during the six months

4    that you worked for the Howards?

5    A.   I can't say daily because that didn't happen Thursday,

6    Friday, or days I was on my period.

7    Q.   But other than Thursdays and Fridays and other than the

8    days that you were having your period, is it your testimony

9    that you were often raped more than once a day?

10   A.   Yes, outside of being on my period for a number of days,

11   three or four days.

12           THE COURT:  Next question.

13   Q.   All right.  You define rape, you understand rape as you

14   use the term to mean sexual intercourse with penetration, don't

15   you?

16   A.   That is one of them, but that's not the only definition

17   that I consider to be rape.

18   Q.   All right.  Is it your testimony that Mr. Howard engaged

19   in -- let me make sure with the translation that I am being

20   clear.

21           Do you have an understanding of what I mean when I

22   say sexual intercourse?

23           THE COURT:  Why don't you tell her what your

24   definition is, and then if you have questions about it, ask

25   them.

S. Roe - Cross

401

1          MR. RINALDO:  I will.

2     BY MR. RINALDO: (Continuing)

3     Q.   When I say sexual intercourse in a question, what I'm

4     talking about is I'm talking about sex between a man and a

5     woman, I know there are other definitions, but with

6     penetration.

7     A.   If you give me the opportunity, I can explain.

8          MR. RINALDO:  Well, I'm just asking, telling her my

9     definition for you.

10         THE COURT:  There is no question there.  That's his

11    definition of rape -- or sexual intercourse.

12         MR. RINALDO:  No, it's my definition of sexual

13    intercourse, Your Honor.

14         THE COURT:  Sexual intercourse.  And then ask your

15    next question now.

16         MR. RINALDO:  I want to make sure --

17    BY MR. RINALDO: (Continuing)

18    Q.   Do you understand what I mean by that?

19    A.   That's why I wanted to explain my view of different ways

20    of sexual intercourse whether it's rape or consensual.

21         THE COURT:  Okay.  The attorney is saying, I define

22    sexual intercourse as penetration between a man and a woman.

23    And so she must understand that.

24         And then the follow-up question will be -- you shall

25    need to define the term sexual intercourse as he has defined it

S. Roe - Cross

402

1    when answering the next question.  It doesn't include any

2    reference to whether it's consensual or non-consensual.

3           Okay, ask your next question, see where we go.

4           MR. RINALDO:  Yes, Your Honor.

5    BY MR. RINALDO: (Continuing)

6    Q.   Is it your testimony, Ms. Roe, that Russell Howard engaged

7    in sexual intercourse with you more than once a day except

8    Thursdays, Fridays, or when you were on your period?

9           THE COURT:  That's not her testimony.

10          MR. RINALDO:  No, I said is it.

11          THE COURT:  You have already asked it several ways,

12   and she has given you her best answer.  And she said she can't

13   tell you whether it happened every day or more than once a day.

14          MR. RINALDO:  Let me --

15          THE COURT:  No, let's move on to the next question.

16          MR. RINALDO:  The question I would like to ask is,

17   did he ever engage in sexual intercourse with her more than

18   once on the same day?  That is a different question.

19          THE COURT:  That is a different question.  Go ahead.

20   BY MR. RINALDO: (Continuing)

21   Q.   Did Russell Howard ever engage in sexual intercourse, as I

22   define the term, with you more than once on the same day?

23   A.   Correct.

24   Q.   He did, that's your testimony?

25          THE COURT:  She has answered.

S. Roe - Cross

403

1  Q.   All right.  Did Russell Howard ever engage in sexual

2  intercourse with you, as I define it, more than twice a day?

3  A.   Yes, when he had been drinking at night.

4  Q.   So let's move to another area.  In November of 2007, Ms.

5  Roe, Russell Howard and Linda Howard left Yemen, didn't they?

6  A.   Yes, they did, but I don't remember exactly when that

7  happened.

8  Q.   I will try to help refresh your recollection.  They went

9  back to the United States because Mrs. Howard's stepfather had

10 died, you knew that, didn't you?

11 A.   Yes, that is correct.

12 Q.   And you were still working for them at the time that they

13 left?

14 A.   That is correct.

15 Q.   And they were gone for more than a week, weren't they?

16 A.   I know it was ten days.

17 Q.   Ten days?

18 A.   Yes.

19 Q.   And you were -- and you continued to work for them after

20 they returned, did you not?

21 A.   That is correct.

22 Q.   During the time that they were in the United States in

23 November for ten days, did you stay at the Howard residence?

24 A.   Yes.

25 Q.   And you had your own key to the residence all the time,

S. Roe - Cross

404

1    didn't you?

2    A.    Yes, I had that key to the main door.

3    Q.    Yes, that's what I was asking.  Thank you.  So for

4    example, on your days off when you could go out on your own,

5    you had a key to the residence so that you could come back to

6    the residence regardless of whether anyone else was home?

7    A.    Are you saying the days that I would leave the house

8    during my days off?

9    Q.    Well, anytime really.  If you had your own key, you could

10   come back when you came back.

11   A.    That is correct.

12   Q.    Now, at some point after you say the rapes started, you

13   testified yesterday that you overheard telephone conversations

14   made by Russell Howard, correct?

15   A.    Correct.

16   Q.    And if I understood your testimony correctly, you said on

17   only one of those occasions did you pick up a different phone

18   to listen to both sides of the conversation?

19   A.    Yes, when I realized that he was talking about me, I did

20   ear drop.

21   Q.    Just to be clear, Your Honor, it only happened one time

22   that you picked up the other phone?

23   A.    I think so.

24   Q.    Just once?

25   A.    Yes, one time.  The other occasions --

S. Roe - Cross

1  Q.   We're getting to the other occasions.  Now, the rest of

2  the times that you say you overheard Mr. Howard talking on the

3  telephone, you overheard his side of the conversation because

4  you did not pick up the other phone, correct?

5  A.   Yes, I did not, except that I heard him speak.  And I knew

6  what the conversation was about, and it was pretty clear who

7  was on the other phone.

8  Q.   You were assuming that he was talking to Mrs. Howard?

9  A.   I did not assume.  I was sure.

10  Q.   I understand.  But you did not hear her voice, did you?

11  A.   Yes.  After that first time of ear dropping on the phone,

12  I did not hear her voice, but I know that they talk about

13  everything and he only talks to her and his friend, Dr. Piet.

14  Q.   Dr. Piet, that is Dr. Piet Tampere?  Did you know his last

15  name?

16  A.   I do not know his last name.  I just know he is Piet.

17  Q.   Dr. Piet?

18  A.   Yes, Dr. Piet.

19  Q.   I am sorry, I didn't mean to interrupt.  Dr. Piet in fact

20  frequently came to the residence for dinner and the like, did

21  he not?

22  A.   Yes, very often.

23  Q.   And the Howards frequently had guests over for dinner, did

24  they not?

25  A.   Yes, and he would often come.

S. Roe - Cross

1  Q.   He would be in that group; is that correct?

2  A.   Yes.  He was very involved.  He would be invited to lots

3  of parties, to the pool party or other embassy parties.

4           THE COURT:  Let's take our mid-morning break.

5           All right, let's take 15 minutes and we will come

6  back.  Thank you, you are excused.

7           NOTE:  At this point the jury leaves the courtroom;

8  whereupon the case continues as follows:

9  JURY OUT

10          THE COURT:  All right, we're in recess.

11          NOTE:  At this point a recess is taken; at the

12 conclusion of which the case continues in the absence of the

13 jury as follow:

14 JURY OUT

15          THE COURT:  All right.  Ready for our jury?

16          All right, Joe, let's get our jury, please.

17          NOTE:  At this point the jury returns to the

18 courtroom; whereupon the case continues as follows:

19 JURY IN

20          THE COURT:  All right, please be seated.

21          Mr. Rinaldo, please, whenever you are ready, sir.

22          MR. RINALDO:  Thank you, Your Honor.

23 BY MR. RINALDO: (Continuing)

24 Q.   Ms. Roe, I would like to take you back to the time that

25 you were employed as the housekeeper for the Howards in Yemen,

S. Roe - Cross

407

1   and I would like to begin after the break by discussing the

2   duties you had with respect to cooking.  I just want to make

3   sure you know where I'm going.

4   A.   Okay.

5   Q.   Assisting with the cooking was part of your job, right?

6   A.   Correct.

7   Q.   And Russell Howard did most of the cooking for the family;

8   isn't that right?

9   A.   Yes.

10  Q.   And frankly, Linda Howard didn't do virtually any of the

11  cooking, did she?

12  A.   Sometimes only.

13  Q.   Mrs. Howard, Linda Howard left the house every morning

14  sometime between 6 and 7:30, to the best of your knowledge; is

15  that right?

16  A.   Correct.

17  Q.   And she left via a car that the State Department sent for

18  her to pick her up, correct?

19  A.   Yes.

20  Q.   And the embassy, since you lived there, the embassy was

21  what, about 45 minutes away from the compound where the Howards

22  lived?

23  A.   I don't know.  I'm not sure if it's 45 minutes exactly.

24  Q.   All right.  But it wasn't within walking distance, was it?

25  A.   It wasn't.

408

1   Q.   All right.  And Mrs. Howard returned from the embassy in

2   the evening also via a car that was provided by the United

3   States State Department, right?

4   A.   Correct.

5   Q.   And her time of arrival at home in the evenings was

6   typically between what, 6:30 and 7:30?

7   A.   Yes.

8   Q.   All right.  As a general rule, Mrs. Howard did not come

9   home for lunch, did she?

10  A.   Correct.

11  Q.   Now, during the time she was at the embassy working, she

12  didn't typically come home at any time between the time she

13  left in the morning and the time she returned in the evening,

14  both via State Department cars?

15  A.   Please repeat the question.

16  Q.   It was probably an inartful question.  Let me put it this

17  way.

18          You have already said that based on your experience,

19  Mrs. Howard did not come home for lunch?

20  A.   Correct.

21  Q.   From the time she left in the morning until the time she

22  returned in the evening, as a general rule she didn't come home

23  at all, right?

24  A.   That is correct.

25  Q.   Now, on the days she had off, those days were Thursdays

S. Roe - Cross

409

1    and Fridays, correct?

2    A.    Correct.

3    Q.    And Friday was your day off as well, correct?

4    A.    Correct.

5    Q.    All right.  Let's go back to the cooking for a minute

6    before I got distracted there.  Would it be fair to say that

7    Mr. Howard considered himself to be in charge of the cooking as

8    opposed to you?

9    A.    Yes, he's very good at cooking.

10   Q.    And from time to time were there disagreements between you

11   and Mr. Howard as to how some food might be prepared?  For

12   example, cutting certain vegetables a particular way?

13   A.    Never.

14   Q.    You never disagreed at all about how to prepare a meal; is

15   that right?

16   A.    Never.

17   Q.    And is it your testimony that Linda Howard never came in

18   to referee a disagreement between you and Mr. Howard about how

19   to prepare food?

20          MS. PATTERSON:  Objection, she never raised that

21   phrase, referee.

22          THE COURT:  Why don't you rephrase the question.

23   Referee is not a word that is going to be understood easily.

24          MR. RINALDO:  You are right, Your Honor.  Let me try

25   to think about how to rephrase that.

S. Roe - Cross

410

1           THE COURT:  Argument.

2           MR. RINALDO:  Okay.  It probably wasn't that much.

3  BY MR. RINALDO: (Continuing)

4  Q.   But is it your testimony that Mrs. Howard was never --

5  never came into the kitchen at any time to express an opinion

6  as to an argument that you might have been having with Mr.

7  Howard about how to prepare a certain type of food?  Is that

8  your testimony?

9  A.   Never.

10 Q.   And is it your testimony that in the context of -- that

11 may be a bad word here with the translation -- let me rephrase.

12          Is it your testimony that when we're talking about

13 food, that Mrs. Howard never said to you, just do it his way

14 and make him happy, in the context of food?

15 A.   We have never had an argument in regards to food.

16 Q.   Let me rephrase the question.  Just one try, Your Honor.

17          THE COURT:  All right.

18 Q.   Is it your testimony that Linda Howard never said to you,

19 just do it his way and make him happy, when talking about food?

20 A.   Never, I don't remember.

21 Q.   How old was Russell Howard when you worked for the Howards

22 in 2007?

23 A.   I can't say exactly how old he was.  He was an older

24 gentleman.  Obviously, he was retired.

25 Q.   Well, let's talk about that.  When you say he was retired,

S. Roe - Cross

1   he was retired as an Australian diplomat, correct?

2   A.   I do not know anything about that.  My understanding is

3   that they told me that he was retired.

4   Q.   Well, you knew that he occasionally left the Howards'

5   residence via a car provided by the State Department to perform

6   services as a consultant at the embassy, didn't you?

7   A.   I remember that.

8   Q.   And that took him out of the house, didn't it?

9   A.   Please repeat.

10  Q.   And that took him out of the house, didn't it?

11  A.   Yes, I remember, that's correct.

12  Q.   And in addition, Mr. Howard also provided services for the

13  Hunt Oil restaurant, correct?

14  A.   I have never heard or seen that happen.

15  Q.   Do you know whether -- maybe my providing services was a

16  bad word.  Do you know whether Mr. Howard ever did any kind of

17  accounting or inventory work for the restaurant, the Hunt Oil

18  or the Indian restaurant, either one?

19  A.   Never.

20  Q.   You don't know that?

21  A.   I have never heard or seen such thing.  I was home

22  24 hours a day.

23  Q.   Well, you weren't home on your days off, were you?

24  A.   Correct, I was not home during my days off.  I was just

25  trying to explain during my stay, I never heard or seen that.

S. Roe - Cross

412

1  Q.   All right.  And with respect to Mr. Howard's age, would

2  you agree that it would be fair to say he was in his 60s?

3  A.   I think so.  He may be.

4  Q.   With respect to the sexual misconduct that occurred, the

5  rapes and the intercourse that you talked about earlier, is it

6  your testimony that that continued all the way up until the

7  time you left the Howard's employ?

8  A.   The times I worked in their home, correct?

9  Q.   Yes?

10  A.   Yes, besides on my days off and the times I was on my

11  period.

12  Q.   Let me try to clarify.  You left the Howards' employ in

13  December of 2007, correct?

14  A.   I don't quite remember the months.  It was in 2007, I

15  believe.

16  Q.   Did I hear your testimony correctly on direct examination

17  to say that it was around Christmas time, the season?

18  A.   Yes, I remember, I was there on Christmas day, and I left

19  after Christmas.

20  Q.   All right.  So let's take the question as clearly as

21  possible.  If you were there on Christmas day, did the rapes

22  continue that you are alleging took place, are you claiming

23  they continued to take place between the time Mr. and Mrs.

24  Howard returned from America in late November until Christmas?

25  A.   That is correct, outside of my days off and days I was on

1    my period.

2    Q.   Now, at some point you left the Howards' employ and you

3    took a job at B6, correct?

4    A.   Correct.

5    Q.   And is B6 located on the compound?

6    A.   Yes.

7    Q.   And what job did you take there?

8    A.   Waitress.

9    Q.   And that was a restaurant that was actually run by Hunt

10   Oil, wasn't it?

11   A.   I only know that it was with Intracs.

12   Q.   But it was called B6?

13   A.   Yes, the name of the building was B6.

14   Q.   All right.  And the restaurant was in that building?

15   A.   Yes, that is correct.

16   Q.   And how far was that restaurant from the Howards'

17   residence?

18   A.   Not far.  There were two buildings in between.

19   Q.   And did you start that job in December of 2007?

20   A.   I believe two weeks after I ended my employment with them.

21   I don't remember exactly what month.

22   Q.   Well, two weeks after you ended the employment, if you

23   were there on Christmas, there were only seven days left in

24   2007.  So did you start in 2008?

25   A.   Then that's what it is.

S. Roe - Cross

414

1   Q.   Then what's what it is?

2   A.   Yes, I remember celebrating New Year's there.

3   Q.   Ahh.  And was that your first day of work, or did you

4   already work there?

5   A.   I don't think it was my first day.

6   Q.   All right.  So then we can agree, I think, that you began

7   your work sometime between Christmas day and New Year's Eve of

8   2007, can we agree on that?

9   A.   I remember on Christmas day I was in the home with them.

10  Q.   And on New Year's Day you were working at the restaurant,

11  correct?

12  A.   I just remember that I was working at the restaurant two

13  weeks later.

14  Q.   Did I misunderstand your testimony about being there on

15  New Year's Day?

16  A.   Yes, I was there for New Year's.

17  Q.   All right.  I won't belabor the point.  Mr. and Mrs.

18  Howard actually got you that job at the restaurant, didn't

19  they?

20  A.   That's not correct.

21  Q.   In fact, Mr. Howard and Mrs. Howard knew the people who

22  ran the restaurant, didn't they?

23  A.   My understanding is that she got me the job.  He didn't

24  get me the job.

25  Q.   Fair enough.  It was a bad question.  So that the record

S. Roe - Cross

415

1   is clear, it's your testimony that your understanding is that

2   it was Mrs. Howard that got you the job at B6?

3   A.   That is correct.

4   Q.   And did I understand your testimony correctly this morning

5   that -- or yesterday, I am sorry, that the owner of B6 asked

6   for a written recommendation letter from Mrs. Howard for his

7   files?

8   A.   Yes, the manager asked me for a recommendation from

9   previous jobs.

10  Q.   Did you ask for a recommendation from any previous jobs

11  other than the job as a housekeeper for the Howards?

12  A.   Yes, I did in fact provide him other documents along with

13  their recommendation letter.

14  Q.   From previous employers?

15  A.   Yes, every document that he requested, including copies of

16  passport.

17  Q.   You had your passport with you, didn't you?

18  A.   Correct.

19  Q.   With respect to the letter Mrs. Howard wrote, did you

20  contact her and ask for the letter?

21  A.   Yes, I asked her when she came to the restaurant.

22  Q.   To B6?

23  A.   Correct.

24  Q.   And she agreed to write you the letter, didn't she?

25  A.   That is correct.

S. Roe - Redirect

416

1    Q.   And she did write you the letter, didn't she?

2    A.   Correct.

3    Q.   And if I remember correctly, during direct examination you

4    saw the letter as Plaintiff's Exhibit 6 -- excuse me, Your

5    Honor.

6            Is it 2?  Thank you, Melissa.  I believe it was

7    Plaintiff's Exhibit 2.  The court officer will show you the

8    letter.

9            The court officer is graciously showing you the

10   letter.

11           Do you remember that's the letter we're talking

12   about, right?

13           THE INTERPRETER:  Could you start over for the

14   interpreter.

15   Q.   I would be happy to.  I was asking the witness, Ms. Roe,

16   whether she saw a letter as part of the direct examination, the

17   letter of recommendation.  Now I'm asking her to look at it

18   again and confirm that that's the letter that Linda Howard

19   wrote at her request.

20   A.   Correct.

21           MR. RINALDO:  I have no further questions, Your

22   Honor.

23           THE COURT:  All right.  Redirect?

24           MS. PATTERSON:  Yes, Your Honor.

25           REDIRECT EXAMINATION

1    BY MS. PATTERSON:

2    Q.   Good morning, Ms. Roe.

3    A.   Good morning.

4    Q.   What calendar is used in Ethiopia?

5            THE COURT:  I didn't hear the question.  I'm sorry.

6    Q.   Sure, Your Honor.  What calendar is used in Ethiopia?

7    A.   Ethiopian calendar, their own.

8    Q.   Is that different than the calendar here in the United

9    States?

10   A.   That is correct.

11   Q.   In what way is it different?

12   A.   I think it's seven or eight years difference in between.

13   Q.   Sarah, you had mentioned on cross-examination, you were

14   asked some questions about malls in Yemen.  Were there malls in

15   Yemen?

16   A.   Yes, many malls.

17   Q.   Can you name any malls for us in Yemen?

18   A.   Yes.

19   Q.   When you use the term "mall," what are you referring to?

20   A.   Stores that carry different types of merchandise, gold,

21   clothing, shoes, things like that.

22   Q.   The Court's indulgence.

23           THE COURT:  Yes.

24   Q.   Sarah, I want to ask you some questions that Mr. Rinaldo

25   asked you about on cross-examination.

1          Mr. Rinaldo was asking you about the uniform that

2   Linda and Russell Howard asked you to wear.

3   A.   Yes.

4   Q.   And you said that you didn't wear it for your own reasons.

5   Do you remember that?

6   A.   I remember.

7   Q.   What were those reasons?

8   A.   Because the uniforms they were referring to, they were

9   very short, and they are the type of clothes that you wear to

10  go out.  I wouldn't feel comfortable wearing those to work.

11  Q.   You also discussed with Mr. Rinaldo some items that you

12  had to sell before you moved into the Howards' home.  Do you

13  remember that testimony?

14  A.   I remember.

15  Q.   Why did you sell those things?

16  A.   First of all, I didn't have the storage where I could

17  store these items.  Second, they were new.  So I didn't want to

18  throw them away.

19  Q.   You mentioned to Mr. Rinaldo that you wanted to send them

20  home to your mother.  Why did you not send them home to your

21  mother?

22  A.   At that time I didn't have enough money to pay for

23  shipping.

24  Q.   Sarah, I would like to direct your attention to another

25  topic that Mr. Rinaldo talked to you about.

1    A.    Okay.

2    Q.    Do you remember when Mr. Rinaldo was asking you about when

3    Russell Howard would rape you for a third time on certain days?

4    A.    I remember.

5    Q.    And your answer was that he did sometimes if he had been

6    drinking; is that correct?

7    A.    That is correct.

8    Q.    Was Linda Howard home during those third rapes?

9    A.    That is correct.

10   Q.    Did Linda Howard observe Russell Howard touching you in a

11   sexual manner?

12   A.    Correct.

13   Q.    What do you mean by sexual manner?

14   A.    He would touch me on my boobs and my ass.

15   Q.    Did he touch you in those places while Linda Howard was

16   watching?

17   A.    Correct.

18   Q.    Mr. Rinaldo also mentioned a Dr. Piet.  Do you remember

19   that?

20   A.    Yes.

21   Q.    Did Dr. Piet observe Russell Howard touching you in a

22   sexual manner?

23   A.    Correct.

24            MS. PATTERSON:  No further questions, Your Honor.

25            THE COURT:  All right.  I will allow you to recross

1   on the additional topics of whether Mrs. Howard was home during

2   the evening sexual assaults and the touching in a sexual

3   manner, I think those were -- and Dr. Piet being present.

4          MR. RINALDO:  Dr. Piet.  I have one question on

5   something else she asked, but only one.

6          THE COURT:  All right.

7          MR. RINALDO:  And I will start there and move on.

8      RECROSS-EXAMINATION

9   BY MR. RINALDO:

10  Q.   You testified on redirect, Ms. Roe, that you didn't have

11  any storage space for your appliances, correct?

12  A.   Correct.

13  Q.   The Howards didn't either, did they?

14  A.   Correct.

15  Q.   All right.  With respect to the examination that we just

16  got, you said that Mrs. Howard was present and observed you

17  touch -- observed Russell Howard touch you in a sexual manner,

18  correct?

19  A.   Yes, correct.

20  Q.   No one else was present when you say that happened,

21  correct?

22          THE COURT:  No one but --

23          MR. RINALDO:  But them.

24          THE COURT:  But the two Howards?

25          MR. RINALDO:  Correct.

1   A.   Repeat the question, please.

2            THE COURT:  Go ahead, rephrase the question.

3            MR. RINALDO:  The interpreter is trying to get water,

4   Your Honor, that's why I was waiting.

5            THE COURT:  Oh.  Thank you.

6            THE INTERPRETER:  Thank you.

7   BY MR. RINALDO: (Continuing)

8   Q.   No one else other than the Howards was present when you

9   say Linda Howard observed Russell Howard touching you in a

10  sexual manner, correct?

11  A.   Yes, there were another person.

12  Q.   So you're saying someone else saw that other than the

13  Howards?  When Mrs. Howard was present?

14           THE COURT:  Dr. Piet.  She testified Dr. Piet.  So if

15  you want to try --

16           MR. RINALDO:  I will try to put it another way.

17  BY MR. RINALDO: (Continuing)

18  Q.   You testified on redirect examination that Dr. Piet saw

19  Russell Howard touch you in a sexual manner, correct?

20  A.   That is correct.

21  Q.   You did not say that Dr. Piet was there at the same time

22  Linda Howard was when that occurred, did you?

23           THE COURT:  She didn't say one way or the other.

24           MR. RINALDO:  I said, you didn't say that.  That's

25  why I asked it that way.

```
 1              THE INTERPRETER:  Could you repeat the question for
 2    the interpreter?
 3              MR. RINALDO:  I will tell you what, Your Honor, I
 4    will withdraw the question.
 5              THE COURT:  Thank you.
 6              MR. RINALDO:  And that's all I have.
 7              THE COURT:  All right.  All right, Ms. Roe, please,
 8    you may resume your seat in the courtroom.  Thank you.
 9              NOTE:  The plaintiff stood down.
10              THE COURT:  Ms. Patterson, any other witnesses for
11    your case in chief?
12              MS. PATTERSON:  One moment, Your Honor.
13              THE COURT:  Yes.
14              MS. PATTERSON:  May we approach, Your Honor?
15              THE COURT:  Yes.
16              NOTE:  A side-bar discussion is had between the Court
17    and counsel out of the hearing of the jury as follows:
18    AT SIDE BAR
19              MR. DeLORME:  Your Honor, I apologize, this one is on
20    me.
21              THE COURT:  That's all right.
22              MS. PATTERSON:  We also have Linda Howard on our
23    witness list.  We just ask that we be given the same latitude
24    that was given to Mr. Rinaldo, that she can be examined outside
25    the scope of direct on cross-examination.
```

```
 1              MR. RINALDO:  I figured you were going to do that,

 2   Your Honor.

 3              THE COURT:  I am.  That permission will be granted.

 4              MR. DeLORME:  In addition, Your Honor, we want to

 5   have a discussion with you about whether or not the Court will

 6   take judicial notice regarding certain elements of the T visa.

 7   We didn't want to do that in front of the jury --

 8              THE COURT:  Judicial notice of what?  Jurisdiction?

 9              MR. RINALDO:  No, the elements of a T visa.  I think

10   you have already excluded that.

11              MR. DeLORME:  I think quite the contrary.

12              THE COURT:  You are moving the exhibit in?

13              MR. DeLORME:  Our initial request would be to move

14   the exhibit in.

15              THE COURT:  Okay.

16              MR. DeLORME:  Our alternative request, should the

17   Court deny that, would be that the Court take judicial notice

18   that the 2000 Congress created this act to allow for people to

19   immigrate into the United States if they were victims of human

20   trafficking.

21              THE COURT:  Well, we can argue that outside the

22   presence of the jury.

23              MR. DeLORME:  That's why I wanted to bring it up

24   here.

25              THE COURT:  That's fine.  I will give you an
```

1    opportunity to argue that.  I want to hear you frame it first,

2    and we should do that all outside the presence of the jury.  I

3    will preserve your objection to -- your moving to do so.

4             MR. DeLORME:  Essentially, we are in a position to

5    close our case subject to those discussions.

6             THE COURT:  All right.

7             MR. RINALDO:  They are going to rest right now?

8             THE COURT:  They are going to rest.

9             MR. RINALDO:  Do you want me to start with Linda

10   before lunch?  I am happy to.

11            THE COURT:  Yeah, we are going to keep going until

12   1 o'clock.  Does that work?

13            MR. RINALDO:  Sure, that works for me, Your Honor.

14            MS. PATTERSON:  Thank you, Your Honor.

15            THE COURT:  Mr. Battle.

16            MR. BATTLE:  In typical cases, there are motions at

17   the end of the plaintiff's case.

18            MR. RINALDO:  We took care of that this morning.

19            MR. BATTLE:  And there is no objection to doing that,

20   since we are going to do that at the end, correct?

21            THE COURT:  I am preserving defendant's right to do

22   so.

23            MR. BATTLE:  And no waiver?

24            THE COURT:  No waiver.  And you may do so at the end

25   of the testimony in the case.

1          MR. RINALDO:  Thank you.  Including motions to strike

2   parts of the complaint under Rule 50?

3          THE COURT:  Yes.  Absolutely.

4          MR. BATTLE:  All right.

5          THE COURT:  All right.  Thank you.

6          NOTE:  The side-bar discussion is concluded;

7   whereupon the case continues before the jury as follows:

8   BEFORE THE JURY

9          THE COURT:  All right.  Is that your last witness,

10  Ms. Patterson?

11         MS. PATTERSON:  Yes, Your Honor.  The plaintiff

12  rests.

13         THE COURT:  All right, thank you.

14         Mr. Rinaldo, your first witness.

15         MR. RINALDO:  Yes, Your Honor.  The defendant, Linda

16  Howard, calls Linda Howard.

17         THE COURT:  All right.  Mrs. Howard, please come and

18  be sworn.

19         NOTE:  The defendant is sworn.

20         MR. RINALDO:  I am getting some assistance from my

21  local counsel with my water supply.

22         THE COURT:  All right.  Please proceed.

23         LINDA HOWARD, the defendant herein, called in her own

24  behalf, first being duly sworn, testifies and states:

25     DIRECT EXAMINATION

L. Howard - Direct

426

1    BY MR. RINALDO:

2    Q.   Good morning, Mrs. Howard.

3    A.   Good morning, Richard.

4    Q.   Let's begin by stating your full name for the record.

5    A.   My name is Linda Howard.

6    Q.   And how old are you, Mrs. Howard?

7    A.   I am 62 years old.

8    Q.   And where do you reside at this point?

9    A.   I reside in Melbourne, Australia.

10   Q.   And how long have you lived there?

11   A.   Approximately five years.

12   Q.   Could you tell us a little bit by way of background about

13   your education.  Are you a college graduate?

14   A.   Yes, I am.

15   Q.   And where did you attend college?

16   A.   I graduated university from the University of California

17   La Jolla.

18   Q.   Do you remember about when that was?

19   A.   '99 -- end of '90.

20   Q.   Did you work before you finished college?

21   A.   Yes, I did.

22   Q.   For whom did you work?

23   A.   I worked for the San Diego County Sheriff's Department.

24   Q.   And what did you do?

25   A.   I was a Communications Officer there.

L. Howard - Direct

427

1  Q.    Did that include 911 calls?

2  A.    Yes, it did, it included 911 emergency calls on the

3  telephone, and also working with deputies in their cars on the

4  radio.

5  Q.    And did you do that between high school and college for a

6  while?

7  A.    Yes, I did.

8  Q.    All right.  When you graduated from college, did you

9  receive a degree?

10  A.    Yes, I did.

11  Q.    And what was that degree?

12  A.    My degree was a Bachelor's degree in Third World studies.

13  Q.    After you graduated from college, at that point you were

14  still single, correct?

15  A.    That's correct.

16  Q.    Did you apply to work with the United States State

17  Department?

18  A.    Yes, I did.

19  Q.    And what year did you apply?

20  A.    It would have been just prior to my graduating in 1990.

21  Q.    All right.  So you actually applied for employment with

22  the State Department before you graduated?

23  A.    Oh, yes, definitely.

24  Q.    And were you accepted for employment with the State

25  Department?

L. Howard - Direct

428

1    A.    Yes, I was.

2    Q.    And were you accepted that same year?

3    A.    I was accepted in 1991.

4    Q.    1991.  When you first started with the State Department,

5    could you tell us, please, how that works.  How is a new

6    employee at the State Department trained?

7    A.    Well, when we sign on with the Department of State, of

8    course we come from our home of record to Washington, D.C., and

9    we have training in our specialty.

10             Now, that training for me was communications

11   training.  And that was a six-month course here in Washington,

12   D.C.

13   Q.    When you said come from our home of record, you reminded

14   me that I forgot to ask you where you lived when you graduated

15   from college?

16   A.    Well, I lived in San Diego, California.

17   Q.    All right.  Then you came here for the training with the

18   State Department, correct?

19   A.    That's correct.

20   Q.    After you finished your training for six months, did you

21   receive an assignment?

22   A.    Yes, I did.

23   Q.    And where was that assignment?

24   A.    My first assignment for the Department of State was Paris,

25   France.

L. Howard - Direct

429

1    Q.   And what was your job in your first assignment in Paris?

2    A.   My job was working in the communications center as a

3    Communications Officer.

4    Q.   Could you explain for us what the duties of a

5    Communications Officer for the United States State Department

6    were at that time.

7    A.   Yes.  This was in 1991.  So it was previous to personal

8    computers.  My job was processing telegrams from the Department

9    of State headquarters here in Washington, D.C. to the embassy

10   in Paris, either backward or forward.

11            I was also responsible for mail and communications,

12   other communications that would come in and out.

13   Q.   All right.  And how long did you serve at that posting --

14   is posting the proper word with the State Department?

15   A.   That's correct.

16   Q.   How long did you serve with that posting in Paris?

17   A.   I was in Paris for two years.

18   Q.   Does the United States State Department have kind of a

19   general policy about how long postings last?

20   A.   Yes.  The normal posting is two years to three years,

21   depending on the country you're in, the embassy you're in, and

22   that type of thing.  There are quite a few variables, but

23   normally two to three years.

24   Q.   So most State Department -- in your experience, would most

25   State Department employees move from one posting to another

1  every two or three years?

2  A.   That's correct.

3  Q.   All right.  With respect to the Paris posting, when did

4  you leave again?  When did you leave the Paris posting?

5  A.   I left Paris in June or July of 1993.

6  Q.   And where was your next posting?

7  A.   My next assignment was Geneva, Switzerland.

8  Q.   What was that assignment?  Where were you assigned?

9  A.   I was assigned to the United States Mission to the United

10  Nations there in Geneva.

11  Q.   And what were your job duties there?

12  A.   My job was also Communications Officer, information

13  management.

14  Q.   So that we don't need to do it every posting you had,

15  given the fact that you're in communications, you talked about

16  the change in technology, could you tell us, please, sort of

17  summarizing how your job duties might have changed with the

18  change in technology during your career with the State

19  Department?

20  A.   Well, if we all think back, 1991 was a bit archaic, it was

21  before cell phones, it was before personal computers, it was

22  basically before e-mail as we know it now.

23       So the changes in communications through those years

24  also made my job evolve.  So there were changes that I had to,

25  should I say, learn, cope with, change with, and adapt to as my

1    job and career progressed.

2    Q.   All right.  You said that you were attached to the U.S.

3    Mission to the United Nations in Geneva?

4    A.   Correct.

5    Q.   And where did you go after that?

6    A.   After Geneva I was assigned to the U.S. Mission to the

7    United Nations in New York.

8    Q.   Do you remember when you arrived there?

9    A.   Yes, I arrived at the end of 1995.

10   Q.   And your job was still Communications Specialist?

11   A.   Yes.  The job had evolved into a new title of Information

12   Management Officer, but it covered the same purview.

13   Q.   How long were you stationed or posted at the United States

14   Mission to the United Nations in New York?

15   A.   I was in New York from the end of 1995 until the middle --

16   summer of 1999.

17   Q.   And did you receive a new posting at that time?

18   A.   Yes, I did.

19   Q.   And where was that?

20   A.   After I left New York, I was transferred to Melbourne,

21   Australia.

22   Q.   And at that point what was your duty there and where were

23   you located?

24   A.   I was at the consulate in Melbourne, and I was an

25   Information Management Officer with the consulate.

L. Howard - Direct

432

1  Q.   Mrs. Howard, if you could help me with something.  You

2  talked about being assigned to an embassy, a consulate, and a

3  mission.  Could you kind of very briefly summarize, based on

4  your experience, what the difference is.

5  A.   Yes.  Embassies are in capital cities.  For example, let's

6  use Australia as an example.  The capital Australia is

7  Canberra.  Our, the United States Embassy is located in

8  Canberra, Australia.

9       Consulates are smaller buildings that are in -- not

10 in capital cities, but are in large cities in countries.

11 Q.   Missions?

12 A.   And United States Missions are specifically to the United

13 Nations.  I believe there is also a U.S. Mission to NATO and

14 various other organizations.

15 Q.   Thank you.  So you were assigned to the consulate in

16 Melbourne; is that correct?

17 A.   That's correct.

18 Q.   How long were you there?

19 A.   From 1999 until 2003, summer of 2003.

20 Q.   So you have been to Paris -- you have had Paris, you have

21 had Geneva, you have had New York, and you have been Melbourne,

22 Australia.  What was your next posting with -- you were still

23 with State Department, right?

24 A.   That's correct.

25 Q.   And what was your next posting?

433

1    A.    After I left Australia, Melbourne, Australia, I was

2    assigned to Guatemala City, Guatemala.

3    Q.    And did you actually apply for that position?

4    A.    Yes, I did.

5    Q.    And what was your duty, what were duties in Guatemala?

6    A.    I was Information Management Officer there, but I was the

7    Information Systems Officer as well.

8    Q.    And I guess Guatemala is a little different from Melbourne

9    and Paris and so forth.  Why did you apply for Guatemala?

10   A.    Well, if you remember, I graduated with a degree in Third

11   World studies, and I had wanted to work in the Third World, but

12   this was the first opportunity and the first time that I was

13   able to.

14   Q.    And when did you arrive in Guatemala?

15   A.    I arrived in Guatemala in 19 -- I am sorry, 2003.

16   Q.    And how long were you in Guatemala?

17   A.    Until 2005.

18   Q.    And what was your next posting?

19   A.    After Guatemala I was assigned to the U.S. Embassy in

20   Sana'a, Yemen.

21   Q.    When did you arrive?

22   A.    I arrived in Sana'a, Yemen I believe the 28th of

23   September 2005.

24   Q.    And when did you leave Sana'a, Yemen?

25   A.    I left Sana'a, Yemen the 2nd of September 2008.

L. Howard - Direct

434

1   Q.   Why do you remember the 2nd of September 2008?

2   A.   Well, I remember those dates because when I agreed to go

3   to Sana'a, I agreed to go because it was a hardship post, and

4   they needed someone that would make a firm commitment.

5          So before I was assigned, I had to make a firm

6   commitment to do three years in Yemen.  And according to that,

7   the firm commitment was you actually had to do three years.

8          So if you arrived in September, you could leave in

9   September.  And that is why I remember those dates.

10  Q.   During the time that you were in Sana'a, we heard Mr.

11  Meszaros testify about ordered evacuations and the like.  There

12  were two different kinds of evacuations he talked to.  Can you

13  remind me what those were.

14  A.   Yes, it's departures.  There is an authorized departure

15  and an ordered departure.

16  Q.   And what's the difference?

17  A.   Well, I will reiterate what Mr. Meszaros said.  An

18  authorized departure is when the Department of State decides

19  due to circumstances that families and non-essential personnel

20  are allowed to depart a post should they wish.

21  Q.   Ordered.

22  A.   An ordered departure is when you're ordered to leave, you

23  must leave post.  And the only personnel that can remain at

24  post are essential personnel.  That is personnel that are

25  essential to the U.S. government mission.

1   Q.   Were you considered essential to the U.S. government

2   mission so that you were not ordered out at any time during

3   your time in Yemen?

4   A.   I was essential personnel due to my job.

5   Q.   But your husband, Russell Howard, was a family member and

6   was he ordered out?

7   A.   Yes.

8   Q.   And when did that happen?

9   A.   My husband departed on ordered departure at the end of

10  March 2008.  That was about two weeks after the embassy was

11  bombed on March 18, 2008.

12  Q.   Mrs. Howard, with respect to your career as a person

13  employed by the United States Department of State, did you ever

14  receive any awards or commendations for your service?

15  A.   Yes, I was very fortunate that my service to my country

16  was recognized and I was -- I did receive some awards.

17  Q.   We heard Mr. Meszaros say that he had received something I

18  believe called a Superior?

19  A.   Yes, a Superior Honor Award.

20  Q.   What -- do you have an understanding of what a Superior

21  Honor Award is?

22  A.   Yes, that's the highest award awarded to a career foreign

23  service officer by United States Department of State.

24  Q.   And did you receive one of those?

25  A.   Yes, I did.  I received a Superior Honor Award in 2010.

1    That's after I left Sana'a and Tokyo and was here in

2    Washington, D.C.

3    Q.   And you received a Superior Honor Award in the year 2010,

4    correct?

5    A.   That's correct.

6    Q.   During the time you were in Sana'a, Yemen -- you say you

7    went from Sana'a, Yemen to Tokyo, right?

8    A.   That's correct.

9    Q.   Was there ever any talk about you going to Germany after

10   Yemen for a new posting?

11   A.   Not that I recall.

12   Q.   Did you apply for one?

13   A.   No.

14   Q.   Did you apply for a posting in Tokyo?

15   A.   Yes, I did.

16   Q.   And you received it?

17   A.   Yes, I did.

18   Q.   And what was your job duty in Tokyo?

19   A.   I was an Information Management Officer.  I was a Systems

20   Officer.

21   Q.   All right.  Mrs. Howard, I started earlier this morning by

22   saying at some point you were single.  That changed, didn't it?

23   A.   Yes, it did.

24   Q.   All right.  You were married to Russell Howard, correct?

25   A.   Yes, I was.

L. Howard - Direct

437

1    Q.   And how long were you married to Russell Howard?

2    A.   We were married from 1994 until his death in

3    September 2012.

4    Q.   What day did he die?

5    A.   My husband died September 4, 2012.

6    Q.   Could you tell us sort of briefly the circumstances of his

7    passing, what he died from and so forth.

8    A.   My husband died from pancreatic cancer approximately five

9    weeks after the diagnosis.  He was admitted to the hospital on

10   the 28th of July 2012.

11   Q.   And did he pass away in the hospital?

12   A.   Yes, he did.

13   Q.   And where was the hospital that he was admitted to?

14   A.   When he first became unwell, we were on our way back to

15   Australia.  And he become unwell in the United Kingdom in

16   Abergavenny, Wales, and he was admitted to a hospital there.

17   My husband died in a hospital in Melbourne, Australia.

18   Q.   Was Russell Howard an Australian national?

19   A.   Yes, he was.

20   Q.   He was an Australian citizen, wasn't he?

21   A.   Yes, he was, fourth generation Australian born.

22   Q.   So he died in Australia?

23   A.   Yes, he did.

24   Q.   Based on your marriage to him -- when did you marry him?

25   A.   I married Russell May 13, 1994.

1   Q.   So if he died in 2012 in September, you are married for

2   18 years?

3   A.   Yes, that's correct.

4   Q.   What did Russell Howard do at the time you married him?

5   A.   My husband was the Director of Communications for the

6   Australia Embassy in Paris, France.

7   Q.   And what is the equivalent, the Australian equivalent of

8   the United States State Department?

9   A.   The Department of Foreign Affairs and Trade.

10  Q.   And was Mr. Howard employed by the Department of Foreign

11  Affairs and Trade at that time?

12  A.   Yes, he was.

13  Q.   All right.  And you have already described his duties.

14  Did you meet him in Paris?

15  A.   Yes, I did, I met my husband in Paris.

16  Q.   And when did you meet him in Paris?

17  A.   I met my husband on November 5, 1991.

18  Q.   And you were married when?

19  A.   We were married May 13, 1994.

20  Q.   And where were you married?

21  A.   We were married at the Australian Embassy in Paris.

22  Q.   So once you were married, you then said your next post

23  after Paris was Geneva?

24  A.   That's correct.

25  Q.   Did Mr. Howard go to Geneva with you?

L. Howard - Direct

439

1   A.    No, he did not.  He remained at his assignment in Paris.

2   Q.    So you were separated for how long, approximately?

3   A.    After we were married?

4   Q.    Yes, after you were married.

5   A.    Well, my husband put me on the train to go back to Geneva

6   after our honeymoon, and we were separated for approximately a

7   year-and-a-half.

8   Q.    At some point were you reunited, and I say that

9   geographically?

10  A.    Yes.  After my assignment was completed in Geneva and

11  Russell's assignment was completed in Paris, we were stationed

12  in New York.

13  Q.    And both of you were in New York?

14  A.    Yes.  I was at the United States Mission to the United

15  Nations and my husband was at the Australian Mission to the

16  United Nations.

17  Q.    What was his job at the Australian Mission to the United

18  Nations?

19  A.    He was a Communications Officer.  He was also the Interpol

20  Liaison Officer.  And he was the Regional Security Officer for

21  their mission.

22  Q.    Did you say Interpol security?

23  A.    The Interpol Liaison Officer, correct.

24  Q.    And he did that in New York?

25  A.    Yes, he did.

L. Howard - Direct

440

1   Q.   After New York, you went to -- let's see that was what,

2   Melbourne?

3   A.   Yes, after New York we went to Melbourne.

4   Q.   And he went at the same time; is that right?

5   A.   That's correct.

6   Q.   So you were together in his home country?

7   A.   Yes.

8   Q.   How long did you stay in Melbourne?

9   A.   We were in Melbourne from 1999 to 2003, the middle of

10  2003.

11  Q.   And now that you are no longer with the State Department,

12  you've just taken up residence in Melbourne, correct?

13  A.   That's correct, it's my husband's home.

14  Q.   And you are expecting -- you like it?

15  A.   I love it, it's lovely.

16  Q.   With respect to Mr. Howard, after you finished in

17  Melbourne, you were transferred to Guatemala?

18  A.   That's correct.

19  Q.   Did Mr. Howard accompany you to Guatemala?

20  A.   Yes, he did.

21  Q.   Was he still employed by the Australian version of the

22  United States State Department?

23  A.   No, he was not.

24  Q.   And how did that separation come about?

25  A.   My husband retired after 36 years with the Australian

1   government in 2001.

2   Q.   Russell Howard was older than you, right?

3   A.   Yes, he was.

4   Q.   What year was Russell Howard born?

5   A.   My husband was born in 1945.

6   Q.   And then he was 38 years with the Australian government?

7   A.   36 years.

8   Q.   36.  And then he retired?

9   A.   That's correct.

10  Q.   So did he go with you to Guatemala?

11  A.   Yes, he accompanied me to Guatemala.

12  Q.   Although he had retired from the Australian version of the

13  State Department, did he do any work in Guatemala?

14  A.   Yes, of course he did.  He kept himself busy --

15  Q.   Can you tell me what it is.

16  A.   Well, he had --

17  Q.   My question was did he, you said yes.

18  A.   Yes.

19  Q.   Okay.  Can you tell me what it was that he did.

20  A.   In Guatemala?

21  Q.   In Guatemala, yes.

22  A.   My husband had quite a bit -- 36 years experience with

23  government.  And in Guatemala he helped in the administrative

24  section, any duties that needed to be done.  He was an

25  administrative person, so he was able to get contracts and do

L. Howard - Direct

442

1   that type of work.  He also worked on the newsletter --

2   Q.   I don't mean to interrupt you, but when you said the

3   administrative section, the administrative section for whom?

4   A.   The United States Embassy.

5   Q.   So is it your testimony that Mr. Howard received contract

6   work with the United States Embassy in Guatemala?

7   A.   Yes, he did.

8   Q.   I am sorry, I didn't mean to interrupt, but I wanted to

9   make sure that it was clear that it was with the U.S. Embassy.

10  Go ahead.

11        And then you were talking about he also did newspaper

12  work.

13  A.   He did the newsletter, the embassy newsletter.  He was a

14  writer, so he did some writing in local newspapers.  He did a

15  lot of pre-blogging before blogging was actually a word.  And

16  he kept himself busy.

17  Q.   At the time your tour ended in Guatemala, you then went to

18  Sana'a, Yemen, right?

19  A.   That's correct.

20  Q.   I would like to take you to your time in Yemen, if I

21  could.  First, obviously, Russell Howard went with you?  I

22  don't think anybody disputes that.

23  A.   Yes, Russell went with me.

24  Q.   And would it be fair to say that the environment in Yemen

25  was pretty different from what you were used to?

1   A.   Yes.

2   Q.   Let's talk -- let's begin by talking about your living

3   quarters.  Okay.  Could you describe for us what your apartment

4   looked like as far as number of bedrooms, size, things like

5   that.

6   A.   We were assigned a three-bedroom, three-bath apartment

7   with a maid's -- I am sorry, a housekeeper/maid's quarters en

8   suite that was off the kitchen.

9        The apartment had a good flow-through for

10  entertaining.  There was a large backyard.  There was a lounge

11  room -- dining room.

12  Q.   In your apartment?

13  A.   That's correct.

14  Q.   Were you on the first floor?

15  A.   Yes, I was.

16  Q.   Go ahead further.  How many bedrooms, for example?

17  A.   There were three bedrooms and three bathrooms.

18  Q.   All right.  When you say there were three bedrooms, was

19  one of the bedrooms the en suite quarters?  Or were -- the en

20  suite quarters consisted of a bedroom and a bath, correct?

21  A.   The housekeeper's quarters had a bedroom and a bathroom.

22  Q.   Right.

23  A.   And I had a bedroom with an en suite.  And then there was,

24  there were two other bathrooms in the home.

25  Q.   How many other bedrooms in the home?

L. Howard - Direct

444

1   A.   There were three bedrooms, three bathrooms, and the

2   separate en suite for staff.

3   Q.   And you were on the first floor?

4   A.   That's correct.

5   Q.   All right.  Was there a kitchen?

6   A.   Yes, a large kitchen.

7   Q.   A dining room?

8   A.   Yes.

9   Q.   And did you have a storage area in the apartment?

10  A.   We had a small storage area that was just off the kitchen

11  where the washer and dryer were located, and there were shelves

12  for us to store our consumables.

13  Q.   Could you tell me what you mean by consumables.

14  A.   Yemen is termed a consumables post.  And that meant we had

15  to bring our own food.  So it does sound a bit strange, but

16  there were no supplies available.  So we had to bring our own

17  flour, our own sugar.  If you wanted a specific type of candy

18  or a specific cereal, you had to have all those in your

19  consumables.  And I believe, but I'm not positive, that we were

20  allowed something like 5 or 600 pounds of those goods to

21  accompany us.

22  Q.   So do I understand you correctly that you would have to

23  bring a three-year supply of sugar?

24  A.   Not a three-year supply.  You just brought a supply for

25  half of your term, and then you could replenish halfway through

1   your assignment.

2   Q.   How would one go about replenishing at the Yemen

3   assignment?

4   A.   Well, it was not easy, but you had someone that would help

5   you in making an order in the overseas grocery stores.  What I

6   am meaning is in America.  And that order would be shipped and

7   you would receive it in Yemen.

8           My husband was responsible at the Commissary there

9   for helping people make those half-year orders.

10  Q.   That Commissary was the Commissary at the United States

11  Embassy?

12  A.   That's correct.  The plaintiff referred to it, it was next

13  to Uncle Sam's.

14  Q.   All right.  So the Commissary at the United States

15  Embassy, when you say your husband was responsible for it,

16  could you tell us, please, what it was he did there.

17  A.   Well, my husband worked in the Commissary as the

18  Commissary manager.  And he was, as I just explained, helped

19  people order their consumable shipments.

20          He also ran a little store where there would be

21  T-shirts, there would be baseball caps, there would be embassy

22  logo items that visitors might want to purchase.  And by

23  visitors, I mean military personnel, DoD personnel, other

24  agency personnel that might come from the United States.

25  Q.   DoD personnel being from the Department of Defense?

1    A.   Yes, DoD, Department of Defense.

2    Q.   And did his duties as a -- I guess he did it as a contract

3    employee of the State Department at the Commissary?

4    A.   Well, the Commissary was not run by the State Department.

5    The Commissary is run by a Commissary Board.

6    Q.   I see.  And was your husband under contract with the

7    Commissary Board for his work at the Commissary?

8    A.   Correct.

9    Q.   All right.  And obviously he was -- was he paid for that?

10   A.   Yes, it was paid employment.

11   Q.   And did his work require him to be at the embassy at the

12   location of the Commissary on occasion?

13   A.   Yes, it did.

14   Q.   Okay.  Would it have been more than once a week?

15   A.   Yes, it was.

16   Q.   And those would have been days when it wasn't the Yemen

17   weekend, right?

18        MS. PATTERSON:  Objection, Your Honor.  These are all

19   leading.

20        MR. RINALDO:  That was leading, I will change it.

21        THE COURT:  All right.

22   BY MR. RINALDO: (Continuing)

23   Q.   What was the weekend in Yemen?

24   A.   The weekend was Thursday and Friday.

25   Q.   If Mr. Howard had obligations to work at the Commissary,

L. Howard - Direct

1  would those have taken place on weekend or weekday days?

2  A.   The Commissary was open, I believe it was two days a week

3  during normal working hours.  It was not open on Thursday or

4  Friday.

5  Q.   So if he were to work at the Commissary, it would be on a

6  day that you were also at work?

7  A.   Correct.

8  Q.   All right.  And was that true during the last six months

9  of 2007, did he continue to do that work there?

10  A.   Yes, he was working with the Commissary.  He also had some

11  other jobs.

12  Q.   Well, let's talk about the other jobs.  But right now

13  let's make sure that we're talking about the Commissary.  His

14  work at the Commissary continued through the last six months --

15  did it continue during the last six months of 2007?

16  A.   Yes, but the job was different.

17  Q.   And how was the job different?

18  A.   It was different because rather than being hands on in the

19  Commissary, he was doing more work with the Commissary Board.

20  Q.   Oh, okay.  Now, did you say he had other jobs?

21  A.   Yes.

22  Q.   And what other positions did he have?

23  A.   He also worked for the accounting for the Hunt restaurant

24  and the embassy.

25  Q.   When you say he worked for accounting, let's say for the

L. Howard - Direct

448

1  embassy first, what were his duties with respect to accounting

2  for the embassy?

3  A.   Well --

4  Q.   What did he do?

5  A.   Well, he worked in the, sometimes in the Accounts office.

6  But what his normal job was -- may I go off and explain to you

7  how --

8  Q.   I was actually asking you to do that.

9  A.   There was a restaurant in our housing compound called B6.

10 It was run by Hunt Oil.  And Hunt Oil graciously allowed

11 American employees to eat there.  However, the Hunt Oil

12 restaurant could not take money.  So if you were going to eat

13 at the restaurant, you had to sign a voucher saying that you

14 were having a meal.  And you were charged a certain amount per

15 meal.

16       And my husband's job was to coordinate those vouchers

17 and how many meals each individual had, and to make sure that

18 through the accounting office in the embassy, that the Hunt

19 office was reimbursed for those meals.

20 Q.   Did Mr. Howard during the time that you were in Yemen

21 continue any newspaper work?  You testified he did that in

22 Guatemala.

23 A.   Yes, briefly.  He worked for a Yemeni newspaper, he did

24 some consulting and English language.

25 Q.   And English language?

L. Howard - Direct

449

1    A.    That's correct.

2    Q.    So if you arrived in -- did you arrive in September of

3    2005?

4    A.    Yes, that's correct.

5    Q.    And if he was born in 1945, am I correct, that he would

6    have been 60 at that time?

7    A.    Yes.

8    Q.    So we started by talking about your living quarters, but I

9    would like to turn your attention for a few minutes, if I

10   could, to your working conditions, just so you know where I am

11   asking.  All right?

12          With respect to your working conditions, how many

13   days a week did you work at the embassy?

14   A.    I worked at the embassy five days a week, but I was on

15   call 24 hours a day.

16   Q.    And when you say you were on call, did you have like a --

17   by that time there were cell phones?

18   A.    Yes, I had a cell phone at that time.

19   Q.    And it was a work cell phone?

20   A.    Correct, it was a work cell phone.

21   Q.    Supplied by the embassy?

22   A.    Supplied by the United States Embassy.

23   Q.    And in 2005 your normal work week would have been what

24   days of the week?

25   A.    My normal work week was Saturday through Wednesday.

L. Howard - Direct

450

1   Q.   Let's talk about your hours for a minute.

2   A.   Okay.

3   Q.   What time did you typically leave on a workday for the

4   embassy?

5   A.   Well, there was no typical time because we had to vary our

6   routes and vary our times to work.  But normally anywhere

7   between 6 a.m. and 7:30 a.m.

8   Q.   Do you have an understanding about why the embassy, the

9   State Department required employees to vary their departure

10  times and their routes?

11  A.   Yes.

12  Q.   Could you tell us what that is.

13  A.   Yemen was a dangerous place.  And in order to foil any

14  attempted attacks on our convoy or our armored vehicles, we had

15  to reroute different ways and at different times every day.

16  Q.   You added armored vehicles there.

17  A.   Yes.

18  Q.   When you were picked up, you were picked up, correct, by

19  the State Department?

20  A.   That's correct.

21  Q.   And you were driven to the embassy?

22  A.   That's correct.

23  Q.   And what type of vehicle was used to transport you?

24  A.   An armored vehicle.  I went back and forth to work every

25  day in an armored car.

L. Howard - Direct

451

1    Q.   Were you the only person in the car other than the driver?

2    You didn't drive, right?

3    A.   No, I did not drive the armored car.  And I was not the

4    only person in the armored car.  There were other individuals

5    from the compound in the car as well.

6    Q.   So would it be fair to say that the armored car from the

7    United States State Department picked up certain employees and

8    transported them to work?

9    A.   Correct.

10   Q.   And were there other armored cars that picked up other

11   employees and transported them to work, more than one armored

12   car?

13   A.   The thing about Yemen security is it was very fluid and it

14   was very changeable.  So sometimes there would be more than one

15   armored car.  Because if there was a security lock down and you

16   were not allowed to leave the compound accept to go to work,

17   then everyone had to ride the armored cars.

18            But the majority of time there was only a certain

19   number of us, maybe five, six or seven that routinely rode the

20   armored cars to work.

21   Q.   And did you return home essentially the same way?

22   A.   Correct.

23   Q.   Armored car?

24   A.   Correct.

25   Q.   Varied routes?

L. Howard - Direct

452

1  A.    Correct.

2  Q.    Varied times?

3  A.    Correct.

4  Q.    How long did it generally take you to get from the embassy

5  to your residence?

6  A.    Generally it was a 45-minute drive.  But as I said, they

7  have various routes, and we were varying our routes.  So it

8  could be a little less, a little more.

9  Q.    And was that true the entire time that you were in Yemen?

10 A.    Correct.

11 Q.    Did you come home for lunch --

12 A.    No.

13 Q.    -- during your time in Yemen?

14 A.    No, not routinely.

15 Q.    Do you remember any times you came home for lunch?

16 A.    No, I don't.

17 Q.    All right.  Once you got to the embassy, you started work

18 when you arrived, correct?

19 A.    Correct.

20 Q.    Did you eat lunch at the embassy?  Or did you bring

21 something from home?

22 A.    Well, I normally spent my lunch hour exercising at the

23 gym, and then I would eat something that I had brought from

24 home afterwards, after exercising.

25 Q.    All right.  With respect to bringing something from home,

1    it kind of takes us to the question of who did the cooking?

2    A.   My husband did the cooking.  He was a fabulous cook.

3    Q.   I take it you did not?

4    A.   Not normally, no.  My husband did.

5    Q.   And was that true during virtually your entire married

6    life?

7    A.   Yes, I would say so.  My husband loved to cook.

8    Q.   Would it be fair to say that when you took something from

9    home to the embassy, it was probably something your husband

10   prepared?

11   A.   Yes.

12   Q.   All right.  And did your husband prepare on a regular

13   basis the evening meal?

14   A.   Yes, he did.

15   Q.   When you had a housekeeper, and we're going to go into

16   housekeeping more, but when you had a housekeeper, did the

17   housekeeper typically assist, during your time in Yemen, did

18   the housekeeper assist Russell with the cooking?

19   A.   Yes, they did.

20   Q.   Okay.  And who was in charge, based on your observations?

21   A.   My husband was in charge in the kitchen.

22   Q.   And the housekeeper's job was to assist?

23   A.   Correct.

24   Q.   Did the housekeepers that you had, perhaps even including

25   Ms. Roe in this case, did they occasionally make dishes on

1   their own, Ethiopian dishes?

2   A.   Well, Ms. Roe occasionally did.

3   Q.   All right.  And if she wanted to do that, nobody prevented

4   her from doing that, did they?

5   A.   No.

6   Q.   With respect to -- let's go back then to the conditions

7   that you have there.  All right.  With respect to your

8   conditions, the Hunt Oil Compound is located outside the

9   embassy grounds, right?

10  A.   Yes, 45 minutes away.

11  Q.   All right.  And what is security like at the Hunt Oil

12  Compound?

13  A.   Well, the Hunt Oil Compound had similar security to what

14  we had at the U.S. Embassy.  We had a six-foot perimeter wall

15  which surrounded the compound.  There were armed guards

16  surrounding the compound, and they had AK-47s.  And then there

17  was also a security force inside the compound, they were a

18  contract force, and they had weapons as well.

19  Q.   The contract force, were those Yemeni nationals?

20  A.   That's correct.

21  Q.   And the security at that compound, that was provided by

22  Hunt or the United States?

23  A.   I believe it was the United States government that

24  provided that security, but I could be wrong.

25  Q.   Inside the Hunt Oil Compound, did people other than

L. Howard - Direct

455

1   government employees live there?  For example, Hunt Oil

2   employees.

3   A.   Yes.

4   Q.   All right.  Did Hunt Oil have a -- I will try to

5   characterize this.  Did Hunt Oil have a significant presence in

6   Sana'a, Yemen between 2005 and 2008?

7   A.   Yes, they did.

8   Q.   If you understand what I mean by significant?

9   A.   Yes.

10  Q.   Were there a fair number of people there employed by Hunt

11  Oil?

12  A.   Yes, there were.

13  Q.   And did the people who were employed by Hunt Oil between

14  2005 and 2008 in Sana'a generally live in the compound?

15  A.   Yes, they did.

16  Q.   Were they required to, to the best of your knowledge?

17  A.   I don't know.

18  Q.   All right.  But would it be fair to say that you and your

19  husband had friends who were employed by Hunt Oil?

20  A.   Yes.

21  Q.   And were not employed by the State Department?

22  A.   Correct.

23  Q.   There were others there employed by the State Department?

24  A.   Correct.

25  Q.   With respect to the living conditions, we have heard

L. Howard - Direct

456

1    testimony that you generally had a live-in housekeeper --

2    A.   Yes.

3    Q.   -- while you were in Yemen.  And could you explain why you

4    thought -- why you decided you preferred a live-in housekeeper.

5    A.   Well, my number one reason for having a live-in

6    housekeeper were my hours of working.  And my husband prepared

7    the meals.  So when I arrived home, I would shower, change my

8    clothes and wait for my dinner to be given to me by my husband.

9              After dinner, I didn't want to get up and clear the

10   table.  I wanted somebody to do that.  So it was very important

11   to me that someone wait on the table and serve my guests and my

12   husband and I in our home.

13   Q.   Were you aware of other families in the Hunt Oil Compound

14   who also had live-in housekeepers?

15   A.   Yes.

16   Q.   Were some of these employees of the Hunt Oil company?

17   A.   Yes, there were Hunt Oil employees and their families.

18   Q.   And did they have live-in housekeepers?

19   A.   Yes, they were quite a few.

20   Q.   And would that have been during the period 2005 to 2008

21   when you were living in Sana'a?

22   A.   Yes, that was from 2005 to the beginning of 2008, before

23   the evacuation.

24   Q.   Were Hunt Oil employees also evacuated?

25   A.   Yes.

L. Howard - Direct

457

1    Q.   Now, as far as the live-in housekeepers are concerned, did

2    you know -- did you visit some of the other Hunt Oil employees

3    who had live-in housekeepers?

4    A.   Yes.

5    Q.   And did you socialize with them from time to time?

6    A.   Yes, they were families, we associated with our families.

7    Q.   Were there rules about who could be there as far as

8    families with children?

9    A.   Yes, there was a rule.

10   Q.   And what was that rule?

11   A.   The rule was that there could be no children over five

12   years of age accompanying either a State Department person or a

13   Hunt Oil person.

14   Q.   No children over five years?

15   A.   Over five, yes.

16   Q.   So children under five years of age, they could have with

17   them?

18   A.   Correct.

19   Q.   Do you have an understanding of why that was?

20   A.   Yes, there were no schools in Yemen.

21   Q.   So that --

22   A.   When children become of school age, you couldn't

23   accommodate them at post.  So they didn't allow for any

24   families with children over five.

25        So we mostly had infants and toddlers.

1  Q.   Based on your experience in Sana'a between 2005 and 2008,

2  how late did you sort of typically finish dinner on a workday?

3  A.   In my home?

4  Q.   In your home.

5  A.   Usually 9 to 9:30 in the evenings.

6  Q.   Was it dark in Yemen 9 to 9:30 in the evenings?

7  A.   Yes, it was.

8  Q.   And do you have experience with the environment in Sana'a

9  outside the compound?  In other words, do you have an

10 understanding of what conditions were like?

11 A.   Yes.

12 Q.   Was it safe for a woman to be on the streets after dark in

13 Sana'a outside the compound?

14 A.   No.

15 Q.   Would that be true for an unaccompanied woman on the

16 street?

17 A.   It was unsafe for an unaccompanied woman to be on the

18 street at any time in Sana'a.

19 Q.   Would that be intensified after dark?

20 A.   Yes.

21 Q.   When you arrived in Sana'a, you were considering, you were

22 considering a live-in housekeeper.  Did you -- how did you go

23 about trying to find one when you first arrived?  Did you ask

24 anyone?

25 A.   Well, I went to the embassy, to the Community Liaison

L. Howard - Direct

459

1    Officer, and they had a list of housekeepers that had worked

2    for other American families and had recommendations.

3    Q.   And could you tell me the racial or ethnic composition of

4    the list you saw.

5    A.   The ladies were mostly Ethiopian.  And I believe there

6    were a couple of Filipinos as well.

7    Q.   There were no Yemeni women on the list?

8    A.   No.

9    Q.   Why not?  Do you know why?

10   A.   Yemenis are Muslims, and Muslims are not allowed to work

11   in a home that is not their own.  They are not allowed to go

12   outside without a male accompanying them, a male family member.

13   So a Muslim woman could not work in my home.

14   Q.   Or anyone else's?

15   A.   Or anyone else's.

16   Q.   With respect to the Muslim country, for a minute.  Did

17   that also affect how you and your husband could, for example,

18   eat out?

19   A.   We could not eat out together.

20   Q.   Anywhere?

21   A.   I should correct that.  We could eat at the Sheraton

22   Hotel, or the Mövenpick Hotel, or the Taj Sheba Hotel.  Those

23   were considered Western hotels, and we were permitted to eat

24   there.

25   Q.   Do you have an understanding of why you weren't permitted

460

1   to eat anywhere else outside of like the compound?

2   A.   Sana'a is a Muslim country.  Women are treated a bit

3   differently than they are treated here in the United States.

4   And my husband and I under Muslim law could not eat together in

5   a restaurant.

6   Q.   So in other words, the prohibition against women eating in

7   a restaurant, did that apply not only to Muslims, but also to

8   Western women?

9   A.   Yes.

10  Q.   Now, you could eat -- could you eat together at the Hunt

11  Oil restaurant?

12  A.   Yes, we could eat together at the Hunt Oil restaurant

13  because the Hunt Oil restaurant was in the Hadda Compound, and

14  it was surrounded by a six-foot wall.  So nobody could observe

15  us eating together.

16  Q.   In the restaurants that are non-Western -- well, for

17  example, outside the compound, could women actually work there?

18          MS. PATTERSON:  Objection, Your Honor.

19          MR. RINALDO:  I will rephrase.  It was inartful.

20  BY MR. RINALDO: (Continuing)

21  Q.   Could Yemeni women actually be employed in the non-Western

22  restaurants outside the compound?

23          MS. PATTERSON:  Objection, Your Honor, there is no

24  foundation for this.  She has already said --

25          THE COURT:  Sustained.  You can lay a foundation.

1  BY MR. RINALDO: (Continuing)

2  Q.   With respect to the B6 compound, you ate there, right?

3  A.   Yes.

4  Q.   Or the B6 restaurant?

5  A.   Yes.

6  Q.   In the B6 restaurant, was that run by Hunt Oil?  Who owned

7  it?

8  A.   Well, I don't know who owned it, but I know that it was

9  the Hunt Oil Company restaurant.

10  Q.   And did your husband provide some services for that

11  restaurant, right?

12  A.   Yes, he did.

13  Q.   If we could go back now, we go back now to your --

14        THE COURT:  Well, why don't we break for lunch now

15  that you are going back to a different subject matter.

16        MR. RINALDO:  I am.

17        THE COURT:  Okay.  Then we are going to break for an

18  hour for lunch and we will come back and hear further

19  testimony.

20        All right.  You are excused for lunch.  I hope it is

21  enjoyable.  Thank you.

22        NOTE:  At this point the jury leaves the courtroom;

23  whereupon the case continues as follows:

24  JURY OUT

25        THE COURT:  Okay.  All right, Mrs. Howard, you are in

L. Howard - Direct

462

1    the middle of your testimony, so please don't discuss the

2    testimony you have given so far with anyone.  You certainly may

3    speak about anything else with your counsel.  All right?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  Okay.  Anything we need to talk about?

6              MR. RINALDO:  No, Your Honor.

7              THE COURT:  Okay.

8              MR. RINALDO:  We are due back at 2?

9              THE COURT:  Due back at 2 o'clock.

10             MR. RINALDO:  Thank you.

11             THE COURT:  All right, we're in recess.

12             NOTE:  At this point a lunch recess is taken; at the

13   conclusion of which the case continues in the absence of the

14   jury as follows:

15   JURY OUT

16             THE COURT:  Just for planning purposes, I have got a

17   plea at 3:30, which should take 15 minutes.  So I will do it

18   during the break.  So as a result, we will break at 3:30 so I

19   can do that.  And you can just kind of move your stuff to the

20   side a little bit, and then we'll continue as soon as we're

21   done with that.  All right?  Good.

22             All right, Joe, let's get our jury, please.

23             NOTE:  At this point the jury returns to the

24   courtroom; whereupon the case continues as follows:

25   JURY IN

463

1        THE COURT:  All right, please be seated.

2        Mrs. Howard, let's resume the stand, please.

3        Please proceed.

4        MR. RINALDO:  Thank you, Your Honor.

5   BY MR. RINALDO: (Continuing)

6   Q.   Just as we broke for lunch we were turning to a new area,

7   and the area to which I would like to turn is when you first

8   met the plaintiff, Sarah Roe, in this case.

9        When did you and your husband arrive in Yemen?

10  A.   We arrived in Yemen on September 28, 2005.

11  Q.   And how long thereafter was it before you met the

12  plaintiff?

13  A.   I don't recall how long afterwards.

14  Q.   Do you remember the circumstances of your meeting?

15  A.   Yes.

16  Q.   Could you tell us what it was.

17  A.   Yes.  My husband and I were in the cafeteria, and there

18  was a lady behind the cashier's desk ringing out our

19  sandwiches, ringing them up, and we got into a conversation.

20  Q.   And who was the cashier?

21  A.   The plaintiff.

22  Q.   And was that the first time you had met her?

23  A.   Yes.

24  Q.   And we have heard testimony, I don't think it's all that

25  significant, that there were two places at the embassy where

1    you could eat.  There was something called Uncle Sam's?

2    A.    Yes.

3    Q.    And there was the cafeteria, correct?

4    A.    Yes.

5    Q.    What is your recollection about where she was working as a

6    cashier at the time?

7    A.    My recollection when I first met her was she was in the

8    cafeteria in the lower level of the embassy.

9    Q.    And not at Uncle Sam's?

10   A.    That's correct.

11   Q.    When you first met her, you just said you got into a

12   conversation.  Was that conversation in English?

13   A.    Yes.

14   Q.    And was she able to understand what you were saying?

15   A.    She responded to me, so I -- yes, she did understand me.

16   Q.    Did she respond to you in English?

17   A.    Yes, she did.

18   Q.    Do you remember any of the details of that initial

19   conversation at all?

20   A.    Not accurately, but I believe the discussion was about the

21   contents of the sandwich that we were buying.

22   Q.    After that first meeting, how long was it before you saw

23   her again?

24   A.    I don't recall.

25   Q.    Was it a matter of days or weeks?

L. Howard - Direct

465

1   A.    Probably weeks.

2   Q.    Do you remember where you saw her?

3   A.    No, I do not.

4   Q.    Did you see her somewhere on the embassy grounds?

5   A.    Yes.

6   Q.    In the cafeteria?

7   A.    Perhaps.

8   Q.    You just don't know?

9   A.    I just don't know.

10  Q.    Did you have a conversation on the occasion of that second

11  meeting?

12  A.    I don't recall a conversation.

13  Q.    After the first two meetings, was there a time for a while

14  when you did not see her?

15  A.    Yes.

16  Q.    Do you remember about how long that was?

17  A.    No, I do not.  It's difficult to recall, there were so

18  many employees at the embassy.

19  Q.    We are talking about 2005, '6, that's 12 or 11 years ago,

20  right?

21  A.    Correct.

22  Q.    What is the next contact you recall with the plaintiff?

23  A.    Well, I remember she would always be around at the embassy

24  compound or embassy functions or that type of thing.  But

25  conversations, I really don't think I had many conversations

1   with her.

2   Q.   So when you say you saw her around at embassy functions,

3   what kind of functions are you talking about?

4   A.   Perhaps a luncheon at the embassy.  Or when I was jogging

5   around the compound.  You ran into people every day that you

6   work with.  There were quite a few of us.  And you would share

7   pleasantries and then be on your way.

8   Q.   Well, did there come a time when she telephoned you asking

9   for a job?

10  A.   Yes, she did, I recall that conversation.

11  Q.   And do you remember about when that was?

12  A.   No, I do not.  But I would think perhaps mid-2006.

13  Q.   If you could just give us your best estimate.

14  A.   Okay.

15  Q.   And do you remember what she said?

16  A.   Yes.

17  Q.   Could you tell us, please, what you recall of her -- what

18  she said when she called requesting a job.

19  A.   The phone rang and it was the plaintiff.  We exchanged

20  pleasantries.  And she said that she was out of a job and did I

21  know of any jobs available.

22       I did know of a job available because I'm on the

23  administrative staff, so we do have staff meetings and we know

24  when openings come up.  And I asked the plaintiff to call the

25  HR office and inquire about an opening.  And that was it.

1  Q.  And did you do anything further?  Did you call HR to find

2  out if it was still open?

3  A.  No, I'm not permitted to do that.  That would be beyond my

4  scope of my job.

5  Q.  Did you come to understand that the plaintiff had applied

6  for that job?

7  A.  I don't recall knowing how many applicants there are for any

8  jobs because it's an HR responsibility, not mine.

9  Q.  Let me rephrase the question.  At some point did you learn

10  that Sarah Roe had gotten the job?

11  A.  Yes.

12  Q.  Okay.  And do you remember what that job was from the

13  information you had?

14  A.  I can explain it.

15  Q.  That will be fine.

16  A.  We weren't as sophisticated as you might think, and many

17  of the sections in the embassy had their vital information,

18  their contact information on a Rolodex.  And the job involved

19  someone taking the information from the Rolodex and inputting

20  into a basic database that one of the LES staff had developed

21  in Yemen.

22  Q.  Was it your understanding that that's the job the

23  plaintiff got?

24  A.  Yes.

25  Q.  Did you have an understanding of whether that data entry

L. Howard - Direct

468

1   job was data entry done in English?

2   A.   Yes, it was in English.

3   Q.   Do you remember about how long that job lasted, or do you

4   know?

5   A.   I don't recall exactly, but I could estimate about six

6   weeks.

7   Q.   About six weeks?

8   A.   Correct.

9   Q.   And did you understand that it was a temporary position

10  back when it started?  Was that what you understood the job

11  opening --

12  A.   I believe HR advertised it as a temporary position.

13  Q.   That was my question.

14  A.   Yes.

15  Q.   All right.  You were here for Sarah Roe's testimony?

16  A.   Yes.

17  Q.   Both yesterday and this morning?

18  A.   Yes, I was.

19  Q.   And do you recall hearing her testify that she came to

20  your home around the time of the data entry job, and that you

21  used your home computer to show her how to do some things?

22       Do you remember that testimony?

23  A.   Yes, I remember that testimony.

24  Q.   First of all, was Sarah Roe ever in your home before you

25  interviewed her for the job in June?

L. Howard - Direct

469

1    A.   No, she was not.

2    Q.   Did you ever invite her into your home around the time she

3    got the data entry position at all?

4    A.   No, I did not.

5    Q.   So did you ever use either your computer or anyone else's

6    computer to assist Sarah Roe in learning anything about how to

7    do data entry skills?

8    A.   No, I did not.

9    Q.   And we'll hold this until at least June of 2007.  So

10   before June of 2007, did you ever assist Sarah Roe in learning

11   anything about how to handle e-mails?

12   A.   No, I did not.

13   Q.   And to the best of your knowledge, when you were home or

14   when you weren't home, Sarah Roe was never in your house until

15   June of 2007?

16   A.   To the best of my knowledge and recollection, she was

17   never in my home until we interviewed her for the position.

18   Q.   And what month would that interview have taken place?

19   A.   Well, we know that -- I know that I was on R&R in France.

20   And so, I would say June, the very end of June, first of

21   July 2007.

22   Q.   You were in the courtroom and heard testimony that Sarah

23   Roe said she called you, do you remember that call?

24   A.   I remember that testimony.

25   Q.   Do you remember whether she called you while you were out

L. Howard - Direct

470

1   of the country with your husband?

2   A.   Yes, she did.

3   Q.   Mrs. Howard, if I could turn your attention for a moment

4   to Defendant's Exhibit C.

5   A.   Is it tab C?

6   Q.   Tab C, that's how they are organized.

7            THE COURT:  8.

8            MR. RINALDO:  C.  The defendants use letters, Your

9   Honor.

10           THE COURT:  Okay.

11  BY MR. RINALDO: (Continuing)

12  Q.   I would like you take a look at that for a minute and page

13  through it and tell me whether you recognize it.

14  A.   Yes, I do recognize it.

15  Q.   Could you tell us what that is.

16  A.   Well, this is a U.S. government travel voucher.  And if

17  anyone has any experience as a U.S. government employee, you

18  know we do have to file these after travel.

19  Q.   Did I understand you to say that during this period you

20  were on R&R?

21  A.   Yes.

22  Q.   And did I hear you say that you were on R&R in France?

23  A.   Yes.

24  Q.   If you turn to the page that is numbered at the bottom

25  LH-0013, do you see that?

L. Howard - Direct

471

1    A.    Yes, I do.

2    Q.    Does that list your itinerary?

3    A.    Not the entire itinerary, no.

4    Q.    Does it list the beginning itinerary, the 17th through the

5    22nd?

6    A.    Of June 2007.

7    Q.    That's what I --

8    A.    That's a partial itinerary, yes.

9    Q.    Okay.  And it says that you were in Frankfurt, correct, on

10   the 17th?

11   A.    The 17th of June 2007, yes.

12   Q.    Right.  And then on the 18th through I guess the 21st, it

13   says:  Attend IM0 conference Garmisch.

14   A.    Yes.

15   Q.    My lack of world travel, where is Garmisch?

16   A.    That's Garmisch-Partenkirchen, and that's in Germany.

17   Q.    All right.  Were you attending a conference there?

18   A.    Yes, I was.

19   Q.    What's an IMO conversation?

20   A.    That's an Information Management Officer conference.

21   Q.    After that was finished, it says it you went back to

22   Frankfurt?

23   A.    Yes.

24   Q.    And what did you do after the 22nd?

25   A.    The 22nd of June?

L. Howard - Direct

472

1    Q.   Correct.

2    A.   We traveled in and out of Frankfurt because that was the

3    connection of the airplane, but I had R&R in conjunction with

4    this travel.  And so, we were in France.

5    Q.   So my question was, what were you doing after you left the

6    conference?

7    A.   I was in France on vacation.

8    Q.   So you and your husband went to France on vacation after

9    that conference, correct?  Is that right?

10   A.   That's correct.

11          THE COURT:  You are making this more difficult just

12   by asking all these leading questions.  Can you just ask her

13   what did she do next?

14          MR. RINALDO:  Fine.

15          THE COURT:  Okay.

16   BY MR. RINALDO:  (Continuing)

17   Q.   When you were in France, did you receive a telephone call

18   from the plaintiff?

19   A.   Yes, I did.

20   Q.   And what did the plaintiff ask you, if anything?

21   A.   She asked me if I knew of any jobs available at the

22   embassy.

23   Q.   Do you remember what you told her?

24   A.   I told her that I was out on R&R and I didn't know of any

25   jobs available because I was on vacation.  And I asked her to

1   please call me at the end of the month.

2   Q.   To the best of your recollection, did Ms. Roe call you at

3   the end of the month?

4   A.   Yes, she did.

5   Q.   Did you call her or did she call you?

6   A.   When I returned from R&R?

7   Q.   Yes.

8   A.   I asked letter to call me at the end of the month.  And

9   she called me.

10  Q.   Do you remember that conversation?

11  A.   Yes.

12  Q.   And could you tell us what you recall of that

13  conversation, please.

14  A.   After returning from R&R, the conversation that I had with

15  the plaintiff was that she was again out of a job and was

16  looking for some work, any work.

17  Q.   Did you tell her anything about that?

18  A.   Yes.  I talked to her for a few moments, and I told her

19  that I didn't have anything available, that she was a waitress

20  or a cashier or a clerk, and there were no jobs that I was

21  aware of available for her.

22  Q.   Do you remember what she said, if anything, in response?

23  A.   Yes, I do.

24  Q.   What did she say?

25  A.   She said that she was desperate for employment and would

1   do anything, any employment, any type of employment in the

2   home, in a restaurant, anywhere.

3   Q.   Do you remember what you responded, if anything?

4   A.   I'm not sure the exact words, but I believe I told her

5   that I would see if I could find anything at the Hunt

6   restaurant or any other restaurant job, and to call me back.

7   Q.   And did you attempt to find anything like that?  Did you

8   attempt to call the Hunt Oil restaurant or another restaurant

9   to see if any jobs were available?

10  A.   I can't recall that I did.  I don't believe that I would

11  have gone out of my way to make that phone call.

12  Q.   At some point did the plaintiff call you back?

13  A.   Yes, she did.

14  Q.   And do you remember that conversation?

15  A.   Yes, I do.

16  Q.   Could you tell us what that conversation was.

17  A.   She called me back to ask if there were any jobs

18  available.  And I told her, no, that I didn't know of any at

19  the restaurant.  And I said but I did have a job available at

20  my home.  And that it was below her level, her skill level, and

21  her experience level, but if she wanted to come in for an

22  interview, I would gladly interview her for the position.

23  Q.   Mrs. Howard, was that the first time you ever discussed

24  with her, with the plaintiff, the possibility of her working in

25  your home as a housekeeper?

L. Howard - Direct

475

1    A.    Yes, it was.

2    Q.    And with respect to Russell Howard, before the interview

3    did Russell Howard ever discuss in your presence with the

4    plaintiff the possibility of the plaintiff working in your home

5    as a housekeeper?

6    A.    No, he did not.

7    Q.    At some point the plaintiff came to your home for the

8    interview, correct?

9    A.    Yes.

10   Q.    Was Russell Howard present for that interview?

11   A.    To the best of my recollection, yes.

12   Q.    And did you meet at your home or somewhere else?

13   A.    No, we met at -- we met at my home, yes.

14   Q.    Do you remember what time of day that interview was?

15   A.    I remember it was on a weekend because we were both

16   together, and more than likely at lunchtime or shortly

17   thereafter.

18   Q.    A weekend would have been a Thursday?

19   A.    I am sorry, a weekend would have been a Thursday or a

20   Friday.

21   Q.    And during that interview, did you explain to Ms. Roe what

22   her duties would be expected to be as the housekeeper?

23   A.    Yes.

24   Q.    Could you tell us what you explained to her at the time.

25   A.    Well, I explained to the plaintiff that I needed help in

1    the household.  And I gave her a list of duties -- well, I read

2    to her a list of duties that I would like her to accomplish,

3    such as cleaning, doing the laundry, helping my husband in the

4    kitchen when he prepared meals, and going for basic groceries

5    if needed, fresh fruit and fresh vegetables.  They were

6    available off the compound.  And also fresh bread which was

7    baked daily.

8            And we did have in our home at that time chickens

9    that had to be -- you had to go to the chicken man, and the

10   chickens were alive, so you had to order them in the morning,

11   and then he would pluck them, and you would come back and pick

12   them up.

13           So household staff did that type of job.  So I wanted

14   her to do that for my family.

15   Q.   All right.  Did she have any objections to any of those

16   duties?

17   A.   Not that I recall.

18   Q.   In addition, as far as when you say doing the laundry,

19   washing and drying clothes, is that what you're talking about?

20   A.   Correct.

21   Q.   Did you have a washer and dryer at your apartment?

22   A.   Yes, I did, an American size washer and dryer.

23   Q.   Where was it located?

24   A.   It was located in the room off of the kitchen that was

25   also a storage room.

1   Q.   We talked this morning I think about the storage, the food

2   storage there, right?

3   A.   Correct.

4   Q.   We won't do it anymore.  But my question is, other than

5   that storage room, did you or your husband have any separate

6   storage areas outside of the space of your apartment itself?

7   A.   No, we did not.

8   Q.   You know what I'm talking about, like a storage bin or

9   something like that?

10  A.   For bicycles or things like that?

11  Q.   Yes.

12  A.   No, we stored our bicycles outside.

13  Q.   Was there anyplace, was there anyplace in your apartment

14  that you could have stored a second refrigerator?

15  A.   I had two refrigerators in my kitchen already, so there

16  was no place where I could store a third refrigerator.

17  Q.   Would that also be true about a washer and dryer?

18  A.   That's correct.  I had a full American size washer and

19  dryer.

20  Q.   You had a stove in the kitchen?

21  A.   Yes, we had a stove in the kitchen.

22          MS. PATTERSON:  I am objecting to the leading.

23          MR. RINALDO:  Okay, I will rephrase that one.

24          THE COURT:  It's not a matter that is in contest, so

25  why don't we just move along.

1   BY MR. RINALDO:  (Continuing)

2   Q.   You did have a stove in the kitchen?

3   A.   Yes.  And a water distiller in the kitchen as well.

4            THE COURT:  She testified she had a full large

5   kitchen.

6   BY MR. RINALDO:  (Continuing)

7   Q.   Did you have anyplace you could have stored another stove?

8   A.   No, I did not.

9            THE COURT:  It's not a matter that is in contest.

10  She said no repeatedly.  So let's move on.  Okay?

11           MR. RINALDO:  I am going to move on, but in a

12  different --

13  BY MR. RINALDO:  (Continuing)

14  Q.   Did Ms. Roe at the time of the interview ever ask you or

15  Russell Howard to bring with her her refrigerator, stove, or

16  washer or dryer?

17           THE COURT:  That's fine.

18  A.   No, she did not.

19  Q.   Did you even know whether she had one?

20  A.   I had no knowledge of her living arrangements or if she

21  had any appliances before she came to work for me.

22  Q.   Let's turn to the question of cooking.  You testified

23  about your husband's cooking.

24  A.   Yes.

25  Q.   What did you explain, if anything, to Ms. Roe about what

1   her duties would be with respect to cooking?

2   A.   Well, my husband was a very good cook.  And he wanted

3   someone to assist him in chopping and cleaning and sorting

4   vegetables, chopping vegetables to his precise configuration,

5   and certain other things that had to be done precisely to his

6   instructions.

7   Q.   To digress for a minute, after Ms. Roe accepted the

8   position, did she assist Mr. Howard in the kitchen?

9   A.   Yes, she did.

10  Q.   Were you ever witness to any disagreements between Ms. Roe

11  and Mr. Howard about food preparation?

12  A.   Yes.

13  Q.   Can you tell us -- we have heard a lot about some of that.

14  So can you tell me what that was.

15  A.   My recollection is I had arrived home from work, and

16  normally I would go and take a shower and change my clothes.

17  But before I got to the shower room, I was interrupted and

18  asked to come into the kitchen.  And there was an animated

19  discussion about how to julienne a carrot.  My husband wanted

20  the carrots for his recipe that evening to be julienned, to be

21  matchstick size.  And the plaintiff was discussing cutting the

22  carrots diagonally to make them coin size.

23  Q.   And --

24  A.   I was asked to give my opinion as to which way the

25  vegetables should be cut for the recipe.

L. Howard - Direct

480

1   Q.   Do you remember what you said?

2   A.   Yes, I do.

3   Q.   What did you say in that?

4   A.   I said, do it Russell's way and make him happy.

5   Q.   Do you recall ever saying in Sarah Roe's presence on

6   another occasion the words "just make him happy"?

7   A.   Not out of context of the kitchen, no.

8   Q.   All right.  So let's go back to where we were at the

9   beginning of the job.  When Sarah Roe was interviewing for the

10   position, did you show her where her quarters would be?

11   A.   Yes, we did.

12   Q.   And she went in and got a chance to look at it, correct?

13          MS. PATTERSON:  Objection, Your Honor.  Again, this

14   is leading.

15          THE COURT:  It's leading.  Sustained.

16          MR. RINALDO:  All right.  Fine.

17   BY MR. RINALDO: (Continuing)

18   Q.   Did you show Sarah Roe her quarters?

19   A.   Yes.

20   Q.   Did she have an opportunity to go in and look at them?

21   A.   Yes.

22   Q.   And did she take the opportunity to go in and look at

23   them?

24   A.   Yes.

25          THE COURT:  These are all leading.  What happened,

L. Howard - Direct

481

1   what did she do?

2   BY MR. RINALDO: (Continuing)

3   Q.   Did she express any concerns?

4   A.   No.  No, she did not express any concerns.

5   Q.   Did she have a chance to look at the rest of the

6   apartment?

7   A.   Yes.

8   Q.   Do you remember about how long that interview lasted?

9   A.   I can't say, but less than a half an hour.

10  Q.   Was compensation discussed?

11  A.   Yes, it was.

12  Q.   What do you remember about that discussion?

13  A.   I remember the plaintiff asking me for $150 a month.

14  Q.   Did you agree to that amount?

15  A.   Yes, I did.

16  Q.   Did you at that time have any understanding about what the

17  generally accepted amount was in that area of the country?

18  A.   Yes, I did.

19  Q.   Could you tell us what that understanding was.

20  A.   My understanding --

21        MS. PATTERSON:  There is no foundation for what her

22  understanding is.

23        THE COURT:  All right.  Overruled.  I will allow the

24  question.

25  BY MR. RINALDO: (Continuing)

L. Howard - Direct

482

1   Q.   You can answer it.

2   A.   Could you ask it again, please, Richard.

3   Q.   Sure.  What was your understanding about the regularly --

4   regular compensation, the kind of normal compensation for

5   services of that type?

6           That's as close as I could come, Your Honor.

7   A.   For normal services of a live-in housekeeper?

8   Q.   Yes.

9   A.   For families in the compound in the Sana'a area, it was

10  150 to $200 a month.

11  Q.   And how did you know that?

12  A.   Because I asked the Community Liaison Officer, I asked

13  some of my friends that lived in the compound that had families

14  and had live-in help, and I also did a bit of research about

15  the minimum wage in Yemen and the maximum wage for employees in

16  Yemen.

17  Q.   Did Sarah Roe express any objection to the wage rate?

18  A.   No, she did not.

19  Q.   Because she was live-in, she had living quarters at the

20  facility.  Did you charge her for that?

21  A.   No, I did not.

22  Q.   Was Sarah Roe charged any amount for any food that she ate

23  while she was living there?

24  A.   No, she was not.

25  Q.   During that interview, did you discuss with Sarah Roe the

1   question of whether to wear a uniform?

2   A.   Yes.

3   Q.   And what do you remember about that conversation?

4   A.   I remember asking Sarah Roe, would she prefer to wear a

5   uniform or would she prefer to wear her regular clothes to

6   work.

7   Q.   Do you remember what she said?

8   A.   Yes.  She told me she preferred to wear her regular

9   clothes to work.

10  Q.   Did you ever show her a proposed uniform at the interview?

11  A.   No, I did not.

12  Q.   Did you even have a uniform at that time?

13  A.   No, I did not.

14  Q.   There was talk, and I don't remember if it was within the

15  interview or a little later, but there was talk that you had

16  made a proposed uniform, you had made it yourself.

17          Were you here for that testimony?

18  A.   Yes, I was.

19  Q.   Do you make your own clothes?

20  A.   No, I do not.

21  Q.   Does anybody else -- do you make clothes for anyone else?

22  A.   No, I do not.

23  Q.   So you did not make a proposed uniform for Sarah Roe?

24  A.   No, I did not.

25          MS. PATTERSON:  Objection.

1          THE COURT:  I will allow the question.

2          MR. RINALDO:  I'm moving on.

3          THE COURT:  Yes.

4    BY MR. RINALDO:  (Continuing)

5    Q.   Once Sarah Roe started, how long was it after she got the

6    job that she started?

7    A.   I don't recall, but it was probably within a week.

8    Q.   And what were her hours on non-weekends?  In other words,

9    on work days.

10   A.   On normal Saturday through Wednesday days?

11   Q.   Correct.

12   A.   Her hours to start were 9 in the morning, not before 9.

13   Q.   Why was that?

14   A.   Well, it was a Muslim country, and the call to prayer

15   would wake us up at 4 a.m.  We would always hear that noise, I

16   am sorry, the music and the interlude in the background at

17   4 a.m.  I had to get up usually at 5 to go to work, but my

18   husband liked to sleep in.  And I liked him to sleep in as well

19   because I liked to sleep in on the weekends.  So --

20   Q.   So when did Ms. Roe's workday start?

21   A.   9 o'clock.

22   Q.   And how long was that period of work expected to last?

23   A.   Well, she was expected to do her duties in the morning.

24   And then if my husband was home, he would have a sandwich for

25   lunch.  It was my understanding that someone would go out and

L. Howard - Direct

485

1   buy bread at the bread maker around the corner.

2          After lunch, she was free for the afternoon to do as

3   she pleased.  Provided, if required, she did grocery shopping

4   or any other tasks that might need to be done.  As long as she

5   was back in the apartment before 4, 4:30, so that dinner

6   preparations could continue.

7   Q.   And was that her schedule from Saturday through Wednesday?

8   A.   That's correct.

9   Q.   To the best of your knowledge, was that schedule generally

10  followed during the time she worked there?

11  A.   Yes, to the best of my knowledge.  I was normally at work,

12  but I don't recall anything, any arguments or anything about

13  time.

14  Q.   On Friday -- on Thursday, what was her schedule?

15  A.   Thursday was our weekend, Thursday, Friday.  And so, what

16  would normally happen was the plaintiff would get up in the

17  morning at 9 o'clock, and then she would ask either, usually my

18  husband, sometimes me, if there was anything that needed to be

19  done before she could take off for the weekend.

20         And if there was anything that needed to be done at

21  the last minute, maybe some dishes needed to be put away or

22  whatever, she would complete those tasks.  And then she was

23  free to enjoy her weekend.

24  Q.   When you say weekend, that's Thursday and Friday?

25  A.   That's correct.

L. Howard - Direct

486

1  Q.   Was she required to return to the premises on Thursday or

2  Friday night?

3  A.   No, she was not.

4  Q.   Were there occasions when she stayed out all night?

5  A.   Yes.

6  Q.   Did you ever ask her anything about where she was?

7  A.   No, I did not.

8  Q.   Why not?

9  A.   It was none of my business.

10  Q.   When she came back, did she come back on Saturday

11  mornings?

12  A.   I'm assuming she did.  Her hours to start were Saturday at

13  9 a.m.  I was already in the office on Saturday at 9 a.m.  But

14  I don't recall any complaints about her being late or tardy

15  more than a few times.

16  Q.   The only person who would have known when she came back

17  would have been Russell Howard?

18  A.   Provided Russell was awake.

19  Q.   Right.  All right.  Now, we heard some testimony, and I

20  don't need to go into it long, that you and Russell Howard left

21  Yemen in November of 2007, correct?

22  A.   Yes, we did.

23  Q.   Why did you leave Yemen?

24  A.   We had to go back to my home of record, which is Las

25  Vegas, Nevada because my stepfather had died and my mother

L. Howard - Direct

487

1    needed me.

2    Q.    Did Russell Howard go with you?

3    A.    Yes.

4    Q.    And how long were you away?

5    A.    I believe we were gone for about ten days.

6    Q.    Was the plaintiff your live-in housekeeper when you left?

7    A.    Yes, she was.

8    Q.    And was she still there when you got back?

9    A.    Yes, she was.

10   Q.    Did she have a key to the outer door?

11   A.    Yes, she did.

12   Q.    At all times?

13   A.    Yes, she did.

14   Q.    Do you know where she stayed while you were gone?

15   A.    No, I do not.

16   Q.    When you and Russell Howard came back, she continued to

17   work for you?

18   A.    Yes, she did.

19   Q.    Let's go back then to kind of more general things.  Are

20   you familiar with something called the Marine Club?

21   A.    Yes.

22   Q.    Could you tell us, please, what your understanding of the

23   Marine Club is and where it is located.

24   A.    The Marine Club in Sana'a, Yemen?

25   Q.    Yes.

L. Howard - Direct

488

1  A.   May I preface something first?  Most embassies overseas

2  have a Marine Club because we have a Marine contingent guarding

3  the embassy.

4        In Yemen, the Marine Club was on the embassy

5  compound.  And those Marines, it was their lounge and their

6  barracks and their recreation area.  And they were our Marine

7  contingent that guarded the embassy compound.

8  Q.   And what was the Marine Club?

9  A.   It was their, basically their barracks.

10 Q.   Did they ever invite others to visit what is called the

11 Marine Club?

12 A.   Yes, they did, quite frequently.

13 Q.   Could you tell me kind of the normal scheme for how that

14 happened.

15 A.   It was normally every week, every other week on Wednesday

16 afternoon.  Our working hours, our working days, remember, were

17 Saturday to Wednesday.  So the Marines would host a function at

18 about 5 o'clock on Wednesday afternoon.

19       And this was a function for all embassy employees and

20 their families.  There would be a barbecue, sometimes.  There

21 was people sitting outside conversing.  There was trivia games,

22 Trivial Pursuit and that type of thing.  The younger children

23 would play outside, those toddlers and children that were less

24 than five years old that were allowed to be there.  And it was

25 a general, nice family event.

489

1        Later in the evening, they would have dancing.  And

2   of course, there was a bar there with drinks, soft drinks and

3   alcoholic beverages available.

4   Q.   Did you and Russell go to the Marine Club for these

5   events?

6        MS. PATTERSON:  Your Honor, I don't mean to interrupt

7   Mr. Rinaldo, but Mr. Meszaros and Ms. Roe already testified to

8   this and it is not in dispute.

9        MR. RINALDO:  Yea, but she gets to --

10       THE COURT:  I will allow the questioning.  Thank you.

11       Go ahead.

12  BY MR. RINALDO: (Continuing)

13  Q.   Did you and Russell Howard attend these events?

14  A.   Not all of the events.  It depended on my schedule at

15  work.  The Marine Club usually started at 5.  And I was

16  sometimes still in the office until 6:30 or so.  But I tried to

17  go to as many of those functions as I could.

18  Q.   And did you invite the plaintiff, Sarah Roe, to some or

19  all of these functions?

20  A.   Yes.

21  Q.   Did she go to the Marine Club functions with you and

22  Russell Howard from time to time?

23  A.   Well, I was already at the embassy, I was already working,

24  so all I had to do was walk across the courtyard to get to the

25  Marine Club.  I don't know how she got to the club, but I'm

1   assuming that she took a taxi.  My husband would take the

2   shuttle.

3   Q.   If your husband took -- was she allowed to take a shuttle?

4   A.   No, she was not.

5   Q.   At the Marine Club, what time did you and your husband

6   leave as a general rule?

7   A.   Well, it was the end of the week, our Friday, and the last

8   shuttle from the embassy compound to the housing compound was

9   about 8, 8:30 at night.  And most people made sure they got on

10  that last shuttle.

11  Q.   Did Sarah Roe leave before you did, at the same time, or

12  after, to the best of your recollection?

13  A.   To the best of my recollection, Sarah Roe always left

14  after we left.

15  Q.   Do you recall her coming home after you and Russell had

16  arrived back at your residence from the Marine Club?

17  A.   Generalization, most times?

18  Q.   Yes.

19  A.   Yes.

20  Q.   And do you remember about what time that might have been?

21  A.   Well, the Marine Club, to the best of my knowledge, closed

22  at 2 in the morning.  And normally Ms. Sarah Roe would make it

23  back after that time, I could hear the key in the door.

24  Q.   When did Sarah Roe leave your employ?

25  A.   To the best of my recollection, it was the end of

1    December 2007.

2    Q.    Do you know why she left?

3    A.    Yes, I do.

4    Q.    And what was the reason she left?

5    A.    Well, if you recall, during the interview I talked to

6    Sarah Roe about her being a skilled worker, cashier, restaurant

7    worker.  And throughout her employment with us I actively

8    looked for jobs on the Hunt Oil Compound at the B6.  Every time

9    my husband and I would go there, we would ask, anything open.

10        Finally a job came open, and Sarah Roe took that job.

11   Q.    Did you come to write a letter of recommendation for her?

12   A.    Yes, I did.

13   Q.    Could you tell us why you did that.

14   A.    She was a good employee.  And also she asked me to write a

15   recommendation because her supervisor or boss at the B6 had

16   requested it from her.

17   Q.    And did you know the boss at the B6?

18   A.    Yes.

19   Q.    Could you show her the plaintiff's exhibits.  I think it

20   is what, 6.  I believe it is 6.

21        Could you turn to Plaintiff's Exhibit 6.

22   A.    Yes.

23   Q.    Wrong one, she is turning to the wrong one.

24   A.    Number 3?

25   Q.    No, it's 2.

L. Howard - Direct

492

1    A.    Yes, I have number 2.

2    Q.    And other than the name change, to say Sarah Roe rather

3    than the real name of the plaintiff, is that the letter you

4    wrote?

5    A.    This is my signature, but this is not the original letter.

6    So there has been some changes.

7    Q.    What changes do you recognize?

8    A.    Well, the name has been changed.

9    Q.    We've all agreed to that.

10   A.    Okay.

11   Q.    No other changes?

12   A.    No other changes.

13   Q.    All right.  I think the witness didn't hear me say that,

14   Your Honor, I'm sorry.

15           Mrs. Howard, I would like to about your marriage to

16   Russell Howard for a bit.  Based on your 18-year experience,

17   could you describe your marital relationship with Russell

18   Howard.

19   A.    We had a wonderful marriage.  He was a wonderful man and

20   my friend, and I miss him every day.  And we had a normal

21   marriage as normal families do.  Occasionally there was a

22   squabble over how to julienne and the vegetables.  But other

23   than that, we were very happy and very much in love.

24   Q.    During the time that you were in Yemen, Mrs. Howard, did

25   you and Mr. Howard have an active sexual relationship?

L. Howard - Direct

493

1   A.   Yes, we did.

2   Q.   And was it within the range of what it had been before?

3   A.   Yes, it was.  We had a very fulfilling sexual

4   relationship.

5   Q.   And was that all the way through 2005 to 2008?

6   A.   Yes.  Through our entire marriage.

7   Q.   You have sat here and heard the claims that Sarah Roe

8   made.

9   A.   Yes.

10  Q.   And this isn't the first time you have heard Sarah Roe

11  make the claims.  I mean, there was when the complaint was

12  filed and so forth, so that was in 2016.

13          At the time you saw these claims, did you believe

14  them?

15  A.   No, I did not.

16  Q.   Did you believe that Russell Howard had raped Sarah Roe?

17  A.   No.

18  Q.   Did you believe that Russell Howard had engaged in sexual

19  abuse of Sarah Roe?

20  A.   No.

21  Q.   Did you believe that Russell Howard had engaged in

22  inappropriate sexual conduct with respect to Sarah Roe?

23  A.   No.

24  Q.   As you sit here today, do you believe it?

25  A.   No, I do not.

L. Howard - Cross

494

1        MR. RINALDO:  I have no further questions.

2        THE COURT:  All right.  Thank you.

3        Cross-examination.

4        MS. PATTERSON:  Yes, Your Honor.

5        MR. DeLORME:  The Court's indulgence, Your Honor.

6    CROSS-EXAMINATION

7    BY MS. PATTERSON:

8    Q.   Good afternoon, Mrs. Howard.

9    A.   Good afternoon.

10   Q.   I want to bring you back to something you were talking to

11   Mr. Rinaldo about, and that's the relationship with my client,

12   Ms. Roe.

13        You stated earlier that you met her while you were

14   working at the U.S. Embassy; is that correct?

15   A.   That's correct.

16   Q.   And Ms. Roe was working on the embassy grounds as well; is

17   that right?

18   A.   That's correct.

19   Q.   And you recalled meeting her for the first time at some

20   point in 2005, right?

21   A.   Yes, I believe so.

22   Q.   But you didn't remember the next time that you had met her

23   with specificity; is that right?

24   A.   No.

25   Q.   And you may be -- you said that you may have seen her

1   around the embassy?

2   A.    Correct.

3   Q.    Maybe at lunch?

4   A.    Perhaps.

5   Q.    You said, you know, while you were -- maybe while you were

6   jogging you saw her around; is that right?

7   A.    Could have, yes.

8   Q.    And you exchanged pleasantries with her?

9   A.    Of course.

10  Q.    Now, the next concrete memory that you recall with Sarah

11  Roe is when she called you seeking a job; is that right?

12  A.    When she called me seeking a job, yes.

13  Q.    Right.  Why did you provide your business phone number to

14  an individual that you barely knew?

15  A.    I didn't provide my business phone number to Sarah Roe.

16  My business phone number was on a phone list that was available

17  to anyone in the embassy.  So when she called me, I was not

18  surprised because I received calls day in and day out from

19  people.

20  Q.    Now, you testified earlier that Ms. Roe worked either at

21  the cafeteria or Uncle Sam's; is that right?  You weren't sure

22  where she worked?

23  A.    That's correct.

24  Q.    But you thought it was either at the cafeteria or at Uncle

25  Sam's; is that right?

1   A.   I don't recall saying that.  I recall saying that I met --

2   I recall meeting her in the cafeteria on the bottom floor of

3   the embassy.

4   Q.   And that cafeteria is on the embassy grounds; is that

5   right?

6   A.   Yes.

7   Q.   But it's not -- it's not run by the embassy; is that

8   right?

9   A.   It's in the embassy building.  There is a committee that

10  overseas the cafeteria.  I'm not -- I don't know -- I'm

11  assuming it is a contractor or was when the plaintiff was

12  working.

13  Q.   Right.  So it was a contractor, to the best of your

14  understanding, that ran the cafeteria?

15  A.   Correct.

16  Q.   Now I want to talk to you a little bit about your live-in

17  housekeepers.  You spent a little bit of time on that direct

18  examination.

19          You stated that your primary reason to have a live-in

20  housekeeper was because of your schedule; is that right?

21  A.   Well, because of my schedule and also -- yes, that's

22  right.

23  Q.   It was because you worked from 9 a.m. to 6 p.m. or later;

24  is that right?

25  A.   Correct.

1   Q.   Your fellow State Department employees or fellow

2   colleagues also worked similar hours at the Hadda complex; is

3   that right?

4   A.   They worked similar hours, yes, at the embassy complex

5   according to what their job duties were.

6   Q.   Right.  And you described for us on direct examination the

7   shuttle schedule; is that right?

8   A.   Yes.

9   Q.   And you stated that all State Department employees had to

10  take that shuttle; is that right?

11  A.   No, I did not state that.

12  Q.   But you stated that many State Department employees took

13  that shuttle along with you; is that right?

14  A.   I stated that five or six State Department employees took

15  that shuttle along with me.

16  Q.   At each time; is that correct?

17  A.   At each time meaning once in the morning and once in the

18  afternoon?

19  Q.   Yes.

20  A.   That's correct.

21  Q.   And each time the shuttle went back and forth; is that

22  correct?

23  A.   Well, we should talk about, as I mentioned before, the

24  security situation.  Sometimes everyone had to take the

25  shuttle, and the shuttle would go back and forth.  But normally

1    there was one shuttle in the morning and one shuttle in the

2    afternoon, and there were four or five, six people that rode

3    every day back and forth.

4    Q.   Mrs. Howard, you testified that you were the only State

5    Department member at the Hadda complex with live-in help; is

6    that right?

7    A.   No, I did not say that.

8    Q.   You stated that all the other people that you knew that

9    had live in-help were members of the Hunt Oil Company; is that

10   right?

11   A.   No, I did not.

12   Q.   Mr. Meszaros, you were here during his testimony; is that

13   correct?

14   A.   Yes, I was.

15   Q.   And do you remember that Mr. Meszaros -- do you remember

16   that Mr. Meszaros testified that you were the only State

17   Department employee that had live-in help; is that right?

18             MR. RINALDO:  Objection, Your Honor.  Mr. Meszaros'

19   testimony --

20             THE COURT:  Yeah.  This is part of your job moving

21   forward, is to recollect the testimony that we have heard over

22   the last several days, and your recollection will govern.

23             So the fact that counsel may in a question put

24   substantive information, who lived where, that's not evidence.

25   The evidence is the answers that we receive from witnesses who

1    are under oath in the witness box.  And it's not uncommon for

2    there to be errors made in questioning about certain matters.

3              But that's why you have such an important job

4    ultimately, is to decide what the testimony was.

5              So quite properly Mrs. Howard has disagreed when she

6    has heard a version that she doesn't believe was what she

7    testified to previously.  All right.

8              So ask your next question.

9              MS. PATTERSON:  Yes, Your Honor.

10             THE COURT:  Go ahead.

11             MS. PATTERSON:  Yes, Your Honor.

12   BY MS. PATTERSON: (Continuing)

13   Q.   Mrs. Howard, you lived in Sana'a for about three; is that

14   correct?

15   A.   Yes.

16   Q.   And in those three, you had at least four live-in

17   housekeepers; is that correct?

18   A.   I believe so, yes.

19   Q.   You had Sabha; is that right?

20   A.   I do not recall that name.

21   Q.   Do you remember the name -- you remember the name Brhan;

22   is that right?

23   A.   Yes, I do.

24   Q.   And that -- and then you remember my client, Ms. Roe; is

25   that correct?

1    A.    The plaintiff, yes.

2    Q.    And then you remember Ms. Doe; is that correct?

3    A.    That's correct.

4    Q.    Now, Brhan left your employment because she ran away while

5    you were abroad on your R&R; is that correct?

6    A.    Correct.

7    Q.    Ms. Roe was fired by Russell Howard; is that correct?

8    A.    I am sorry, can you repeat that.

9    Q.    Sure.  I will go to Ms. Doe.  Ms. Doe was fired by Russell

10   Howard; is that correct?

11   A.    Ms. Doe?

12   Q.    Yes.  She was the third witness to testify, the other

13   live-in housekeeper that you had that was not Ms. Roe.

14   A.    We're talking about Sana'a, Yemen, correct?

15   Q.    We're talking about the housekeepers that you had

16   beginning while you were in Sana'a, Yemen.

17   A.    You're talking about the housekeepers I had in Sana'a,

18   Yemen?

19   Q.    Mrs. Howard, my question is, Ms. Doe was fired by Russell

20   Howard; is that correct?

21   A.    No, it is not correct.

22   Q.    Ms. Doe worked for you in Sana'a; is that correct?

23   A.    Ms. Doe worked for me in Sana'a --

24   Q.    And then you took her with you --

25            MR. RINALDO:  Excuse me, does my witness get to

501

1   finish her answer?

2            THE COURT:  She started to answer before the question

3   was -- so let's start over.

4   BY MS. PATTERSON: (Continuing)

5   Q.   Mrs. Howard, Ms. Doe worked for you, began working for you

6   in Sana'a, Yemen; is that correct?

7   A.   That's correct.

8   Q.   And then you took her with you to Tokyo, Japan; is that

9   correct?

10  A.   She followed us to Tokyo, yes.  She arrived after we

11  arrived, that's correct.

12  Q.   But you brought her to Tokyo to be your live-in

13  housekeeper?

14  A.   That's correct.

15  Q.   And then when she was your live-in housekeeper in Tokyo,

16  she was fired by Russell Howard; is that correct?

17  A.   Yes, that is, in Tokyo.

18  Q.   Going back to Sana'a.  You testified that it was unsafe

19  for any woman to be home alone -- or to be alone on the streets

20  of Sana'a; is that right?

21  A.   Yes, in my opinion, it was.

22  Q.   You sent your housekeepers to go to the grocery store; is

23  that right?

24  A.   Yes.

25  Q.   And the grocery store was outside the complex or the Hadda

1    housing complex?

2    A.   Yes.

3    Q.   And you regularly required all of your live-in

4    housekeepers to go to the grocery store; is that correct?

5    A.   Yes.

6    Q.   And all of your live-in housekeepers were women; is that

7    correct?

8    A.   Yes.

9    Q.   Mrs. Howard, I would like to ask you about Russell Howard.

10   You stated on direct examination that you got married in 1994;

11   is that correct?

12   A.   That's correct.

13   Q.   And you were 36 at the time?

14   A.   I met my house when I was 36.  I married him when I was

15   almost 39.

16   Q.   And he was about a decade older than you; is that right?

17   A.   That's correct.

18   Q.   So he was 49 when you got married?

19   A.   Yes.

20   Q.   Russell Howard had been previously married before, right?

21   A.   Yes.

22   Q.   And he was divorced?

23   A.   Yes.

24   Q.   He had three children?

25   A.   Yes.

1   Q.   He was estranged from those three children; is that right?

2   A.   Correct.

3   Q.   And none of his three children attended your wedding; is

4   that right?

5   A.   No -- that is correct, none of the children attended, but

6   there was a family member at the wedding.

7   Q.   But none of his children attended?

8   A.   No.   They were in Australia.

9   Q.   You and Russell Howard were close; is that right?

10  A.   Yes, we were married, and we were married in a very good

11  marriage.

12  Q.   A very loving marriage?

13  A.   Correct.

14  Q.   You confided in each other?

15  A.   Yes.

16  Q.   You told each other basically everything?

17          MR. RINALDO:  Objection, Your Honor.  She can testify

18  to what she told him.

19          THE COURT:  Sustained.  You may ask it in a more

20  general matter if she believed that.

21  BY MS. PATTERSON: (Continuing)

22  Q.   You believed that you told each other everything, didn't

23  you?

24  A.   Yes.

25  Q.   You believed that you had no secrets from each other?

1    A.    Yes.

2    Q.    I want to talk to you a little bit about -- let's see.

3          The Court's indulgence, Your Honor.

4          I want to talk to you a little bit about Jane Doe.

5    Now, we talked a little earlier about that Jane Doe had moved

6    with you at some point to Tokyo to be your live-in housekeeper;

7    is that correct?

8    A.    That's correct.

9    Q.    And you were the one who paid for her ticket to go to

10   Japan; is that right?

11   A.    Yes.

12   Q.    You gave her funds to do so?

13   A.    No.

14   Q.    You paid for it directly?

15   A.    Correct, with the embassy travel office.

16   Q.    You also bought her clothing?

17   A.    Yes.  I believe she needed a coat and some boots because

18   of the change in climate from Yemen to Tokyo.

19   Q.    She also needed a visa to come with you to Tokyo; is that

20   correct?

21   A.    Yes, she did.

22   Q.    And you helped file the documents for that visa?

23   A.    What do you mean by help?

24   Q.    You went to the U.S. -- you went to the consul at the U.S.

25   Embassy in Tokyo as part of the visa process; is that right?

1    A.   I was in Yemen when the paperwork was filed, and she had

2    to file the paperwork in Ethiopia.  She had to go to her own

3    country to file.

4    Q.   Is it your testimony that you did not go and help arrange

5    for filing the visa at the consul of the U.S. Embassy in Tokyo?

6    A.   No, it is not.  It is my testimony that I am a State

7    Department employee, and I could pass those papers back and

8    forth via e-mail.  So that's how it was done.

9         The contract and the visa and the sponsorship had to

10   be approved by the U.S. Embassy and by the Japanese government

11   before we could take Sarah to Tokyo.

12   Q.   So let me unpack that.

13        MR. RINALDO:  Excuse me, so the record is clear, it

14   should be Jane Doe.

15        THE COURT:  Ms. Doe, right.  Thank you.

16   BY MS. PATTERSON: (Continuing)

17   Q.   So with Jane Doe, she needed a visa to come with you to

18   Tokyo; is that correct?

19   A.   Tokyo required a working visa, correct.

20   Q.   And Tokyo also required an employment contract; is that

21   correct?

22   A.   The embassy of the Tokyo required an employment contract,

23   correct.

24   Q.   And did I hear you correctly in your answer that while you

25   didn't take the documents to file, you were a conduit for those

1    documents; is that right?

2    A.   Yes, within the embassy system, correct.

3    Q.   So you helped her file your -- her visa documents?

4    A.   No, they weren't her visa documents.  They were documents

5    approving her for me to sponsor her by the American Embassy.

6    In order for her to get her visa, she had to physically go to

7    her home country and get her visa.

8    Q.   Mrs. Howard, you stated that Russell Howard fired Jane

9    Doe; is that correct?

10   A.   You asked me if Russell Howard fired her.  And, yes, Jane

11   Doe was fired.

12   Q.   And Jane Doe was fired by Russell Howard?

13   A.   And Linda Howard.

14   Q.   You both fired her?

15   A.   Correct.

16   Q.   And that was back in 2009; is that correct?

17   A.   Yes, I believe so.

18   Q.   After you kicked out Jane Doe from your home in Japan --

19              MR. RINALDO:  Objection, Your Honor.

20              THE COURT:  Sustained.

21   BY MS. PATTERSON: (Continuing)

22   Q.   After you fired -- after you fired Jane Doe in Tokyo,

23   Russell Howard went to Ethiopia; is that correct?

24   A.   Well, the time frame is a few years later.

25   Q.   But he did go -- sorry, I didn't mean to interrupt.  Go

1    ahead.  Go ahead, I am sorry, I didn't mean to interrupt.

2    A.    Could you please ask the question again.

3    Q.    Sure.  After Jane Doe was fired from your home in Tokyo,

4    Russell Howard went to Ethiopia; is that correct?

5    A.    Many years after Jane Doe's employment was terminated my

6    husband did go to Ethiopia.

7    Q.    That was about 2011; is that correct?

8    A.    I don't have any recollection of when that was, but it was

9    many years after we left Tokyo.

10   Q.    You stated that Mr. Howard died in 2012; is that correct?

11   A.    That's correct.

12   Q.    And Ms. Doe was fired from your home in 2009; is that

13   correct?

14   A.    Ms. Doe's employment was terminated in 2009, correct.

15   Q.    So sometime between 2009 and 2012 Russell Howard went to

16   Ethiopia; is that correct?

17             MR. RINALDO:  Objection, Your Honor.  The witness

18   already said 2011.

19             THE COURT:  Let's approach the bench, please.

20             NOTE:  A side-bar discussion is had between the Court

21   and counsel out of the hearing of the jury as follows:

22   AT SIDE BAR

23             THE COURT:  Where are we going?

24             MS. PATTERSON:  We are going to ask Mrs. Howard about

25   Mr. Howard filing the criminal charges against Jane Doe when he

1      got to Ethiopia.

2              MR. RINALDO:  Against Jane Doe?

3              MS. PATTERSON:  Yes.

4              MR. RINALDO:  In Ethiopia?  Okay.

5              THE COURT:  And where --  what's the point of that?

6              MR. RINALDO:  In this case.

7              MS. PATTERSON:  Your Honor, my client testified that

8      she was afraid of what Russell Howard would do because he

9      threatened to file criminal charges against her.  Ms. Doe also

10     testified about that.

11             This shows that Russell Howard was willing to do --

12     shows that Russell Howard is willing to follow through with

13     those threats.  It also shows consciousness of guilt.  And the

14     fact that the threats that he made against both of the victims,

15     that he -- sorry, let me take a step back.

16             So first it shows that he is willing --

17             THE COURT:  He followed through on threats.

18             MS. PATTERSON:  He followed through.  Secondly, it

19     was based on the timing, we are going to ask her about the

20     investigations into her.  Regardless of what the results of

21     that investigation were, there was a pending investigation.  He

22     went during that investigation to file criminal charges against

23     her.  And in fact did file those charges.  Mrs. Howard states

24     as much at her deposition.

25             MR. RINALDO:  But we have to remember, Your Honor,

1    that what we're talking about, and you just heard the time

2    frame, is that Jane Doe was terminated in 2009.

3              THE COURT:  And when did --

4              MR. RINALDO:  2011 is when she said that he even went

5    to Ethiopia.  We haven't gotten to what he was doing there.

6              THE COURT:  When was the administrative investigation

7    begun?  Was that 2009?

8              MS. PATTERSON:  I believe it was in 2009.

9              THE COURT:  I believes that's what the T visa says.

10             MS. PATTERSON:  Right.  And Mrs. Howard admits to the

11   fact that he went there because of the allegations that Jane

12   Doe made against the Howards.

13             MR. RINALDO:  But that's at least four years after

14   this witness -- it doesn't show a pattern.

15             THE COURT:  It doesn't need to show a pattern, but it

16   is directly against Ms. Doe that he files the criminal charges.

17   And there has been testimony by both the victims that he

18   threatened them with this.

19             MR. RINALDO:  There is no testimony that my client

20   threatened them.

21             THE COURT:  Correct.  And she may not know the answer

22   to any of this.  I don't know what happened in the deposition.

23   But I will permit the question.  Your exception is noted.

24             MR. RINALDO:  Your Honor, I can't see the clock.  Are

25   you at 3:30?

1          THE COURT:  It is quarter after.

2          MR. RINALDO:  Oh, fine.

3          THE COURT:  Okay.

4          NOTE:  The side-bar discussion is concluded;

5     whereupon the case continues before the jury as follows:

6     BEFORE THE JURY

7     BY MS. PATTERSON:  (Continuing)

8     Q.   Mrs. Howard, before the bench conference we were talking

9     about Russell Howard's trip to Ethiopia.  Do you recall that?

10    A.   I recall you asking me that, yes.

11    Q.   He stayed in Ethiopia for multiple days; is that correct?

12    A.   I don't know.

13    Q.   He told you that he stayed in Ethiopia for multiple days;

14    is that correct?

15    A.   Yes.

16    Q.   You told him it wasn't a good idea for him to be in

17    Ethiopia; is that correct?

18    A.   You're taking the conversation out of context.  But

19    essentially when he phoned me and told me he was in Ethiopia, I

20    told him that that wasn't a very good idea, and that he should

21    leave as soon as possible.  Unfortunately, the next flight out

22    was three days later.  The Africa flights don't usually run as

23    often as U.S. flights.  So that was the first available flight.

24    Q.   But you did tell him that it wasn't a good idea?

25    A.   Yes, I recall that.

```
1    Q.   You advised him that it wasn't a good because of the

2    allegations made against him by Jane Doe; is that correct?

3    A.   No, it is not.

4    Q.   Do you remember coming to do a deposition at Jones Day?

5    A.   Yes.

6    Q.   That was back in May of this year; is that correct?

7    A.   Yes.

8    Q.   There was a court reporter there?

9    A.   Yes.

10   Q.   You swore to tell the truth?

11   A.   Yes.

12           THE COURT:  Well, are you going to refresh her

13   recollection or -- I mean, what are you -- or are you

14   impeaching her?

15           MS. PATTERSON:  We will be impeaching her, Your

16   Honor.

17           THE COURT:  All right.  Pass those out.

18           Do you want to direct her to --

19           MS. PATTERSON:  Yes, Your Honor.

20   BY MS. PATTERSON: (Continuing)

21   Q.   Mrs. Howard, if I could turn your attention to page 344.

22   It actually starts at 343.

23           Actually, before we begin --

24   A.   343.

25   Q.   It says your name there at the top of 343, Linda Howard;
```

1    is that correct?

2    A.    Let me find 343, please.

3           MR. RINALDO:  Your Honor, we will stipulate it's a

4    copy of the deposition.

5           THE COURT:  I'm sorry.

6           MR. RINALDO:  We'll stipulate that this is a copy of

7    the deposition if that is where Ms. Patterson is going.

8           THE COURT:  Thank you, sir.  All right.  So this is a

9    copy of the deposition.  Please direct her to any specific

10   location at 343.

11          MS. PATTERSON:  Yes.  It's at the bottom of 343,

12   starting at line 22.

13   BY MS. PATTERSON: (Continuing)

14   Q.    Are you there?

15   A.    343, line 22.  Yes.

16   Q.    Please read silently as I read aloud:  Why did you advise

17   him it wasn't a good idea for him to be there?

18          And this is now on page 344.  Because I knew that --

19   your answer:  Because I knew that there was allegations by him,

20   against him by -- and then it's redacted, it says Jane Doe.

21          Did I read that correctly?

22          MR. RINALDO:  Objection, Your Honor.  Just how is

23   this impeachment?

24          THE COURT:  She denied in her earlier answer that she

25   had advised him -- why she had -- well, I can't remember the

1   earlier question.  I apologize.

2          MR. RINALDO:  This answer says it wasn't a good idea

3   for his safety.  That's what it says.

4          THE COURT:  Okay.  I apologize.  Mr. Linnell, can you

5   read back the earlier question prior to the deposition being

6   obtained.

7          MR. RINALDO:  Your Honor, in the interests of moving

8   along, I will withdraw my objection and let her read it.

9          THE COURT:  Okay.  All right, read it, please.

10         MS. PATTERSON:  Read it again?

11  BY MS. PATTERSON: (Continuing)

12  Q.   Mrs. Howard, can you read the answer from line 2 through 5

13  on page 344.

14  A.   May I preface this?

15         MR. RINALDO:  No, you just --

16  Q.   No.  Please just read the answer.

17  A.   What did you want me to read again?

18  Q.   It's lines 2 through 5 on page 344.

19  A.   Line number 2, Answer:  Because I knew that there was

20  allegations against him by Jane Doe, and I thought it wasn't a

21  very good idea for his safety for him to be in Ethiopia.

22         MS. PATTERSON:  Thank you, Mrs. Howard.

23         THE COURT:  Why don't we break now.  And I have a

24  plea at 3:30 that will take maybe 15 or 20 minutes.  So, we may

25  be a little later coming back than the 15 minutes I try and

1    hold our breaks to.  But I will get that done as quickly as

2    possible.

3             And I apologize.  I need to mix in criminal and stuff

4    that is a daily part of the job.  I do it in the mornings and

5    the evenings as best I can, and at lunch, but sometimes we need

6    to do it in the middle of the day as well.

7             So you are excused at this time.  Thank you.

8             NOTE:  At this point the jury leaves the courtroom;

9    whereupon the case continues as follows:

10   JURY OUT

11            THE COURT:  Okay.  If you will just make enough room

12   so we can proceed with our plea, then we will get back together

13   as soon as that is completed.

14            MR. RINALDO:  Your Honor, my client understands that

15   she is on the stand, and we won't discuss anything during the

16   break that she has testified to.

17            THE COURT:  All right, thank you.

18            All right, we're in recess.

19            NOTE:  At this point a recess is taken; at the

20   conclusion of which the case continues in the absence of the

21   jury as follows:

22   JURY OUT

23            THE COURT:  All right.  Ready for our jury?

24            MS. PATTERSON:  Yes, Your Honor.

25            MR. RINALDO:  Yes, Your Honor.

1          THE COURT:  All right, Joe, please.

2          NOTE:  At this point the jury returns to the

3  courtroom; whereupon the case continues as follows:

4  JURY IN

5          THE COURT:  Okay, please have a seat.

6          Ms. Patterson, please proceed.

7          MS. PATTERSON:  Yes, Your Honor.

8  BY MS. PATTERSON: (Continuing)

9  Q.   Mrs. Howard, before the break we were talking about

10 Russell Howard's trip to Ethiopia.  Do you recall that?

11 A.   Yes, I recall.

12 Q.   You spoke with Mr. Howard about this trip; isn't that

13 correct?  After he arrived in Ethiopia?

14 A.   Yes.

15 Q.   And when you spoke with him, he told you that he was going

16 to there to file a police report against Jane Doe; isn't that

17 correct?

18 A.   When my husband rang me from Ethiopia, he told me he was

19 there to file a police report on Jane Doe.

20 Q.   And he said he was filing a police report against Jane Doe

21 because of the incident that happened in Tokyo with her; is

22 that correct?

23 A.   To the best of my knowledge, yes.

24 Q.   And because of the allegations that she made about what

25 happened in Tokyo; is that correct?

1    A.    Yes.

2    Q.    And he did in fact file a police report in Ethiopia

3    against Jane Doe; is that correct?

4    A.    I don't know that.  I'm assuming he did because he told me

5    he did, but I was not physically there when that happened.

6    Q.    But he told you that he filed a police report against Jane

7    Doe in Ethiopia; is that correct?

8    A.    Yes, he did.

9    Q.    Mrs. Howard, you mentioned that you went to Tokyo after

10   Sana'a; is that right?

11   A.    After my posting in Sana'a was completed, I was assigned

12   to Tokyo.

13   Q.    You were assigned to Tokyo like you were assigned to those

14   other postings, Sana'a, Guatemala City, et cetera; is that

15   correct?

16   A.    That's correct.

17   Q.    And you arrived in late 2008 or early 2009; is that

18   correct?

19   A.    No.  I arrived about a week before Christmas in 2008.

20   Q.    Okay.  So in December of 2008 you arrived to Tokyo; is

21   that correct?

22   A.    That's correct.

23   Q.    You previously testified that State Department postings

24   are typically two to three years; is that correct?

25   A.    That's correct.

L. Howard - Cross

517

1    Q.   You left Tokyo in 2009; is that correct?

2    A.   Yes.

3    Q.   You left Tokyo in 2009 after the allegations by Jane Doe;

4    is that correct?

5    A.   I left Tokyo in 2009, I think it was June 2009.

6    Q.   That was after Jane Doe made allegations against you and

7    Mr. Howard; is that correct?

8    A.   Yes.

9    Q.   Then you moved to the United States; is that correct?

10   A.   I was transferred back to the United States.  I requested

11   a curtailment, and I came back to Washington, D.C.

12   Q.   And Russell Howard came with you to Washington, D.C.; is

13   that correct?

14   A.   Yes.

15   Q.   This was in 2009?

16   A.   It was June, beginning of June 2009.

17   Q.   At some point before Russell Howard's death he moved back

18   to Australia; is that correct?

19   A.   That's correct.

20   Q.   That's because his visa expired; is that correct?

21   A.   That's correct.

22   Q.   He originally intended or you both intended to renew his

23   visa; is that correct?

24   A.   His United States visa?

25   Q.   Yes, Mrs. Howard.

1   A.   I believe that the United States visa was an older visa

2   that we had gotten on an R&R earlier because it was a ten-year

3   visa.

4   Q.   So I'm going to back to my question.  Mr. Howard moved to

5   Australia; is that correct?

6   A.   Yes.

7   Q.   Because his visa had expired; is that correct?

8   A.   He left the United States because his visa expired.

9   Q.   And you originally intended to renew that visa; is that

10  right?

11  A.   Well, I don't know what his intentions were.  We didn't

12  originally intend to be in the United States at that time, so

13  we --

14  Q.   Sorry.  Sorry about that.  Go ahead and finish.

15  A.   Well, in hindsight we probably should have renewed the

16  visa before we left Tokyo, but we didn't.

17            May I say something?

18            THE COURT:  Just wait for the next question, if you

19  would.

20            THE WITNESS:  Thank you.

21  BY MS. PATTERSON: (Continuing)

22  Q.   Mrs. Howard, you and Russell Howard made an appointment in

23  Canada to renew his American visa; is that correct?

24  A.   I didn't make an appointment.  It might have been an

25  online thing to renew a visa.

519

1    Q.   But there was an appointment to renew his visa in Canada,

2    to renew Russell Howard's visa in Canada; is that correct?

3    A.   I believe so, yes.

4    Q.   And then either you or Mr. Howard or both decided against

5    it; is that correct?

6    A.   Well, it's Russell's visa.  So if -- yes.

7    Q.   And the decision not to renew the visa was made after you

8    consulted an attorney; is that correct?

9    A.   That's correct.

10   Q.   And this attorney was not immigration counsel; is that

11   correct?

12   A.   I don't believe he was.  He might have had some

13   background, but I don't believe so.

14   Q.   It was actually counsel that you had consulted with

15   respect to the allegations?

16           MR. RINALDO:  Objection, Your Honor.

17           THE COURT:  I'll allow the question.

18   BY MS. PATTERSON: (Continuing)

19   Q.   Do you need me to repeat my question, Mrs. Howard?

20   A.   Yes, please.

21   Q.   I had asked you if the counsel you had consulted was

22   counsel that you had spoken to about allegations -- with

23   respect to the allegations?

24           THE COURT:  The Jane Doe allegations?

25   Q.   Yes, Your Honor.

1  A.    The counsel that I spoke to was recommended by the United

2  States Department of State.

3  Q.    That was an attorney that you had spoken to to discuss the

4  allegations made by Jane Doe; is that correct?

5            MR. RINALDO:  Your Honor, objection.

6            THE COURT:  Sustained.  We are getting far afield

7  here.

8  BY MS. PATTERSON: (Continuing)

9  Q.    Mrs. Howard, you were testifying earlier that part of the

10  reason you had a housekeeper is because you didn't want to have

11  to pick up after your guests; is that right?

12  A.    Yes.

13  Q.    As well as yourself; is that right?

14  A.    Dinner dishes, yes.

15  Q.    Because you would often host parties at your home in

16  Sana'a, Yemen; is that correct?

17  A.    We often hosted dinners.

18  Q.    And at those dinners you had guests come to your home; is

19  that correct?

20  A.    That's correct.

21  Q.    And you would serve alcohol at those parties; is that

22  correct?

23  A.    Yes.

24  Q.    When you went to the Marine Club, there was alcohol at the

25  Marine Club as well?

1   A.   Yes.

2   Q.   And you yourself drank alcohol; is that right?

3   A.   Yes.

4   Q.   As well as your husband, Mr. Howard?

5   A.   Yes.

6   Q.   Mrs. Howard, I want to ask you about the Indian restaurant

7   that was across the street from the Hadda complex.  Do you

8   recall that Indian restaurant?

9   A.   Not really.  I know that -- I recall that outside the

10  Hadda main gate there was a street with the chicken guy, the

11  bread guy, the fruit guy, and there was a couple of restaurants

12  along with a barber shop.  The reason I recall that is because

13  that was the main entrance that the shuttle would have to take

14  to get into the compound.

15  Q.   Thank you, Mrs. Howard.  And one of those restaurants was

16  the Indian restaurant; is that correct?

17  A.   Yes.

18  Q.   And you ate at the Indian restaurant?

19  A.   Well, not usually, because women were not allowed to eat

20  at restaurants.

21  Q.   Not usually, but you did in fact eat at the Indian

22  restaurant?

23  A.   May I clarify, please?  It was an earlier point as well.

24  I said that --

25  Q.   Mrs. Howard --

L. Howard - Cross

522

1          THE COURT:  No, go ahead, let her finish.

2   A.    May I please finish?

3   Q.    Yes.

4          THE COURT:  Yes, go ahead.

5   A.    I said that my husband and I did not eat at restaurants

6   outside, but I did not say that I was not allowed to go to

7   restaurants outside.  For something like -- it was less than

8   500 meters outside the door, I could quickly stop for take away

9   or that type of thing.

10  Q.    So you did go to the Indian restaurant; is that correct?

11  A.    I don't recall the Indian restaurant, ever going for take

12  away there.  I do recall going for take away one time at the

13  chicken restaurant.

14  Q.    That was the chicken restaurant outside of the Hadda

15  complex?

16  A.    That's correct.

17  Q.    Did Mr. Howard eat at the Indian restaurant?

18  A.    I am sure he did, yes.

19  Q.    And you didn't accompany him to the Indian restaurant; is

20  that correct?

21  A.    Not normally, no.  As I said, it would be take away or

22  something like that.

23  Q.    And that's in part because Russell Howard cooked most

24  evenings; is that right?

25  A.    Yes.

L. Howard - Cross

523

1   Q.   You said he was a great cook?

2   A.   Yes, he was.

3   Q.   And it was just the two of you in the apartment; is that

4   right?

5           MR. RINALDO:  Could I have a time frame, Your Honor?

6           THE COURT:  Yes.

7           MS. PATTERSON:  I will rephrase.

8           THE COURT:  Are you including Ms. Roe in that or not?

9           MS. PATTERSON:  I will clarify, Your Honor.

10          THE COURT:  All right, let's start over.

11  BY MS. PATTERSON: (Continuing)

12  Q.   Mrs. Howard, aside from any live-in help in Sana'a, Yemen,

13  only you and Mr. Howard resided at your apartment at the Hadda

14  complex; is that correct?

15  A.    It was my husband and I, yes.

16  Q.   You two did not have any kids?

17  A.   No, we were not blessed with children.

18  Q.   The apartment, you stated earlier was a three-bedroom

19  apartment; is that correct?

20  A.    That's correct.

21  Q.   And that was a three-bedroom apartment in Sana'a, Yemen;

22  is that right?

23  A.   Yes.

24  Q.   You stated that you had live-in help in Guatemala as well;

25  is that correct?

L. Howard - Cross

524

1  A.   Yes, that's correct.

2  Q.   That was also a three-bedroom apartment?

3  A.   Yes, it was.

4  Q.   Before you lived in Guatemala, you lived in Melbourne,

5  Australia; is that correct?

6  A.   That's correct.

7  Q.   That was also a three-bedroom apartment?

8  A.   That's correct.

9  Q.   You didn't have live-in help in Australia; is that

10 correct?

11 A.   That's correct.

12 Q.   You had housekeeping help though; is that right?

13 A.   Yes.

14 Q.   You had housekeeping help that came once or twice a week?

15 A.   That's correct.

16 Q.   While you were in Melbourne, Australia Mr. Howard retired

17 from the Australian equivalent of the State Department; is that

18 right?

19 A.   That's correct.

20 Q.   Before Melbourne, you were in -- let's see, New York; is

21 that right?

22 A.   Yes, I was at the U.S. Mission to the United Nations in

23 New York.

24 Q.   And when you were in the mission for the United Nations in

25 New York, you also had help come to your home; is that correct?

1 A. Yes.

2 Q. But that help did not live in your home; is that correct?

3 A. That's correct.

4 Q. That help came once or twice a week?

5 A. Yes.  The concierge at the building organized it.

6 Q. Prior to that, you lived in Geneva?

7 A. Yes.

8 Q. And in Geneva you had help come to your home as well?

9 A. Yes.

10 Q. Again, that help came once or twice a week?

11 A. Correct.

12 Q. And prior to that, you lived in Paris; is that right?

13 A. Yes.

14 Q. And in Paris, Mr. Howard had someone who came once or

15 twice a week; is that right?

16 A. Yes.

17 Q. But that woman did not live in your home?  Or in his home.

18 A. The lady in Paris came once or twice a week.  Yes, she did

19 not live in the apartment.

20 Q. And the housekeeper in Geneva did not live in the

21 apartment?

22 A. That's correct.

23 Q. Nor the housekeeper in New York?

24    MR. RINALDO:  Your Honor, asked and answered already,

25 all three of them.

526

1          THE COURT:  Overruled.  I will allow it.

2   BY MS. PATTERSON: (Continuing)

3   Q.   So the housekeeper in New York did not live in the home;

4   is that correct?

5   A.   That's correct.

6   Q.   And in Guatemala the housekeeper lived inside your home;

7   is that correct?

8   A.   Yes.  There was housekeepers quarters with an en suite in

9   the home in Guatemala, and the housekeeper resided there.

10  Q.   All of your housekeepers in Guatemala were women; is that

11  correct?

12  A.   All of the housekeepers that lived in my home, yes, were

13  women.

14          MR. DeLORME:  The Court's indulgence, Your Honor.

15          THE COURT:  Yes, sir.

16          MS. PATTERSON:  No further questions, Your Honor.

17          THE COURT:  All right.  Redirect?

18          MR. RINALDO:  Perhaps just one or two, please.

19          THE COURT:  Sure.

20      REDIRECT EXAMINATION

21  BY MR. RINALDO:

22  Q.   Mrs. Howard, during cross-examination Ms. Lim Patterson

23  asked you about the time that Russell Howard went to Ethiopia

24  in 2011.  Do you recall that?

25  A.   Yes.

L. Howard - Redirect

527

1    Q.   When he left -- where were you when he left?  Tokyo?  Were

2    you still in Tokyo?

3    A.   No.

4    Q.   Where were you?

5    A.   I was in -- I believe we were in Washington.  I was in

6    Washington, D.C., and he was not in Washington, D.C.

7    Q.   And did you know in advance that he was going to Ethiopia?

8    A.   No, I did not.

9    Q.   When was the first time you found out he was in Ethiopia

10   in 2011?

11   A.   When he rang me on the telephone and told me that he was

12   in Ethiopia.

13   Q.   And what did he tell you he was going to do while he was

14   there?

15   A.   He was going to file a police report.

16   Q.   Against whom?

17   A.   Jane Doe.

18   Q.   And did he tell you what charge he was going to make?  Was

19   there a name for the charge?

20   A.   Yes.

21   Q.   What was that?

22   A.   The word escapes me.  What does it mean when somebody

23   tries to extort money from you?

24          MR. RINALDO:  If you don't remember the name, that

25   will be sufficient.

528

1               I have no further questions, Your Honor.

2               THE COURT:  Okay.  All right, you may step down and

3      return to your seat.  Thank you.

4               THE WITNESS:  Thank you.

5               NOTE:  The defendant stood down.

6               THE COURT:  Any other witnesses, Mr. Rinaldo?

7               MR. RINALDO:  No, Your Honor.

8               THE COURT:  All right.  Any rebuttal testimony?

9               MR. RINALDO:  The only thing is I was going to, I was

10     probably going to offer the plaintiff's exhibit --

11              THE COURT:  If you want to offer exhibits, go ahead.

12              MR. RINALDO:  Just one, that's all I was going to do,

13     I was going to offer Plaintiff's Exhibit C, which was the

14     travel.

15              THE COURT:  The travel.  Any objection to C?

16              MS. PATTERSON:  Defendant's C?

17              MR. RINALDO:  Defendant's C.

18              THE COURT:  Defendant's C.

19              MS. PATTERSON:  We have no objections, Your Honor.

20              THE COURT:  All right.  That will be received.

21              MR. RINALDO:  That's all I wanted to do, Your Honor.

22              THE COURT:  All right, thank you.

23              Do you have any rebuttal witnesses?

24              MS. PATTERSON:  May we approach, Your Honor?

25              THE COURT:  Yes.

529

1           NOTE:  A side-bar discussion is had between the Court

2     and counsel out of the hearing of the jury as follows:

3     AT SIDE BAR

4           MS. PATTERSON:  Your Honor, we have one issue left

5     open, and that's the admissibility and entry of the T visa and

6     the Supplemental B into evidence.

7           As Mr. DeLorme pointed out at the end of our case in

8     chief, he wanted to leave that open in the event that Mr.

9     Rinaldo decides to make the allegations about Ms. Roe making up

10    these allegations in order to get a T visa.

11          MR. RINALDO:  I am not going to say that in my

12    closing.

13          THE COURT:  Okay.  All right.

14          MR. RINALDO:  I may say she was making up the

15    allegations, but it won't be because of the T visa.

16          THE COURT:  I am not going to admit the T visa,

17    especially the Supplemental B.  I think that these

18    administrative matters -- I mean, the evidence is out that

19    there was a T visa filed, and that both Ms. Doe and Ms. Roe are

20    living here in the United States under that.  It was

21    sufficiently described in the testimony.

22          The exhibits themselves go beyond that testimony.

23    And there are findings made by investigators.  There is no due

24    process in the process.  It's really unclear to me what

25    witnesses were spoken to besides the victims.  Whether there

530

1    was any substantive defense offered.  And as a result, they are

2    highly prejudicial and I think inadmissible under 403.

3           So unless you have got another reason why they should

4    come in, I think that's my ruling.

5           MS. PATTERSON:  Yes, Your Honor.  As we mentioned

6    earlier, the one fact we wanted from it is that Ms. Roe raised

7    her allegations in 2009.

8           MR. RINALDO:  She has testified to that.

9           THE COURT:  And that testimony hasn't been contested.

10          MR. DeLORME:  Will she have the latitude in her

11   closing argument to be able to tell the jury that a T visa is

12   designed for those who have suffered from human trafficking?

13          THE COURT:  No.  She is going to -- I am not going to

14   take judicial notice of that.  Again, the testimony is that

15   they both came here on that T visa and were able to come into

16   the United States because of the allegations.

17          MR. DeLORME:  I just don't want her to be hamstrung

18   and not use the word "trafficking" to define the T visa, which

19   is where Mr. Rinaldo is trying to go.

20          MR. RINALDO:  I don't think the judge said that.

21          THE COURT:  Well, what was the testimony?

22          MR. DeLORME:  The testimony was that it was a

23   trafficking visa, and it was shortened, the nomenclature was

24   shortened either by counsel or the witnesses to a T visa.

25          MR. RINALDO:  I am not going to object if they say

L. Howard - Redirect

531

1   the word "trafficking" visa at least once and then shorten it

2   to T visa.

3           But I am going to object if they are going to say

4   what that means as far as a finding by the government because

5   you were not letting that in.

6           THE COURT:  The fact is that they both received a

7   trafficking visa and are here in the United States.

8           MR. DeLORME:  Lawfully.

9           THE COURT:  I think any reference to a finding by the

10  United States government that there is a finding by them that

11  Linda Howard is guilty of that, or Russell Howard, is improper.

12          MR. DeLORME:  I understand the line, Your Honor.

13          MS. PATTERSON:  Absolutely.

14          THE COURT:  All right, good.  So we are done with the

15  evidence?

16          MR. RINALDO:  Right.  You don't have anyone else on

17  rebuttal, right?

18          MS. PATTERSON:  I don't believe so, Your Honor.

19          MR. RINALDO:  So you are going to rest?

20          MS. PATTERSON:  Yes.

21          THE COURT:  Is it quarter after 4.

22          THE CLERK:  It is 4:25.

23          THE COURT:  It's 4:25.  Do you want me to do the

24  instructions before closing arguments?

25          MR. RINALDO:  Please.

532

1              MS. PATTERSON:  Yes, Your Honor.

2              THE COURT:  I am happy to do that.  I can go ahead

3    now and read the instructions and do closing arguments in the

4    morning.  I have a 9 o'clock and a 10 o'clock docket, and I

5    will be done by 11.  So we can do that at 11.

6              MR. RINALDO:  That would be fine with me, Your Honor.

7              THE COURT:  All right.  The first thing I need you to

8    do is look at the proposed jury instructions and make any final

9    objections to them.

10             MR. RINALDO:  Are you going to instruct the jury in

11   the morning or this afternoon?

12             THE COURT:  I was going to do it right now.

13             MR. RINALDO:  Right.  Could we have time -- we

14   haven't had a chance to look at them.  Could we have ten

15   minutes?

16             THE COURT:  I think that's what I just said.

17             MR. RINALDO:  I didn't hear it.  I'm sorry, Your

18   Honor, I didn't hear you.

19             THE COURT:  That's all right.  So let's take ten

20   minutes and look at the instructions, and then I will come back

21   and I will deliver those.

22             The jury verdict form, I still need to work on a

23   little bit more, and we can do that in the morning.  It's

24   obviously not necessary at this stage.

25             MR. RINALDO:  All right.  Thank you, Judge.

1             THE COURT:  All right, thank you all.

2             NOTE:  The side-bar discussion is concluded;

3    whereupon the case continues before the jury as follows:

4    BEFORE THE JURY

5             THE COURT:  Ladies and gentlemen, that concludes the

6    evidence in the case.  We are going to take a recess for 10 or

7    15 minutes to discuss a few matters, and then I'm going to come

8    back and I'm going to read the final jury instructions to you.

9    That will take us up to the end of the day today.  And we will

10   come back tomorrow.

11            I have a docket -- Fridays are days where I have a

12   number of matters each Friday, and I will start with the

13   criminal matters at 9 and then civil matters at 10.  I think

14   that I will be clear of those by 11.

15            So I will need you to come back tomorrow at 11.  You

16   will hear closing arguments at that time, and then be able to

17   deliberate afterwards.

18            All right.  So let's take about a 10- or 15-minute

19   recess now, and we will come back and I will read you my

20   closing instructions.  All right?

21            All right, you are excused.

22            NOTE:  At this point the jury leaves the courtroom;

23   whereupon the case continues as follows:

24   JURY OUT

25            THE COURT:  Okay.  Let's take a look at the

1   instructions.  And remember to preserve your Rule 52 -- or 50

2   motion, right?

3        MR. RINALDO:  Right.  Your Honor, I don't think

4   that's going to take very long.  We could do it in the morning.

5        THE COURT:  That's what I was going to suggest.

6        All right.  Anything else before we break?  All

7   right.  Take a look at them, and we will come back in and talk

8   about it.

9        We're in recess.

10       NOTE:  At this point a recess is taken; at the

11  conclusion of which the case continues in the absence of the

12  jury as follow:

13  JURY OUT

14       THE COURT:  All right.  As you see from the jury

15  instructions, I have left the definitions in, and I think the

16  elements of the offense.

17       I have stripped out some of the factual basis.  I

18  believe that's for argument.  And also the stipulated facts, I

19  think that's for argument.

20       Of course, if you highlight certain facts and not

21  other facts, then you're drawing I think attention to certain

22  of them, and you put into question whether they should believe

23  other ones and what weight to give them.

24       The instruction that I think that they should be

25  governed by is that they have the ability to weigh all facts

L. Howard - Redirect

535

1   and give whatever weight they want to the credibility of any of

2   the testimony.  So that's why I did what I did.

3            And do you have any closing comments on the

4   instructions?

5            MR. RINALDO:  Not on that one, Your Honor, we are

6   fine with that.  At least we are.  We are fine with that, now

7   that we heard why you did it.  I understand.

8            THE COURT:  Okay.  But this is your opportunity to

9   make any further objections.

10           MR. RINALDO:  I know.  Do you guys have any?

11           MR. SALINAS:  We do not, Your Honor.

12           THE COURT:  Okay.

13           MR. RINALDO:  I do.

14           THE COURT:  All right.

15           MR. RINALDO:  I don't think it will take more than

16   about a minute-and-a-half.

17           THE COURT:  All right.

18           MR. RINALDO:  There are only objections to four of

19   them, Your Honor.

20           THE COURT:  All right.

21           MR. RINALDO:  You can put two of them together,

22   number 22 and 28.

23           THE COURT:  Okay.

24           MR. RINALDO:  22 and 28 are clearly implicated by

25   what I think the Court is already aware is going to be a Rule

1    50 motion tomorrow morning.

2            I know the Court is going to instruct tonight.  For

3    purposes of the record, I would like to note an objection to

4    these instructions tonight, to 22 and 28.

5            But what I want to explain to the Court is my

6    thinking on that is that if I were to prevail on my Rule 50

7    motion, the case won't go to the jury at all, so it really

8    won't matter.

9            So for purposes of preserving my appellate rights

10   under the jury instructions, I would like to object to 22 and

11   28 as well, frankly, because they are going to be covered by

12   motions under Rule 50, but we'll see.

13           And then number 29, I don't think there is enough --

14   I mean, Russell Howard acted, I think the evidence is, acted

15   independently, particularly with respect to knowledge.  And I

16   don't think there is enough beyond speculation to give a count

17   on conspiracy per se.

18           I have not objected to number 30 because the

19   statement of the elements and explanation of conspiracy,

20   obviously, are of course in accordance with applicable law.

21   But in terms of giving the instruction at all for 29, that's

22   why I have objected to that.

23           THE COURT:  Okay.

24           MR. RINALDO:  And number 32 on punitive damages,

25   Russell Howard is not a party to this case.  Were Russell

1    Howard a party to this case, I probably wouldn't be able to

2    make an objection on the grounds -- although I don't think -- I

3    don't think, based on the evidence, I couldn't say really that

4    you shouldn't give an instruction at all on punitives.

5             I think for Linda Howard, I object to giving an

6    instruction on punitives as to Linda Howard, who is the only

7    remaining defendant based on the evidence in this case.

8             Thank you.

9             THE COURT:  All right, thank you.

10            Do you want to respond to that, Mr. Salinas?

11            MR. SALINAS:  Briefly, Your Honor.

12            THE COURT:  Yes.  If any of the counts go out

13   tomorrow morning, then I will identify that to the jury and

14   tell them not to consider it.  And they won't have copies of

15   the instructions until tomorrow in any event.

16            So I think we can -- there may be some prejudice that

17   you can identify, but --

18            MR. RINALDO:  That's what I thought, Your Honor.

19   That's why I said that I'm just doing it to preserve the

20   record.  It's not prejudicial on the grounds that I think --

21            THE COURT:  I think we can straighten that out with

22   the jury if it is necessary, I think.

23            MR. RINALDO:  We understand.

24            THE COURT:  All right.  Mr. Salinas.

25            MR. SALINAS:  I will just state that it sounds like

538

1    most of that will be discussed tomorrow morning.

2            But just with regard to punitive damages, I think our

3    position would be that if any claim survives to the jury under

4    this Trafficking Victims Protection Act, a punitive damages

5    instruction is appropriate.

6            THE COURT:  Well, I think with Mrs. Howard charged

7    both as a principal and as an aider and abettor in each one of

8    the substantive counts, 1 through 3, I think she -- if the jury

9    found that she was aware of what Russell Howard was doing and

10   aided either as a principal or an aider and abettor, then I

11   think she is subject to a consideration of punitive damages if

12   they find the evidence beyond a preponderance.

13           So I think that under -- legally, I think that the

14   punitive damages is appropriate to give to the jury for

15   consideration.

16           MR. RINALDO:  You will note my exception on that one.

17           THE COURT:  Yes, sir.  Okay.  Then are we ready for

18   our jury?

19           MS. PATTERSON:  Just one note, Your Honor.

20           THE COURT:  Yes.

21           MS. PATTERSON:  If we could request to have the

22   verdict form and jury instructions e-mailed to us so that we

23   could have a copy tonight, we would appreciate that.

24           THE COURT:  That will be done.

25           MS. PATTERSON:  Thank you, Your Honor.

 1          THE COURT:  So you have the jury verdict form as

 2  well, right?

 3          MS. PATTERSON:  Yes.

 4          MR. RINALDO:  Why do we need the e-mail?  We have

 5  them.

 6          MS. PATTERSON:  We have multiple people on our team,

 7  Your Honor.

 8          MR. RINALDO:  I forgot.

 9          THE COURT:  Because they're not our age, that's why.

10          MR. RINALDO:  That's it, Your Honor.  I am fine, we

11  don't have to get them.  Mr. Battle and I will not be looking

12  at the e-mail copies this evening, we can say that without the

13  jury being here.

14          THE COURT:  All right.

15          MS. PATTERSON:  Thank you, Your Honor.

16          THE COURT:  Happy to do that.

17          Joe, let's get our jury, please.

18          NOTE:  At this point the jury returns to the

19  courtroom; whereupon the case continues as follows:

20  JURY IN

21          THE COURT:  All right, please be seated.

22          As I said before the break, I'm going to read the

23  jury instructions to you.  The bad news is it's going to take a

24  little time, probably close to half an hour or so.

25          The good news is that you will have copies back in

540

1    the jury room with you to reference if need be tomorrow after

2    you get the case for deliberation.

3            But if you will bear with me, I am going to read

4    them.  I have given them many times, but that doesn't mean I am

5    going to get it right if I try and ad lib.  So let me read them

6    instead.

7            Now that you've heard all the evidence that is to be

8    received in the trial, it's my duty to give you the final

9    instructions as to the law applicable to the case.  You should

10   use these instructions to guide you in your decisions.

11           All of the instructions of law given to you, those

12   given at the beginning of the trial and during the trial and

13   these instructions, must guide and govern your deliberations.

14           It's your duty as jurors to follow the law as stated

15   in all the instructions and to apply these rules of law to the

16   facts as you find them to be from the evidence received during

17   the trial.

18           Counsel will refer to some of the applicable rules of

19   law in their closing arguments.  If any differences appear to

20   you between the law as stated by counsel and that stated in

21   these instructions, you are to be governed by these

22   instructions.

23           You are not to single out any one instruction alone

24   as stating the law, but must consider the instructions as a

25   whole in reaching your decisions.

541

1          Neither are you to be concerned with the wisdom of

2   any rule of law.  Regardless of any opinion you may have as to

3   what the law to be, it would be a violation of your sworn duty

4   to base any part of your verdict upon any other view or opinion

5   of the law than that given in these instructions, just as it

6   would be a violation of your sworn duty as judges of the facts

7   to base your verdict on anything but the evidence that was

8   received in the case.

9          You were chosen as jurors for this trial in order to

10   evaluate all of the evidence and to decide each of the factual

11   questions presented by the allegations brought by the plaintiff

12   and the defendant.

13          In resolving the issues presented to you for decision

14   in this trial, you must not be persuaded by bias, prejudice, or

15   sympathy for or against any of the parties to this case or by

16   any public opinion.

17          Justice through trial by jury depends upon the

18   willingness of each individual juror to seek the truth from the

19   same evidence presented to all the jurors here in the courtroom

20   and to arrive at a verdict by applying the same rules of law as

21   are now being given to each of you in these instructions.

22          This case should be decided by you as an action

23   between parties of equal standing in the community, of equal

24   worth, regardless of their stations in life.  Neither plaintiff

25   nor defendant should be favored or disfavored because of her

L. Howard - Redirect

542

1    race, ethnicity, gender, or nationality.  The parties are

2    entitled to the same fair trial at your hands.  They stand

3    equal before the law and are to be dealt with as equals in the

4    court.

5           There is nothing particularly different in the way

6    that a juror should consider the evidence in a trial from that

7    which any reasonable and careful person would deal with any

8    important -- any very important question that must be resolved

9    by examining facts, opinions, and evidence.  You are expected

10   to use your good sense in considering and evaluating the

11   evidence in the case.  Use the evidence only for those purposes

12   for which it has been received, and give the evidence a

13   reasonable and fair construction in light of your common

14   knowledge of the natural tendencies and inclinations of human

15   beings.

16          Plaintiff has the burden in a civil such as this to

17   prove every essential element of plaintiff's claim by a

18   preponderance of the evidence.  If plaintiff should fail to

19   establish any essential element of plaintiff's claim by a

20   preponderance of the evidence, you should find for the

21   defendant as to that claim.

22          "Establish by a preponderance of the evidence" means

23   evidence which, as a whole, shows that the fact sought to be

24   proved is more probably than not.  In other words, a

25   preponderance of the evidence means such evidence as when

1    considered and compared with the evidence opposed to it has

2    more convincing force and produces in your minds belief that

3    what is sought to be proved is more likely true than not true.

4    This standard does not require proof of an absolute certainty

5    since prove to an absolute certainty is seldom possible in any

6    case.

7              In determining whether any fact in issue has been

8    proved by a preponderance of the evidence, unless otherwise

9    instructed, you may consider the testimony of all witnesses,

10   regardless of who may have called them, and all exhibits

11   received in evidence, regardless of who may have produced them.

12             When I instruct you that a party has the burden of

13   proof on any proposition or use the expression "if you find" or

14   "if you decide," I mean that you must be persuaded considering

15   all the evidence in the case that the proposition is more

16   probably true than not.

17             The evidence in the case consists of the sworn

18   testimony of the witnesses, no matter who called the witness;

19   all exhibits received in evidence, regardless of who may have

20   produced the exhibits; and all facts that may have been

21   judicially noticed that you must take as true.

22             And I don't think I gave any judicial notices, but

23   counsel will correct me if I'm wrong.  Any judicial notice?

24             MR. RINALDO:  I think you are right, Your Honor, you

25   didn't.

1          THE COURT:  Okay, thank you.  Depositions have not

2    received in this case as well.

3          Statements and arguments of lawyers are not evidence

4    in the case unless made as an admission or stipulation of fact.

5          We didn't have any stipulations that I recall either.

6    Did we stipulate to any of the facts?

7          MR. RINALDO:  There were some stipulated facts that

8    you decided is more appropriate for us to say tomorrow.

9          THE COURT:  Okay.  Thank you.  If the lawyers on both

10   sides stipulate or agree to the existence of a fact, you must,

11   unless otherwise instructed, accept the stipulation as evidence

12   and regard that fact as proved.

13         If I sustained an objection to any evidence or if I

14   ordered evidence stricken, that evidence must be entirely

15   ignored.

16         Some evidence is admitted for a limited purpose only.

17   If I instruct you that an item of evidence has been admitted

18   for a limited purpose, you must consider it only for that

19   limited purpose.

20         You are to consider only the evidence in the case.

21   But in your consideration of the evidence, you are not limited

22   to the statements of the witness.  In other words, you are not

23   limited solely to what you see and hear as the witnesses

24   testify.  You may draw from the facts that you find have been

25   proved such reasonable inferences or conclusions as you feel

1    are justified in light of your experience.

2            I think I said you must not consider any matter that

3    was rejected or stricken by the Court, it's not evidence and

4    should be disregarded.

5            Direct evidence is the direct proof of a fact, such

6    as testimony by a witness about what the witness said, or

7    heard, or did.

8            Circumstantial evidence is proof of one or more facts

9    from which you could find another fact.

10            You should consider both kinds of evidence.  The law

11    makes no distinction between the weight to be given either to

12    direct or circumstantial evidence.  You are to decide how much

13    weight to give any evidence.

14            As I said, you are to consider only the evidence in

15    the case.

16            And as I believe I indicated, inferences are

17    deductions or conclusions that reason and common sense lead you

18    to draw from facts established by the evidence in the case.

19            And as you can tell, these are general instructions,

20    and every one of these sentences may not apply to the facts of

21    your case, but they are established instructions that will

22    guide you in your deliberations here.

23            If any reference by me or by counsel to matters of

24    testimony or exhibits does not coincide with your own

25    recollection of that evidence, it is your recollection which

1    should control during your deliberations and not the statements

2    of the Court or of counsel.

3         You are the sole judges of the evidence received in

4    the case.

5         The questions asked by counsel for either party in

6    the case are not evidence.  If an attorney asks a question of a

7    witness which contains an assertion of fact, therefore, you may

8    not consider the assertion by the counsel of any evidence -- as

9    any evidence of that fact.  Only the answers are evidence.

10        From time to time it was necessary for me to talk to

11   the attorneys out of your hearing.  The purpose of these

12   conferences is not to keep relevant information from you, but

13   to decide how certain evidence is to be treated under the rules

14   of evidence and to avoid confusion and error.  Do not consider

15   my granting or denying a request for a conference as any

16   indication of my opinion of the case or of what your verdict

17   should be.  These conferences are necessary, and I hope that we

18   limited them as best that we could during the trial.

19        It's my duty to caution or warn an attorney who does

20   something that I believe is not in keeping with the rules of

21   evidence or procedure.  Again, you are not to draw any

22   inference against the side I may have cautioned or warned

23   during the trial.

24        Testimony and exhibits may be admitted into evidence

25   during a trial only if they meet certain criteria or standards.

1    It's a lawyer's or attorney's duty to object when the other

2    side offers testimony or an exhibit that the lawyer believes is

3    not properly admissible under the rules of law.  Only by

4    offering an objection can a lawyer request and obtain a ruling

5    on the admissibility of the evidence being offered by the other

6    side.  You should not be influenced against any lawyer or

7    certainly their client because the lawyer has made objections.

8         Do not attempt to interpret my rulings on objections

9    as somehow indicating how I think you should decide this case.

10   I am simply making a ruling on a legal question.

11        During the trial I have at times asked a witness a

12   question.  Do not assume that I have any opinion about the

13   subject matter of my questions.

14        In deciding the facts, you may have to decide -- you

15   have to decide which testimony to believe and which testimony

16   not to believe.  You may believe everything a witness says,

17   part of it, or none of it.

18        In considering the testimony of any witness, you may

19   take into account many factors, including the witness'

20   opportunity and ability to see, or hear, or know the things the

21   witness testified about; the quality of the witness' memory;

22   the witness' appearance and manner while testifying; the

23   witness' interest in the outcome of the case; any bias or

24   prejudice the witness may have; the other evidence that may

25   have contradicted the witness' testimony; and the

548

1    reasonableness of the witness' testimony in light of all the

2    evidence.

3            The weight of the evidence does not necessarily

4    depend upon the number of witnesses who testify.

5            You are the sole judges of the credibility of the

6    witnesses and the weight to give their testimony.  You may be

7    guided by the appearance and conduct of the witness, or by the

8    manner in which the witness testifies, or by the character of

9    the testimony given, or by evidence contrary to the testimony.

10           You should carefully examine all the testimony given,

11   the circumstances under which each witness has testified, and

12   every matter in evidence tending to show whether a witness is

13   worthy of belief.  Consider each witness' intelligence, motive,

14   and state of mind, and demeanor or manner while testifying.

15           Consider the witness' ability to observe the matters

16   to which the witness has testified, and whether the witness

17   impresses us as having an accurate recollection of these

18   matters.

19           Also consider any relation each witness may have with

20   either side of the case, the manner in which each witness may

21   have been affected -- might be affected by the verdict, and the

22   extent to which the testimony of each witness is either

23   supported or contradicted by other evidence in the case.

24           Inconsistencies or discrepancies in the testimony of

25   a witness or between the testimony of different witnesses may

L. Howard - Redirect

549

1    or may not cause you to discredit such testimony.  Two or more

2    persons seeing an event may see or hear it differently.

3         In weighing the effect of a discrepancy, always

4    consider whether it pertains to a matter of importance or an

5    unimportant detail and whether the discrepancy results from

6    innocent error or intentional falsehood.

7         After making your own judgment, you will give the

8    testimony of each witness such weight, if any, that you think

9    it deserves.  In short, you may accept or reject the testimony

10   of any witness in whole or in part.

11        In addition, the weight of the evidence is not

12   necessarily determined by the number of witnesses testifying to

13   the existence or non-existence of any fact.  You may find that

14   the testimony of a smaller number of witnesses as to any fact

15   is more credible than the testimony of a larger number of

16   witnesses to the contrary.

17        A witness may be discredited or impeached by

18   contradictory evidence, or by evidence that at some other time

19   the witness had said or done something or has failed to say or

20   do something that is inconsistent with the witness' present

21   testimony.

22        If you believe any witness has been impeached and

23   thus discredited, you may give the testimony of that witness

24   such credibility, if any, you think it deserves.

25        If a witness is shown knowingly to have testified

L. Howard - Redirect

550

1  falsely about any material matter, you have a right to distrust

2  such witness' other testimony, and you may reject all the

3  testimony of that witness or give it such credibility as you

4  may think it deserves.

5        An act or omission is knowingly done if the act is

6  done voluntarily and intentionally and not because of a

7  mistake, or accident, or other innocent reason.

8        The law does not require any party to call as

9  witnesses all persons who may have been present at any time or

10 place involved in the case, or who may appear to have some

11 knowledge of the matters in issue at this trial.  Nor does the

12 law require any party to produce as exhibits all the papers and

13 things mentioned in the evidence in the case.

14       The rules of evidence ordinarily do not permit

15 witnesses to testify as to opinions or conclusions.  There is

16 an exception to this rule for expert witnesses.  And expert

17 witness is a person who by education and experience has become

18 expert in some art, science, profession, or calling.  Expert

19 witnesses state their opinions as to matters in which they

20 profess to be expert, and they may also state their reasons for

21 their opinions.

22       You should consider each expert opinion received in

23 evidence in this case and give it such weight as you think it

24 deserves.  If you should decide the opinion of an expert

25 witness is not based on sufficient education and experience, or

1    if you should conclude the reasons given in support of the

2    opinion are not sound, or if you feel the expert's opinion is

3    outweighed by other evidence, you may disregard the opinion

4    entirely.

5          The fact that I instruct you as to the proper measure

6    of damages should not be considered as indicating any view of

7    mine as to which party is entitled to your verdict in this

8    case.  Instructions as to the measure of damages are given for

9    your guidance only in the event you should find in favor of the

10   plaintiff from a preponderance of the evidence in the case in

11   accordance with the other instructions.

12         Nothing said in these instructions and nothing in any

13   verdict form prepared for your convenience is meant to suggest

14   or convey in any way or manner any suggestion as to what

15   verdict I think you should find.  The verdict is your sole and

16   exclusive duty and responsibility as jurors.

17         A person may violate the law even though he or she

18   does not personally do each and every act constituting the

19   offense if that person aided and abetted the commission of the

20   offense.

21         Section 2(a) of Title 18 of the United States Code

22   provides:  Whoever commits an offense against the United

23   States, or aids, abets, counsels, commands, induces, or

24   procures its commission, is punishable as a principal.

25         In order for a defendant to be found liable for

552

1   aiding and abetting the commission of the offenses alleged by

2   plaintiff, it must be proven by a preponderance of the evidence

3   that defendant:  One, knew that the offense alleged was to be

4   committed or was being committed; two, did some act for the

5   purpose of aiding and abetting -- aiding or encouraging the

6   commission of that offense; and, three, acted with the

7   intention of causing the offense alleged to be committed.

8         Before defendant may be found liable as an aider or

9   an abettor, plaintiff must prove by a preponderance of the

10  evidence that some person or persons committed each of the

11  essential elements of the offense alleged as detailed in these

12  instructions.

13        I will now instruct you as to the specific elements

14  plaintiff must prove with respect to her claims.  Plaintiff has

15  asserted four claims based on federal law.  These claims

16  against the plaintiff are claims for violations of federal

17  human trafficking law, a statute known as the TVPA, which is

18  shorthand for Trafficking Victims Protection Act.

19        Because defendant was either employed by or

20  accompanying the federal government at the time of the alleged

21  human trafficking, she was legally obligated to comply with the

22  TVPA even when outside of the United States.

23        If you find that for any of these claims plaintiff

24  has proved that claim by a preponderance of the evidence

25  against the defendant, your verdict should be for plaintiff on

1    that claim.

2           On the other hand, if plaintiff has not carried her

3    burden of proof with respect to one or more claims, your

4    verdict should be for defendant on that particular claim.

5           Count 1, plaintiff's first claim against the

6    defendant, is under the TVPA's provision prohibiting forced

7    labor.  There are two ways in which someone can be liable for

8    forced labor.  First, section 1589(a) of Title 18 of the United

9    States Code provides:  Whoever knowingly provides or obtains

10   the labor or services of a person by any one of, or any

11   combination of, the following means:  One, by means of force,

12   threats of force, physical restraint, or threats of physical,

13   to that person or another person; two, by means of serious harm

14   or threats of serious harm to that person or another person;

15   three, by means of the abuse or threatened abuse of law or

16   legal process; or, four, by means of any scheme, plan, or

17   pattern intended to cause the person to believe that if that

18   person did not perform such labor or services, that person or

19   another person would suffer serious harm or physical restraint,

20   shall be liable for forced labor.

21          The same statute goes on to provide a second way

22   someone might be liable for forced labor.  Section 1589(b)

23   says:  Whoever knowingly benefits financially, or by receiving

24   anything of value, from participation in a venture which has

25   engaged in the providing or obtaining of labor or services by

1    any of the means described in subsection (a), knowing or in

2    reckless disregard of the fact that the venture has engaged in

3    providing or obtaining of labor or services by any means, shall

4    be liable for forced labor.

5           The elements necessary for a defendant to be found

6    liable for forced labor, you must find by a preponderance of

7    the evidence:  One, that the defendant provided or obtained the

8    labor or services of plaintiff, which can include sexual labor

9    or services.  Two, the labor or services were obtained by any

10   one of the four means or methods contemplated by the law which

11   I just read to you.  And three, that the defendant acted

12   knowingly.

13          The first element of forced labor is that the party

14   provided or obtained the labor or services of plaintiff.  In

15   considering the first element, the words "provide" and "obtain"

16   are to be given their ordinary meaning.  "Provide" means to

17   make available or supply.  "Obtain" means to gain or get.

18          Moreover, for purposes of this element, the sexual

19   labor or services involved may include any act of a sexual

20   nature.

21          With regard to the second element, the term "serious

22   harm" includes both physical and non-physical harm, including

23   psychological, financial, or reputational harm.

24          A threat of serious harm, therefore, need not involve

25   any threat of physical force.  It could be threat of any

555

1  consequence, physical or non-physical, considering all the

2  circumstances that would compel a reasonable person of the same

3  background in a similar situation to perform or to continue

4  performing labor or services in order to avoid incurring that

5  harm.

6  　　　The words "scheme," "plan," and "pattern" are to be

7  given their ordinary meanings.  The scheme, plan, or pattern

8  need not involve actual threats of serious harm, but may

9  involve any other means, including deception or psychological

10  coercion used to cause a victim to reasonably believe that she,

11  her family, or any other person would suffer serious harm if

12  she refused to continue providing labor or services.

13  　　　"Abuse or threatened abuse of law or legal process"

14  means the use or threatened use of a law or legal process,

15  whether administrative, civil, or criminal, in any manner or

16  for any purpose for which the law was not designed, in order to

17  exert pressure on another person to cause that person to take

18  some action or refrain from taking some action.

19  　　　All persons have the right to enforce their legal

20  rights in a court of law.  No one, however, may misuse the law

21  or the legal system for the purposes of extortion or unlawful

22  pressure.

23  　　　If you find that the defendant contacted or

24  threatened to contact the police, or that they otherwise used

25  or threatened to use the legal system, and that the purpose was

1    to compel plaintiff's labor or services, then you may find that

2    the defendant abused or threatened to abuse the law or legal

3    process.

4           The third or final element of forced labor is that

5    the responsible party or parties acted knowingly.

6           The term "knowingly" as used in these instructions to

7    describe the defendant's alleged state of mind means that they

8    were conscious and aware of their actions, realized what they

9    were doing or what was happening around them, and did not act

10   because of ignorance, mistake, or accident.

11          The plaintiff's second claim against the defendant is

12   under the TVPA provision prohibiting trafficking with respect

13   to forced labor.  The statute, 18 U.S.C. 1590, provides that:

14   Whoever knowingly recruits, harbors, transports, provides, or

15   obtains by any means any person for forced labor or involuntary

16   servitude, shall be liable.

17          The elements necessary to prove beyond a -- to prove

18   by a preponderance of the evidence are, first, that the

19   defendant recruited, harbored, transported, provided, or

20   obtained her by any means; two, that the defendant did so for

21   purposes of subjecting plaintiff to forced labor or involuntary

22   servitude; and, three, that the defendant acted knowingly.

23          The first element prohibits the defendant from

24   providing or obtaining, and also prohibits the defendant from

25   recruiting, harboring, or transporting.

557

"Recruit" generally means to seek the services of a person.  "Harbor" means to provide a place for a person, either openly or secretly.  And "transport" means to transfer or convey from one place to another.

The defendant only need to have performed one of these actions to be found liable.

The second element requires that the recruiting, harboring, transporting, or providing of the plaintiff be for the purpose of forced labor or involuntary servitude.  This element is satisfied if defendant obtained or recruited plaintiff with the aim of subjecting her to forced labor or involuntary servitude.

The third element is that the defendant acted knowingly as I've read pursuant to the earlier count.

Count 3 also, under the TVPA, is a provision prohibiting commercial sex trafficking.  And Title 18, section 1591, provides that:  Whoever knowingly, in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, maintains, patronizes, or solicits by any means a person; or benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in paragraph 1, knowing that means of force, threats of force, fraud, coercion described in subsection (e)(2), or

1    any combination of such means will be used to cause the person

2    to engage in a commercial sex act, shall be liable for

3    commercial sex trafficking.

4            The elements of commercial sex trafficking are that

5    the defendant knowingly recruited, enticed, harbored,

6    transported, provided, obtained, et cetera, or solicited

7    plaintiff; that the defendant did so knowing that means of

8    force, threats of force, fraud, coercion, or any combination of

9    those means would be used to cause plaintiff to engage in a

10   commercial sex act; and, three, that the defendant's acts

11   affected interstate or foreign commerce or were within the

12   special maritime and territorial jurisdiction of the United

13   States.

14           In considering whether a defendant recruited, et

15   cetera, or solicited, you should use the ordinary, everyday

16   definition of these terms.  "Recruit" generally means to

17   persuade someone to join or work.

18           "Entice" generally means to attract, induce, lure by

19   offering pleasure or advantage.

20           "Harbor" generally means to furnish a place for a

21   person, either openly or secretly.

22           "Transport" generally means to transfer or convey

23   from one place to another.

24           "Provide" means to furnish, supply, or make

25   available.

559

1          "Obtain" means to gain possession of or acquire.

2          "Maintain" means to keep or hold.

3          "Patronize" means to offer financial aid or other

4     support.

5          And "solicit" means to petition or to approach with a

6     request or plea.

7          With regard to the second element, the statute

8     defines "commercial sex act" as any sex act on account of which

9     anything of value is given to or received by any person.

10         The statute defines "coercion" as threats of serious

11    harm or physical restraint against any person; or, B, any

12    scheme, plan, or pattern intended to cause a person to believe

13    that failure to perform an act would result in serious harm or

14    physical restraint against any person; or, C, the abuse or

15    threatened use of law or the legal process.

16         Further, regarding the meaning of "coercion," a

17    serious harm is any harm, whether physical or non-physical,

18    including psychological, financial, or reputational harm that

19    is sufficiently serious under all the surrounding circumstances

20    to compel a reasonable person of the same background in the

21    same circumstances to perform or to continue performing

22    commercial sexual activity in order to avoid incurring that

23    harm.

24         Additionally, the term "abuse or threatened abuse of

25    law or legal process" means use or the threatened use of a law

1    or a legal process in any manner for any purpose for which the

2    law was not designed in order to exert pressure on another

3    person to cause that person to take some action.

4           As I have -- it's also required that this be done

5    knowingly, as I have previously recited.

6           For the third element, you must find that the

7    defendant's actions in violation of the commercial sex

8    trafficking statute affected foreign commerce or took place

9    within the special maritime and territorial jurisdiction of the

10   United States.

11          "Affected foreign commerce" generally means the

12   actions must have been economic in nature, and they must have

13   affected the flow of money in the stream of commerce outside

14   the United States to any degree.

15          "Special maritime and territorial jurisdiction"

16   refers to the federal government's authority over certain

17   federal enclaves, such as military bases, federal buildings,

18   and national parks.  U.S. Embassies in foreign countries, and

19   residences used by embassy personnel in foreign countries, also

20   fall within the special maritime and territorial jurisdiction.

21          Count 4 claims that the defendant conspired to

22   violate portions of federal law.  Specifically, that the

23   defendant and Russell Howard conspired to violate the offenses

24   that have been identified in Claims 1, 2, and 3, which I have

25   just described to you.

1          This additional section which deals with the

2     conspiracy is Title 18, section 1594.  And I have identified in

3     the instruction for you the elements of Counts 1, 2, and 3 for

4     your convenience.

5          In order to sustain the burden of proof that

6     defendant conspired to commit forced labor, forced labor

7     trafficking, and commercial sex trafficking, the plaintiff must

8     prove, one, that the defendant formed, reached, or entered into

9     a conspiracy, agreement, or understanding to commit the acts

10    identified in Counts 1 through 3; and second, that the

11    defendant knew the purpose of the agreement, and then

12    deliberately joined the conspiracy, agreement, or

13    understanding.

14         A conspiracy is an agreement or mutual understanding

15    knowingly made or knowingly entered into by at least two people

16    to violate the law by some joint or common plan or course of

17    action.  It is, in a very true sense, a partnership in crime.

18         A conspiracy or agreement to violate the law need not

19    be formal, written, or even expressed directly in every detail.

20         Plaintiff is not required to prove that the members

21    of the alleged agreement or conspiracy were successful in

22    achieving any or all of the objects of the agreement or

23    conspiracy.  To prevail on this claim, plaintiff need only show

24    that the members conspired to take these actions against her.

25         Plaintiff need not show that members succeeded in

562

1    actually taking the actions against her.  It is proof of a

2    conscious understanding between the members of the conspiracy

3    that should be central to your consideration of the charge of

4    conspiracy.

5           In order to prove the existence of a conspiracy or an

6    illegal agreement, plaintiff is not required to produce a

7    written contract between the parties or even produce evidence

8    of an express oral agreement spelling out all the details of

9    the understanding.  An agreement among people may be inferred

10   from circumstantial evidence concerning the relationship of the

11   parties, their overt acts, and the totality of their conduct.

12          For the second element, the evidence in the case must

13   show by a preponderance of the evidence that the members of the

14   conspiracy knew the goal of the agreement or understanding when

15   they formed it.  And the evidence must show that the members of

16   the agreement deliberately entered into the agreement intending

17   in some way to accomplish the goal through a common plan or

18   action.

19          If the evidence establishes by a preponderance of the

20   evidence that the Howards knowingly and deliberately entered

21   into an agreement to commit an action or actions against

22   plaintiff in violation of Counts 1 through 3, the defendant

23   need not have known all of the details of the agreement,

24   participated in each act, or played a major role in

25   accomplishing the unlawful goal.

1           Indeed, plaintiff is not required to show that all

2    the members of the conspiracy agreed to all of the illegal

3    actions ultimately performed.  Rather, conspirators are liable

4    for all reasonably foreseeable acts of their co-conspirators

5    done in furtherance of the conspiracy.

6           If you find for the plaintiff on any or all of her

7    four counts against the defendant, you may award her

8    compensatory damages.  The purpose of the law of compensatory

9    damages is to award, as far as possible, just and fair

10   compensation for the loss, if any, which resulted from a

11   defendant's violation of plaintiff's rights.

12          Compensatory damages are payments made in order to

13   make plaintiff whole.  That is, to compensate her for the

14   damage she suffered.  Compensatory damages are not limited

15   merely to expenses that plaintiff may have borne.  A prevailing

16   plaintiff is entitled to compensatory damages for physical

17   injury, pain and suffering, mental anguish, shock, and

18   discomfort that she has suffered because of defendant's

19   conduct.

20          The damages that you award must be fair and

21   reasonable, neither inadequate nor excessive.  You should not

22   award compensatory damages for speculative injuries, but only

23   for those juries that the plaintiff has actually suffered, or

24   which she is reasonably likely to suffer in the future.

25          In awarding compensatory damages, if you decide to

L. Howard - Redirect

564

1  award them, you must be guided by dispassionate common sense.

2  Computing damages may be difficult, but you must not let that

3  difficulty lead you to engage in arbitrary guesswork.

4          On the other hand, the law does not require plaintiff

5  to prove the amount of her losses with mathematical precision,

6  but only with as much definiteness and accuracy as the

7  circumstances permit.

8          In all instances, you are to use your sound

9  discretion in fixing an award of damages, drawing reasonable

10  inferences where you deem appropriate from the facts and the

11  circumstances in evidence.

12          If you find defendant liable on any of the counts,

13  you also have the discretion to award punitive damages in

14  addition to compensatory damages.  You may award punitive

15  damages if plaintiff proves by a preponderance of the evidence

16  that the defendant's conduct was malicious and reckless, not

17  merely unreasonable.

18          An act is malicious and reckless if it is done in

19  such a manner and under such circumstances as to reflect utter

20  disregard for the potential consequences of the act on the

21  safety and rights of others.

22          The purpose of punitive damages is to punish

23  defendants for shocking conduct and to set an example in order

24  to deter defendants and others from committing similar acts in

25  the future.

L. Howard - Redirect

565

1          The awarding of punitive damages is within your

2   discretion.  You are not required to award them.  If you decide

3   to award punitive damages, you must use sound reason in setting

4   the amount.  It must not reflect bias, prejudice, or sympathy

5   toward any party.  But the amount may be as large as you

6   believe necessary to fulfill the purpose of punitive damages.

7   In this regard, you may consider the financial resources of the

8   defendant in fixing the amount of punitive damages.

9          Tomorrow after you hear closing arguments, you will

10  retire to your jury room to begin your deliberations.  You must

11  select one of your members to act as the foreperson.  The

12  foreperson will preside over your deliberations and will be

13  your spokesperson here in court.

14         Your verdict must represent the collective judgment

15  of the jury.  In order to return a verdict, it is necessary

16  that each juror agree to it.  It must be unanimous.

17         It's your duty as jurors to consult with one another

18  and to deliberate with one another with a view towards reaching

19  an agreement if you think it can be done without violence to

20  individual judgment.  Each of you must decide the case for

21  himself or herself, but do so only after an impartial

22  consideration of the evidence in the case with your fellow

23  jurors.

24         In the course of your deliberations, do not hesitate

25  to re-examine your own views and to change your opinion if

L. Howard - Redirect

1    convinced it is erroneous.  Do not surrender your honest

2    conviction, however, solely because of the opinion of your

3    fellow jurors or for the mere purpose of being able to return a

4    unanimous verdict.

5          Remember at all times you are not partisans.  You are

6    judges, judges of the facts of the case.  Your sole interest is

7    to seek the truth from the evidence received during the trial.

8          Your verdict must be based solely on the evidence

9    received in the trial.  Nothing you have seen or read outside

10   of the court may be considered.

11         As I have stated, nothing that I have said or done

12   during the course of the trial is intended in any way to

13   suggest to you what I think your verdict should be.

14         Nothing said in these instructions and nothing in any

15   form of verdict is to suggest or convey to you in any way what

16   verdict I think you should return.  The verdict is your

17   exclusive duty and responsibility.

18         And as I have told you many times now, you are the

19   sole judges of the facts.

20         A verdict form will be prepared -- has been prepared

21   and will be sent back to you for your convenience.  After you

22   have reached a unanimous agreement as to your verdict on each

23   of the counts, you will have your foreperson write out that

24   verdict, date and sign the form, and return it to the

25   courtroom.

567

1          If it becomes necessary during your deliberations to

2   communicate with me, you may send a note signed by your

3   foreperson or any other member of the jury through Mr. Ruelas.

4          No juror should ever attempt to communicate with me

5   by any means other than a signed writing.  And I will never

6   communicate with you concerning the evidence or your opinions

7   or the deliberations other than either in writing or orally

8   here in open court.

9          Bear in mind also that you are not to reveal, not

10  even to me, how you stand numerically on the question of

11  whether or not the plaintiff has sustained its burden of proof

12  until after you have come to a unanimous verdict.

13         There were a couple of exhibits admitted, and those

14  will be sent back to you after you retire for your

15  deliberations as well.

16         And as I said, we have produced a verdict form, it

17  will break out each of the counts individually, and there will

18  be a box for either yes or no that the plaintiff has proven by

19  a preponderance of the evidence Count 1 through Count 4.  Each

20  individually, what amount of compensatory damages is

21  appropriate if that's the case.  And then a box for total

22  compensatory damages if you have found any.  And also punitive

23  damages separated out.

24         So it should be easy for you to follow once you have

25  reached your decision on each of the counts.

L. Howard - Redirect

568

1          All right.  That concludes the jury instructions for

2    tonight.  11 o'clock tomorrow, does that work for everybody?

3          And I will tell you now that after the closing

4    arguments, then you will go back, you will select your

5    foreperson, you will begin your deliberations.  You only

6    deliberate when everyone is present.

7          You may decide to take lunch whenever you wish to

8    take lunch.  Just remember that you -- or you can do a working

9    lunch, whatever you want to do.  I will let -- you can talk

10   about that tomorrow.  And the key is not to deliberate until

11   all of the jurors are present.

12         All right.  So you have heard the evidence now.  It's

13   again critical not to go home and talk about the case with

14   anyone, not to do any research, not to do any investigation,

15   not to check social media to see whether anything has been said

16   about the case.  But just have a good evening and we will see

17   you at 11 o'clock tomorrow morning.

18         All right, thank you all.

19         NOTE:  At this point the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22         THE COURT:  All right.  Any comments on the reading

23   of the instructions?  Obviously, I turned some present to past

24   tense when necessary.  And there was a reference to the

25   government at the end that I changed to plaintiff, and I will

1    make that change.  Anything else?

2            MS. PATTERSON:  Your Honor, one small housekeeping --

3            MR. RINALDO:  Other than what -- I'm sorry, Melissa,

4    I didn't hear you.

5            MS. PATTERSON:  Your Honor, just one small

6    housekeeping matter, Your Honor.  Our electronic authorization

7    form was only through today.  We ask if we can have it extended

8    until tomorrow.

9            THE COURT:  I think that is reasonable.

10           MR. RINALDO:  I think they should leave those

11   computers out tomorrow.  No, just kidding.

12           THE COURT:  That's on the 8th floor.  On the 7th

13   floor we still allow electronics.

14           MR. RINALDO:  Your Honor, for defendant, we have

15   nothing beyond what we talked about already.

16           THE COURT:  Okay.  All right.  Thank you.

17           I am pretty confident I will be done by 11, but it

18   will be pretty busy in here before then, so plan on being ready

19   to go at 11.

20           How much time do you want for closing?

21           MR. RINALDO:  Your Honor, since I haven't prepared

22   mine yet, I would like to reserve on that.

23           THE COURT:  Well, you will both have a reasonable

24   amount of time.

25           MS. PATTERSON:  Absolutely.

L. Howard - Redirect

570

1              MR. RINALDO:  That's fair.

2              THE COURT:  All right.  Then thank you.  We are in

3      recess.

4              NOTE:  The July 27, 2017 portion of the case is

5      concluded.

6          -------------------------------------------------

7

8

9

10

11

12

13

14

15

16

17

18

19              I certify that the foregoing is a true and

20          accurate transcription of my stenographic notes.

21

22

                        /s/  Norman B. Linnell
23                  Norman B. Linnell, RPR, CM, VCE, FCRR

24

25