# Exhibit A



Home | Databases | WorldLII | Search | Feedback

# Federal Circuit Court of Australia

You are here:  AustLII >> Databases >> Federal Circuit Court of Australia >> 2017 >> [2017] FCCA 2916

Database Search | Name Search | Recent Decisions | Noteup | LawCite | Download | Help

## Howard v Minister for Immigration [2017] FCCA 2916 (29 November 2017)

Last Updated: 30 November 2017

**FEDERAL CIRCUIT COURT OF AUSTRALIA**

| | | |
|---|---|---|
| *HOWARD v MINISTER FOR IMMIGRATION* | | *[2017] FCCA 2916* |

Catchwords:
MIGRATION – Application for judicial review of decision to cancel non-resident visa – applicant not having been convicted of crime – whether delegates thought she was – delegates not finding applicant charged with or convicted of crime – delegates correctly construing the evidence before them – no jurisdictional error established.

Legislation:
*Civil Procedure Act 2010* (Vic), ss.61, 63
*Migration Act 1958* (Cth), ss.116, 128, 129, 131

*Gong v Minister for Immigration and Border Protection* [2016] FCCA 561

| | |
|---|---|
| Applicant: | LINDA HOWARD |
| Respondent: | MINISTER FOR IMMIGRATION & BORDER PROTECTION |
| File Number: | MLG 2369 of 2017 |
| Judgment of: | Judge Burchardt |
| Hearing date: | 20 November 2017 |
| Date of Last Submission: | 20 November 2017 |

| | |
|---|---|
| Delivered at: | Dandenong |
| Delivered on: | 29 November 2017 |

*REPRESENTATION*

| | |
|---|---|
| Counsel for the Applicant: | Mr Parncutt |
| Solicitors for the Applicant: | Kiatos & Co |
| Counsel for the Respondent: | Mr Yuile |
| Solicitors for the Respondent: | Australian Government Solicitor |

## ORDERS

(1) The application filed 3 November 2017 be dismissed.
(2) The Applicant pay the Respondent's costs fixed in the sum of $7,206.

**FEDERAL CIRCUIT COURT**
**OF AUSTRALIA**
**AT MELBOURNE**

## MLG 2369 of 2017

### LINDA HOWARD

Applicant

And

### MINISTER FOR IMMIGRATION & BORDER PROTECTION

Respondent

### REASONS FOR JUDGMENT

1. By an application filed on 3 November 2017, the applicant seeks to quash decisions of delegates of the respondent which had the effect of cancelling the applicant's subclass 155 Resident Return visa. It should be noted that an extension of time has been agreed between the parties and that an earlier application to the Federal Court is not now of any moment.
2. The matter was listed as a matter of urgency because the Court was informed, without challenge, that the applicant is in Thailand on a visa due to expire on or about 20 November 2017. According to the affidavit of her solicitor, Con Kiatos, sworn 3 November 2017, "*She had nowhere else to live, having little contact with the United States. She is domiciled in Australia and has a house of her own in Docklands, Victoria, with a typical network of friends.*"
3. It is common cause that the applicant's visa was cancelled by a delegate of the respondent while she was overseas. She applied for revocation of that decision and that application was unsuccessful. It

was those decisions that gave rise to this application.

4. In affidavit material of her solicitor, her written submissions and in oral submissions made at the Court, the primary assertion made by the applicant is that set out at paragraph 1 of the applicant's written submissions as follows:

   *No jurisdictional issue or factual information has been raised by the respondent's Response which contradicts the fact that the primary factual premise upon which the decision being reviewed does not exist, namely, that Mrs Howard purportedly committed a crime.*

5. Put shortly, it is submitted that the materials before the two decisionmakers on no view supported any finding that the applicant had committed, let alone been charged or convicted of, any crime. It was submitted that this mistake was an illogical or irrational decision, given that both decisionmakers had found that the applicant had committed a crime. The matter is distilled further at paragraphs 7 and 8 of the written submission:

   *As there was no reliable legal connection between the evidence and the conclusion drawn that a crime had been committed, and even evidence that the applicant had not been prosecuted for the crime, the decision was not open to the respondent on the evidence because of the mistaken reasoning process.*
   *The misunderstanding or misdescription of the evidence amounted to a failure to properly consider the claim advanced by the applicant and a failure to accurately take into account relevant material. For these reasons, the respondent fell into jurisdictional error which ought to be reviewed.*

6. The statutory scheme, so far as relevant, is contained in sections 128 and 116 of the *Migration Act 1958* (Cth) ('the *Act*').

7. Section 128 relevantly provides that the Minister or a delegate may cancel a visa without notice to the visa holder if the visa holder is outside Australia and the Minister is satisfied that:
   (i) there is a ground for cancelling the visa under section 116 of the Act; and
   (ii) it is appropriate to cancel the visa in accordance with subdivision F of Division 3, Part 3 of the Act.

8. Relevantly, section 116 reads:
   1. Subject to subsections (2) and (3), the Minister may cancel a visa if he or she is satisfied that ...
      (e) the presence of its holder in Australia is or may be, or would or might be, a risk to:
         (i) the health, safety or good order of the Australian community or a segment of the Australian community –

9. It should be noted that in *Gong v Minister for Immigration and Border Protection* (2016) 309 FLR 151; [2016] FCCA 561 ('*Gong*') at [41], Judge Smith said:

   *Simply put, the fact that sub-s 116(1)(e) is engaged where the Minister is satisfied that a visa holder's presence "may be a risk" to certain matters means that there does not have to be, as the applicant suggests, any direct, solid or certain foundation before the power to cancel a visa can arise. In other words, it can arise on the possibility that some event occurred in the past.*

10. Given that the thrust of the applicant's case is that the critical evidentiary finding upon which the delegates both proceeded was simply not open, it is appropriate to have regard to what materials were before the delegates.

11. It seems from the Court Book ("*CB*") materials that the department became aware of Ms Howard's circumstances through reports in the press, which reports came to the attention of the department while she was overseas. By 13 June 2017, Ms Sonia Liddell, a Senior Field Officer, Compliance Field Operations, Vic, was writing to Charlotte Kernot about Ms Howard (CB 22-23). It noted that the Supreme Court of Victoria on 6 March 2015 had entered judgment against Ms Howard for a sum in excess of $3.3 million, arising out of what might globally be described as mistreatment of an unnamed Ethiopian national previously employed by the applicant and her husband. It should be

noted that at CB 23, the correspondence asserted:

*Notably, Ms HOWARD did not receive any criminal charges or convictions for the human trafficking and slavery related practices for which she was required to compensate the victim. I believe this was due to the purported crimes occurring abroad (in Japan and Yemen). Without criminal convictions, any consideration for cancellation of Ms HOWARD'S Australian visa can likely only be considered if she is deemed a risk to the Australian community. This case has been referred to the Department's cancellation unit.*

12. The CB has various reports of the Court proceedings in both America and in Victoria. Relevantly for these purposes, the judgment of J Forrest J is set out at CB 32-73. It is appropriate to refer to this judgment in some detail, as it plainly formed a significant part of the reasoning process of both delegates.

13. At paragraphs 1 to 8, under the heading "*Introduction*", his Honour set out the following:
    *1. The plaintiff's application for summary judgment raises several important issues not previously determined in this state concerning the registration in this Court, at common law, of a foreign judgment; in this case, a default judgment obtained in the United States District Court.
    2. On 12 October 2011, the plaintiff (known by the pseudonym 'Jane Doe') commenced a civil action against her former employers, Linda and Russell Howard, the defendants, in the United States District Court for the Eastern District of Virginia (US Court). Jane Doe claimed that during the course of her employment she was subjected to sexual servitude and human trafficking by Mr and Mrs Howard
    3. Mr Howard did not contest the claim. Mrs Howard disputed the claim but failed to comply with court orders as to discovery and the provision of a deposition. Without notice to the US Court, Mrs Howard left the United States in May 2012 and took no further part in the proceeding.
    4. On 4 September 2012, Judge Liam O'Grady of the US Court, having heard evidence from Jane Doe, her husband, and an expert witness on human trafficking, entered default judgment in favour of Jane Doe against Mr and Mrs Howard in the sum of US$3,306,468 (US judgment).
    5. Mr Howard died on 4 September 2012. Mrs Howard now resides in Victoria.
    6. On 28 May 2014, Jane Doe instituted this proceeding against Mrs Howard to enforce the judgment of the US Court. The action is one in debt and, if successful, would enable Jane Doe to register a judgment in this Court and utilise the Court's enforcement processes.
    7. For over two years, Mrs Howard did nothing to set aside or repeal the US judgment. This proceeding is, however, resisted vigorously. Mrs Howard asserts, amongst other things, that she now desires a hearing on the merits of Jane Doe's allegations.
    8. Jane Doe now seeks an order for summary judgment under ss 61 and 63 of the Civil Procedure Act 2010 (Vic) ('CPA') on the basis that Mrs Howard's defence has no reasonable prospect of success.*

14. I note that at paragraph 9, when setting out the issues, the Court observed inter alia:
    *(b) Is Mrs Howard entitled to resist enforcement of the judgment on the basis that it was procured by fraud (i.e. that the complaint made by Jane Doe in the US Court was false and that Jane Doe gave perjured evidence before Judge O'Grady)?
    (d) Is Mrs Howard's defence to this proceeding an abuse of process (or, to put it another way, can Mrs Howard, in this proceeding, agitate issues as to the veracity of Jane Doe's claim which could, and should, have been ventilated in the US Court)?*

15. It should be noted that J Forrest J decided all the relevant issues in the proceeding adversely to Ms Howard and entered judgment against her for the amount claimed.

16. His Honour set out a background of the litigation history in the United States. It noted Mrs Howard's energetic efforts to resist Jane Doe's claim up until April 2012 and at paragraph 19, noted:
    *In the course of the hearing on 20 April, Magistrate Judge Jones raised the issue of Mrs Howard's travel situation and inquired whether she knew of any periods when she would definitely be out of the country. Mrs Howard alluded to her previous movements, but gave his Honour no indication that she was retiring from her employment in ten days time, on 30 April*

*2012 (as her employer's letter establishes), and leaving the United States permanently.*

17. The Court noted further, relevantly, at paragraph 22:

    *On 7 May 2012, the US Court received a letter from Mrs Howard, stating that she was 'leaving for overseas again today, 3 May 2012', 'for an indefinite period' and advised she could be reached by email, which she would check 'periodically'.*

18. The Court noted that Ms Howard had failed to properly respond to applications that she be deposed, her failure to produce documents and to answer interrogatories. Following notice from Magistrate Judge Jones that he would strike Ms Howard's answer if she failed to comply, a trial occurred on 7 August 2012. In the interim, Ms Howard had emailed the US Court stating that she was planning to depart for Australia on 7 August 2012, and gave an address as '*Poste Restante*,' at an address at Lakes Entrance, Victoria. This was the last correspondence from Ms Howard to the US Court.

19. J Forrest J noted at paragraph 33:

    *As to Mrs Howard, Magistrate Judge Jones recommended the entry of default judgment, finding that:*

    *(d) Mrs Howard has demonstrated significant bad faith in the US Court process, as evidenced by:*

    *(i) her representation to the US Court on 20 April 2012 (two weeks before she retired and left the country) that she had no upcoming overseas, work-related travel;*
    *(ii) her refusal to appear for a court- ordered deposition; and*
    *(iii) her refusal to communicate with Jane Doe's counsel to facilitate discovery.*

    *(e) Jane Doe had been severely prejudiced by her inability to take a deposition of Mrs Howard and receive information necessary to prosecute her case.*
    *(f) There was a need to defer defendants from determining that the proper response to litigation is to leave the country and refuse to participate in the resolution of a dispute.*
    *(g) In light of Mrs Howard's flight from the country, less drastic sanctions would not have been effective.*

20. Magistrate Judge Jones found in favour of Ms Doe, and recommended that default judgment be entered against both Mr and Mrs Howard, and that the US Court confine any trial to the assessment of damages.

21. Thereafter, US District Judge Liam O'Grady of the Eastern District of Virginia conducted a trial which assessed Jane Doe's Damages, as I have indicated, in a sum slightly over US$3.3 million. His Honour Judge O'Grady made various findings reported at paragraph 39 of J Forrest Js judgment, which included the rape and sexual abuse of Ms Doe by Mr Howard, that Mrs Howard was complicit in her husband's sexual abuse, that Mrs Howard refused Jane Doe's request to relocate away from Mr Howard to a different room within the US Embassy compound, and that both she and her husband otherwise misconducted themselves in relation to Jane Doe.

22. At paragraph 50 and following, J Forrest J traversed Ms Howard's affidavit material in opposition to Ms Doe's application before him. The paraphrase of her affidavit at paragraph 51 notes a denial of any misconduct by Ms Howard, a denial that she left the United States to thwart discovery orders, stating she had been posted to Curacao in the Netherlands Antilles, and noteworthily, at paragraph 52 of the judgment:

    *(c) She admits that she did not disclose to the Court her intention to retire, and leave the United States for Australia, and that this would mean she was out of the jurisdiction for the US Court hearing on 20 April 2012. She states that she believes she could conduct the litigation from overseas, as she had previously done while in Curacao.*

    *(d) She states that her failure to defend herself in the US Court proceeding was due to her husband's worsening medical condition. Mrs Howard denies that she misled the Court, and provided a psychiatrist's report as to her state of mind at the relevant time.*

23. She also denied that any correspondence sent on her behalf from 4 May 2000 onwards as these were, as she asserted, written by Mr Howard.

24. It should be noted at paragraph 160, his Honour pointed out that the opinion of Magistrate Judge Jones was a recommendation and not an order of the Court, albeit that it was subsequently adopted by Judge O'Grady.

25. At paragraphs 188 - 191, in considering the question as to whether Mrs Howard's defence of fraud was an abuse of the Court processes, his Honour said:
    > Subsumed in this argument is an earlier submission of Jane Doe that Mrs Howard acted in bad faith. The bad faith was said to be Mrs Howard's representation to Magistrate Judge Jones that she knew of no particular periods when she would be out of the jurisdiction, when she knew that she was retiring 10 days later, and leaving the jurisdiction to migrate to Australia permanently.
    > It is also argued that Mrs Howard's failure to pursue her defence in the US Court indicates a lack of sincerity and veracity in pursuing her allegations of fraud and constitutes an abuse of process. Jane Doe argues that if Mrs Howard had evidence upon which to base her allegations of fraud, she ought to have brought it forward in the US Court proceeding, but deliberately decided not to do so. Mrs Howard was furthermore entitled to appeal the judgment or have it set aside under the US Rules on the grounds of fraud, and failed to do so.
    > Mrs Howard contends that she has never been given the opportunity to have the US Court proceeding heard and determined on the merits, and by agitating for such a hearing in this Court she is not abusing its processes, but merely asserting her right for a hearing on the merits.
    > Mrs Howard also contends that the ordinary abuse of process principles do not apply in this proceeding as those principles do not apply abuse of process claims involving default judgments.

26. At paragraph 202, his Honour recorded that Mrs Howard's attempt to reopen the US judgment in his Court was an abuse of process. He went on to say at paragraphs 203 - 207:
    > As I said earlier in this judgment, Mrs Howard was aware of the US Court proceeding, was notified of each stage of the proceeding, attended Court and filed documents with the Court. It was her failure to comply with orders of the Court that led to default judgment being entered in favour of Jane Doe. She chose to leave the country, without notice to the court. I am satisfied that she deliberately misled the US Court when she told the Court she had no plans to leave the United States. I am also satisfied that Mrs Howard chose not to agitate the merits of her case before the US Court. She did not seek to review the recommendation of Magistrate Judge Jones or to set aside the judgment of Judge O'Grady. It was her choice to leave the country and not comply with the requirements of a fair trial of Jane Doe's claim. She was aware of the trial date and had the opportunity, via the Federal Court website, to follow the docket.
    > In summary, Mrs Howard had every chance to litigate her response to Jane Doe's allegations in the US Court. It was her decision to leave the country and to not cooperate with the US Court in completing essential interlocutory processes and not to participate in the trial.
    > Further, after the judgment was entered, Mrs Howard had ample opportunity to apply for rehearing before the US Court, but failed to do so. If she had evidence to suggest that Jane Doe had falsified her evidence, she could have raised those allegations before the US Court in an application to set aside the judgment pursuant to Rule 60 of the Federal Court Rules.
    > I do not accept as credible a number of Mrs Howard's explanations for her actions proffered by her in her affidavit of 2014. Her reasons for not advising the US Court as to her sudden departure lack credence, particularly in light of the fact that her resignation from her employment took effect on 30 April 2012. In addition, Mrs Howard's alleged inability to contact the US Court after her departure from the United States rings hollow. Accepting that Mr Howard's health was poor does not explain why she made no effort to contact the US Court after 7 May 2012. It is simply not credible that she was cut off from any form of contact with the US Court (electronic or postal). I am well satisfied that she was aware that there was a significant risk that her decision not to participate in the US trial would result in a judgment against her.
    > Moreover, Mrs Howard's failure to take any steps to set aside the US Judgment after its entry has not been the subject of any satisfactory explanation. Whilst it can be accepted that the death of her husband in September 2012 would no doubt have placed considerable stress upon her, Mrs Howard did nothing during 2013 and 2014 in the US Court in relation to upsetting the

judgment.

27. His Honour concluded at paragraph 213:
    *It is opportunistic in the extreme now, after two years of silence, to assert that she was denied the choice of a trial on the merits.*

28. His Honour went on to find that she had no reasonable prospect of establishing any of her defences, and even if she did, to permit the defences to be maintained at trial would be an abuse of process. He entered judgment for the sum claimed by Ms Doe.

29. The Notification of Cancellation by the delegate is at CB75 - 77. It notified the ground of cancellation under section 116(1)(e) was said to be established as subsection 116(1)(e)(i), namely that the presence of its holder in Australia "*would or might pose, a risk to the safety of the Australian community.*"

30. The notification letter invited the applicant "*to show why you think the grant for cancellation does not exist and/or to give reasons why your visa should not have been cancelled*".

31. The decision record is at pages CB 78 - 85. The evidence of grounds for cancellation is set out at CB79 - 81. It is plain that the matter relied upon is the judgment of J Forrest J already referred to. The decision noted that the Supreme Court of Victoria on 6 March 2015 entered judgment against Ms Howard and her now deceased husband on the basis of the finding of the US Court in 2012 for the purpose of restitution for the various misconducts of Ms Howard and her husband. The cancellation decision set out extracts from the Supreme Court of Victoria judgment, including findings by the US Court of rape and further misconduct to which I have already referred. The decision noted that on 12 June 2014, an Australian magistrate made a freezing order over the applicant's assets in Australia which had been continued and noted that J Forrest J had found that Ms Howard had no reasonable prospect of establishing any of her defences and, even if she did, they would be an abuse of process and had entered judgment against her. The report noted at CB81:
    *According to The Age Newspaper Victoria on 6 September 2015, following this judgment, and an intense mediation between the parties, the plaintiff informed the Victorian Supreme Court she had received in full a settlement sum from the visa holder.*

32. Having referred to section 128, the decision relevantly reads at CB81 - 82:

    *The evidence detailed in part B indicates the visa holder, while holding a position of power over the plaintiff:*

    - *Was complicit in her husband's ongoing sexual and physical abuse of her*
    - *Participated in psychologically manipulating her to compel her labour and services*
    - *Participated in verbally and mentally abusing her*
    - *Refused her request to relocate away from the visa holder's husband to a different room within the US Embassy compound to avoid further abuse*
    - *Entered into a scheme to induce her to travel from Yemen to Japan for the purpose of forcing her to perform involuntary labour and sexual services*
    - *Acted inequitably in failing to pay her in accordance with the relevant market rate.*

    *I note the visa holder chose not to remain in the United States to comply with discovery orders made by the US courts in consideration of these matters, has not admitted any wrongdoing or shown any remorse for what has occurred and in leaving the United States appears to have attempted to avoid paying the restitution the Court ordered to.*
    *Based on the above evidence and serious nature of the crime, I am satisfied the visa holder's presence in Australia would or might pose a risk to the safety of the Australian community, due to the possibility she may exploit or be complicit in the exploitation of people in the Australian community who are in positions of relative less power than her. Therefore, I am satisfied the grounds for the cancellation of the visa exist under subparagraph 116(1)(e)(i) of the [Migration Act](.).*

33. Having decided that there were grounds for cancellation, the delegate went on to consider the

Case 1:16-cv-00562-LO-JFA   Document 122-1   Filed 12/08/17   Page 9 of 12 PageID# 1627

residual discretion, whether or not to cancel the visa. Relevantly, for these matters, at CB84, the delegate determined to give minimal weight to the circumstances in which the ground for cancellation arose (extenuating circumstances beyond the visa holder's control that led to the grounds existing) on the basis that:

*there is no information before me to indicate exploitation and abuse of the plaintiff, which the visa holder was variously directly involved in or complicit in, occurred due to circumstances beyond her control.*

34. Thereafter, the applicant through her counsel, Mr Parncutt, sought to apply for revocation of the visa cancellation. The written submissions made are at CB93 - 103. The central point made is that at CB 94:

    *It is submitted that the civil case of Jane Doe v Howard in the USA does not form a sound basis for the revocation of the entry visa and cancellation of a visa on character grounds having regard to the fact that it is a civil default judgment inherently capable of being set aside and entered only as a sanction for the visa holder's noncompliance with the Court's discovery procedures ordered in the US.*

35. Essentially, the submissions point to the fact that the findings in the trial against Mrs Howard were made in her absence and without her being heard, the judgment was therefore a default judgment, the claim by Miss Doe had been settled, the applicant had in impeccable reputation otherwise, and at paragraph 8 on CB 103, the matter is summarised as:

    *In my submission, based on the available evidence, the visa holder has neither been charged with, nor convicted of any crime, either in the US or elsewhere and, having regard to her entrenched lifestyle in Victoria as a volunteer, particularly with disabled children, and as a 62-year old widow, there is no reasonable possibility that she is a risk to the health, safety, or could order of anyone in Australia.*

36. The decision on the revocation application is at CB121 - 128. Having noted at CB121 - 122 that the department received advice on 6 March 2015 about the Supreme Court decision, and having set out the matters for which restitution was ordered at CB122, and the fact that the matter had settled, the delegate set out a paraphrase of the submissions made in the application for revocation which, in my view, are an accurate distillation of them. This paraphrase runs from CB122 - 124. There can be no doubt that the delegate was made aware, inter alia, that the default judgment in *Jane Doe v Howard* never involved any criminal charge or prosecution. The delegate then set out [section 131](#) of the *Act*, which provides for the consideration of the revocation (the precise terms of [s 131](#) are not immediately relevant).

37. Having set out the applicant's assertion that the reason she did not attend the trial in the United States was because she travelled to Spain to be with her dying husband, and that she had chosen not to remain in the United States to comply with discovery orders made by the US Courts, the delegate noted at CB125:

    *Her character references and background indicates she is a compassionate person, contrary to the character portrayed in the default judgment. However, the serious nature of the allegations made against the former visa holder and her late husband are concerning. The former visa holder has claimed these allegations were primarily made against her late husband. The former visa holder has not admitted any wrongdoing, nor shown remorse for what has occurred.*

38. The delegate, having referred to a lack of evidence in support of the volunteer/charity work, went on to find at CB126:

    *Based on the evidence and information before me, I am satisfied the former visa holder's presence in Australia would or might be a risk to the safety of the Australian community, due to the possibility she may exploit or be complicit in the exploitation of people in the Australian community. Therefore, I am satisfied the grounds for cancellation of the former visa holder's visa exists under [section 116(1)(e)(i)](#) of the Act.*

39. Relevantly for these purposes, and noting that the delegate gave the applicant credit against a number of the matters considered, the delegate considered the circumstances in which the ground for cancellation arose. The delegate noted the applicant's assertion that there had been never any adjudication on the merits of her defence against the allegations made against her in the US proceedings and noted that she had categorically denied all misconduct. The delegate traversed the applicant's response to the effect that the allegations against her were entirely fabricated, and most particularly those that made her an active applicant in the allegations in which her husband had been the perpetrator. The delegate went on to say about this at CB127;

    *I give minimal weight to this consideration in the former visa holder's favour.*
    *There is no new evidence presented in the revocation request to indicate the exploitation and abuse of the plaintiff, which the Court findings stated the former visa holder was variously directly involved or complicit in, occurred due to circumstances beyond her control.*

40. The delegate went on to conclude on page CB128:

    *After considering the former visa holder's response to the [section 129](#) notice and all other relevant matters, including those set out in procedures advice manual 3 (PAM3), I have decided not to revoke the cancellation of the visa under [section 131](#) of the [Migration Act 1958](#).*

41. At trial, counsel for the applicant emphasised the fact that no actual crime had been committed by the applicant, so the decision could not have been made on that basis. It was submitted that the reasons provided by the delegate for the revocation decision did not provide an intelligible justification for the conclusion reached. It was submitted that the revocation decision was simply based on a false fact. Counsel pointed to the use of the words "*the crime*" in the delegate's decision. There was no crime, let alone even a charge. It was submitted that the respondent was seeking to advance new and different reasons for the delegate's decision, but this is impermissible. The reason must be discernible from the decision itself.
42. It was further submitted that the nonrevocation decision was irrevocably intertwined with the cancellation decision and the error of fact was clearly made out. This jurisdictional fact not being established, the exercise of the power was not sustainable.
43. Counsel for the Minister emphasised first that the cancellation delegate did not make a factual error and that, when the decision of the delegate was read fairly and as a whole, the delegate understood the character of the decision in the United States. It was put in the alternative that this was not jurisdictional error in any event.
44. Although both counsel referred me to relevant authority, in the ultimate I think this case turns on what is to be made of what the task the delegates had was and how they went about it.
45. Contrary to the submissions for the applicant, the task for the delegate in the cancellation decision was not to determine as a jurisdictional fact, first, whether or not the applicant had been charged with and/or convicted of a crime in the United States. What the delegate had to do was determine whether or not the applicant would or might be, if present in Australia:

    *...a risk to the health, safety or good order of the Australian community or a segment of the Australian community.*

46. As earlier indicated, this is a low threshold, as Judge Smith indicated in *Gong*.
47. While the function of the delegate on the revocation decision was slightly different, pursuant to [section 131](#), in substance it involved the same task. The delegate, in the revocation decision had to decide whether she was satisfied that there was a ground for the cancellation of the visa, or whether there was another reason why the cancellation should be revoked.
48. What is interesting in reading both delegates' decisions as a whole, is that it is clear that they did not find that Ms Howard had been convicted of a criminal offence or even charged. What the cancellation decision records, having set out the judgment in the Supreme Court of Victoria, noting the findings of the judge of the US Court that (CB81-82):

The evidence detailed in part B indicates that the visa holder, while holding a position of power over the plaintiff:

- *Was complicit in her husband's ongoing sexual and physical abuse of her;*
- *Participated in psychologically manipulating her to compel her labour and services;*
- *Participated in verbally and mentally abusing her;*
- *Refused her request to relocate away from the visa holder's husband to a different room within the US Embassy compound to avoid further abuse;*
- *Entered into a scheme to induce her to travel from Yemen to Japan for the purpose of forcing her to perform involuntary labour and sexual services;*
- *Acted inequitably in failing to pay her in accordance with the relevant market rate.*

I note the visa holder chose not to remain in the United States to comply with discovery orders made by the US Courts and in consideration of these matters, has not admitted any wrongdoing or shown any remorse for what has occurred and in leaving the United States appears to have attempted to avoid paying the restitution the Court ordered her to.

Based on the above evidence and serious nature of the crime, I am satisfied the visa holder's presence in Australia would or might pose a risk to the safety of the Australian community, due to the possibility she may exploit or be complicit in the exploitation of people in the Australian community who were in positions of relative less power than her. Therefore, I am satisfied grounds for cancellation of the visa exist under subparagraph 116(1)(e)(i) of the [Migration Act](#).

49. The decision of the delegate in the revocation decision relevantly states (CB127):
    > There is no new evidence presented in the revocation request, to indicate the exploitation and abuse of the plaintiff, which the Court findings stated the former visa holder was variously directly involved or complicit in, occurred due to circumstances beyond her control.
50. What I would take from both these passages is that both delegates accepted the findings of the US Circuit Court judge as being established in fact. Contrary to the submissions of counsel for the applicant, they plainly did not find that a criminal charge had been paid and proved. Rather, they found that a Court in the United States had made findings of a very serious nature, involving crimes on any view, in the absence of the applicant.
51. In circumstances where the delegate in the cancellation decision, and by implication in the revocation decision also, found that the applicant had chosen not to stay to contest the hearing by Ms Doe, a finding fully buttressed by the express findings to that effect by J Forrest J which were before them, the delegates were, in my view, doing no more than recording accurately what the material before them was.
52. The case has not been put by the applicant that in adopting the United States Court's findings as facts in themselves, as both delegates in my view did, the delegates fell into jurisdictional error. Rather, the argument has been confined to the question as to whether or not the delegates misunderstood the nature of the record, so to speak, which the applicant correctly submits do not involve the actual charging and conviction of Ms Howard.
53. Nonetheless, and even if this argument were to be advanced, it needs to be borne in mind that the delegate's job was to decide whether the applicant represented a risk to the health, safety or good order of the Australian community. In circumstances where a US Superior Court had made findings of fact, and in particular in circumstances where the US Court's findings of fact about the applicant's failure to contest the proceeding in the United States, and to seek a re-hearing of the case heard in her absence, were important. This is so because J Forrest J had expressly upheld that aspect of the American Court's findings following a hearing before himself.
54. Thus, the finding made by the delegate at CB82:
    > I note the visa holder chose not to remain in the United States to comply with discovery orders made by the US Courts in the consideration of these matters, has not admitted any wrongdoing or shown any remorse for what has occurred, and in leaving the United States appears to have

> *attempted to avoid paying the restitution the Court ordered to.*
>
> was plainly well open to a delegate on the materials before him.

55. Once you know, as the delegate clearly did, that the applicant had, in effect, fled America to avoid the trial and the possibility of execution of a judgment following the trial, and given the nature of the allegations both made and proved, albeit in a non-contested case, it was plainly open to the delegate to conclude that the applicant fell foul of the low threshold that [section 116](#) of the *Act* establishes.
56. In these circumstances, there is clearly no jurisdictional error as alleged by the applicant, and it follows that the application must be dismissed.

**I certify that the preceding fifty-six (56) paragraphs are a true copy of the reasons for judgment of Judge Burchardt**

Associate:

Date: 29 November 2017

---

**AustLII:** [Copyright Policy](#) | [Disclaimers](#) | [Privacy Policy](#) | [Feedback](#)
URL: *http://www.austlii.edu.au/au/cases/cth/FCCA/2017/2916.html*

http://classic.austlii.edu.au/au/cases/cth/FCCA/2017/2916.html[12/8/2017 11:56:40 AM]